**Nos. 2014-1842, -1843**

# In the
# United States Court of Appeals
## for the Federal Circuit

JANSSEN PRODUCTS, L.P. AND
JANSSEN SCIENCES IRELAND UC,

*Plaintiffs-Appellees,*

v.

LUPIN LIMITED, LUPIN PHARMACEUTICALS, INC.,
MYLAN PHARMACEUTICALS INC. AND MYLAN INC.,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the District of New Jersey in No. 2:10-cv-05954-WHW-CLW,
Senior Judge William H. Walls.

**NON-CONFIDENTIAL BRIEF OF DEFENDANTS-APPELLANTS
LUPIN LIMITED AND LUPIN PHARMACEUTICALS, INC.**

Deanne M. Mazzochi
William A. Rakoczy
Amy D. Brody
Tara M. Raghavan
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
(312) 222-6305

*Attorneys for Defendants-Appellants
Lupin Limited and Lupin Pharmaceuticals,
Inc.*

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellants Lupin Limited and Lupin Pharmaceuticals, Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

Lupin Ltd. and Lupin Pharmaceuticals, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not Applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of party represented by me are:

There is no publicly held company that owns 10 percent or more of the stock of Lupin Ltd.

The name of any parent corporation or publicly held company that owns 10 percent or more of the stock of Lupin Pharmaceuticals, Inc. is Lupin Ltd.

4.    The names of all law firms and the partners or associates that have appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

RAKOCZY MOLINO MAZZOCHI SIWIK LLP, 6 West Hubbard Street, Suite 500, Chicago, Illinois 60654:  William A. Rakoczy, Paul J. Molino, Deanne M. Mazzochi, Amy D. Brody, Tara M. Raghavan, Theodore J. Chiacchio, Thomas R. Burns , Luke T. Shannon, Ryan M. Daniel*, Matthew V. Anderson, Cynthia H. Sun;

CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C., 5 Becker Farm Road, Roseland, New Jersey 07068-1739:  James E. Cecchi, Melissa E. Flax, Michael Cross, Audra E. Petrolle*

*No longer affiliated with the firm.

| | |
|---|---|
| <u>    May 1, 2015    </u> | <u>/s/    Deanne M. Mazzochi                    </u> |
| Date | Signature of counsel |
| | |
| | <u>    Deanne M. Mazzochi                    </u> |
| | Printed name of counsel |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ............................................................... vii

TABLE OF ABBREVIATIONS ........................................................... xii

STATEMENT OF RELATED CASES ................................................ xvi

JURISDICTIONAL STATEMENT .......................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF ISSUES .................................................................4

STATEMENT OF THE CASE..............................................................5

    I.      Summary Judgment Proceedings. .........................................5

    II.     Trial. ..................................................................................5

         A.    '015 Patent. ..............................................................5

         B.    '645 Patent. ..............................................................6

         C.    Remedy. ...................................................................8

FACTUAL BACKGROUND.................................................................9

    I.      A Key Darunavir Publication.................................................9

    II.     Claim 1's Bis-THF Synthesis Recites Known Steps or Known
         Alternatives Preparing Intermediate Compounds. ...............10

    III.   Isomers. ...........................................................................11

    IV.   Why Develop Darunavir?...................................................11

ARGUMENT SUMMARY .................................................................14

ARGUMENT ...................................................................................15

I.    No '015 Patent Infringement. .............................................15

    A.    Lupin's ANDA Products Are Materially Different. .................15

    B.    Non-infringement. ....................................................17

II.    '015 Patent § 112 Defenses. ...........................................20

    A.    Lupin Timely Raised § 112 Defenses. .....................................21

    B.    Claim Construction. ...................................................22

        1.    Ordinary Meaning. ..........................................22

        2.    No Lexicography. ...........................................23

    C.    Claim 1 Is Partly Inoperable. ...................................23

    D.    An Isomer-Limited Claim Still Falls. .......................................24

III.    '015 Patent Claim 1—Obviousness. ...................................25

    A.    The District Court's Prejudicial Hindsight. ..............................25

    B.    District Court Ignores Prior Art. ................................26

    C.    Differences Would Have Been Obvious. ..................................27

        1.    Ghosh 1996 Taught Non-ringed Starting Materials
            and Intramolecular Conversion Steps. ..........................27

        2.    Nitroalkane Nef Reaction to Aldehyde. .........................27

        3.    No Hindsight. ...............................................28

    D.    Secondary Considerations. ......................................28

        1.    No Failures by Others. ......................................29

        2.    No Commercial Success. ....................................29

        3.    No Praise. ..................................................30

E.    Weighing Factors. ....................................................................30

IV.    The '645 Patent's Claim 4 Is Invalid. ................................................30

A.    The District Court Erroneously Ignored Prior Art
References. ................................................................................32

B.    Ethanol Solvate Results From Routine Experimentation
Skilled Artisans Were Motivated to Perform; It Is Not
Patentable. ...............................................................................33

1.    Express Ethanolate Teachings Not Required. ...............34

2.    Preparing Ethanolate....................................................35

3.    Infrequent Use Is Not Discouraging Use........................36

4.    The District Court's Erroneous Lead Compound
Analysis. ........................................................................36

a.    Reasons to Develop Darunavir.............................37

b.    Lead Compound Analysis Is Inapplicable. ..........37

c.    Clinical Trial Use Not Required. .........................38

5.    Reasonable Expectation: Pharmaceutical
Composition....................................................................39

C.    Secondary Considerations........................................................40

1.    No Commercial Success.................................................40

2.    Expected Results............................................................41

3.    Praise.............................................................................42

D.    Weighing Factors. ....................................................................42

V.    Janssen Deserves No Remedy........................................................43

A.    No Nexus..................................................................................43

B.    Wrong and Unripe Remedy. ......................................................44

C.    Scope. .......................................................................................44

D.    Standing. ..................................................................................45

E.    Balance of Hardships, Public Interest.....................................45

CONCLUSION ....................................................................................45

ADDENDUM ......................................................................................47

PROOF OF SERVICE .........................................................................48

CERTIFICATE OF COMPLIANCE ....................................................49

### CONFIDENTIAL MATERIAL OMITTED

In this non-confidential Brief, confidential information related to Lupin's proprietary manufacturing process for its proposed ANDA Products has been omitted on page 16.  In the Addendum to this non-confidential Brief, Defendants-Appellants' confidential financial information and proprietary manufacturing information for their respective proposed ANDA Products have been omitted on pages A36-37, A80, A84, A88-89, A92-93, A95, A97, A99, A169-72, A176-78, A182, A184, and A193-95.

# TABLE OF AUTHORITIES

## Federal Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) ........................................................43

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*,
    657 F.3d 1264 (Fed. Cir. 2011) ........................................................23

*AK Steel Corp. v. Sollac & Ugine*,
    344 F.3d 1234 (Fed. Cir. 2003) ...................................................22, 24

*Alcon Research, Ltd. v. Apotex Inc.*,
    687 F.3d 1362 (Fed. Cir. 2012) ........................................................22

*Allergan, Inc. v. Sandoz Inc.*,
    726 F.3d 1286 (Fed. Cir. 2013) ...........................................36, 38, 39

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
    580 F.3d 1340 (Fed. Cir. 2009) ........................................................19

*Apple Inc. v. Samsung Elecs. Co.*,
    735 F.3d 1352 (Fed. Cir. 2013) ...................................................40, 44

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
    499 F.3d 1293 (Fed. Cir. 2007) ........................................................38

*Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*,
    713 F.3d 1369 (Fed. Cir. 2013) ........................................................29

*Bayer Healthcare, LLC v. U.S. Food & Drug Admin.*,
    942 F. Supp. 2d 17 (D.D.C. 2013)....................................................43

*Brenner v. Manson*,
    383 U.S. 519 (1966).........................................................................25

*Eisai Co. v. Dr. Reddy's Labs., Ltd.*,
    533 F.3d 1353 (Fed. Cir. 2008) ........................................................38

*Eli Lilly & Co. v. Am. Cyanamid Co.*,
    82 F.3d 1568 (Fed. Cir. 1996) ............................................... *passim*

*Eli Lilly & Co. v. Barr Labs., Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) ..........................................................................36

*Enzo Biochem, Inc. v. Calgene, Inc.*,
    188 F.3d 1362 (Fed. Cir. 1999) ......................................................................25

*Flexsys Am. LP v. Kumho Tire U.S.A., Inc.*,
    726 F. Supp. 2d 788 (N.D. Ohio 2010) ..........................................................17

*Galderma Labs., L.P. v. Tolmar, Inc.*,
    737 F.3d 731 (Fed. Cir. 2013) ..................................................................27, 38

*Geo M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*,
    618 F.3d 1294 (Fed. Cir. 2010) ......................................................................30

*Gibson v. Mayor & Council of Wilmington*,
    355 F.3d 215 (3d Cir. 2004) ...........................................................................21

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
    336 U.S. 271 (1949) ........................................................................................24

*Harris v. New Jersey*,
    259 F.R.D. 89 (D.N.J. 2007)............................................................................26

*In re '318 Patent Infringement Litig.*,
    583 F.3d 1317 (Fed. Cir. 2009) ......................................................................24

*In re Geisler*,
    116 F.3d 1465 (Fed. Cir. 1997) ......................................................................42

*In re Sneed*,
    710 F.2d 1544 (Fed. Cir. 1983) ......................................................................44

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
    392 F.3d 1317 (Fed. Cir. 2004) ......................................................................29

*Konstantopoulos v. Westvaco Corp.*,
    112 F.3d 710 (3d Cir. 1997) ...........................................................................21

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)............................................................................... *passim*

*Merck & Co. v. Teva Pharm. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005) ..................................................... 30, 40, 41, 44

*Mintz v. Dietz & Watson, Inc.*,
   679 F.3d 1372 (Fed. Cir. 2012) ........................................................28

*Muniauction, Inc. v. Thomson Corp.*,
   532 F.3d 1318 (Fed. Cir. 2008) ........................................................39

*Nike, Inc. v. Wolverine World Wide*,
   43 F.3d 644 (Fed. Cir. 1994) ........................................................26

*Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*,
   77 F.3d 1364 (Fed. Cir. 1996) ........................................................45

*OKI Am., Inc. v. Advanced Micro Devices, Inc.*,
   No. C 04-03171 CRB, 2006 WL 2711555
    (N.D. Cal. Sept. 21, 2006) ........................................................19, 20

*Ormco Corp. v. Align Tech., Inc.*,
   463 F.3d 1299 (Fed. Cir. 2006) ........................................................29, 41

*Orthopedic Equip. Co. v. U.S.*,
   702 F.2d 1005 (Fed. Cir. 1983) ........................................................28

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
   320 F.3d 1354 (Fed. Cir. 2003) ........................................................45

*Pfizer Inc. v. Teva Pharm. USA, Inc.*,
   555 F. App'x 961 (Fed. Cir. 2014) ........................................................23

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ........................................................35, 36, 38

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
   457 F.3d 1284 (Fed. Cir. 2006) ........................................................23

*Pharm. Res., Inc. v. Roxane Labs., Inc.*,
   253 F. App'x 26 (Fed. Cir. 2007) ........................................................24

*Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*,
   377 F. App'x 978 (Fed. Cir. 2010) ........................................................37

*Rasmusson v. SmithKline Beecham Corp.*,
    413 F.3d 1318 (Fed. Cir. 2005) ...................................................24, 25

*Richardson-Vicks Inc. v. Upjohn Co.*,
    122 F.3d 1476 (Fed. Cir. 1997) .......................................................29

*Ritchie v. Vast Res., Inc.*,
    563 F.3d 1334 (Fed. Cir. 2009) .......................................................33

*SanDisk Corp. v. Memorex Prods., Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005) .......................................................22

*SkinMedica, Inc. v. Histogen Inc.*,
    727 F.3d 1187 (Fed. Cir. 2013) .......................................................23

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005) .......................................................35

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) .........................................................26

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
    407 F.3d 1371 (Fed. Cir. 2005) ..................................................26, 33

*Tyco Healthcare Grp., LP v. Ethicon Endo-Surgery, Inc.*,
    774 F.3d 968 (Fed. Cir. 2014) .........................................................26

*Wyeth & Cordis Corp. v. Abbott Labs.*,
    720 F.3d 1380 (Fed. Cir. 2013) .......................................................24

*Wyeth & Cordis Corp. v. Abbott Labs.*,
    Nos. 08-230(JAP), 08-1021(JAP), 2012 WL 175023 (D.N.J. Jan.
    19, 2012) ...........................................................................................24

*Wyeth v. Teva Pharm. USA, Inc.*,
    No. 03-CV-1293(WJM), 2005 WL 2175440 (D.N.J. Sept. 6, 2005) ...............23

## Federal Statutes

28 U.S.C. § 1295(a)(1) .........................................................................1

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1338 ..................................................................................1

28 U.S.C. § 2201(a) ..............................................................................1

35 U.S.C. § 112, ¶ 1 ......................................................................20, 24

35 U.S.C. § 271(g) ....................................................................... *passim*

35 U.S.C. § 271(g)(1) ....................................................................15, 20

35 U.S.C. § 271(g)(2) ...........................................................................20

## Federal Regulations

21 C.F.R. § 314.70(b) .........................................................................44

## Federal Rules

Fed. R. Civ. P. 16(e) ...........................................................................21

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '015 patent | U.S. Patent No. 7,126,015 B2 (A371-95) |
| '645 patent | U.S. Patent No. 7,700,645 B2 (A336-70) |
| 271(g) | 35 U.S.C. § 271(g) |
| AIDS | Acquired Immune Deficiency Syndrome |
| ANDA | An "abbreviated new drug application" filed with the FDA under 21 U.S.C. § 355(j) et seq., by a pharmaceutical company seeking FDA approval to market a generic version of a previously-approved drug in the United States |
| bisfuranol | bis-THF alcohol or hexahydro-furo[2,3-b] furanol |
| bis-THF | bis-tetrahydrofuran |
| Costa | Jeronimo S. Costa et al., *Syn-Selective Michael Addition of Nitromethane Derivatives to Enoates Derived from (R)-(+)-Glyceraldehyde Acetonide*, 62 J. ORGANIC CHEMISTRY 4002 (1997) (A2504-10) |
| darunavir | (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl(1S,2R)-3-[[(4-aminophenyl)sulfonyl](isobutyl)amino]-l-benzyl-2-hydroxypropyl-carbamate |
| Defendants-Appellants | Lupin and Mylan (as defined herein), collectively |
| FDA | U.S. Food and Drug Administration |
| FPTO | Final Pretrial Order, filed in Case No. 2:10-cv-5954-WHW-CLW (D.N.J.) (A22642-3174) |
| Ghosh | Arun K. Ghosh, a third-party fact witness in Case No. 2:10-cv-5954-WHW-CLW (D.N.J.) |
| Ghosh 1994 | Arun K. Ghosh et al., *Structure-Based Design of HIV-1 Protease Inhibitors: Replacement of Two Amides and a 10π-Aromatic System by a Fused Bis-tetrahydrofuran*, 37 J. MEDICINAL CHEMISTRY 2506 (1994) (A2007-09) |

| Ghosh 1996 | Arun K. Ghosh et al., *Nonpeptidal P₂ Ligands for HIV Protease Inhibitors: Structure-Based Design, Synthesis, and Biological Evaluation*, 39 J. MEDICINAL CHEMISTRY 3278 (1996) (A5194-206) |
|---|---|
| Ghosh 1998 | Arun K. Ghosh et al., *Potent HIV Protease Inhibitors Incorporating High-Affinity P₂-ligands and (R)-(hydroxyethylamino)sulfonamide Isostere*, 8 BIOORGANIC & MEDICINAL CHEMISTRY LETTERS 687 (1998) (A3361-64) |
| HIV | human immunodeficiency virus |
| Janssen | Plaintiffs-Appellees Janssen Products, L.P. and Janssen Sciences Ireland UC, collectively |
| Janssens | Luc Donné Marie-Louise Janssens, named inventor of U.S. Patent No. 7,700,645 B2 |
| Kesteleyn | Bart Rudolf Romanie Kesteleyn, named inventor of U.S. Patent No. 7,126,015 B2 |
| Lupin | Defendants-Appellants Lupin Limited and Lupin Pharmaceuticals, Inc., collectively |
| Lupin Ltd. | Lupin Limited |
| Mylan | Mylan Pharmaceuticals Inc. and Mylan Inc., collectively, Defendants-Appellants to Appeal No. 2014-1843, which is consolidated into this current appeal |
| Mylan's ANDA Products | the darunavir, 75 mg, 150 mg, 300 mg, 400 mg and 600 mg, products that are the subject of Mylan Pharmaceuticals Inc.'s ANDA No. 202136 |
| Lupin's ANDA Products | the darunavir, 75 mg, 150 mg, 300 mg, 400 mg, 600 mg and 800 mg products that are the subject of Lupin Ltd.'s ANDA No. 202073 |
| Marshall | Garland R. Marshall, Ph.D., expert witness on behalf of Defendants-Appellants |
| Myerson | Allan S. Myerson, Ph.D., expert witness on behalf of Janssen |

| | |
|---|---|
| Patrocinio | Vera L. Patrocinio et al., *Diastereoselective Michael Addition of Nitromethane to Enoates Derived from* (R)-*Glyceraldehyde Acetonide*, 1 SYNTHESIS 474 (1994) (A2511-15) |
| PI(s) | protease inhibitor(s) |
| PTX842A | Matthew L. Peterson et al., *Multi-component Pharmaceutical Crystalline Phases: Engineering for Performance*, *in* ORGANIC CRYSTAL ENGINEERING: FRONTIERS IN CRYSTAL ENGINEERING 67 (Edward R. Tiekink et al. eds, 2010) (A5988-6025) |
| Quaedflieg | Peter Jan Leonard Mario Quaedflieg, named inventor of U.S. Patent No. 7,126,015 B2 |
| Reider | Paul J. Reider, Ph.D., expert witness on behalf of Janssen |
| Rosini | Goffredo Rosini & Roberto Ballini, *Functionalized Nitroalkanes as Useful Reagents for Alkyl Anion Synthons*, 11 SYNTHESIS 833 (1988) (A2536-52) |
| Searle '775 | U.S. Patent No. 6,248,775 B1 (A1632-746) |
| Seebach | Dieter Seebach et al., *Nitroaliphatic Compounds – Ideal Intermediates in Organic Synthesis?*, 33 CHIMIA 1 (1979) (A2516-35) |
| Surleraux | Dominique L.N.G. Surleraux et al., *Discovery and Selection of TMC114, a Next Generation HIV-1 Protease Inhibitor*, 48 J. MEDICINAL CHEMISTRY 1813 (2005) (A4143-52) |
| Thoné | Daniel Joseph Christiaan Thoné, named inventor of U.S. Patent No. 7,700,645 B2 |
| Uchiyama | Masahiko Uchiyama et al., *Stereoselective Synthesis of Optically Active Perhydrofuro[2,3-b]furan Derivatives*, 42 TETRAHEDRON LETTERS 4653 (2001) (A2500-03) |
| Wigerinck | Piet Tom Bert Paul Wigerinck, named inventor of U.S. Patent No. 7,700,645 B2 |

| | |
|---|---|
| Yoshimura | Kazuhisa Yoshimura et al., *A Potent Human Immunodeficiency Virus Type 1 Protease Inhibitor, UIC-94003 (TMC-126), and Selection of a Novel (A28S) Mutation in the Protease Active Site*, 76 J. VIROLOGY 1349 (2002) (A2319-30) |
| Young | Steven D. Young, Ph.D., expert witness on behalf of Janssen |
| Zaworotko | Michael J. Zaworotko, Ph.D., expert witness on behalf of Lupin |
| Zingman | Barry Zingman, M.D., expert witness on behalf of Defendants-Appellants |

## STATEMENT OF RELATED CASES

The instant appeal arises from two lawsuits—*Janssen Products, L.P. et al. v. Lupin Limited et al.*, Lead Consolidated Civil Action No. 10-5954-WHW-CLW (D.N.J.) and *Janssen Products, L.P. et al. v. Lupin Limited et al.*, Civil Action No. 11-4027-WHW-MCA (D.N.J.).  These and other related cases were consolidated for purposes of discovery and trial under Civil Action No. 10-5954-WHW-CLW (D.N.J.).  Counsel for Lupin is aware of one related case currently pending in this Court, an appeal from the same district court action that this Court has consolidated into Lupin's appeal (No. 2014-1842):

*Janssen Products, L.P. et al. v. Mylan Pharmaceuticals, Inc. et al.*, No. 2014-1843.

There have been no other appeals in or from these civil actions previously pending before this Court or any other appellate court.

The following related cases filed in the district court against Lupin and others remain pending but were not consolidated under Civil Action No. 10-5954-WHW-CLW (D.N.J.) and are not the subject of this appeal: *Janssen Products, L.P. et al. v. Lupin Limited et al.*, Civil Action No. 13-3891-WHW-CLW (D.N.J.); *Janssen Products, L.P. et al. v. Lupin Limited et al.*, Civil Action No. 14-1370-WHW-CLW (D.N.J.); *Janssen Products, L.P. et al. v. Mylan Pharmaceuticals Inc. et al.*, Civil Action No. 14-4550-WHW-CLW (D.N.J.); *Janssen Products, L.P. et*

*al. v. Cipla Ltd. et al.*, Civil Action No. 14-5093-WHW-CLW (D.N.J.); *Janssen Products, L.P. et al. v. Cipla Ltd. et al.*, Civil Action No. 14-1056-SLR (D. Del.); *Janssen Products, L.P. et al. v. Cipla Ltd. et al.*, Civil Action No. 15-2549-WHW-CLW (D.N.J.); *Janssen Products, L.P. et al. v. Cipla Ltd. et al.*, Civil Action No. 15-307-SLR (D. Del.); and *Janssen Products, L.P. et al. v. Hetero Labs., Ltd., Unit III et al.*, Civil Action No. 13-1444-WHW-CLW (D.N.J.).

Aside from those identified above, there are no other cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

Janssen asserted Lupin infringed '645 patent claim 4 and '015 patent claim 1; Lupin counterclaimed. 28 U.S.C. §§ 1331, 1338, 2201(a) provided jurisdiction over the former; the district court erred exercising jurisdiction over the latter.

Lupin timely-filed its September 12, 2014 Notice of Appeal (March 12, 2014 infringement summary judgment; August 14, 2014 trial judgment/injunction) and Amended Notice on November 5, 2014. 28 U.S.C. § 1295(a)(1) provides this Court's appellate jurisdiction.

# INTRODUCTION

Janssen asserts '015 patent claim 1 and '645 patent claim 4.

'015 patent claim 1 encompasses a bis-THF synthesis. Lupin will never import bis-THF. Lupin's darunavir is materially changed from bis-THF under 271(g). The district court's contortions holding otherwise, and refusal to consider facts in Lupin's favor, reflect reversible summary judgment errors. Claim 1 further falls for encompassing nonexistent isomers; and syntheses obvious to prepare existing isomers. The district court's efforts to sustain claim 1's validity despite Janssen's clear case-dispositive factual admissions are riddled with errors.

'645 patent claim 4 encompasses pharmaceutical compositions containing 1:1 darunavir ethanolate. Janssen's Myerson identified only 1:1 ethanolate element as potentially patentable; it would have been obvious because skilled artisans performing drug development know how to find and prepare crystals. The '645 patent admits such crystallization techniques were routine; running darunavir through routine crystallization screens with ethanol produced the claimed ethanolate. The fruits of routine experimentation skilled artisans already are motivated to pursue are obvious. Claim 4 is no exception.

The district court tried to generate invalidity obstacles (*e.g.*, crediting an uncorroborated invention story newly presented at trial; refusing to consider relevant prior art involving crystallization and ethanol solvates; imposing a "lead

compound" analysis despite darunavir being known; or touting secondary considerations having nothing to do with ethanol solvate). Applying the correct legal analyses to the admitted prior art, particularly given Janssen's own admissions about crystallization, motivation, and what skilled artisans can reasonably expect, claim 4 is obvious.

Moreover, Janssen nowhere demonstrated actionable harm justifying injunctive relief.

The appealed decisions—one largely replicating Janssen's proposed findings of fact and conclusions of law verbatim[1]—include multiple case-dispositive reversible errors that necessitate reversal.

---

[1] *Compare* A8-13, A22-29, A32-33, A35-40, *with* A23215-16, A23230-38, A23245-50, A23281, A23283, A23287-91, A23309, A23311-12, A2336, A23338-41, A23344-48 ('015 patent); *compare* A17-20, A63-70, A72-75, *with* A23484-85, A23488-93, A23506-07, A23545-49, A23559, A23564-69, A23580, A23586-90 ('645 patent).

## STATEMENT OF ISSUES

***Claim 1, '015 process patent.***  Whether the district court erred finding:

- 271(g) infringement;

- claim 1 valid despite encompassing inoperable compounds lacking credible utility; and

- nonobviousness by misunderstanding hindsight; ignoring Janssen's no-differences admissions; striking prior art; and emphasizing irrelevant "secondary considerations";

***Claim 4, '645 ethanol solvate patent***.  Whether the district court's nonobviousness judgment erred when Janssen witnesses admitted 1:1 ethanolate resulted from routine drug development work; "lead compound" analysis is inapplicable; and secondary considerations cited were irrelevant or, if accepted, render claim 4 non-enabled; and

***Remedy***.  Whether the district court erred enjoining Lupin's ANDA *Products*.

## STATEMENT OF THE CASE

### I.    Summary Judgment Proceedings.

Undisputedly below, Lupin's ANDA Products are overseas-produced. (A21318). Janssen insisted Lupin's darunavir tablets generate 271(g) infringement by using bis-THF/bisfuranol intermediate; Lupin raised the "material change" defense. (A179). The district court held on summary judgment ***no*** material change exists between claim 1's bisfuranol (left) and darunavir (right):

(A179-89).

The district court denied Janssen's '645 validity motion given material fact disputes. (A152).

### II.    Trial.

Janssen asserted '015 patent claim 1 and '645 patent claim 4. (A23175-76; A24057-58). Lupin challenged validity and remedy.

#### A.    '015 Patent.

Lupin challenged claim 1 for covering inoperable isomers; rather than invalidate the claim, the district court rewrote it with claim construction and rejected Lupin's § 112 defenses. (A35-40).

The district court identified three prior art/claim 1 differences to find nonobviousness, (A27-28), despite Reider's concessions such differences were nonexistent or known solutions to prior art problems.  (A1404, A1408-10).

**B.    '645 Patent.**

Janssen's expert conceded the 1:1 ethanolate element represented the only potentially nonobvious prior art difference.  (A1315, A1304).

The district court touted Wigerinck's uncorroborated tale of crystallization "failures," (A17-19), despite ChemShop's documents reporting success:  "the initial crystallization" with 2-propanol "went without problems."  (A5183).  Even the "failed" sample worked; purifying it "resulted in a subsequent problemless crystallization from ethanol/water."  (A5183).

The district court states after Chemshop "failed," Wigerinck's scientists performed 40 failed experiments (A18); Wigerinck's oral testimony is uncorroborated (despite Janssen's policy requiring recording such investigations). (A836; A4685-86, A4551).

The district court deemed meaningful Wigerinck's claim he produced crystals scratching glassware.  (A18).  This "long-known" method is literally one of the oldest techniques in the book, taught to undergraduate chemists, to induce crystallization.  (A18-19; A3245).

Contrasting Wigerinck, other named inventors freely conceded pre-trial that nothing was memorable about darunavir crystallization or formulation. (A1506 (Janssens "assign[ed] the development of the conditions to develop a drug substance" to contractors); A1512 (Thoné couldn't "recall suffering any setbacks during the development of the darunavir tablet formulation")).

As was the trend in the PI class, which already had produced ethanol solvates, darunavir too produced ethanol solvate. (A2861-67; A3255-63; A3264-312; A3313-53). 1:1 darunavir ethanolate results from routine drug-development crystallization screens with ethanol—as third-party crystallization screens from the era confirmed. (A814-15; A1292; A1506, A1510; A3441-44; A2091).

This led the district court to conclude obviousness turned on whether "darunavir was a compound of interest in 2002." (A65-66). Applying a structural obviousness analysis despite darunavir being a known compound, the district court rejected darunavir as a lead because its use in clinical trials was not sufficiently public and Prezista® had good clinical effects. (A64-73). That ignores the state of the art relevant to the claimed invention, which involves an earlier stage of development. The prior art *undisputedly* taught skilled artisans darunavir's structure, potency, oral dosing utility, and tight crystal binding, rendering darunavir an attractive development candidate. (A1744; A3361-63; A921-26, A936, A943-44, A952-53; A691). *Preclinical* drug development necessitates

performing crystallization screens (A3078-79, A3081; A1292), and obviously occurs before the pivotal human clinical trials.

### C.    Remedy.

Disregarding Lupin's causal nexus, prematurity, and over-breadth objections, the district court's injunction precludes FDA from approving Lupin's ANDA *Products*.  (Argument Section V).

# FACTUAL BACKGROUND

## I.    A Key Darunavir Publication.

Darunavir is a PI drug.  (A924; A680).  Ghosh 1998 disclosed darunavir's

structure, synthesis and drug potency.  (A3362-63; A924-26, A952-53).

In Ghosh 1998's synthesis:

Scheme 1

when **X**=NH$_2$, "**R**"=   , compound 13 (darunavir) results.  (A3362-63).

Preparing "R" requires (3R,3aS,6aR)bis-THF/bisfuranol starting material that

Ghosh 1998 states was "known[4]", citing *e.g.*, Ghosh 1996.  (*Id.*)  Ghosh 1998

separately motivated developing darunavir as an oral drug candidate.  (A3361-63;

A924-26, A952-53; A1522-23).  '015 Patent involves bis-THF synthesis; '645

patent's 1:1 ethanolate results from routine drug development steps occurring after

darunavir's synthesis.

## II.    Claim 1's Bis-THF Synthesis Recites Known Steps or Known Alternatives Preparing Intermediate Compounds.

Ignoring prior art references and crediting Reider's testimony that claim 1's bis-THF synthesis was "counterintuitive" and "dramatically" different from prior art, the district court touted three differences.  (A27-28).

*First,* was starting materials lacking bis-THF's rings, (A28) which non-inventor Wigerinck did "not expect to work."  (A11).  Ghosh 1996 Scheme 1 used starting materials with *neither* bis-THF ring, (A5195), which Reider *conceded* worked.  (A1405, A1407-08; A5195; A5199-5201).

*Second,* was cyclizing the compound of formula (6) to bis-THF.  (A27; A1374).  Reider conceded Ghosh 1996's Scheme 1 generated bis-THF the same way.  (A1404, A1407-08; *see also* A771).

*Third,* were early intermediate syntheses.  Claim 1 requires "nitromethane" derivatives "subsequently transforming" to compound of formula (6); this occurs via unclaimed aldehyde intermediates.  (A391-92; A1408).  Reider admitted Ghosh 1996's ozonolysis prepared aldehyde intermediates, (A1407-08; A5195), but skilled artisans avoid large-scale ozonolysis (A1408, A1412).  Reider admitted skilled artisans knew Nef reactions alternatively make aldehydes from nitroalkane starting materials; these starting materials and intermediates were known and matched claim 1's.    (A1408-12 (Costa, glyceraldehyde(1));  Patrocinio, nitromethane(3)); A2506-07; A2513).

## III.    Isomers.

Darunavir requires (3R,3aS,6aR)bis-THF isomer:



(A813).  Claim 1 lacks stereochemistry designations, covering 8 isomers:



(A391-92; A1403, A1409; A820; A1028).   Janssen's witnesses conceded 4 of 8 isomers cannot be made.  (A1377; A821).  The '015 patent suggests utility for only 1 isomer to synthesize darunavir.  (A386; A813, A821; A1373; *see also* A1527, A1529-30).   Rather than invalidate claim 1, the district court construed it to exclude the inoperable isomers, (A35-38); and used post-filing-date publications to justify darunavir-unrelated isomers' utility.  (A38-40).

## IV.    Why Develop Darunavir?

The district court identified darunavir's development rationale as "*the*" issue.  (A65).

Pre-trial, Janssen contested Ghosh 1998 encouraged developing darunavir.  (A7005-10).   Lupin's experts confirmed Ghosh 1998 tested and approvingly compared Compound 13 (darunavir) to amprenavir (FDA-approved in 1999), and noted biological studies were ongoing.  (A924-26, A952-53; A3362-63; A3357).

11

Janssen insisted (on summary judgment) that skilled artisans lacked darunavir development motivation, without crystallization screens never occur. (A7010-19).   Lupin identified many darunavir development rationales (*e.g.*, A15180-81, A15183-88, A15190-93).   Lupin separately noted Janssen's expert Young conceded darunavir was in clinical trials, and thus already developed by the relevant date.  (A15180).

By trial, it was uncontested that Ghosh 1998 and other PI art recommended darunavir as a compound of interest justifying routine drug development steps[2]— Janssen never called Young.  (*See* A22713-14).

Post-trial, the district court incorrectly characterized Lupin's position as: darunavir development would never proceed absent public knowledge of clinical trials.  (A65-67).  Lupin's evidence <u>confirms</u> darunavir's structure; potency; oral dosing expectations; and tight crystal binding which each reflected reasons rendering darunavir an attractive development candidate.  (A1744; A3361-63, A924-26, A936; A943-44, A952-53; A691).   Skilled artisans routinely perform crystallization screens on drug candidates, (A1292, A1317-18; A841; A3079; *see also* A357, A361), and that too *before* pivotal clinical trials.  (A3081).  Routine screens were reasonably expected to, and did, produce darunavir

---

[2] A925-26, A936, A952.

ethanolate.   (A814-15;  A1229;  A1506-07;  A3038;  A3079;  A3440-76).   1:1

ethanolate was nothing special.  (A1319).

## ARGUMENT SUMMARY

*'015 patent*.    Material changes exist between bis-THH/bisfuranol; darunavir's molecule; and Lupin's tableted product, precluding 271(g) liability.

The district court's invalidity-related errors (*e.g.*, construing claim 1 to exclude inoperable subject matter; excluding prior art; touting nonexistent claim differences; and relying on Prezista® *product* attributes as secondary considerations *process* evidence) necessitate reversal.

*'645 patent*.    Routine crystallization screens include ethanol; darunavir crystallizes from ethanol, readily generating 1:1 darunavir ethanolate.  The district court's nonobviousness analysis reversibly erred by preconditioning routine drug development activities for a *known* molecule on satisfying lead compound and public clinical-trial thresholds; and secondary considerations theories divorced from purportedly novel, non-prior-art claim elements (which, if accepted, show non-enablement).

*Remedy*.  The district court improperly presumed irreparable harm to enjoin: Lupin's ANDA *Products* via the '015 *process* patent, without commercial or retail product sales; and FDA approval even if Lupin changes its process or form.

**ARGUMENT**

**I.    No '015 Patent Infringement.**

Lupin's manufacturing processes are overseas (A9543, A9549; A9856); thus, Janssen argued 271(g) infringement (A182-84).  Lupin invoked the "material change" exception; the district court erroneously rejected it.  (A179-89).

**A.    Lupin's ANDA Products Are Materially Different.**

Products "made by a [U.S. patent] process" will "not be considered to be so made" once "materially changed by subsequent processes."  35 U.S.C. § 271(g)(1).

Claim 1's last process yields bisfuranol:

Lupin's accused tablets comprise darunavir:

(A9866).

CONFIDENTIAL INFORMATION REDACTED – SUBJECT TO PROTECTIVE ORDER



Bisfuranol and darunavir's chemical, physical, analytical and clinical properties differ.   (A10403; A10487; A10405-07; A364, A361; A10558-59; A10307; A10222, A10224; A11810-11; A1527).   This confirms darunavir is materially changed from bis-THF/bisfuranol. *Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1573, 1575-77 (Fed. Cir. 1996) (materially changed when "chemical properties of the two compounds are completely different, the 'basic utility' of the products is different, and the chemical structure of the two products is significantly different"); *Flexsys Am. LP v. Kumho Tire U.S.A., Inc.*, 726 F. Supp. 2d 788, 799-802 (N.D. Ohio 2010) (4-ADPA process noninfringed; reductive alkylation process materially changed product).

## B.    Non-infringement.

The district court complained Lupin viewed darunavir as "an irreducible whole" not a "collection of individual parts," (A186); insisted comparing bis-THF and darunavir structures lacked "common sense," (*id.*); decided *Lilly* "cannot possibly be the correct inquiry" for process patents to "moieties of pharmaceutical products," (A188); and concluded the correct analysis considers whether bis-THF's original structure remains within the final product, (A185-86, A188).   This requires reversal.

The district court's "moiety" analysis focused on bis-THF's hydrogen (arrow) "lost" to bond formation:

(A185-86), while ignoring the massive structure *added*:

(A1744).   Janssen conceded these above-highlighted groups collectively impact activity and drug resistance profiles versus bis-THF.  (A11787).

A "moiety" analysis doesn't differentiate *Lilly*.   Cefaclor incorporated the claimed "moiety":

U.S. Patent 4,160,085 R'=ArCQQ, Ar=phenyl ; COX=carboxy,

**Cefaclor**

(A21205, A21177-205), as *Lilly* recognized.  *Lilly*, 82 F.3d at 1573 (compounds shared same cephem nucleus providing antibiotic activity).   But subsequent

reactions changed groups impacting biological activity (*e.g.*, OH→Cl), creating a material change and supporting non-infringement. *Id.* at 1570, 1573.

The overwhelming majority of darunavir's structure *is not* bis-THF-derived:

.

Like *Lilly*, the non-highlighted structural additions are *essential* to darunavir's biologic performance; bis-THF/bisfuranol alone cannot treat HIV.[3]

The district court deemed *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340 (Fed. Cir. 2009) and *OKI America, Inc. v. Advanced Micro Devices, Inc.*, No. C 04-03171 CRB, 2006 WL 2711555 (N.D. Cal. Sept. 21, 2006) "more analogous." (A188-89).

*Amgen* differentiated biologic proteins like EPO from small molecules like *Lilly*'s cefaclor and darunavir. 580 F.3d at 1379. Roche's PEGylated EPO achieved biological results like Amgen's claimed EPO. Lupin's bis-THF and darunavir never do. (*See* n.3).

---

[3] A10574-77; A10584-85; A10592; A10595-96; A10602-05; A10608-09; A10465; A10306, A10308-11.

*OKI*'s accused devices contained chips sliced from a debris-free master silicon wafer partially resulting from the claimed Allen process steps. 2006 WL 2711555, at \*14. Subsequent processing steps never impacted the debris-free product's nature. *Id.* at \*14-15. Lupin's subsequent steps generate transformative chemical reactions and undisputedly different biological attributes. (*See* n.3).

The district court's policy argument that it "def[ied] logic" for Congress to allow foreign manufacturers to sidestep molecular component process patents was inapt. (A188). Congress treads carefully with extraterritorial targets; 271(g)(1)'s "no material change" test is restricted to process modifications with illusory product-performance effects. *Lilly*, 82 F.3d at 1574-77 (*e.g.*, converting to "a salt or amino-derivative"; adding a base, acid, hydrate, or ester; or removing protective groups); 35 U.S.C. § 271(g)(2) (independent trivial/non-essential component exception). Lupin's processes here invoke real-world clinical effects, thus qualifying for the material-change exemption.

## II.    '015 Patent § 112 Defenses.

Claim 1's structures impose no stereochemistry restrictions; consequently, all isomers are included. Janssen conceded 4 of 8 isomers cannot be made (A1377; A821); the specification offers credible utility for just 1 (*see* A386). Claim 1's full scope is non-enabled and unsupported. 35 U.S.C. § 112, ¶ 1.

## A.    Lupin Timely Raised § 112 Defenses.

The district court insisted Lupin's non-enablement defense was undisclosed in the FPTO.  (A36, A38).

*First*, Lupin *raised* non-enablement and written description in the FPTO. (A22660, A22665, A22741, A23050-55, A23070).

*Second*, Janssen never objected to Lupin presenting or eliciting 112 testimony.  (*E.g.*, A820-21; A989, A997, A1027-29, A1031-32; A1085; A1401-03, A1405, A1407, A1409-10; A1447-48; A1525, A1527-28, A1530); *Gibson v. Mayo & Council of Wilmington*, 355 F.3d 215, 225 & n.4 (3d Cir. 2004).

*Third*, FPTOs can be retroactively amended to prevent "manifest injustice." FED. R. CIV. P. 16(e).  Applying the *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) factors:

• Janssen never argued prejudice/surprise at trial.

• Janssen responded on the merits, (A1368, A1372-73, A1377-78, A1401-03, A1405).

• Lupin proffered no new documents or witnesses.

• No bad faith or willful disobeyance existed.

*Fourth*, once the district court—after Defendants objected to *Janssen* raising undisclosed theories—proclaimed FPTO amendments unnecessary, and parties

free to present any evidence (A911-12), it is unjust to disparately subject Lupin to harsher standards.

### B.    Claim Construction.

Post-trial, the district court construed claim 1 to exclude four inoperable bis-THF isomers so "there is no enablement issue and Lupin's enablement argument dissolves." (A38). Courts "can't simply disavow the invalid portion and keep the valid portion…." *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368 (Fed. Cir. 2012); *accord AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1243-44 (Fed. Cir. 2003).

### 1.    Ordinary Meaning.

Janssen untimely asserted lexicography limits claim 1 to four isomers. (*Compare* A23338-41, *with* Janssen's L.Pat.R. 4.3, 4.5 disclosures (A23943-51; A6674-89; A131-95; A130)); *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005) (precluding late-proposed construction).

Claim 1's product structure has 3 stereocenters, encompassing 8 isomers:



(A391-92, A377; A1377; A820; A1028; A37). Claim 1 lacks affirmative stereochemistry designations seen in other claims and specification locations

(A393-94, A390; *see also* A1403), thereby including 8 isomers. *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 555 F. App'x 961, 965 (Fed. Cir. 2014).

### 2.    No Lexicography.

The district court proposed the specification justified narrow isomer scope. (A36-38). But the specification emphasizes examples cannot "be construed as limiting the invention's scope" (A386); and "[a]ll stereochemically isomeric forms" are "embraced within the scope…." (A376; A997). That is expansive, not isomer scope-narrowing, language. *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1288-90 (Fed. Cir. 2006) (Examples' racemate-limited preparations couldn't narrow claim without "improperly import[ing] limitations from the specification").

The district court's cases are distinguishable.[4] *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1276-79 (Fed. Cir. 2011) (lexicography expanded claim scope); *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195-96. 1210-11 (Fed. Cir. 2013) (surrender from expressly differentiating between 3-dimensional and bead cultures).

### C.    Claim 1 Is Partly Inoperable.

Four bis-THF isomers are "impossible to form." (A37; A821; A1337; A1525, A1527-28). Claim 1 covers them, proving non-enablement. *Graver Tank*

---

[4] *Wyeth v. Teva Pharm. USA, Inc.*, No. 03-CV-1293(WJM), 2005 WL 2175440 (D.N.J. Sept. 6, 2005) was vacated. (A23952).

*& Mfg. Co. v. Linde Air Prods. Co.*, 336 U.S. 271, 276-77 (1949); *Pharm. Res., Inc. v. Roxane Labs., Inc.*, 253 F. App'x 26, 30-31 (Fed. Cir. 2007).

In *AK Steel*, the patentee claimed compositions with up to about 10% silicon. 344 F.3d at 1237. The specification deemed problematic silicon above 0.5%. *Id.* at 1244. The specification was "inadequate as a matter of law" for "expressly teach[ing] against" the claims, "tell[ing] the public that higher amounts of silicon will not work." *Id.* The '015 patent teaches 4 of 8 isomers were thermodynamically unstable; the district court found 4 nonexistent (A37; A1377), rendering claim 1 non-enabled.

The district court downplayed Lupin's written description defense inventors cannot possess what cannot exist. (A38 n.4). It erred construing claims to exclude inoperable isomers, and rejecting Lupin's defense. *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380 (Fed. Cir. 2013), *aff'g*, Nos. 08-230(JAP), 08-1021(JAP), 2012 WL 175023, at *7-10 (D.N.J. Jan. 19, 2012).

### D.    An Isomer-Limited Claim Still Falls.

The *specification* must confirm the *inventors* possessed a credible utility. 35 U.S.C. § 112, ¶ 1; *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1322-23 (Fed. Cir. 2005); *In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1323-24 (Fed. Cir. 2009). The '015 patent only asserts isomer 7.1's utility. (A386, A393-94). That doesn't establish credible use for *all four* isomers.

With a specification lacking test data (A40), utility hinges on what skilled artisans accept without question from existing prior art. *See Rasmusson*, 413 F.3d at 1323. The district court relied on Ghosh 1996 and Surleraux (A39-40), but still cannot show credible utility for *all four* isomers. Ghosh 1996 makes two. (A39; A5199; A3362-63; *see also* A922-23, A925; A1527, A1529, A1530). That isn't enough. *See Brenner v. Manson*, 383 U.S. 519, 530-32 (1966); (A922-24). Surleraux, which published post-filing (A372; A4143), is legally insufficient. *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1371-72 (Fed. Cir. 1999).

Thus, with no contemporaneous art providing credible utility for *all 4* isomers, claim 1 still falls.

## III.    '015 Patent Claim 1—Obviousness.

Claim 1 encompasses known processes to prepare known compounds.

### A.    The District Court's Prejudicial Hindsight.

Kesteleyn—Janssen's Rule 30(b)(6) designee on bis-THF's development (A990)—testified development was unremarkable. (A990-91, A994). Fresh from his Ph.D. program, he devised scalable bis-THF routes by reviewing the literature. (A990-91, A994; A5284-304). He varied "the routes of Ghosh," (A99-94); Ghosh 1996's Scheme 1 was "more appealing," and amenable to scale-up except for ozonolysis, (A994). Third-party DSM scaled-up, optimizing routes to be "more profitable." (A992, A995-96).

Kesteleyn's 30(b)(6) testimony is binding. *Harris v. New Jersey*, 259 F.R.D. 89, 92 (D.N.J. 2007); *Nike, Inc. v. Wolverine World Wide*, 43 F.3d 644, 648 (Fed. Cir. 1994) (limiting patentee to theories 30(b)(6) witness disclosed). Wigerinck's trial-inspired tales (A707, A710, A741-43, A746-47; A10-12, A30) are uncorroborated (A991, A1328).

### B.    District Court Ignores Prior Art.

The district court improperly excluded prior art, (A25-26), reversibly erring. *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1378-80 (Fed. Cir. 2005).

The district court insisted someone *actually* had to possess and use Lupin's prior art (Patrocinio, Costa) to make bis-THF. (A25-27). Skilled artisans are presumed aware of "all … pertinent prior art." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985).

Patrocinio and Costa relevantly teach solutions to skilled artisans' known problems: preparing intermediates for aldehydes without Ghosh's ozonolysis reaction. *Tyco Healthcare Grp., LP v. Ethicon Endo-Surgery, Inc.*, 774 F.3d 968, 979 (Fed. Cir. 2014). Rebutting Janssen's "protected glyceraldehyde" nonobviousness theory, Lupin identified further evidence confirming the stability problem and solution (*in situ* preparation from D-(+)-mannitol) was known. (A1405, A1409-10; A2983; A2513; A2506). The district court erroneously ignored it. (A27-29).

26

### C.    Differences Would Have Been Obvious.

The district court's three differences (A27-28) were neither novel nor nonobvious.

### 1.    Ghosh 1996 Taught Non-ringed Starting Materials and Intramolecular Conversion Steps.

Ghosh's Scheme 1 taught non-ringed starting materials (A5195; A1007), precluding teaching away.  *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013).  Ghosh 1996 taught claim 1's compound of formula (6) and its intramolecular conversion to bisfuranol, albeit in writing.  (A5195; A1406-08).  These are non-differences.

### 2.    Nitroalkane Nef Reaction to Aldehyde.

Prior art bis-THF syntheses—including Ghosh 1996—used ozonolysis[5] to prepare aldehyde structures—appropriate for lab scale, undesirable for commercial scale-up.  (A742; A993-94; A1407-08).  The "design need" to avoid ozonolysis gave skilled artisans "good reason to pursue the known options" within their "technical grasp."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Reider conceded that:  alternatives to synthesizing aldehydes with ozonolysis were Nef reactions, (A1404-05); Patrocinio taught nitroalkane structures useful for Nef reactions, (A1408-09); and Costa prepared structures with

---

[5] A1083; A1407; A5201; A1412; A5209; A1530; A2007; A993-94, A996-97; A1007, A1012, A1024.

the precise stereochemistry darunavir requires.   (A1409-11; *see also* A1016-17; A2506-07).   Reider admitted Patrocinio/Costa structures and processes match claim 1's requirements, including the protected glyceraldehyde.   (A1408-10; A391-92; *see also* A1070-71).   As noted above, while glyceraldehyde was too unstable to *purchase* at commercial scale (A28), Reider conceded the prior art taught a workaround.  (A1409-10; A2983).

### 3.    No Hindsight.

The district court erroneously labeled "hindsight" any syntheses lacking *starting materials* identical to existing bis-THF syntheses.   (A10-11, A28-29). Equally valid syntheses can start with *known end products*—bis-THF—and apply existing roadmaps (Ghosh 1996 Scheme 1) to work backwards, applying *known* solutions (alternative aldehyde routes) where *known* problems appear (ozonolysis). (A1404; A991; A1003-07; A1374).   That isn't hindsight, which uses *the patent* to guide through prior art or define the problems requiring solution.   *Orthopedic Equip. Co. v. U.S.*, 702 F.2d 1005, 1012 (Fed. Cir. 1983); *see also Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377-78 (Fed. Cir. 2012).

### D.    Secondary Considerations.

The district court's secondary considerations evidence—emphasizing only one of four isomers; and unclaimed commercial-scale production—was "legally

insufficient." *Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013).

### 1.    No Failures by Others.

The district court speculated Ghosh's research goal was generating commercial-scale bis-THF. (A30-31). Ghosh never so testified or published (A1524-30; A4444-51; A5194-206; A3913-43; A5211-14).[6] Ghosh designed new drug compounds to resist HIV mutations (A2249). No skilled artisans failed to produce commercial-scale bis-THF using nitroalkane/Nef reactions. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1313 (Fed. Cir. 2006).

The district court relied on time passed between Ghosh 1994 and 2001 (A31); such is not evidence of nonobviousness. *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324-25 (Fed. Cir. 2004).

### 2.    No Commercial Success.

The district court relied on Prezista[®]'s "[s]ales figures and market data" for commercial success (A31), insufficient absent causal nexus. *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1482-83 (Fed. Cir. 1997).

The district court emphasized needing commercial-scale processes to make commercial sales. (A32). Commercial sales equally require patients, darunavir,

---

[6] Uchiyama (A30) nowhere expresses commercial-scale preparation goals; it prepared new perhydrofuro[2,3-*b*]furans—not bis-THF. (A2500).

excipients, etc.  Despite recognizing "multiple factors" prompted Prezista® success (A32-33), the district court wouldn't assess claim 1's *independent* process value (A945; A1536; A814; A1447; A952).    Nor is claim 1's process the *only* commercial-scale one; Mylan avoids it.  (A1403; A1027).  Blocking patents and regulatory exclusivities further weaken nexus.  *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1376-77 (Fed. Cir. 2005).  (A107; A22637-38; A23637-38; A3636).

### 3.    No Praise.

Praise for Prezista®'s clinical performance (A33) is not praise of claim 1's bis-THF *process*, and thus irrelevant.  *Geo M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1305 (Fed. Cir. 2010).

### E.    Weighing Factors.

The district court's judgment relied on nonexistent or obvious differences and irrelevant secondary considerations; it requires reversal.

## IV.    The '645 Patent's Claim 4 Is Invalid.

Routine drug development proceeds in phases: design a drug molecule; prepare drug material; *then* prepare the human medicine, *e.g.*, tablet.  (A1216-17; A841; A1292).  Clinical trials subsequently occur.  The '645 patent is directed to the routine drug material part of drug development.

The district court was improperly led astray by Wigerinck's uncorroborated assertion that Janssen overcame crystallization difficulties to prepare an invention.

(A17-19; A836; A4685-86, A4551).    There *was no invention* here on the corroborated facts and Janssen's admissions.

While claim 4 encompasses pharmaceutical compositions containing 1:1 darunavir ethanolate (A17), Janssen's expert Myerson opined in reality, claim 4's patentability hinged on whether darunavir ethanolate itself would have been obvious, not the pharmaceutical composition-related elements.  (A1315, A1304).

The most Janssen's documents show about crystallization "difficulties" is that highly impure samples are harder to crystallize.  (A5183).  The art has long-taught techniques to resolve this, including the very technique Janssen used—scratching glassware.  (A18-19; A3245).  While the district court highlighted that Janssen's early crystallization efforts used isopropanol and ethanol/water mixtures, it also found Janssen attained crystals "using pure ethanol as a solvent."  (A19).  Janssen's expert conceded that skilled artisans would know if they used pure ethanol as a solvent, there are but two possible crystals that can result: ethanol solvate or non-solvated crystals.  (A1317).  There was nothing surprising about pure ethanol solvent generating an ethanol solvate.  (*Id.*).  Even the '645 patent confirms routine techniques can be used to achieve the purportedly inventive solvates.  (A357, A361, A363).

Moreover, even giving Wigerinck's uncorroborated "failures" the heavy import the district court assigned them, the district court confirmed Wigerinck's

entire crystal-search process took a few weeks from start-to-finish. (A18-19; A757-59, A761-63). That Wigerinck tried and failed to find a better *non-solvate* (A18-19) is irrelevant; the claims are limited to the ethanol solvate that readily crystallized, (A370; A814-15; A1292; A1506, A1510; A3441-44; A2091).

In short, there was absolutely nothing about producing ethanol solvate or its formulation that was out of the ordinary in drug development, and the named inventors pre-trial conceded as much. (A1506; A1512). Claim 4 is invalid; protecting "advances that would occur in the ordinary course without real innovation retards progress…." *KSR*, 550 U.S. at 419.

## A.    The District Court Erroneously Ignored Prior Art References.

The district court refused to consider (A63) multiple prior art references describing routine development steps pertaining to drug materials, including references discussing:

> • crystallization, and reasons for routinely performing crystallization screens during drug development (A3030-75; A3236-54; A3076-87; A3184-231; A3005-29; A1292);

> • solvent choice, including in crystallization screens (A3076-87; A845); and

> • the many PIs that already had been prepared as ethanol solvates, (A2861-67; A3255-63; A3264-312; A3313-53).

The district court's rationale—none mention darunavir, its solvate, or provide "the conditions needed to form an ethanolate solvate of darunavir" (A63)—reflects reversible error. Such art involves issues and problems skilled artisans routinely

encounter and solve when developing drug materials, and thus cannot be excluded. *See Syntex*, 407 F.3d at 1378-80.

### B. Ethanol Solvate Results From Routine Experimentation Skilled Artisans Were Motivated to Perform; It Is Not Patentable.

The fruit of routine experimentation skilled artisans normally undertake is obvious. *Ritchie v. Vast Res., Inc.*, 563 F.3d 1334, 1337 (Fed. Cir. 2009). The art confirmed, and Janssen's expert conceded, that crystallization screens are routinely done, including with ethanol; and ethanol solvates within this drug class were known. (A1292, A1317-18; A844-45; A3079, A3082; A3235; A2861-67; A3255-63; A3264-312; A3313-53). As discussed above, nothing required going beyond the prior art teachings to develop darunavir (A836, A1316-17, A1506, A1512, A1519); or make ethanolate itself—Janssen's expert conceded it was unsurprising ethanol solvates would result from ethanol crystallizations. (A1317).

The district court identified *no* difference between claim 4 and the *product of routine darunavir experimentation*. (A64-68). While rejecting Zaworotko's testimony (A67-68, A71), the district court ignored Janssen's Myerson conceded the same facts. Skilled artisans routinely perform crystallization screens for any molecule in drug development; ethanol is 1 of the 2 most common pharmaceutical solvents prioritized in crystallization screens; and ethanol solvates are 1 of 2 crystalline options resulting from ethanol crystallizations. (A1292, A1317-18;

A844-45; *see also* A3079, A3082; A3235).  Janssen never disputed darunavir crystallizations from ethanol yield 1:1 ethanolate.  (A1317, A1319).

The district court's other issues emphasized to try to bolster claim 4 were irrelevant; uncorroborated; or inapplicable, requiring reversal.

### 1.    Express Ethanolate Teachings Not Required.

The district court complained the prior art only explicitly mentioned salts, esters or prodrugs, not darunavir 1:1 ethanolate.  (A64).  The skilled artisan's knowledge and motivations go beyond expressly published statements to references' "interrelated teachings"; demands known to the design community or marketplace; and "background knowledge." *KSR*, 550 U.S. at 418.

Drug material development includes routine, standardized steps.  (A1216-17; A1292, A1091).  The pharmaceutical community long knew different crystal forms existed—the ritonavir PI experience prompted FDA to insist companies routinely seek, identify, characterize and evaluate different crystal forms for every development drug.  (A1222-24; *see also* A1509, A1516, A1519; A814-15; A3220-21).  The steps to perform when developing drug materials need not be express for skilled artisans to execute them.

Moreover, inherent results flowing from routine drug development work are not patentable—and that includes polymorphs that flow from performing known processes.  *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367-68 (Fed. Cir.

2007); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343-45 (Fed. Cir. 2005).

As for salts, esters or prodrugs, Janssen's expert recognized darunavir salts were no good. (A878). The district court cites no record evidence that skilled artisans would develop salts, esters or prodrugs to the exclusion of darunavir. (A64). Janssen's salt/ester/prodrug efforts (A17-19) do not show otherwise.

## 2.    Preparing Ethanolate.

The skilled artisan had available known processes reasonably expected to generate ethanolate. The art already prepared ethanolates with other PIs. (*See* pp. 32-33). Myerson admitted skilled artisans reasonably expect achieving crystalline drug products because "most things can eventually be made into a crystal," (A1292), and "only two crystal options" result from crystallizing darunavir from ethanol: "ethanol solvate and a nonsolvate." (A1317).

The '645 patent concedes solvates may be achieved "applying any suitable technique to induce crystallization," listing several "common in the art." (A357, A367). That ordinarily-skilled artisans could prepare ethanolate is confirmed by crystallization screens Janssen outsourced to independent labs. Darunavir easily crystallized from ethanol, yielding 1:1 ethanolate. (A814-15; A1227; A1506, A1510; A3440-76).

As for preparing ethanolate with a 1:1 ratio, ethanol solvates are overwhelmingly 1:1 solvates, (A1319), rendering it reasonable to expect a 1:1 ratio. *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 969 (Fed. Cir. 2001) (salt most commonly used for basic drugs was obvious).

### 3. Infrequent Use Is Not Discouraging Use.

The district court emphasized solvates are "rarely used" and avoided when possible. (A64). The district court perceived contradictions when Lupin's expert, Zaworotko, agreed ethanolates are lesser-used versus hydrates/non-solvates; while opining that identifying and preparing ethanol solvates was obvious and reasonably expected. (A67; A6, A71). The district court was wrong. Zaworotko's analysis follows *Pfizer*, which found a rarely used (0.25%) salt obvious—despite synthetic methods, test properties, and human effects being unpredictable—because salt-preparation was *routine*. 480 F.3d at 1361-62, 1364; *see also Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013) (science's "degree[s] of unpredictability" cannot avoid obviousness).

### 4. The District Court's Erroneous Lead Compound Analysis.

Because crystallization screens are routinely done during drug development, the district court asserted demonstrating darunavir was a compound of interest in 2002 was *the* essential part of Lupin's obviousness burden. (A65). It erred by

imposing a rigid lead compound analysis satisfied only with proof darunavir was in public clinical trials.  (A66); *KSR*, 550 U.S. at 415.

### a.    Reasons to Develop Darunavir.

HIV was epidemic; high mortality rates and resistance required continuous new drug options.  (A940-41).

Zaworotko relied on Zingman and Marshall to justify darunavir's development selection.  (A1222).  Both testified without contradiction that Ghosh 1998 (A3361-63) taught darunavir's high potency, biological activity, and oral bioavailability design.  (A924-26, A943-44, A952-53).  Searle '775 specifically claims darunavir, and its pharmaceutical compositions.  (A1742-44; A926).  Both encouraged pursuing darunavir as a drug product, to the exclusion of other circa-2002 possibilities.  (A923-26, A936, A943-44, A952-53).  Darunavir's interaction with protease itself, as crystal studies revealed, independently recommended it.  (A921, A925).  Darunavir was 1 of 4 PIs showing promise (A924), which justified development. *Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, 377 F. App'x 978, 982 (Fed. Cir. 2010) (motivation when art taught tramadol was 1 of 14 to develop).

### b.    Lead Compound Analysis Is Inapplicable.

The district court fundamentally misunderstood this Court's "lead compound" analysis.  (A65).  Lead compound analyses evaluate whether *novel* drug molecules are structurally obvious. *Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533

F.3d 1353, 1356-57 (Fed. Cir. 2008).  Once the drug's molecular structure is known and non-novel, traditional obviousness reasoning applies.  *See Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1300-02 (Fed. Cir. 2007) (no lead compound analysis evaluating isomer obviousness); *Pfizer*, 480 F.3d at 1360-64 (no lead compound analysis evaluating salt obviousness; compound not in known clinical trials at the time of obviousness); *Galderma*, 737 F.3d at 736-38 (no lead compound analysis evaluating drug formulation obviousness).

### c.    Clinical Trial Use Not Required.

The district court further erred tying skilled artisans' reasons to develop darunavir exclusively to public knowledge of darunavir's clinical-trial use (A65-67), which directly conflicts with prior art drug material teachings.

Courts cannot impose rigid restrictions on the skilled artisan's reasons for pursuing a given pathway.  *KSR*, 550 U.S. at 415-22; *Allergan*, 726 F.3d at 1292 ("no requirement in patent law" development motivation be "based on a rationale that forms the basis for FDA approval.").  Clinical trials may confirm, but are unnecessary, to advance darunavir to drug development.  (A1245).

The art instructed identifying solid-state forms *before* initiating pivotal clinical trials.  (A3081).  The district court's clinical trials emphasis *contradicts* the prior art's teachings.

Nevertheless, the district court acknowledged Yoshimura taught "[a] potent analog of UIC 94-003, TMC 114, with a similar resistance profile, is currently undergoing clinical trials…." (A66). Skilled artisans appreciated darunavir was an analog of Yoshimura's UIC 94-003. (A992; A2321-22, A2329; A3363). The district court's assumption such clinical trials are generally secret was contradicted by Janssen's PI-specific publicity efforts—Janssen's Erickson held press conferences concerning PI development well before the priority date. (A1523-24; A2205-40).

### 5.    Reasonable Expectation: Pharmaceutical Composition.

The district court opined solvent-loss risks precluded skilled artisans from reasonably expecting success developing claim 4's composition. (A67-68). The district court later contradicted itself, stating skilled artisans "could just take the inert carrier and the active ingredient and fill them into a capsule and they'd have a pharmaceutical formulation to make the claim." (A74-75).

The '645 patent nowhere solves any solvent-loss problem with ethanolates. That renders the issue either irrelevant, *Allergan*, 726 F.3d at 1292-93 (patentee cannot rely on problems the specification never resolves to undermine success expectations), or demonstrates non-enablement, *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 & n.3 (Fed. Cir. 2008) (if resolving a problem requires efforts beyond the skilled artisan's ability and the patent "is itself silent" about how

to implement the problem, then "the claims present an enablement issue, rather than support a conclusion of nonobviousness").

## C.    Secondary Considerations.

Secondary considerations do not justify nonobviousness.

### 1.    No Commercial Success.

The district court erroneously touted Prezista®'s sales for the same reasons in Argument Section III(D)(2).

Again, earlier blocking patents and regulatory exclusivities weakens the commercial-success nexus for the '645 patent.  *Merck*, 395 F.3d at 1376-77; (A107; A22637-38; A23637-38; A3636).

No-one buys Prezista® for its ethanol solvate (A1320-21; A1234; A1536; *see also* A689-90; A940; A1469).   Janssen insisted Mylan's non-infringing amorphous product would rapidly take Prezista® market share.  (A23616; A1462). Attributes driving Prezista® sales (*e.g.*, side effect profile) are tied to darunavir's molecule, not ethanolate.   (A953).   That destroys '645 patent nexus; the purportedly novel feature never drives sales.  *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1360 (Fed. Cir. 2013).

The district court cited AIDS drugs with formulation problems.   (A69). Prior PI formulations possessed such problems and high pill burden.   (A931; A4472).  What solved the problem, allowing for once-daily or twice-daily dosing,

was not ethanol solvate, but co-administering darunavir with ritonavir—an invention Dr. Ghosh separately-patented, Janssen licensed, and which expires in 2019. (A1537; A3913-43; A3403-23; A1467-68; A3636). That destroys nexus. *Merck*, 395 F.3d at 1377.

## 2. Expected Results.

The district court erroneously concluded ethanol solvate formulations unexpectedly worked. (A70-71).

Zaworotko never agreed darunavir ethanolate was "an unusual crystal form" skilled artisans had "aversion[s]" to developing; Zaworotko agreed PTX842A reported ***indinavir sulfate*** ethanolate was chosen over more-common hydrates and non-solvates ***despite*** solvent-loss and stability risks. (A67, A70 (referencing PTX842A (A5988-6025)), A6001). PTX842A reports indinavir's ethanolate yielded ***benefits*** (superior pharmacokinetics, stability, high drug content/capsule). (A6001-02). Precisely because *it was known* different polymorphs may yield different pharmacokinetics, industry routinely performs crystallization screens and evaluates *all* forms. (A1223-24, A1233; A1292; A841; A3220-21).

As for suitability/stability, this is unclaimed. *Ormco*, 463 F.3d at 1311-12. And, if essential to the invention, it demonstrates non-enablement, since the '645 patent itself nowhere solves the suitability/stability problem. (A1094-95, A1310-

11). Solvate-selection frequency cannot render ethanolate nonobvious for reasons already discussed. (*See* p. 36).

The district court erred emphasizing Mylan and Prezista® bioequivalence. (A70-71). Janssen never established amorphous darunavir was the closest prior art. (A1315, A1308-09). Regardless, ethanolate performing *comparably* to prior art is unremarkable. *In re Geisler*, 116 F.3d 1465, 1469-70 (Fed. Cir. 1997). Mylan's formulation also differs from Prezista®'s, which independently impacts bioequivalency. (A2355-56; A14495-99; A1093, A1095). Janssen lacked comparative solubility/dissolution rates for ethanolate versus amorphous either in bulk or from the *same* formulation.

### 3.    Praise.

The district court's praise-for-Prezista® analysis mirrors its '015 patent analysis, suffering from similar flaws. (Argument Section III(D)(3)). Janssen's expert conceded no-one praised darunavir ethanol solvate's discovery. (A1321).

### D.    Weighing Factors.

Whether prejudiced by Wigerinck's uncorroborated invention story; mistakenly applying lead compound or clinical-trial thresholds; ignoring relevant prior art; invoking "secondary considerations" evidence irrelevant to ethanolate, and the many other problems noted above, the district court reversibly erred at every step of the analysis. Because the *relevant* facts were conceded: darunavir's

potency rendered it a compound of interest for further development; skilled artisans were motivated to perform crystallization screens on drug compounds in development, and reasonably expected ethanol solvates from ethanol solvent; and pharmaceutical compositions with the solvate can be prepared just by sticking it in a capsule shell with some excipient—claim 4 is invalid for obviousness.

## V.     Janssen Deserves No Remedy.

### A.     No Nexus.

Lupin's infringement is non-dispositive on nexus.   (A84-85, A97-98). Janssen's "harm" (A79-81) results from *competition*, not infringement—Janssen asserts identical "harms" notwithstanding 2 different generic products and 3 different patents.   (A79-81, A92-93, A97; *see* A23595-600, A23616, A23624). Such "harms" also are monetary, not irreparable.  *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1338 (Fed. Cir. 2012).

Janssen's lost revenues/R&D dollars argument (A80, A97; A688) could be made in every patent case.  *Lilly*, 82 F.3d at 1578.  No *specific* R&D project hinges on Prezista® sales.  *Cf. Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, 942 F. Supp. 2d 17, 25-26 (D.D.C. 2013).

The district court refused to separate Lupin's process or polymorph "from the product itself" when assessing consumer demand, further assuming Lupin could never avoid '015/'645 infringement.  (A85, A86; *see also* A98-99).  Mylan's

ANDA Products infringe neither patent, yet identical Janssen "harm" results. (A92-93). That *confirms* the causal nexus break. *In re Sneed*, 710 F.2d 1544, 1551 (Fed. Cir. 1983).

The district court proclaimed darunavir tablets' simplicity permitted disregarding Lupin's unchallenged proof that: prior art features and dosing regimens covered by molecule and treatment-method patents;[7] and not how bis-THF is made or any ethanolate in Lupin's ANDA Products, drives sales. (A85-87). Such proof destroys causal nexus. *Merck*, 395 F.3d at 1377 (blocking patents); *Apple*, 735 F.3d at 1360 (sales not driven by patented feature).

## B.    Wrong and Unripe Remedy.

Lupin may amend its ANDA process, *see* 21 C.F.R. § 314.70(b), (A21799; A21802-08), including before any 271(g) importation. Janssen failed to show no other remedy (*e.g.*, reasonable royalty) was ripe or available.

## C.    Scope.

The district court erroneously enjoined Lupin's ANDA *Products* (A91, A100; A1-2), even if later non-infringing; and resurrecting claims Janssen voluntarily dismissed with prejudice. (A23175-77; A24057-59).

---

[7] A2010-50; A2051-60; A3403-23; A1466-68; A692-93; A3636.

**D.    Standing.**

The district court deemed Lupin waived its standing challenge the Janssen entity allegedly losing sales/experiencing competition is not the patentee/assignee. (A88).  Standing cannot be waived or altered by stipulation.  *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003).  Ownership has changed hands again to Janssen Sciences Ireland UC.  (Doc. 30 at 2; Doc. 33).

**E.    Balance of Hardships, Public Interest.**

Janssen's competition harm cannot outweigh Lupin's and the public's harm should Lupin's ANDA Products remain enjoined, even if modified to be non-infringing.  *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1371 (Fed. Cir. 1996).

## CONCLUSION

The district court should be reversed, and judgment entered favoring Lupin.

Respectfully Submitted,                    Dated: May 1, 2015

/s/ Deanne M. Mazzochi
Deanne M. Mazzochi
(dmazzochi@rmmslegal.com)
William A. Rakoczy
(wrakoczy@rmmslegal.com)
Amy D. Brody (abrody@rmmslegal.com)
Tara M. Raghavan
(traghavan@rmmslegal.com)
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
Telephone:  312-222-6305

*Attorneys for Defendants-Appellants*
*Lupin Ltd. and Lupin Pharmaceuticals, Inc.*

# ADDENDUM

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JANSSEN PRODUCTS, L.P. et al.,

                    Plaintiffs,              :          **ORDER**

        v.                                   :          Civ. No. 2:10-05954 (WHW)

LUPIN LIMITED et al.,

                    Defendants.              :

### Walls, Senior District Judge

It is on this 14th day of August, 2014,

### ORDERED, ADJUDGED AND DECREED that:

### '015 Patent against Lupin

1) The importation, use, sale or offer for sale in the United States of the darunavir tablets
   described in the Lupin ANDA, ANDA 202073, would infringe claim 1 of U.S. Patent
   No. 7,126,015 (the '015 Patent) and that claim is not invalid; and

2) Lupin and its officers, directors, employees, agents, successors, affiliates, and assigns,
   and all persons and entities acting in concert or participation with them, are enjoined
   until the expiration of the '015 Patent from using, selling, or offering for sale in the
   United States, or importing into the United States, the darunavir tablets described in
   the Lupin ANDA, ANDA 202073, or any darunavir product that includes a bis-THF
   component made by any colorable variation of the process used to make Lupin's
   ANDA 202073 product.

**'411 Patent against Mylan**

3) The importation, use, sale, or offer for sale in the United States of the darunavir tablets described in Mylan's ANDA, ANDA 202136, would infringe claim 13 of U.S. Patent No. 7,772,411 (the '411 Patent) and that claim is not invalid; and

4) Mylan and its officers, directors, employees, agents, successors, affiliates, and assigns, and all persons and entities acting in concert or participation with them are enjoined until the expiration of the '411 Patent from using, selling, or offering for sale in the United States, or importing into the United States, the darunavir tablets described in Mylan's ANDA, ANDA 202136, or any darunavir product made by any colorable variation of the process used to make Mylan's ANDA 202136 product.

**'645 Patent against Lupin**

5) Claim 4 of U.S. Patent No. 7,700,645 (the '645 Patent) is infringed by Lupin and not invalid;

6) Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval of Lupin's darunavir tablets in ANDA 202073 shall not be earlier than the day after the expiration of the '645 Patent and its associated pediatric exclusivity; and

7) Lupin and its officers, directors, employees, agents, successors, affiliates, and assigns, and all persons and entities acting in concert or participation with them, are enjoined until the day after the expiration of the '645 Patent and its associated pediatric exclusivity from making, using, selling, or offering for sale in the United States, or importing into the United States, the darunavir tablets described in the Lupin ANDA, ANDA 202073, or any darunavir product that includes darunavir ethanolate in a darunavir/ethanol ratio of approximately 1:1 or any colorable variation thereof.

2

It is further **ORDERED** that:

8) Mylan and Lupin's motion for judgment on partial findings of no remedy, ECF No. 841, is **DENIED**; and

9) Lupin's motion for judgment on partial findings of invalidity due to lack of enablement of claim 1 of the '015 Patent, ECF No. 843, is **DENIED**.

It is further **ORDERED** that:

The Opinion in this matter shall be temporarily filed under seal. The parties must notify the Court by August 28, 2014 of any objections to the Opinion being unsealed. If no objections are received, the Opinion will be unsealed.

> **/s/ William H. Walls**
> United States Senior District Judge

**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JANSSEN PRODUCTS, L.P., et al., | : |
| Plaintiffs, | : **OPINION** |
| v. | : Civ. No. 2:10-cv-05954 (WHW) |
| LUPIN LIMITED, et al., | : **FILED UNDER SEAL** |
| Defendants. | : |

**Walls, Senior District Judge**

By complaints, Plaintiff patent-holders and drug-makers have sued Defendant generic drug manufacturers for alleged infringements of patents on a chemical compound used in the manufacture of Plaintiff's product, Prezista. The patents, for this opinion, are U.S. Patent No. 7,700,645 B2 (the "'645 Patent"), U.S. Patent No. 7,126,015 B2 (the "'015 Patent"), and U.S. Patent No. 7,772,411 B2 (the "'411 Patent").

Prezista is an ethanolate form of the chemical compound named darunavir. The '015 Patent claims processes for manufacturing a chemical structure or moiety, bis-THF, that is part of the darunavir molecule. The '411 Patent is directed to a process for manufacturing darunavir in Prezista and Defendant Mylan's generic version. The '645 Patent claims the ethanolate form that Plaintiff Janssen developed and sells as Prezista.

Earlier summary judgment motion practice by the parties caused the Court to determine that:

1

**FOR PUBLICATION**

    1) Janssen's motion for summary judgment of infringement of the '411 Patent against
        Mylan was granted.

    2) Janssen's motion for summary judgment on the validity of the '645 Patent was
        denied.

    3) Janssen's motion for summary judgment of infringement of the '015 and '408 Patents
        was granted in part and denied in part: the Court found that Lupin infringed certain
        claims of the '015 Patent, including asserted claim 1.

    4) Teva's motion for summary judgment of non-infringement of the '645 Patent was
        denied.

    5) Mylan's motion for summary judgment of non-infringement of the '645 Patent was
        denied.

    6) Lupin's and Teva's motion for summary judgment of non-infringement of the '015
        and '408 Patents was denied.

Before trial, Teva and Janssen resolved their dispute, and the '408 Patent is no longer at
issue.

A bench trial has been held on the remaining matters: the validity of the patents—as to
Lupin, claim 4 of the '645 Patent and claim 1 of the '015 Patent, and as to Mylan, claim 13 of the
'411 Patent.

This Opinion will be based and concentrated on what the Court has found to be material
and supportive facts necessary to answer the primary question: Did either Defendant prove
invalidity of a patent-in-suit by clear and convincing evidence?

To find the answer(s), the Court has reviewed the relevant evidence adduced at trial, aided
by recollection, notes, trial transcripts, and the parties' proposed findings of fact. The Court has
evaluated the credibility of all witnesses, lay and expert, testing not only what the person said, but

2

**FOR PUBLICATION**

how it was said and what was not said, against these criteria: Was this more likely so or not? Did what was said make sense in the totality of the circumstances? Was this, after all, clearly convincing to the fact finder?

To its chagrin, the Court has determined that expert witnesses, though not all, called by the defense were more interested in obfuscation than in helping the Court as a fact finder "seek the truth." Too often—and too repeatedly—the Court had to importune and finally direct certain defense witnesses to directly answer questions posed. The trial transcripts will identify these persons as Dr. Trevor Laird and Dr. Michael Zaworotko. *See, e.g.*, Laird Tr. 1450:20-1451:5, 1486:23-1487:10, 1488:5-22; Zaworotko Tr. 1650:16-19, 1684:5-24, 1712:18-19. Ironically, such representatives of science were more interested in evasion than intellectual candor. As to their testimony, the Court as fact finder invokes *falsus in uno, falsus in omnibus*. Each did the cause of his particular Defendant no good.

In challenging the patents' validity, Defendants face a heavy burden. By statute, issued patents are "presumed valid," 35 U.S.C. § 282 (2012), and Defendants must overcome that presumption by clear and convincing evidence. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012). "Clear and convincing evidence is such evidence that produces 'an abiding conviction that the truth of [the] factual contentions are highly probable.'" *Id.* (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

The Court finds that neither Defendant met its obligation to overcome the presumption of validity of the patents-in-suit by clear and convincing evidence.

## I. Findings of Fact

To the extent any finding of fact reflects a legal conclusion, it shall be to that extent deemed a conclusion of law, and vice versa.

3

**A00006**

**FOR PUBLICATION**

> A. Background

>> i. The patents at issue

On October 24, 2006, the Patent and Trademark Office ("PTO") issued the '015 Patent, entitled "Method for the Preparation of Hexahydro-furo-[2,3-b]furan-3-ol." Pre-Trial Order at 12, ¶ 34. Lupin does not contest—for the purposes of this litigation only—that the '015 Patent has a priority date of September 10, 2001, nor that Janssen R&D Ireland holds title to the '015 Patent. *Id.* at 12, ¶¶ 35, 36. Janssen is asserting claim 1 of the '015 Patent against Lupin. *Id.* at 12, ¶ 37.

On August 10, 2010, the PTO issued the '411 Patent, entitled "Process for the Preparation of (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl(1S,2R)-3-[[(4-aminophenyl) sulfonyl](isobutyl) amino]-1-benzyl-2-hydroxypropylcarbamate." *Id.* at 13, ¶ 44. Mylan does not contest—for the purposes of this litigation only—that the '411 Patent has a priority date of December 23, 2003, nor that Janssen R&D Ireland holds title to the '411 Patent. *Id.* at 13, ¶¶ 45, 46. Janssen is asserting claim 13 of the '411 Patent against Mylan. *Id.* at 13, ¶ 47.

On April 20, 2010, the PTO issued the '645 Patent, entitled "Pseudopolymorphic Forms of a HIV Protease Inhibitor." *Id.* at 11, ¶ 29. Lupin does not contest—for the purposes of this litigation only—that the '645 Patent has a priority date of May 16, 2002, nor that Janssen R&D Ireland holds title to the '645 Patent. *Id.* at 11, ¶¶ 30, 31. Janssen is asserting claim 4 of the '645 Patent against Lupin. *Id.* at 11, ¶ 32.

>> ii. Prezista (darunavir)

Janssen Products, L.P. is the holder of approved New Drug Application ("NDA") No. 21-976 for Prezista (darunavir). Janssen manufactures, markets and sells Prezista, a human immunodeficiency virus (HIV-1) protease inhibitor. *Id.* at 9, ¶¶ 14, 15. The FDA has approved Prezista for the treatment of HIV-1 infection in adult patients and in pediatric patients 3 years of

4

**A00007**

**FOR PUBLICATION**

age and older. *Id.* at 9, ¶ 16. The active pharmaceutical ingredient in Prezista is darunavir in an

ethanolate form. *Id.* at 9, ¶ 17. Prezista tablets are currently sold in the United States in 75 mg, 150

mg, 400 mg, 600 mg, and 800 mg dosage strengths. *Id.* at 9, ¶ 18. The '645 Patent is listed in an

FDA publication entitled Approved Drug Products with Therapeutic Equivalence Evaluations

(known as the "Orange Book") with respect to Prezista. *Id.* at 9, ¶ 20.

### iii. The ANDAs

On June 23, 2010, Mylan filed ANDA No. 202136 with the FDA, seeking approval to sell

darunavir tablets, 75 mg, 150 mg, 300 mg, 400 mg, and 600 mg, described in the ANDA. *Id.* at 9,

¶ 21.

On June 23, 2010, Lupin filed ANDA No. 202073 with the FDA seeking approval to sell

darunavir tablets, 400 mg and 600 mg, described in the ANDA. On June 3, 2011, Lupin amended

its ANDA No. 202073 to incorporate additional strengths of 75 mg, 150 mg, and 300 mg. *Id.* at

10, ¶¶ 23-24.

### iv. Claim construction

In its *Markman* opinion, the Court construed "solvate" in the asserted claims of the '645

Patent to mean "a crystal form that contains stoichiometric or non-stoichiometric amounts of

solvent." ECF No. 477 at 5; Pre-Trial Order at 13, ¶ 48. The Court also construed the term

"compound of formula (6)" in the asserted claims of the '411 Patent as "darunavir," or the graphic

depiction of darunavir. *Markman* Op. at 11; Pre-Trial Order at 13-14, ¶ 49.

### B. The '015 Patent

#### i. The invention and the claim at issue

The invention of the '015 Patent "relates to a method for the preparation of

[bis-THF] . . . ." Defendants' Trial Exhibit ("DTX") 7 ('015 Patent) at col. 1:12-14. The

A00008

**FOR PUBLICATION**

specification states that bis-THF "is an important pharmacological moiety present in the structure

of retroviral protease inhibitors . . . ." *id.* at col. 1:18-24, and identifies and incorporates by

reference the European versions of G.D. Searle & Co.'s ("Searle") darunavir patent,[1] *id.* at col.

1:18-24. It recommends bis-THF as having "particular interest" for use in darunavir. *Id.* at col.

28:24-31; col. 28:37-40.

The specification also indicates that the "main object of the . . . ['015] invention is to

provide an improved method for producing [bis-THF] when compared to the art-known methods

and their drawbacks." *Id.* at col. 2:25-28. "[A]nother object" of the '015 Patent is "to provide a

method for the synthesis of [bis-THF] which is suitable for industrial scaling-up." *Id.* at col. 2:28-

30.

Claim 1 of the '015 Patent, which is being asserted against Lupin, recites:

A method for the synthesis of hexahydro-furo[2,3-b]furan-3-ol of formula (7)
starting from an intermediate of formula (1) . . . transforming said intermediate of
formula (1) into a nitromethane derivative of formula (3) . . . subsequently
transforming said nitromethane derivative into a tetrahydrofuran derivative of
formula (6) . . . and then transforming the intermediate of formula (6) into
hexahydro-furo[2,3-b]furan-3-ol of formula (7) by way of an intermolecular
cyclisation reaction.

*Id.* at col. 38:44-39:40.

ii. Development of the '015 Patent invention

Tibotec, later acquired by Johnson & Johnson in 2002, Stoffels Tr. 98:18-21; 99:1-4, began

considering compounds containing bis-THF for possible use as protease inhibitors, and

immediately recognized the difficulty of synthesizing bis-THF. Reider Tr. 2004:17-23. The bis-

---

[1] After discovering that certain compounds of interest were of a family of compounds covered by
patents owned by Searle, Tibotec approached Searle and obtained a license to use the compounds
that Searle had discovered, including darunavir, in further research and development efforts.
Stoffels Tr. 89:22-25, 90:20-91:8.

6

**FOR PUBLICATION**

THF molecule has a double-ring structure, with three "chiral centers," also known as "stereocenters" or "optical centers." DTX 7 ('015 Patent) at col. 9:21-28. The three chiral centers made bis-THF an "incredibly complex" molecule that presented a "formidable challenge" to synthesize. Reider Tr. 2004:17-23; *see also id.* 2008:23-2009:3; Ganem Tr. 1159:11-15. Tibotec initially explored whether it could avoid the problem by replacing bis-THF with a different chemical group that would have similar benefits but would be easier to synthesize. Wigerinck Tr. 186:19-188:5; *see generally* Plaintiff's Trial Exhibit ("PTX") 346 (Laboratory Notebook 37); PTX 351 (Tibotec Feb. 2001 Powerpoint) at PREZ04980686. Tibotec made and tested many compounds containing alternatives to bis-THF but none of the compounds had activity comparable to the compounds with bis-THF. Wigerinck Tr. 190:17-191:10, 200:12-20; PTX 351 (Tibotec Feb. 2001 Powerpoint) at PREZ04980686. After concluding that bis-THF was a "special and crucial" component for the design of protease inhibitors, Tibotec began developing a process for making bis-THF that could be used for synthesis on an industrial scale. Wigerinck Tr. 191:11-17.

Tibotec began working on this scalable synthesis for bis-THF in May 1999. *Id.* at 238:22-239:9. The work done over the next two years, including attempting more than twenty methods for making bis-THF before selecting the route claimed in the '015 Patent, is summarized in a progress report that Tibotec prepared in October 2000. *Id.* at 257:7-258:14; PTX 404 (Tibotec Progress Report). Initially, Tibotec tried the synthesis that was favored in the prior art, i.e., starting with a compound known as dihydrofuran, essentially the "left ring" of bis-THF's double ring, and proceeding from there to build the right-hand ring. Wigerinck Tr. 239:24-241:12, 258:15-259:10. This strategy was described, *inter alia*, in the earliest prior art synthesis of bis-THF, the Pezechk 1986 Article (PTX 391), and in multiple references by Dr. Arun Ghosh, one of the pioneers to use bis-THF as part of an HIV protease inhibitor, including Scheme 2 of the Ghosh 1996 Article (PTX

7

**FOR PUBLICATION**

389). *See* Wigerinck Tr. 239:24-241:12, 243:2-7. At trial, the experts from both sides agreed that

starting with bis-THF's left-hand ring was a logical strategy. *See* Reider Tr. 2009:21-2010:16 ("the

literature taught that this is a great place to start"); Ganem Tr. 1204:2-5 (agreeing that this is a

"reasonably straightforward way[ ] of thinking about how to make a two-ring bicyclic structure").

However, when Tibotec used this strategy, it encountered a problem with a step in the

synthesis described in the Pezechk 1986 Article and the Ghosh 1996 Article. Both methods used

ozonolysis, a reaction step using ozone, with which Tibotec and the prior art had not had a problem

on a laboratory scale. Wigerinck Tr. 243:15-244:4; Ganem Tr. 1207:19-24. But Tibotec found that

when it attempted the ozonolysis step on a larger scale, the reaction would generate smoke, even

after stopped, which suggested that the reaction could not be controlled and had the potential to

explode. Wigerinck Tr. 243:15-245:13.

In the end, none of the routes that Tibotec explored starting with bis-THF's left-hand ring

proved satisfactory. *See* PTX 404 (Tibotec Progress Report) at PREZ05110825-26.

Tibotec also explored several routes that started with bis-THF's right-hand ring and then

built the molecule's left ring. Unlike dihydrofuran, the right hand ring was not commercially

available, "so that made the route more complex." Wigerinck Tr. 259:20-260:11; *see* PTX 404

(Tibotec Progress Report) at PREZ05110827-32. None of these efforts succeeded. *Id.*

Finally, Tibotec explored the use of starting materials that had neither of bis-THF's rings

and thus entailed creating both rings. Wigerinck Tr. 260:14-25; PTX 404 (Tibotec Progress

Report) at PREZ05110833-42. The scientists at Tibotec, including Dr. Wigerinck, "did not expect

[this concept] to work." Wigerinck Tr. 260:14-25. Creating both rings from scratch was the

approach that Dr. Ghosh had used in his initial synthesis of bis-THF for Merck in the early 1990s—

an approach that Merck had rejected as unduly complicated: Dr. Ghosh believed "nobody in [his]

8

**FOR PUBLICATION**

right mind would launch a project based upon this literature of bis-tetrahydrofuran, when they see the synthesis [is] so complex." Tr. 2457:24-2458:2. Tibotec failed in its efforts to reproduce the process that Dr. Ghosh had used, Wigerinck Tr. 241:24-242:8, but developed different routes which also involved creating both rings from scratch.

The route that Tibotec ultimately adopted and claimed in the '015 Patent was described in the October 2000 Progress Report as Route 4.1. PTX 404 (Tibotec Progress Report) at PREZ05110833-39; Ganem Tr. 1211:2-8. This route starts with an "open chain molecule," Reider Tr. 2011:14-17, with chirality built in. The starting material is a "protected glyceraldehyde" known as glyceraldehyde acetonide, and Tibotec referred to this route internally as the "glyceraldehyde acetonide" or "protected glyceraldehyde" route. PTX 404 (Tibotec Progress Report) at PREZ05110833; Wigerinck Tr. 260:14-261:4. The protected glyceraldehyde is referred to in the '015 Patent as compound (1). *See* DTX 7 ('015 Patent) at col. 2:50-65.

Tibotec recognized that the protected glyceraldehyde route was problematic in several respects. Glyceraldehyde acetonide was not commercially available; "you can't buy it." Wigerinck Tr. 202:20-203:17. It was also unstable and could not be stored for long periods of time. *Id.*; Ganem Tr. 1211:9-1212:2. In addition, glyceraldehyde acetonide "has the chirality in it from the very beginning at the center," which complicates the synthesis. Reider Tr. 2012:8-24.

Despite the complexity of the protected glyceraldehyde route, Tibotec came to recognize that it was "the best route from both an economic and a technical viewpoint," PTX 396 (E-mail from M. Lubben dated May 22, 2001) at PREZ05001242-43; Wigerinck Tr. 261:24-262:25. Tibotec selected this route for its commercial process and uses it to this day. Reider Tr. 2025:1-15. The "protected glyceraldehyde route" is described and claimed in the '015 Patent, and it is the subject of claim 1 of the '015 Patent.

9

**FOR PUBLICATION**

Lupin uses the claim 1 method to make bis-THF for use as a component of its ANDA products. This Court has granted summary judgment that Lupin's importation or sale of darunavir containing bis-THF made by that method would infringe claim 1 of the '015 Patent. Summ. J. Op. at 49-59 (ECF No. 769).

    C. The '411 Patent

        i. The invention and the claim at issue

The '411 Patent has a priority date of December 23, 2003, the latest of the three patents at issue in this litigation. Pre-Trial Order at 13; DTX 13 ('411 Patent) (cover). The '411 Patent discloses the full "suite" of Tibotec's darunavir patents, "bring[ing] all the pieces together" and enabling production of the darunavir molecule as a pharmaceutically acceptable drug capable of being manufactured on an industrial scale. Reider Tr. 1990:22-1991:19, 2035:5-12.

Asserted claim 13 of the '411 Patent depends from claim 2, which in turn depends from claim 1. The claim requires a five-step process for synthesizing darunavir. Independent claim 1 recites a four-step synthesis of the right-hand sulfonamide component of the darunavir molecule (referred to in the patent as the "compound of formula (5)"). The third step is "(iii) reducing the nitro moiety of the resultant compound of step (ii)," and the separate fourth step is "(iv) deprotecting the resultant compound of step (iii)." DTX 13 ('411 Patent) at col. 23:45-48. The fifth and final step involves coupling the compound of formula (5) to a bis-THF derivative to form darunavir. *Id.* at col. 23:48-51; Reider Tr. 2035:20-2036:5; Laird Tr. 1460:23-1461:8.

Claim 2, which depends from claim 1, adds a requirement for a "tert-butoxycarbonyl," or "boc" protecting group to be used in the chemical intermediates of claim 1.[2] DTX 13 ('411 Patent)

---

[2] A protecting group protects part of the molecule from unwanted reactions while other parts of the molecule are being worked on. Reider Tr. 2038:20-2039:10.

A00013

**FOR PUBLICATION**

at col. 23:52-25:3; Reider Tr. 2051:5-25. The boc protecting group is one of many possible protecting groups, DTX 13 ('411 Patent) at col. 6:27-67, and before the '411 Patent, had never been used in the synthesis of darunavir, Reider Tr. 2051:7-12.

Claim 13, which depends from claim 2, identifies a specific coupling agent, BNPC, for use in the final step of the process in which the bis-THF moiety is coupled with the sulfonamide moiety to form darunavir. *Id.* at 2054:4-9; DTX 13 ('411 Patent) at col. 26:10-13.

ii. Development of the '411 Patent invention

The invention of the '411 Patent is a method for making darunavir by making the sulfonamide, or "right-hand side" of the darunavir molecule, and then coupling the sulfonamide with the left-hand bis-THF to form the completed darunavir molecule. Reider Tr. 1991:15-19. The inventors of the '411 Patent did not set out to create a new manufacturing process for darunavir. Wigerinck Tr. 176:19-177:8. Rather, they expected to use the process developed by Searle that Searle had granted Tibotec a license to use under Searle's '775 Patent, which discloses a commercially suitable method of manufacturing darunavir. *Id.*; Stoffels Tr. 90:23-91:8. Searle had successfully manufactured approximately 100 kilograms of a starting material suitable to make the right-hand sulfonamide component of darunavir. They transferred that material to Tibotec where the Tibotec inventors initially worked with it. Wigerinck Tr. 281:5-282:2. This starting material had a "dibenzyl" protecting group. *Id.*

Tibotec recognized that Searle's dibenzyl-protected starting material provided an "attractive" and "short synthesis route" for making darunavir. *Id.* at 281:5-282:2. Specifically, the Searle dibenzyl route allowed two chemical transformations—the "reduction" and "deprotection" transformations—to be consolidated into a single step, thus saving time and expense. *Id.* at 282:22-283:6. However, Tibotec "unexpectedly" experienced "big, big problems" with the Searle dibenzyl

11

A00014

**FOR PUBLICATION**

route. *Id.* at 282:3-16. The route had a tendency to "poison" the palladium catalyst used in the

hydrogenation step used for deprotecting, or removing, the dibenzyl protecting group. *Id.* at 282:3-

18, 284:9-285:17. Catalyst poisoning refers to the tendency of certain contaminants to bind to the

catalyst instead of the desired chemical compound. Reider Tr. 2046:1-16. This slows down the

reaction, leading to high levels of impurities and the need for excessive amounts of the palladium

catalyst, a precious metal "more expensive than gold." Wigerinck Tr. 283:23-284:8, 285:10-17;

PTX 374 (ChemShop Project Report) at PREZ04997815.

In addition to catalyst poisoning, Tibotec experienced safety issues with the Searle dibenzyl

route, specifically serious exothermic reactions that suddenly released heat and had the potential

to cause a "runaway" reaction and explosions. Wigerinck Tr. 283:7-20.

The Searle '775 Patent also taught the use of a different protecting group, the benzyloxy

carbonate, or CBZ, protecting group. Reider Tr. 2039:17-21. Tibotec considered using CBZ

instead of dibenzyl, but did not pursue this option because the two protecting groups were removed

"in an identical way" and Tibotec "would be facing the same difficulties" as it had with the

dibenzyl-protected process. Wigerinck Tr. 287:14-19.

Eventually Tibotec concluded that it could solve the problems it had identified only by

giving up the major advantage of the Searle route, which was performing reduction and

deprotection simultaneously in one step. Tibotec separated these into two separate steps, which

increased cost and lengthened the time of production. *Id.* at 282:22-283:6. Tibotec accomplished

the separation of the deprotection and reduction steps by replacing the dibenzyl protected starting

material with a "boc" protected starting material. *Id.* at 285:18-286:2. Unlike the dibenzyl group,

the boc protecting group did not require a catalyzed hydrogenation reaction for deprotection, and

12

**FOR PUBLICATION**

as a result, Tibotec could better control the reaction that had previously led to an exotherm and poisoned catalyst. *Id.*

In addition to building the sulfonamide, the '411 Patent covers the final process step in which bis-THF is attached to the rest of the darunavir molecule—the "coupling" step. Tibotec also sought to improve this step. As discussed, bis-THF is separately manufactured by the process claimed in the '015 Patent. DTX 13 ('411 Patent) at col. 15:4-6. Then it is coupled to the sulfonamide, or right-hand side of the molecule, which is called the compound of formula (5) in the '411 Patent. *Id.* at col. 15:6-10; 16:26-48. This coupling step requires a coupling agent, which activates the bis-THF so that the coupling reaction can take place. Reider Tr. 2035:24-2036:12. Tibotec first tried disuccinimidyl carbonate ("DSC") as a coupling agent, but was dissatisfied and searched for years for a better option; it even hired an independent laboratory, Carbogen, to study alternatives to DSC. Wigerinck Tr. 295:5-21; PTX 434 (Carbogen Process Research Report) at PREZ5073327. Carbogen concluded that "commercially available alternative coupling agents with promising reactivity were not uncovered." PTX 434 (Carbogen Process Research Report) at PREZ5073327.

Tibotec continued to experiment, and two years later, discovered the bis-(4-nitrophenyl) carbonate, or BNPC, coupling agent recited in claim 13 of the '411 Patent. PTX 433 (Chem-Pharm Team Meeting Minutes) at PREZ05041021. Tibotec claimed the BNPC coupling agent in the '411 Patent. DTX 13 ('411 Patent) at col. 26:10-13.

Before trial, the Court granted summary judgment to Janssen that Mylan infringes claim 13 of the '411 Patent. Summ. J. Op. at 5-8.

13

A00016

**FOR PUBLICATION**

      D. The '645 Patent

         i. The invention and the claim at issue

The invention of the '645 Patent is the ethanolate form of the drug that Janssen developed and sells as Prezista. Asserted claim 4 is a dependent claim that depends from claim 3. Claim 3 recites "[a] composition comprising an ethanolate solvate of the compound [darunavir], in which the ratio of compound to ethanol is about 1:1, and an inert carrier." PTX 1 ('645 Patent) at col. 30:35-40. Claim 4 recites "[t]he composition of claim 3 wherein the inert carrier is a pharmaceutically acceptable carrier." *Id.* at col. 30:41-42.

         ii. Development of the '645 Patent invention

When Tibotec initially synthesized darunavir, the compound was in the form of a "sticky oil," which Tibotec could not use for development or testing. Wigerinck Tr. 303:16-22; 304:19-305:1. Tibotec set out to transform the "sticky oil" formulation of darunavir into a solid powder form. *Id.* at 299:24-300:5, 303:16-22. Initially, Tibotec tried making salt forms of darunavir, as salts are common for pharmaceuticals (approximately half of all marketed pharmaceuticals are salts) since they typically have good solubility, which allows them to dissolve in the body. *Id.* at 300:18-301:8; Myerson Tr. 638:18-639:6; Gould Tr. 1291:4-6, 1291:23-24. Tibotec created and tested multiple salt forms, and while the salt forms of darunavir could have been used and delivered inside a capsule, Tibotec determined that they were not optimal. Wigerinck Tr. 301:9-16, 335:9-11; Reider Tr. 2080:19-2081:5.

Tibotec also made prodrugs of darunavir, Wigerinck Tr. 300:18-21, 301:17-202:15, but rejected that formulation because it was "quite complex to make." *Id.* at 303:11-15.

After rejecting both salts and prodrug formulations of darunavir, Tibotec sought a different formulation, and to assist in this effort it hired ChemShop, a laboratory which had expertise in

14

**FOR PUBLICATION**

making solid forms of pharmaceutical substances. *Id.* at 284:15-17, 303:16-24, 306:14-24. ChemShop found that making a solid powder form of darunavir was "unexpectedly difficult," *id.* at 303:16-24, and did not succeed in crystallizing darunavir from any solvent, *id.* at 306:14-24. After ChemShop's failure, Dr. Wigerinck brought the project back in-house at Tibotec where the Tibotec chemists repeated the crystallization experiments that ChemShop had performed, but again failed. *Id.* at 303:24-304:4. After that, over the course of several weeks, Dr. Wigerinck had each of Tibotec's 20 chemists perform two crystallization experiments a day, one in the morning and one in the afternoon, so that in total Tibotec was performing "more than 40 experiments a day, just to try to convert the sticky oil to a white powder." *Id.* at 304:5-11. In these experiments, Tibotec used many different solvents, including ethanol, and a variety of other conditions. *Id.* at 307:12-18, 311:9-16. Tibotec failed to obtain a crystalline powder form of darunavir from ethanol. *Id.* at 311:9-13.

When these efforts failed, Dr. Wigerinck instructed his scientists to employ a "scratching" technique to try to "obtain a first crystal" of darunavir. *Id.* at 304:5-18, 307:22-25. The technique is "long-known" in the art for trying to create a crystalline form of a compound. Zaworotko Tr. 1614:9-13. In these experiments, Tibotec continued to vary the solvents, anti-solvents, temperatures ("25 degrees, 60 degrees, 80 degrees"), purification methods, and even the rates of scratching. Wigerinck Tr. 319:1-322:12. Eventually, using isopropanol as a solvent, Tibotec discovered conditions that would make a powder—a relatively pure crystalline form of darunavir. *Id.* at 323:21-325:1; PTX 344 (Vergouwen Laboratory Notebook) at PREZ0007450; DTX 2088 (Translation of PTX 344); Wigerinck Tr. 532:10-533:19, 536:7-16.

This crystalline material that Tibotec had made turned out to be a solvate—a crystal in which the solvent is part of the crystal. Myerson Tr. 570:23-571:3. This was not what Tibotec had

15

A00018

**FOR PUBLICATION**

hoped for, as solvates are "not that easy to handle" and "are not ideal because they can have limited stability." Wigerinck Tr. 178:11-13, 299:21-23, 332:14-15, 494:19-21.

The solvate from isopropanol was also problematic because there were unacceptable amounts of isopropanol sticking to the powder. *Id.* at 325:15-326:5. Using an isopropanol solvate can present a "toxicity issue" and the amount of isopropanol in the resulting solvate was "above what a person [should] ingest." Myerson Tr. 589:4-13. To solve this problem, Tibotec tried recrystallizing the isopropanol solvate in an ethanol/water mixture, but the results were still unsatisfactory. Tibotec then repeated the dissolution and re-crystallization steps a second time on the resulting powder, this time using pure ethanol as a solvent. Wigerinck Tr. 324:22-328:1; PTX 377 (Tibotec Research Information Report) at PREZ05002056. This entire process took Tibotec six weeks. Wigerinck Tr. 326:6-328:1.

Using this three-step crystallization procedure, Tibotec was able to make an ethanolate where the ratio of darunavir to ethanol in its ethanolate was about 1:1. PTX 377 (Tibotec Research Information Report) at PREZ05002056; Wigerinck Tr. 332:7-18, 327:1-328:1. The three-step process is described in the specification of the '645 Patent as Example 1. DTX 1 ('645 Patent) at col. 15:49-67; Myerson Tr. 588:4-590:9; Zaworotko Tr. 1713:22-1714:3.

After creating an ethanolate of darunavir, Tibotec continued to search for a solid form of darunavir that would not be a solvate. Wigerinck Tr. 332:7-333:16. Tibotec commissioned a study by a third-party contractor to "obtain [darunavir] in a non solvated form," but its efforts were unsuccessful. PTX 356 (Solvias Polymorphism Study Report) at PREZ0497447-8; Wigerinck Tr. 333:3-16, 334:25-335:11. Tibotec was never able to find a better formulation than darunavir ethanolate. Wigerinck Tr. 335:9-11.

16

**FOR PUBLICATION**

Before trial, Lupin entered into a so-ordered stipulation stating that it does not dispute infringement of the asserted claims of the '645 Patent (including claim 4) and that "a judgment of infringement will be entered against Lupin" as to "any of the Asserted Claims [that] are not invalid . . . ." ECF No. 375.

## II. Conclusions of Law

### A. Legal Standards for Obviousness, Enablement and Written Description

Under the patent statute, a "patent is presumed to be valid, 35 U.S.C. § 282 (1994), and this presumption can only be overcome by clear and convincing evidence to the contrary." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).

"[O]bviousness is ultimately a question of law . . . ." *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 990 (Fed. Cir. 2009); 35 U.S.C. § 103. That "legal question" is "based on underlying factual determinations," *Unigene Labs., Inc. v. Apotex*, 655 F.3d 1352, 1360 (Fed. Cir. 2011), which include: "1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the claimed invention and the prior art; and 4) evidence of secondary factors, also known as objective indicia of nonobviousness." *Id.* (listing what are called the "*Graham* factors" from *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). "Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination." *Id.* (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)). "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.* Obviousness is judged from the perspective of a hypothetical person of ordinary skill in the art, who is "a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.

17

**FOR PUBLICATION**

In addition, an "obviousness determination requires that a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1069 (Fed. Cir. 2012) (citation omitted). Courts must be aware of the "danger of hindsight bias" in an obviousness analysis. *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1320 (Fed. Cir. 2004); *see also KSR*, 550 U.S. at 421; *Graham*, 383 U.S. at 36; *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011).

Challenges to validity based on inadequate written description and enablement require resolution of facts. *See Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1318 (Fed. Cir. 2013); *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013). The written description requirement is satisfied if the patent specification "clearly allow[s] a person of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011). The enablement requirement "is met when at the time of filing the application one skilled in the art, having read the specification, could practice the invention without 'undue experimentation.'" *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013) (citation omitted). To satisfy the enablement requirement a patent does not need to describe what was known in the art. *Epistar Corp. v. ITC*, 566 F.3d 1321, 1336-37 (Fed. Cir. 2009).

B. The '015 Patent

i. Obviousness

1. Level of Ordinary Skill in the Art

Janssen and Lupin offered separate definitions for a person having ordinary skill in the art. Dr. Paul Reider, on behalf of Janssen, said that a person of ordinary skill in the art would have had

18

**FOR PUBLICATION**

a master's degree in chemistry and several years of laboratory experience. Reider Tr. 2003:4-7.

Dr. Bruce Ganem, on behalf of Lupin, opined that a person of ordinary skill in the art would have

a Ph.D. in chemistry and work experience in the pharmaceutical industry specifically directed to

synthetic chemistry. Ganem Tr. 1001:10-16, 1003:15-1004:12. The Court finds that either of these

definitions is satisfactory and that regardless of which is chosen, the analysis herein would be the

same. Dr. Reider and Dr. Ganem each stated that their opinions on validity did not depend on the

definition of the level of ordinary skill in the art and would be the same under either side's

definition. Reider Tr. 2003:17-20; Ganem Tr. 1006:11-14. The Court adopts Dr. Reider's broader

definition of a person of ordinary skill in the art which the trial evidence has shown to be

pragmatically realistic.

### 2. Scope and Content of the Prior Art

Under *Graham*, the Court must define the scope and content of the prior art as of September

10, 2001, the priority date of the '015 Patent. Pre-Trial Order ¶ 35. A reference qualifies as prior

art for an obviousness determination under 35 U.S.C. § 103 only when it is analogous to the

claimed invention. *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1321 (Fed. Cir.

2011). "Two separate tests define the scope of analogous prior art: (1) whether the art is from the

same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within

the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the

particular problem with which the inventor is involved." *In re Bigio*, 381 F.3d 1320, 1325 (Fed.

Cir. 2004). "A reference is reasonably pertinent if, even though it may be in a different field from

that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically

would have commended itself to an inventor's attention in considering the problem." *In re Clay*,

966 F.2d 656, 659 (Fed. Cir. 1992).

19

**FOR PUBLICATION**

Janssen identifies seven prior art references that describe methods of making bis-THF:

**The Pezechk 1986 Article (PTX 391):** This article describes a method for synthesizing bis-THF that starts with dihydrofuran, an achiral cyclic compound virtually identical to the left-hand ring in bis-THF's double-ring structure. PTX 391 at PREZ05017244-45.

**The Ghosh 1994 Article (DTX 91):** This article "touts bis-THF" for use as a component for analogs of a protease inhibitor known as saquinavir. Ganem Tr. 1217:15-18, 1196:4-8; DTX 91 at PREZ05005264. The method described, developed by Merck, starts with diethyl malate, a linear, open chain (non-ring) structure with a chiral center. DTX 91 at PREZ05005263; Ganem Tr. 1159:16-22.

**The Ghosh 1995 Article (PTX 222):** In this 1995 article, Dr. Ghosh adopted the approach that Pezechk advocated earlier and synthesized bis-THF by starting with dihydrofuran and constructing only a second ring. PTX 222 at 507; Ganem Tr. 1117:11-16.

**The Ghosh 1996 Article (PTX 389):** This article describes two methods for making bis-THF. Scheme 1 is the diethyl malate route previously disclosed in the Ghosh 1994 Article. PTX 389 at PREZ04989981; Ganem Tr. 1159:16-22. Scheme 2 starts with dihydrofuran and is similar to the route described in the Ghosh 1995 Article. PTX 389 at PREZ04989981.

**U.S. Patent No. 7,470,506 (PTX 35):** The '506 Patent was filed in 1998. Dr. Erickson is the first named inventor and Dr. Ghosh is one of three co-inventors. Like the Pezechk 1996 Article and various articles by Dr. Ghosh, the '506 Patent teaches a synthesis that starts with dihydrofuran. PTX 35 at Fig. 2.

**The Ghosh 1999 Article (PTX 392):** This 1999 article also uses dihydrofuran as a starting point, with certain improvements in the method described in Dr. Ghosh's earlier articles. PTX 392 at PREZ05142935.

20

A00023

**FOR PUBLICATION**

**The Uchiyama 2001 Article (DTX 790):** The route described in this article also starts with dihydrofuran. DTX 790 at 4654-55.

Based on these references, Janssen argues that the prior art taught that a method using bis-THF's left-hand ring as a starting point was desirable, *see* PTX 222 (Ghosh 1995 Article) at 506 (describing the method as "convenient," "efficient," and "operationally simple"), and that nothing in any prior art reference suggested that this method had any drawbacks or disadvantages. Janssen asserts that the method of claim 1 of the '015 Patent is not identified anywhere in the bis-THF prior art, and that to find prior art that describes these steps of the '015 Patent's method (involving a protected glyceraldehyde, nitromethane, and the use of a Michael addition reaction and a Nef reaction—reactions used in the claimed method of the '015 Patent), Lupin had to go outside the relevant art and turn to references that do not relate to protease inhibitors in general or to bis-THF in particular.

Lupin argues, however, that a person of ordinary skill in the art would have been motivated to devise an improved synthesis of bis-THF in view of the known drawbacks of prior art syntheses, and that a person of ordinary skill in the art would have been motivated to apply retrosynthetic analysis in order to find an improved synthesis route. Retrosynthetic analysis is a technique originally developed by Nobel laureate Dr. Elias Corey. Ganem Tr. 1011:10-13; *see generally* DTX 1400 (Corey 1967); DTX 1399 (Corey 1975). The technique involves developing a synthetic scheme by working backwards from a target molecule and in an iterative manner breaking strategic bonds in order to identify a simpler compound. The goal of the technique is to get to a starting material that is commercially available or could be easily prepared from the literature along with a set of well-known or otherwise established reactions that then may be used in the forward direction to synthesize the target molecule. Ganem Tr. 1009:4-12, 1013:22-1014:5; Reider Tr.

21

**FOR PUBLICATION**

2138:24-2139:15; DTX 1399 (Corey 1975) at 6117; DTX 1400 (Corey 1967) at 19-21. According

to Lupin, a person of ordinary skill in the art applying retrosynthetic analysis would have been led

to prior art identifying key starting materials, intermediates and the Michael addition reaction using

nitromethane suitable in devising a bis-THF synthetic scheme. In particular, Lupin identifies four

references that it argues should be considered prior art, summarized below:

**The Patrocinio 1994 and Costa 1997 Articles (DTX 792A and DTX 793A):** These

articles are two publications from the same laboratory that describe the same study, with Costa

providing additional detail. Reider Tr. 2022:2-13. These references identify a protected

glyceraldehyde (a synthetically useful chiral building block easily obtained from inexpensive D-

(+)-mannitol) and the use of a Michael addition reaction using nitromethane as a reagent for the

transformation of compound (1) to compound (3). Ganem Tr. 1087:2-1088:12.

**The Seebach 1979 and Rosini 1988 Articles (DTX 794A and DTX 795A):** These

articles, specifically referred to in the Patrocinio 1994 and Costa 1997 Articles, describe chemistry

performed on a class of compounds known as nitroalkanes. They disclose the Nef reaction ("the

transformation of a nitroalkene derivative into a carbonyl derivative," Kesteleyn Tr. 984:4-10),

one of the reactions used in the claimed method of the '015 Patent. Ganem Tr. 1065:23-1067:19.

The Patrocinio 1994, Costa 1997, Seebach 1979, and Rosini 1988 Articles do not mention

protease inhibitors in general or bis-THF in particular. Reider Tr. 2022:14-17, 2023:19-22; Ganem

Tr. 1191:5-8. The ideas in those references were well known in the art between 1994 and 2001

when the relevant bis-THF art was being developed, but no one in the art turned to their teachings

for the synthesis of bis-THF. Ganem Tr. 1070:7-21, 1072:6-12, 1118:25-1119:21. When asked by

this Court why no one looked to the Patrocinio 1994, Costa 1997, Seebach 1979, and Rosini 1988

Articles in designing routes for synthesizing bis-THF if it was obvious to do so, Dr. Ganem only

22

**FOR PUBLICATION**

stated: "It's possible that they didn't search for it. I don't know." Ganem Tr. 1070:14-18. The
Court finds that this testimony demonstrates that it is only with hindsight that one of ordinary skill
in the art would have come across these four references.

These four references are not analogous prior art because they would not logically have
commended themselves to a person skilled in the art. This Court is not convinced that the
retrosynthetic analysis described by Dr. Ganem "unambiguously" leads to these four references,
and subsequently to the starting point of the claim 1 synthesis. Ganem Tr. 1186:16-22.
Retrosynthetic analysis is a "stimulating tool for creativity" that allows a chemist to consider a
wide array of possible synthetic routes. Reider Tr. 2019:21-2020:11. As credibly explained by Dr.
Reider, referencing the work by the pioneer of retrosynthetic analysis Dr. Corey, retrosynthetic
analysis does not lead unambiguously anywhere, but rather suggests exploration and analysis of a
large number of possible routes for creating molecules. *Id.* Dr. Ganem agreed on cross-
examination that "retrosynthetic analysis doesn't point to one unequivocal choice." Ganem Tr.
1182:25-1183:3.

Dr. Ganem's retrosynthetic analysis also improperly relies on hindsight. Real-world
evidence demonstrates that retrosynthetic analysis would lead persons of skill in the art to choose
dihydrofuran, not a protected glyceraldehyde, as the starting point for synthesizing bis-THF. As
Dr. Ganem conceded, the authors of Uchiyama 2001 applied retrosynthetic analysis in developing
their synthesis of bis-THF. *Id.* at 1188:17-1189:22. Their application of retrosynthetic analysis
resulted in the selection of dihydrofuran as a starting point. *Id.*; DTX 790 (Uchiyama 2001 Article)
at 4654. Similarly, Tibotec utilized a form of retrosynthetic analysis by studying various ways of
breaking the bonds of bis-THF to arrive at different synthetic routes, and that analysis led to the

23

**FOR PUBLICATION**

dihydrofuran method taught in the prior art. Reider Tr. 2010:21-2011:17; PTX 404 (Tibotec Progress Report).

In sum, retrosynthetic analysis provides no reason to search out or come across the Patrocinio 1994, Costa 1997, Seebach 1979, or Rosini 1988 Articles. They are random references that have nothing to do with bis-THF, darunavir, protease inhibitors or HIV/AIDS drugs. As Dr. Ganem conceded, these references were available before Ghosh's work, but neither Dr. Ghosh— who had studied with Dr. Corey, the pioneer of retrosynthetic analysis, at Harvard—nor anyone else in the art used those references in a method for making bis-THF. Ganem Tr. 1070:10-18, 1118:25-1119:18. The only explanation for pulling these references out of the vast sea of chemistry literature is the knowledge—obtained from working backwards from the '015 Patent—that they can be tacked together to re-create the process that Tibotec created. As a result, the scope and content of the prior art is limited to the seven references that Janssen identifies.

3. Differences between the Asserted Claims and the Prior Art

This Court finds that the process described in claim 1 for making bis-THF is unlike the processes for making bis-THF described in the prior art. The process of claim 1 starts with a protected glyceraldehyde (referred to in the '015 Patent as compound (1)), which does not contain either of bis-THF's rings. That compound is then transformed using nitromethane to a compound referred to as compound (3). Compound (3) is further transformed, in part by the use of a Nef reaction, to a compound referred to as compound (6). In the final step of the claimed process, compound (6) is transformed via an intramolecular cyclization reaction to form the second ring of bis-THF. The result is compound (7), or bis-THF. *See* Reider Tr. 2018:6-2019:2. The claim 1 process is "counterintuitive" and "dramatically" different from the prior art methods. Reider Tr.

24

**FOR PUBLICATION**

2013:24-2014:1, 2025:1-5. This Court finds that claim 1 would not have been obvious to a person of ordinary skill in the art.

Using a protected glyceraldehyde (compound (1) of the '015 Patent) as the starting point for synthesizing bis-THF was "counterintuitive" and not obvious. Reider Tr. 2013:22-2014:21. Unlike the routes described in the prior art that start with a molecule containing bis-THF's left-hand ring, the claim 1 process starts with a compound that contains neither of the bis-THF rings, which means that both of the bis-THF rings have to be created, instead of only one. *See* Reider Tr. 2009:21-2010:16; Ganem Tr. 1117:17-24. There were also other drawbacks to starting with a protected glyceraldehyde—it is "not commercially available in scale. It's not stable, and it has chirality in it from the very beginning at the center." Reider Tr. 2012:13-24. For these reasons, a person of ordinary skill in the art would not have chosen a protected glyceraldehyde as the starting point for making bis-THF. Reider Tr. 2019:10-13. There would have been no reason, other than hindsight, for a person of ordinary skill to pick the Patrocinio and Costa references from the large library of chemical literature and to select a protected glyceraldehyde as a starting point for making bis-THF.

To resay, Dr. Ganem's retrosynthetic analysis is not persuasive. Real-world evidence, rather than conjecture in court testimony, demonstrates that restrosynthetic analysis would lead persons of ordinary skill in the art to choose dihydrofuran, not a protected glyceraldehyde, as the starting point for synthesizing bis-THF. As Dr. Ganem conceded, the authors of the Uchiyama 2001 Article applied retrosynthetic analysis in developing their synthesis of bis-THF, Ganem Tr. 1188:17-1189:22, and their application resulted in the selection of dihydrofuran as a starting point. *Id.*; DTX 790 (Uchiyama 2001 Article) at 4654. Similarly, in designing its program to synthesize bis-THF, Tibotec utilized a form of retrosynthetic analysis—that is, studying various ways of

25

**FOR PUBLICATION**

breaking the bonds of bis-THF to arrive at different synthetic routes. Again, that analysis led to the dihydrofuran method taught in the prior art, and Tibotec worked with that method before developing the method claimed in the '015 Patent. Reider Tr. 2010:21-2011:17; PTX 404 (Tibotec Progress Report).

Lupin attempts to turn the scope of the claim into an issue in its obviousness case by pointing out that claim 1 is not limited to an industrial scale synthesis. The '015 Patent's value is that it allows the manufacture of bis-THF on an industrial scale, but the full scope of the claim is very different from anything in the prior art, no matter how it is analyzed. The prior art taught starting with dihydrofuran and then making bis-THF's other ring and it discouraged making both rings from scratch. The prior art taught starting with a commercially available, stable compound that was achiral. This is true whether on a laboratory scale or an industrial scale. And the prior art provided no motivation to change the known methods, whether for laboratory scale or industrial scale synthesis. Dr. Ganem admitted that "nothing in the prior art stated that there was any problem with the Ghosh synthesis based on ozonolysis," at "any scale." Ganem Tr. 1207:19-24. It follows that one of skill in the art would have seen no reason to modify the Ghosh dihydrofuran route, whether for laboratory or industrial use.

4. Secondary Considerations

The last of the *Graham* factors directs the Court's attention to secondary considerations, or "objective indicia of nonobviousness." *Graham*, 383 U.S. at 17-18. "Objective indicia of nonobviousness play a critical role in the obviousness analysis." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013). "Objective indicia 'can be the most probative evidence of nonobviousness in the record, and enables the court to avert the trap of hindsight.'" *Id.* (citation omitted).

26

**FOR PUBLICATION**

### a. Failure of others

Janssen first asserts that the failure of others in finding an improved synthesis route for bis-THF, particularly one that could be used on an industrial scale, goes to the nonobviousness of the '015 Patent. Jansssen states that Dr. Ghosh, a chemist of "greater than ordinary skill," Ganem Tr. 1201:20-22, was unable to create a commercially viable synthesis. Dr. Ghosh described his initial method, which he worked on while at Merck and which is discussed in the Ghosh 1994 Article (DTX 91), as "not a very good step." Ghosh Tr. 2457:21-22. He said that "nobody in [his] right mind would launch a project based upon this literature . . . when they see the synthesis [is] so complex." *Id.* at 2457:24-2458:2.

Janssen states that over the next seven years, Dr. Ghosh and others attempted to develop improved processes for making bis-THF. Dr. Ghosh's work is described in the Ghosh 1995 Article (PTX 222), the Ghosh 1996 Article (PTX 389), the '506 Patent (PTX 35), and the Ghosh 1999 Article (PTX 392). In 2001, Dr. Uchiyama also tried to improve the synthesis. DTX 790 (Uchiyama 2001 Article). Tibotec determined that the method described in these references was useful only on a laboratory scale, DTX 7 ('015 Patent) at col. 2:22-24, and that the batting average for these prior art attempts to improve the synthesis was "pretty pathetic." Ganem Tr. 1197:23-1198:2, 1201:7-10, 1217:18-21. Janssen claims that the Tibotec inventors succeeded where others had failed by developing a novel method of manufacturing bis-THF that is suitable for synthesis on both a laboratory and on an industrial scale. Reider Tr. 2009:4-8; Wigerinck Tr. 266:10-12.

Lupin responds that none of the prior art syntheses of bis-THF reflect a "failure of others," but rather reflect a successful effort on the part of the researchers to synthesize bis-THF, albeit on a small scale. Ganem Tr. 1104:5-11.

27

**FOR PUBLICATION**

This Court finds that the "failure of others" to create a commercially available synthesis of bis-THF weighs against a finding of obviousness as to claim 1 of the '015 Patent. It is clear to the Court that in the time period between 1994, when Ghosh published the synthesis route he had worked on at Merck, and 2001 when Tibotec discovered the patented process, there indeed was a failure of others to synthesize bis-THF on a commercial scale. *See generally* PTX 222 (Ghosh 1995 Article); PTX 389 (Ghosh 1996 Article); PTX 35 ('506 Patent); PTX 392 (Ghosh 1999 Article). The Court finds Lupin's disingenuous argument about these prior art references, which were obviously working toward a synthesis that could actually be used in commercial production and subsequently in a pharmaceutical product, rather than only on a laboratory scale, utterly unpersuasive.

### b. Commercial success

Next, Janssen argues that the commercial success of Prezista is a secondary factor that weighs against a finding of obviousness. Janssen asserts that bis-THF is a key component of the darunavir molecule in Prezista, Wigerinck Tr. 191:11-17; Reider Tr. 2025:8-13, and that since its introduction, Prezista has been a huge success, with approximately one million prescriptions annually. Stoffels Tr. 104:12-16, 105:18-20, 108:13-17, 112:1-11. Worldwide sales of Prezista in 2013 were more than $1.6 billion and U.S. sales were more than $800 million. Leffler Tr. 2288:21-24, 2311:9-15; Stoffels Tr. 112:12-14. Prezista is "the number-one selling protease inhibitor." Leffler Tr. 2311:22-2312:3. Sales figures and market data are strong evidence of commercial success. *See Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1360-61 (Fed. Cir. 1999).

Lupin responds by arguing that Janssen's general allegations of commercial success lack a specific nexus to the process steps required by claim 1 of the '015 Patent. *See In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually

28

A00031

**FOR PUBLICATION**

results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."). Lupin asserts that when it comes to why doctors prescribe Prezista, the particular process by which darunavir is made, including the process used to make bis-THF, has never been shown to be clinically relevant. Zingman Tr. at 861:16-25. In support, Lupin asserts that Janssen has never marketed that Prezista includes a bis-THF group, Falcon Tr. 2494:15-17, and also makes clear that bis-THF alone has weak pharmacologic activity and that it has not been approved by the FDA for any clinical use. Wigerinck Tr. 463:3-20; Reider Tr. 2210:10-12.

This Court is unpersuaded by Lupin's argument of lack of nexus and finds that the secondary consideration of commercial success weighs against a finding of obviousness. Prezista could never have been launched as a commercial product—let alone become the success it has become—without a method for making bis-THF suitable for manufacture in industrial scale quantities. Leffler Tr. 2322:16-20. Bis-THF is a critical component of darunavir, accounting for 90 percent of the cost of manufacture. Wigerinck Tr. 279:20-25. Janssen uses the process of claim 1 of the '015 Patent to manufacture the bis-THF in Prezista. Reider Tr. 2025:8-15. This Court finds that there is a nexus between Prezista's commercial success and the claim 1 invention. *See Tec Air*, 192 F.3d at 1360-61 (finding a nexus between a product's commercial success and a patent on a method used to manufacture a component of the product); *Akzo N.V. v. Int'l Trade Comm'n*, 808 F.2d 1471, 1481 (Fed. Cir. 1986) (finding commercial success where a product made by a patented method was commercially successful).

The Court finds no merit in Lupin's lack of nexus argument that doctors do not make prescription decisions based on the method of manufacturing bis-THF, Zingman Tr. 890:3-6, or its argument that Janssen does not promote the presence of bis-THF in darunavir in its marketing

29

**FOR PUBLICATION**

materials, Falcon Tr. 2494:15-17. Assuming that these contentions are true, they do not detract from the causal nexus between the method of making bis-THF and Prezista's commercial success. The success of darunavir, and Prezista, is attributable to multiple factors, with the manufacturing processes as critical steps in the chain of success. Stoffels Tr. 136:18-20 ("[W]e never would have had the drug if we didn't develop the drug and had invested over a billion dollars in this molecule.").

Because there is a nexus between claim 1 of the '015 Patent and the commercial success of Prezista, which was demonstrated at trial to be quite significant, this secondary consideration weighs against a finding of obviousness.

### c. Praise and industry acceptance

Praise and industry acceptance provide additional evidence of nonobviousness. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) (praise); *Pro-Mold & Tool Co. v. Great Lakes Plastics Inc.*, 75 F.3d 1568, 1574 (Fed. Cir. 1996) (industry acceptance). Prezista has received widespread praise: the guidelines for treating AIDS patients that are promulgated by the U.S. Department of Health and Human Services list Prezista as one of only two "preferred" protease-inhibitor based regimens for treating HIV/AIDS. PTX 592 (Guidelines for the Use of Antiretroviral Agents in HIV-1-Infected Adults and Adolescents) at F-4. This is the "highest possible recommendation" in the guidelines. Zingman Tr. 908:7-909:3. Prezista's acceptance among physicians is reflected by it being the leading protease inhibitor for treating AIDS. Leffler Tr. 2312:2-3. As with commercial success, none of this would have been possible without the method of making bis-THF that the '015 Patent describes and claims.

Lupin expresses the exact same lack of nexus arguments as it did with regard to commercial success. For the same reasons, the Court finds a causal nexus between claim 1 of the '015 Patent

30

**FOR PUBLICATION**

and the praise and industry acceptance of Prezista. The Court finds the showing Janssen made as to praise and industry acceptance persuasive such that these secondary factors also weigh against a finding of obviousness.

### d. Copying

Finally, Janssen asserts that Lupin and Teva both copied the '015 invention and argues that such copying is another objective indicium of non-obviousness. Reider Tr. 2027:16-2028:20. Lupin and Teva both admitted using the method of claim 1 of the '015 Patent to manufacture bis-THF for their respective ANDA products. Summ. J. Op. at 54.

Lupin counters that in the context of Hatch-Waxman[3] cases, the Federal Circuit has deemed evidence of copying by generic manufacturers to be "not probative of nonobviousness because a showing of bioequivalence is required for FDA approval." *Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013); *see also Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 718 F. Supp. 2d 382, 443-44 (S.D.N.Y. 2010) ("[C]opying bears little weight on its own as an objective indicator of non-obviousness in the context of generic drugs. The burdensome NDA [New Drug Application] procedures provide generic drug manufacturers with an incentive to copy an already approved drug, so that they can avail themselves of the less burdensome ANDA procedure of the Hatch-Waxman Act."). Lupin is correct, and as such the Court will not consider this secondary consideration of nonobviousness.

---

[3] The Hatch-Waxman Act is officially the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (codified as amended in sections of 15, 21, 35, and 42 U.S.C.).

31

**FOR PUBLICATION**

### 5. Conclusion: The '015 Patent was not obvious

This Court finds that claim 1 of the '015 Patent would not have been obvious to one of ordinary skill in the art under 35 U.S.C. § 103. Lupin has fallen well short of its mandate to provide evidence to support "'an abiding conviction'" that any of its factual contentions are "'highly probable.'" *ActiveVideo*, 694 F.3d at 1327 (quoting *Colorado v. New Mexico*, 467 U.S. at 316). Rather, Lupin's case amounts only to a hindsight reconstruction of the invention.

In asserting that a retrosynthetic analysis would have "unambiguously" led a person of ordinary skill in the art to the starting point used in claim 1 of the '015 Patent, Dr. Ganem was improperly relying on hindsight. Dr. Ganem analogized his analysis to using a roadmap to find his way to his goal, Ganem Tr. 1009:19-1010:5—that is improper use of hindsight. When used to prove that an invention is obvious, working backwards presents a clear risk of hindsight. This Court is not aware of any case in which a court relied on retrosynthetic analysis as part of an obviousness analysis.

Secondary considerations provide additional evidence of nonobviousness. Here the objective considerations all confirm the nonobviousness of the '015 invention: failure by others, *see DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1328 (Fed. Cir. 2009); commercial success, *TecAir*, 192 F.3d at 1360-61; praise and industry acceptance, *Power-One*, 599 F.3d at 1352.

### ii. Enablement and Written Description under 35 U.S.C. § 112

Lupin argues that claim 1 of the '015 Patent is invalid under 35 U.S.C. § 112, ¶ 1 for not providing an enabling disclosure of the claimed invention. Lupin makes this argument in its Proposed Findings of Fact and Conclusions of Law, and also in its Memorandum in Support of its Rule 52(c) Motion for Judgment on Partial Findings of Invalidity Due to Lack of Enablement. ECF

32

**FOR PUBLICATION**

No. 843. This Court rejects Lupin's lack of enablement argument and finds that claim 1 of the '015

Patent is fully enabled, and it follows that this Court denies Lupin's Rule 52(c) Motion for

Judgment on Partial Findings of Invalidity.

Lupin argues that, as a theoretical matter, there are eight stereoisomers of compound (7),

but that only four exist (the specification affirmatively states that only four exist). Lupin contends

that the specification does not enable the full scope of the claim—allegedly, a method for making

eight stereoisomers of compound (7)—due to the fact that the claim does not disclose any

stereochemistry.

As an initial matter, this Court finds that Lupin has made this argument in an untimely

manner and therefore it must be rejected. This non-enablement argument is new and was not

identified before trial nor mentioned in the Pre-Trial Order. *See* Janssen's Opp'n to Lupin's Rule

52(c) Motion at 2-6 (ECF No. 842). Under the express terms of the Pre-Trial Order and under Fed.

R. Civ. P. 16(e), Lupin may not raise issues not disclosed in the Pre-Trial Order unless it can show

"manifest injustice." Pre-Trial Order at 108.

Not only did Lupin fail to raise this issue before trial, it affirmatively embraced the

accuracy and completeness of the '015 Patent's disclosure of bis-THF's stereoisomers. Lupin's

expert, Dr. Ganem, speaking in reference to the European analog of the '015 Patent (which is

identical in all relevant respects, and referred to as the "'853 publication"), stated in his expert

report that "[i]t is readily apparent" that the patent "contemplates and discloses all possible

stereoisomers of bis-THF." Decl. of Ryan Mott, Ex. A at 49-50 (ECF No. 842). "In essence, the

'853 publication represents a full disclosure of all thermodynamically stable bis-THF isomers."

*Id.* at 55.

33

Confidential Information Redacted – Subject to Protective Order

**FOR PUBLICATION**

Even if this argument were not untimely, it has no substance. Both the claim itself and the specification make clear that the compound of formula (7) is limited to the four actual stereoisomers of compound (7). The face of the claim shows a molecule with three chiral centers that is created by a "cyclization" reaction. The location of the chiral centers is such that the cyclization reaction can create only four stereoisomers, and this is apparent to one of skill in the art—even an undergraduate chemistry major—from the claim itself. Reider Tr. 2030:22-2031:6. Dr. Ganem did not disagree with this analysis. Ganem Tr. 1223:4-6.

If there were any doubt as to this issue, the specification removes it. The specification explains that eight stereoisomers of bis-THF "theoretically" are possible, but only four "are deemed to exist." DTX 7 ('015 Patent) at col. 9:8-14. In both words and drawings, the specification defines the compound of formula (7) to consist only of the four actual stereoisomers, which are denominated 7.1, 7.2, 7.3 and 7.4. *Id.* at col. 9:14-35. *See AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1276-79 (Fed. Cir. 2011) (finding that patentee chose to apply a "special meaning to [a claim term]" where the ordinary meaning would have required a material that is "physically impossible to make"); *SkinMedica, Inc. v. Histogen, Inc.*, 727 F.3d 1187, 1195-96 (Fed. Cir. 2013) ("[I]f the specification reveals an intentional disclaimer, or disavowal, of claim scope by the inventor, the scope of the claim, as expressed in the specification, is regarded as dispositive." (citation omitted)); *Wyeth v. Teva Pharms. USA, Inc.*, 03-cv-1293(WJM), 2005 WL 2175440, at *6 (D.N.J. Sept. 6, 2005) (adopting the narrower of two proposed constructions in reliance on statements in the specification that some embodiments were "impossible to achieve" and the principle that "[c]laims are not correctly construed to cover what was expressly disclaimed"

34

**FOR PUBLICATION**

(citation omitted)). When the compound of formula (7) is construed correctly, as covering the four stereoisomers of bis-THF that actually exist, there is no enablement issue and Lupin's enablement argument dissolves.[4]

Lupin also offers another invalidity theory, based on the "how to use" prong of the enablement inquiry. *See* Mem. in Support of Rule 52(c) Mot. for J. on Partial Findings of Invalidity Due to Lack of Enablement at 17-19; Joint Proposed Findings of Fact ¶¶ D421-38. Again, Lupin did not raise this theory at trial or in the Pre-Trial Order. In this enablement defense, Lupin does not dispute the adequacy of the '015 Patent's disclosure of the usefulness of compound 7.1 as a component of darunavir, but argues that the '015 Patent does not "identify a use for any of the other [stereo]isomers" of bis-THF. Mem. in Support of Rule 52(c) Mot. for J. on Partial Findings of Invalidity Due to Lack of Enablement at 18.

Again, having failed to raise this theory earlier, Lupin cannot raise it now. *See Pfizer Inc. v. Teva Pharms. USA, Inc.*, 482 F. Supp. 2d 476 (D.N.J. 2007) (barring defendants from relying on a new invalidity theory that was "never raised, or even alluded to, at trial or in the Pretrial Order"); *see also* Janssen's Opp'n to Lupin's Rule 52(c) Mot. at 2-6. But even if this Court were to consider this argument, it would find it meritless. The specification specifically describes bis-THF's use as a component of protease inhibitors:

> [bis-THF] is an important pharmacological moiety present in the structure of retroviral protease inhibitors such as those described in Ghosh et al. in *J. Med. Chem.* 1996, 39(17), 3278-90, EP 0 715 618, WO 99/67417 and WO 99/76870. Said publications are hereby incorporated by reference.

---

[4] Lupin also argues that claim 1 of the '015 Patent does not meet the written description requirement of 35 U.S.C. § 112 because the claim covers isomers that are impossible to form, and one of ordinary skill in the art cannot accept that the inventors possessed a nonexistent invention. For the same reasons discussed, this argument is meritless. *See, e.g., Wyeth*, 2005 WL 2175440, at *6 ("[c]laims are not correctly construed to cover what was expressly disclaimed").

35

**FOR PUBLICATION**

DTX 7 ('015 Patent) at col. 1:18-24. This teaching is not limited to a specific stereoisomer of bis-THF.

Dr. Ghosh's 1996 Article (PTX 389)—"incorporated by reference" in the specification, *id.*, and "effectively part of the ['015 Patent] as if it were explicitly contained therein," *Cook Biotech, Inc. v. Acell, Inc.*, 460 F.3d 1365, 1376 (Fed. Cir. 2006) (citation omitted)—provides potency data on a protease inhibitor with the 3(R),3a(S),6a(R) stereoisomer of bis-THF and another protease inhibitor with the 3(S),3a(R),6a(S) stereoisomer (which the '015 Patent refers to as compounds 7.1 and 7.3 respectively). *See* DTX 7 ('015 Patent) at col. 9:30-35. The Ghosh 1996 Article states that both had "antiviral potency" and "prevented the spread of HIV" in infected human cells. PTX 389 (Ghosh 1996 Article) at 3281. Furthermore, applying standard techniques, a person of ordinary skill could have determined without undue experimentation that protease inhibitors with all four stereoisomers of bis-THF have antiviral potency against the wild-type HIV virus. Such work is described in the Surleraux Article (PTX 114). Protease inhibitors with the 7.1, 7.2, 7.3 and 7.4 stereoisomers of bis-THF are referred to in the Surleraux Article as Compounds 1a, e, f and g respectively. *Compare* PTX 114 (Surleraux Article) *with* DTX 7 ('015 Patent) at col. 9:31-34. As described in the Surleraux Article, testing showed that protease inhibitors with all four stereoisomers of bis-THF have activity against the HIV virus. *See* PTX 114 (Surleraux Article) at 1817 (Table 3). There is no evidence that a person of ordinary skill reading the patent could not have obtained the same results at the time of the patent without undue experimentation.

Lupin's untimely "how to use" theory is unsupported by any evidence. Lupin did not elicit any testimony from any witness suggesting that a person of ordinary skill in the art would need undue experimentation to determine the utility of the four stereoisomers of bis-THF that can exist

36

**FOR PUBLICATION**

(or, for that matter, determining that the other four stereoisomers cannot exist). Lupin has a complete failure of proof.

The argument also fails on the law. Under black-letter law, a patent does not need to provide any test data showing the usefulness of any embodiment. *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984). "It is well settled that an invention may be patented before it is actually reduced to practice," i.e., before it is made, let alone tested. *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1189 (Fed. Cir. 2014). "'[T]he burden is on one challenging validity to show by clear and convincing evidence that [a patent's] prophetic examples together with other parts of the specification are not enabling.'" *Id.* (quoting *Atlas Powder*, 750 F.2d at 1577). Lupin has not met that burden.

Finally, Lupin's remaining argument—that bis-THF in isolation had "no known clinical use" (Mem. in Support of Rule 52(c) Mot. at 18)—is off target. The enablement issue is not whether bis-THF is useful by itself to prevent the spread of the AIDS virus or for other clinical purposes. As the specification explains, DTX 7 ('015 Patent) at col. 1:18-23, bis-THF is useful as a component of protease inhibitors. The specification provides an adequate disclosure of that utility. *See* DTX 7 at col. 1:18-24; DTX 389 (Ghosh 1996 Article) at 3281; *see also Alcon*, 745 F.3d at 1189; *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1337-39 (Fed. Cir. 2003).

This Court finds that the '015 Patent is enabled and meets the written description requirement.

37

C. The '411 Patent

    i.  Obviousness

        1.  Level of Ordinary Skill in the Art

Janssen and Mylan offered separate definitions for a person having ordinary skill in the art. Dr. Reider, on behalf of Janssen, said that a person of ordinary skill in the art would have had a master's degree in chemistry and several years of laboratory experience. Reider Tr. 2003:4-7. Dr. Laird, on behalf of Mylan, opined that a person of ordinary skill in the art would have a Ph.D. in chemistry and several years' experience in related fields, such as organic chemistry or process chemistry. Laird Tr. 1383:11-18. The Court finds either of these definitions satisfactory and that regardless of which is selected, the analysis herein would be the same. Dr. Reider and Dr. Laird each stated that their opinions on validity did not depend on the definition of the level of ordinary skill in the art and would be the same under either side's definition. Reider Tr. 2003:17-20; Laird Tr. 1386:9-13. The Court adopts Dr. Reider's broader definition of a person of ordinary skill in the art which the trial evidence has shown to be pragmatically realistic.

        2.  Scope and Content of the Prior Art

Under *Graham*, the Court must define the scope and content of the prior art as of December 23, 2003, the priority date of the '411 Patent. Pre-Trial Order ¶ 45.

There is no dispute between the parties that there are three references that are part of the scope and content of the prior art with regard to the '411 Patent, and indeed each of these three references is asserted on the face of the '411 Patent. Laird Tr. 1457:2-18, 1489:21-25; DTX 13 at 2-3. These references are summarized below.

**The '775 Patent (DTX 5):** The '775 Patent, with an August 1994 priority date, discloses a class of "hydroxyethylamino sulfonamides," including darunavir. DTX 5 (title). In addition to

38

**FOR PUBLICATION**

describing the darunavir compound, the '775 Patent teaches a synthetic route that can be used for the synthesis of darunavir. *Id.* at cols. 64:47-65:9, 81:38-82:25, 82:53, 161:1-162:67; Laird Tr. 1467:9-13. The starting material used in the '775 Patent's scheme for synthesizing darunavir contains a "benzyloxycarbonyl," or "CBZ" protecting group. Reider Tr. 2039:17-21; Laird Tr. 1466:22-1467:8; PTX 948 (Laird diagram of '775 patent scheme). The '775 Patent calls the CBZ protecting group "a preferred amino protecting group." DTX 5 ('775 Patent) at col. 14:13-14.

The final step of the synthesis of darunavir in the '775 Patent, the "coupling" of bis-THF to the rest of the darunavir molecule, is carried out using DSC as the coupling agent. Laird Tr. 1398:3-13; DTX 5 ('775 Patent) at col. 82:52-54; Reider Tr. 2037:19-2038:1.

Janssen contends that another significant element of the '775 Patent is that it teaches simultaneous reduction and deprotection steps. Reider Tr. 2040:4-2041:14. Janssen asserts that combining the reduction of the nitro moiety and the deprotection of the CBZ-protected amino group into a single step was "kill[ing] two birds with one stone," *id.* at 2041:1-6, and would be seen as "highly efficient" by those of skill in the art. *Id.* at 2041:15-21. Mylan disputes this characterization of the reduction and deprotection steps in the '775 Patent. According to Mylan, one of ordinary skill in the art would not treat the reduction and deprotection steps of the '775 Patent as constituting a single chemical reaction. Rather, Mylan contends that two chemical reactions involving two different groups in two different structural locations take place irrespective of the identity of the protecting group and reagents used. Laird Tr. 1468:7-10, 1520:3-23. Mylan supports this position by stating that because the reduction reaction proceeds more quickly than the deprotection reaction on a molecular level, the simultaneous reduction/deprotection step of the '775 Patent is actually two steps. Laird Tr. 1519:19-1521:7. Mylan also claims that Janssen ignores that the reduction/deprotection steps can be performed as "one pot" reactions irrespective of the

39

**FOR PUBLICATION**

protecting group used, which minimizes the impact of the protecting group choice even if the

number of steps was of import. Laird Tr. 1520:24-1521:7; Ebert Tr. 1308:3-17.

As of the priority date of the '411 Patent, a person of ordinary skill in the art would have

viewed the synthesis disclosed in the '775 Patent as suitable for use on an industrial scale. Reider

Tr. 2037:9-13; Laird Tr. 1464:19-25 ("I have said I thought it was scalable, yes."), 1472:17-1473:7

(the '775 scheme "would scale reasonably well").

**The '889 (Ajinomoto) Publication (PTX 499):** Ajinomoto is a major Japanese chemical

company. The Ajinomoto Publication is discussed in detail in the specification of the '411 Patent.

*See* DTX 13 ('411 Patent) at col. 2:10-30. It is a published patent application that discloses the

same synthetic scheme as the '775 Patent. Reider Tr. 2038:7-14. Where the '775 Patent is directed

to a class of compounds, the Ajinomoto Publication is addressed to industrial processes for

synthesizing a single compound, the compound of formula (5), the penultimate compound before

darunavir. Laird Tr. 1473:18-24; PTX 499 (title). The Ajinomoto Publication expressly teaches,

by its reference to the Ghosh 1998 Article (discussed below), that this compound can be used to

make HIV protease inhibitors including darunavir. PTX 499 at [0119].

The Ajinomoto Publication states that "an object of the present invention is to provide [ ]

an industrially useful production method" for making what the '411 Patent calls compound (5).

PTX 499 at [0008]. It says that Ajinomoto scientists "conducted intensive studies . . . to

develop . . . [an] industrial production method," *id.* at [0009], and developed a method that can be

used "industrially and efficiently," *id.* at [0141]. *See also* Reider Tr. 2037:9-15, 2043:12-20; Laird

Tr. 1478:10-20, 1479:13-20.

40

**FOR PUBLICATION**

The Ajinomoto Publication also discusses the benefits of "simultaneously performing" the "reduction" and "deprotection" reactions as a single process step. PTX 499 at [0090]; Laird Tr. 1477:3-7.

**The Ghosh 1998 Article (DTX 1180):** Like the Ajinomoto Publication and the '775 Patent, the Ghosh 1998 Article teaches a synthesis for making darunavir. Janssen asserts that like the '775 Patent and the Ajinomoto Publication, the Ghosh 1998 Article teaches a synthesis for making darunavir in which the reduction and deprotection reactions are combined in a single step. DTX 1180. Mylan again objects to this characterization of the reduction/deprotection steps, for the same reasons enumerated.

The Ghosh 1998 Article also teaches the use of DSC as a coupling agent to couple bis-THF with the sulfonamide at the final stage of the synthesis. Reider Tr. 2038:2-5; Laird Tr. 1463:4-1464:1. However, unlike Ajinomoto and the '775 Patent, Ghosh 1998 does not use a CBZ protected starting material, but instead uses an "azide" group. Laird Tr. 1462:14-18. Use of an azide group would "[set] some alarm bells ringing, because azides are well known to be potentially explosive, and some of them are shock-sensitive." Laird Tr. 1408:25-1409:17.

In addition to these three references, Mylan relies on two references that deal with amprenavir (an earlier generation HIV protease inhibitor, Laird Tr. 1393:5-9) called Kim and Tung, discussed below. This Court finds that neither of these references is analogous art that provides useful information for the synthesis of darunavir.

**The Kim 2001 Article (DTX 604):** The Kim 2001 Article discloses a 14-step, laboratory-scale synthesis to make amprenavir. Reider Tr. 2078:1-6. Kim does not disclose darunavir or bis-THF. Its only alleged relevance in this case is its use of a boc protecting group. DTX 604 at 2351

41

**FOR PUBLICATION**

(Scheme 2). A person of ordinary skill in the art would have had no reason to look to Kim in selecting a protecting group to use in the synthesis of darunavir.

**The Tung '397 Patent (DTX 1001):** The Tung patent discloses non-darunavir sulfonamides, including amprenavir. Reider Tr. 2076:17-20. The Tung patent lists 196 different compounds and processes for making them. DTX 1001 at col. 11-52. One of its 196 examples (Example 82) uses BNPC as a coupling agent. Reider Tr. 2076:9-16. The Tung patent does not discuss BNPC anywhere else in the specification. A person of ordinary skill in the art would have had no reason to look to Tung in selecting a coupling agent to use in the synthesis of darunavir.

3. Differences between the Asserted Claims and the Prior Art

The closest prior art methods for making darunavir have three key features: (1) simultaneous reduction and deprotection reactions, (2) use of a CBZ protecting group, and (3) the use of a DSC coupling agent. The method of claim 13 of the '411 Patent uses none of these features. Rather, claim 13 has separate reduction and deprotection steps, uses a boc protecting group, and uses a BNPC coupling agent. None of the prior-art methods for making darunavir—Ghosh 1998, the '775 Patent, or the '889 Ajinomoto Publication—teaches the use of any of these features, much less all of them in combination. Mylan's obviousness theory relies on combining the darunavir references with selected non-darunavir references (Kim and Tung). But Mylan failed to demonstrate, or even identify, any reason or motivation that would have led a person of ordinary skill in the art to search the non-darunavir art and choose these particular features to combine with the known methods of making darunavir. Mylan failed to prove that one of skill in the art would have any reason to change the known methods of making darunavir at all. Mylan has failed to meet its burden of establishing obviousness by clear and convincing evidence.

42

A00045

**FOR PUBLICATION**

a. Separate reduction and deprotection steps

The inventors of the '411 Patent identified problems that the prior art had not recognized—

e.g., exothermic reactions that could lead to explosions and catalyst poisoning—and solved these

problems by separating the reduction and deprotection steps. Wigerinck Tr. 283:7-284:8; Reider

Tr. 2047:1-10. The specification of the '411 Patent highlights this discovery in its discussion of

the Ajinomoto process, which uses a simultaneous reduction/deprotection step with the CBZ

protecting group. The specification describes how, in the Ajinomoto process,

> This intermediate of interest is obtained . . . [by forming the compound of formula
> (3)], which is simultaneously reduced and deprotected to obtain the intermediate of
> interest. . . . It is observed that the simultaneous reduction . . . and Cbz deprotection
> . . . results in a highly exothermic reaction. Exothermic reactions, if possible, should
> be avoided.

DTX 13 ('411 Patent) at col. 2:10-30. The specification also identifies the catalyst poisoning

problem with the Ajinomoto process. "A poisoned catalyst will inevitably result in the appearance

of side-products thus decreasing product selectivity." *Id.* at col. 2:37-45. Mylan presented no

evidence that suggests that a person of ordinary skill in the art would have seen a reason to abandon

the simultaneous reduction/deprotection step disclosed in both the '775 Patent and the Ajinomoto

Publication, and replace it with a process that separates these two steps, resulting in an extra step

to the process.

At trial, Mylan argued that the simultaneous reduction/deprotection step of the '775 Patent

and the Ajinomoto Publication is actually two steps. Dr. Laird asserted that the '775 Patent had

distinct reduction and deprotection steps, for a total of "five steps." Laird Tr. 1404:13-21. He

adhered to this view on cross-examination, but admitted that the Ajinomoto process had "a

simultaneous reduction and deprotection step." *Id.* at 1475:9-10. It would be difficult to claim

43

A00046

**FOR PUBLICATION**

otherwise, as Ajinomoto states that it "simultaneously perform[s] elimination (deprotection) . . . and reduction . . . ." PTX 499 (Ajinomoto '889 Publication) at [0090].

 This Court finds that the evidence adduced at trial shows that in the prior art '775 Patent and Ajinomoto references, the CBZ protecting group was removed (deprotected) under the "same conditions" by which the nitro moiety was reduced (specifically, a hydrogenation reaction), so that a single chemical step triggered both reactions, "kill[ing] two birds with one stone." Reider Tr. 2040:13-2041:6; *see also* Laird Tr. 1468:11-16 (agreeing that by using a hydrogenation reaction "you've chosen a reagent which happens to do those things at the same time, and that's an advantage for further development"). This hydrogenation reaction that was doing two things at the same time is what the prior art taught. In contrast, the '411 Patent calls for use of a protecting group (boc) which is not removed under reductive conditions, and, as a result, must be deprotected separately from the reduction step. Reider Tr. 2047:1-10, 2114:15-22. Thus this Court finds that the difference between the prior art processes and the '411 Patent is irrefutable. Two steps are required in the '411 Patent's process. That these two steps may be performed sequentially in a single vessel does not change the fact that they are separate steps. Unlike Ajinomoto and the '775 Patent, the method of claim 13 requires separate reduction and deprotection steps. *Id.* at 2119:7-16. The patent claims each as a separate "step"—reduction is "step (iii)" and deprotection is "step (iv)." DTX 13 ('411 Patent) at col. 23:7-50. Using two steps when the prior art taught one step runs counter to the conventional wisdom and increases time and cost. But it provides benefits in terms of safety and elimination of catalyst poisoning.

### b. Boc protecting group

 To repeat, the Ghosh 1998 Article uses an azide group to protect the second amino group in the synthesis of darunavir, while the '775 Patent and the Ajinomoto Publication both taught the

44

**A00047**

**FOR PUBLICATION**

use of a CBZ protecting group. Claim 13 of the '411 Patent does not use an azide group or the CBZ protecting group, but rather a boc protecting group. DTX 13 ('411 Patent) at cols. 23:52-24:50, 26:10-13. Before the '411 Patent, no one had ever used a boc protecting group in the synthesis of darunavir. Reider Tr. 2051:7-12. Unlike the dibenzyl and CBZ protecting groups, the boc protecting group does not come off during the reduction step that reduces the nitro moiety; this makes it possible to separate the reduction and deprotection steps of the darunavir synthesis when using a boc group. Wigerinck Tr. 285:18-286:2. Switching to the boc group contributed to solving the exotherm and catalyst poisoning problems that Tibotec experienced when attempting to reduce and deprotect in a single step. *Id.*

The change to a boc group also resulted in a yield improvement: 70 percent compared to the 47 percent yield produced by using the dibenzyl protecting group Tibotec had obtained from Searle. Wigerinck Tr. 290:25-291:11; PTX 427 (Tibotec Report on boc versus dibenzyl) at 2-3. The use of the boc protecting group also generated yields that were better than those reported in Ajinomoto, which used the CBZ protecting group in a synthesis suitable for industrial scale. Reider Tr. 2238:7-9; 2242:22-2243:3. From the data in the examples in the Ajinomoto Publication, one of ordinary skill in the art can calculate that the yield of its CBZ route "is worse" than the yield that Tibotec obtained using a boc group. Reider Tr. 2235:10-15.

Mylan presented no evidence that one of skill in the art would have had any reason or motivation to use boc, and no reason to expect the yield increases that resulted from that choice. As shown, while those of skill in the art would have been motivated to—and did—replace the azide group of the Ghosh 1998 Article with the CBZ group of the '775 Patent and the Ajinomoto Publication, Laird Tr. 1409:19-1410:2, 1462:21-23, nothing in the art suggested any reason to

45

**FOR PUBLICATION**

replace the CBZ group of the '775 Patent and Ajinomoto. On the contrary, Dr. Laird conceded that these processes would have been expected to "scale reasonably well." Laird Tr. 1472:17-1473:3.

Mylan has argued that the '775 Patent's general identification of boc as an alternative protecting group, without any reference to darunavir, renders it an obvious alternative. DTX 5 ('775 Patent) at col. 14:13. But one needs a reason or motivation to make a switch, *see infra* Section II(C)(i)(5), and Mylan does not present one. The '775 Patent expressly identifies CBZ, not boc, as a "preferred" choice for the synthesis of darunavir. DTX 5 ('775 Patent) at col. 14:13-14, 81:38-82:25.

Mylan also points to the Kim 2001 Article, which teaches the use of boc in the synthesis of amprenavir—but Kim does not provide any reason to use boc in the synthesis of darunavir. First, the synthetic route for amprenavir disclosed in Kim is completely different from the known routes for darunavir, and does not involve making the compound of formula (5) as in the '411 Patent. The Kim 2001 Article does not discuss darunavir at all. Moreover, Kim identifies no particular benefits of the boc group. Dr. Reider credibly testified that if Kim were considered at all, it would have been seen as unhelpful for developing an industrial scale darunavir synthesis because it teaches an unattractively lengthy synthetic scheme (14 steps) for a different molecule, and uses toxic tin chloride. Reider Tr. 2078:9-2079:11. This Court finds that all that Kim teaches is that a boc protecting group has been used in the past to make a different compound, but it does not provide any reason to combine boc with the darunavir art.

### c. BNPC coupling agent

All of the prior art references that discuss darunavir—the '775 Patent, the Ajinomoto Publication, and the Ghosh 1998 Article—either expressly taught a DSC coupling agent or incorporate such a teaching by reference. DTX 5 ('775 Patent) at col. 82:53; Laird Tr. 1398:3-13,

46

**A00049**

**FOR PUBLICATION**

1476:8-11, 1463:9-12; PTX 499 (Ajinomoto Publication) at [0119]; DTX 1180 (Ghosh 1998 Article) at PREZ00302761. Those references did not teach any reason to seek an alternative to DSC. Reider Tr. 2055:8-10. None taught or suggested the use of BNPC, the coupling agent in claim 13.

Tibotec found that the benefits of using BNPC were substantial—specifically, a significant increase in yield in the valuable last step and greater purity of the end product. Tibotec discovered that BNPC generated yields up to 80 percent for the final coupling step, compared to 71 percent for DSC. PTX 433 (Chem-Pharm Team Meeting Notes) at PREZ05041021. BNPC also allowed for a cleaner impurity profile and provided a more robust process. *Id.*; *see* Laird Tr. 1505:8-25, 1506:19-24. An internal memorandum confirmed that "[t]his coupling process [BNPC] has major advantages over the use of DSC as [a] coupling reagent: [1] it allows to increase the yield significantly, which has a major impact on the COGS [cost of goods sold;] [and 2] the quality of the DS [drug substance] is increased significantly . . . ." PTX 433 (Chem-Pharm Team Meeting Notes) at PREZ05041021. These superior qualities of BNPC are reflected in the '411 Patent. Examples 7 and 8 show that BNPC has a higher purity than DSC and a higher yield in experiments using the same reagents. DTX 13 ('411 Patent) at col. 21:46-22:40; Reider Tr. 2055:19-2059:25.

Mylan's arguments as to why the use of BNPC is obvious are contrary to the documentary record. First, Mylan notes that Tibotec did not ultimately use BNPC in its commercial process. Tibotec counters that by the time it discovered BNPC, it was "too late to introduce the change [from DSC] in time" for it to be used in Tibotec's application for regulatory approval of darunavir. Laird Tr. 1505:2-25, 1506:21-25; Wigerinck Tr. 296:18-297:1; Reider Tr. 2060:6-16. Mylan challenges this by stating that, to this day, Janssen has not amended its process to use BNPC as a coupling agent, which calls its claims as to its superiority into question. But that Janssen has not

47

**FOR PUBLICATION**

chosen to amend its process to use BNPC is not dispositive of anything, and this Court cannot conjecture as to why it has made that choice. Tibotec/Janssen's use of DSC does not erase the advantages of BNPC that were adduced at trial, advantages which Mylan itself has recognized.

Second, Mylan disputes that the examples in the '411 Patent show the superiority of BNPC. It argues that Example 9 showed the possibility of an 81 percent yield with DSC and claimed that was comparable to the 81 percent yield obtained with BNPC in Example 8. Laird Tr. 1440:5-1441:14. But Dr. Reider credibly explained that that comparison was inapt. First, the BNPC in Example 8 was dissolved in triethylamine, while the DSC in Example 9 was dissolved in pyridine. Based on the data he examined, Dr. Reider stated that he would expect an increase in yield with BNPC if it were dissolved in pyridine. And beyond the yields, the DSC in Example 9 was only 95 percent pure, while the BNPC in Example 8 was 100 percent pure, meaning that BNPC resulted in a purer end product in any event. Reider Tr. 2059:4-25. Examples 7 and 8 were the best comparisons and they are completely consistent with Tibotec's internal documents showing the same results. *Id.* at 2244:15-2245:2.

The sole prior art reference Mylan relies on for the use of BNPC is the Tung patent. The Tung patent is not about darunavir. It discloses amprenavir and other non-darunavir sulfonamides whose synthesis is not analogous to the synthesis of darunavir. Only one of the 196 different compounds in Tung uses BNPC as a coupling agent, and there is no suggestion of any benefit associated with its use. Laird Tr. 1510:6-1512:2. There would have been no reason for a person of ordinary skill in the art to look to Tung for a coupling agent to use in the synthesis of darunavir. Mylan used hindsight to reconstruct the invention by looking to the prior art for BNPC, and as a result it cites a single mention of BNPC in a non-analogous patent. Reider Tr. 2077:13-15.

48

**FOR PUBLICATION**

Tibotec's experience confirms what an analysis of the prior art shows—that replacing DSC with BNPC was not obvious. Tibotec made a concerted effort to find an alternative to DSC. The contractor it retained to study the issue concluded that "commercially available alternative coupling agents with promising reactivity were not uncovered." PTX 434 (Carbogen Process Research Report) at PREZ5073327. It was not until two years later that Tibotec, on its own, discovered BNPC and its advantages.

### 4. Secondary Considerations

#### a. Unexpected results

Janssen asserts that the prior art provided no reason for one of skill in the art to alter the known methods of making darunavir and arrive at claim 13 of the '411 Patent, and that the prior art provided no reason to expect that there would be any advantage in doing so. However, Janssen claims, it turned out that using the boc protecting group and the BNPC coupling agent had advantages over prior art methods that were entirely unexpected. Those unexpected results were that the boc protecting group and the BNPC coupling agent provided enhanced yield and purity, while reducing costs. Janssen contends that these unexpected results are objective indicia of nonobviousness.

Mylan counters by stating that the percent yield increases discussed by Janssen are not the type of results that were unexpected. Mylan cites to Federal Circuit precedent that "[u]nexpected results that are probative of nonobviousness are those that are different in kind and not merely in degree from the results of the prior art." *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013). "Results which differ by percentages are differences in degree rather than kind, where the modification of the percentage is within the capabilities of one skilled in the art at the time." *Id.* Mylan argues that the improved yields Janssen cites are based on improper comparisons,

49

**FOR PUBLICATION**

and that even if such improvements were indeed real, they are not the type of result that is different in kind rather than degree.

First, with regard to protecting group yields, Mylan states that the '411 Patent does not provide any head-to-head comparative yield data of the product of the boc chemical reactions with those that used the CBZ protecting group. *See* DTX 13 ('411 Patent). Mylan contends that yield improvements failed to materialize when using the Ajinomoto Publication as a comparator. PTX 499 (Ajinomoto Publication). When considering the upper and lower yield ranges reported in the '411 Patent for the synthesis of the entire "right hand" side of the molecule, multiplying out the lower yield ranges using boc produced a 65.25 percent overall yield. Reider Tr. 2217:25-2218:6. Using the upper ranges produced a 77.35 percent overall yield. *Id.* at 2218:7-14. The reported overall yield to produce the same structure via the CBZ protecting group by way of the Ajinomoto Publication was 61.9 percent overall yield on the low end and approximately 80 percent on the high end. *Id.* at 2216:2-7, 2216:25-2217:4. Mylan asserts that these ranges squarely overlap and there is no evidence of any meaningful difference between the yields achievable with CBZ versus boc in a way which would indicate the boc results were unexpectedly superior.

With regard to coupling agents, Mylan asserts that Dr. Wigerinck's testimony on direct examination that the use of BNPC as the coupling agent led to better yields than DSC was based on his recollection, and not any documentary evidence presented at trial. Wigerinck Tr. 417:16-418:12. Mylan also points out that Dr. Wigerinck was not personally involved with the relevant research work, and that work was conducted by the Schaffhausen group within Johnson & Johnson, including by Hartmut Zinser and Birgit Ebert. *Id.* at 418:19-419:18. Mylan states that Dr. Wigerinck pointed to one test document from Carbogen, a third-party laboratory Tibotec contracted with, where the coupling agents were varied. In these experiments, the coupling

50

**FOR PUBLICATION**

reactions were not shown to outperform DSC. PTX 434 (Carbogen report); Wigerinck Tr. 410:20-411:17.

Mylan also attacks Dr. Wigerinck's claim that it was significant that the yield reported for Example 7 of the '411 Patent (using DSC as the coupling agent) was 71 percent while the yield for Example 8 of the '411 Patent (using BNPC as the coupling agent) was reported to be 81 percent. DTX 13 ('411 Patent) at col. 22:8-9; 39-40; Wigerinck Tr. 543:9-544:5. Mylan states that this is a false comparison because the comparison should be limited to the first part of the process, which relates to production of crude darunavir (i.e., before the subsequent recrystallization step which also affects yield). Laird Tr. 1440:5-1441:2. Mylan claims that the yield for the coupling procedure is the same for Examples 7 and 8: 43.5 grams. DTX 13 ('411 Patent) at col. 22:1, 32; Wigerinck Tr. 415:10-14, 416:2-14, 416:24-417:3; Laird Tr. 1440:5-1441:2. The same amount of starting material was used in both Examples. DTX 13 ('411 Patent) at col. 21:52; col. 22:17; Wigerinck Tr. 416:24-417:3.

Finally, Mylan argues that Janssen's arguments that BNPC is superior to DSC are undermined by the circumstance that Janssen itself does not use BNPC for its commercial process. Janssen claims that it was too late for them to adopt BNPC based on the timing of regulatory filings. Wigerinck Tr. 296:17-297:1, 420:10-14. Mylan disputes this position arguing that the NDA for Prezista was submitted in December 2005, over two-and-a-half years after the benefits of BNPC were discussed at a Chem-Pharm meeting. Wigerinck Tr. 424:6-425:20; PTX 433 (Apr. 11, 2003 Chem-Pharm Minutes) at PREZ05041021. Mylan further says that even if that initial window was missed, the FDA allows process changes to be made after submission of regulatory filings, Laird Tr. 1439:16-21, and that to this day, Janssen has never attempted to pursue BNPC as a coupling reagent for its product despite Dr. Wigerinck's claim that doing so would have a "major

51

**FOR PUBLICATION**

impact on the COGS [cost of goods sold]." Wigerinck Tr. 297:20-298:3. Mylan asserts that Janssen

subsequently made other changes to the proposed commercial process for making the darunavir

active pharmaceutical ingredient in Prezista that involved changing a solvent and using a pyridine

reagent. Laird Tr. 1439:3-15. As a result, Mylan argues that there was no reason why Janssen could

not have implemented the change from DSC to BNPC if it was genuinely advantageous to do so,

and that because Janssen has not done so, Dr. Wigerinck's assertion that the yields attained would

have constituted a significant improvement is not credible.

    The Court finds that the '411 invention did produce unexpected results and that this

secondary consideration weighs against a finding of obviousness. As to the differences in yields

between using a boc protecting group rather than CBZ, this Court agrees with Janssen that the use

of a boc protecting group generated yields superior to those reported in Ajinomoto, which used the

CBZ protecting group in a synthesis suitable for industrial scale. Reider Tr. 2238:7-9, 2242:22-

2243:3. From the data of the Ajinomoto Publication's examples, one of ordinary skill in the art

can calculate that the yield of its CBZ route "is worse" than the yield that Tibotec obtained using

a boc group. Reider Tr. 2235:10-15.

    With regard to coupling agents, this Court also agrees with Janssen that the benefits of

using BNPC over DSC were substantial and unexpected. The superior qualities of BNPC are

reflected in the '411 Patent. Examples 7 and 8 show that BNPC has a higher purity than DSC and

a higher yield in controlled experiments using the same reagents (that is, everything in the

experiment, including the crystallization steps, was exactly the same, except one used DSC and

one used BNPC). DTX 13 ('411 Patent) at col. 21:46-22:40; Reider Tr. 2055:19-2059:25. These

examples show that BNPC is a superior coupling agent to DSC. Reider Tr. 2244:15-2245:2. As to

Mylan's argument that Janssen's position that BNPC is superior to DSC is undermined because

52

**FOR PUBLICATION**

Janssen does not use BNPC for its commercial process, this Court is not convinced. This Court does not conjecture as to why Janssen has chosen not to use BNPC in its synthesis up to this point, but that it does not is of no moment. Evidence presented at trial clearly demonstrates the unexpected result that BNPC is superior to DSC. That is what matters for the inquiry under this secondary consideration.

As to Mylan's argument that the unexpected results demonstrated by Janssen relate to degree rather than kind, again this Court is not convinced. The case law Mylan cites refers to results that are changes of degree instead of kind because they are achieved through routine optimization, including varying elements like temperature and concentration available to a person of skill in the art. *See, e.g., Galderma*, 737 F.3d at 739. Here, the Court is not dealing with those types of variations, but rather with variations of different compounds, and Janssen has shown that the modification of the yield percentages were not "within the capabilities of one skilled in the art at the time." *Id.* The trial evidence here does not indicate that skilled artisans were capable of achieving greater yield by adjusting and controlling factors that were known to affect the yield percentages.

### b. Copying

Janssen also argues that the fact that Mylan practices claim 13 of the '411 Patent is a secondary consideration that weighs against a finding of obviousness.

Mylan responds, as Lupin did with regard to the '015 Patent, that in the context of Hatch-Waxman cases, the Federal Circuit has deemed evidence of copying by generic manufacturers to be "not probative of nonobviousness because a showing of bioequivalence is required for FDA approval." *Bayer*, 713 F.3d at 1377. Again, Mylan is correct. The Court does not consider this secondary consideration of nonobviousness.

53

A00056

**FOR PUBLICATION**

### 5. Conclusion: The '411 Patent was not obvious

Under the governing legal standards for obviousness, Mylan has failed to establish by clear and convincing evidence that the method of claim 13 would have been obvious to a person of ordinary skill in the art. Under Mylan's obviousness theory, a person of ordinary skill in the art would have rejected an acceptable manufacturing process for making darunavir taught in the prior art, despite the absence of any reason for doing so, and would then have formulated a longer and more expensive process that combined aspects of the prior art methods with isolated features chosen from non-analogous, non-darunavir references. Without the benefit of hindsight, there is no reason why a person of ordinary skill in the art would have done that.

As an initial matter, Mylan has failed to identify any reason or motivation that would have led a person of ordinary skill in the art to depart from the known methods for making darunavir as taught, especially by the '775 Patent and the Ajinomoto Publication. As Mylan's expert even conceded, the methods taught in those references were "pretty good." Laird Tr. 1472:17-1473:3. The prior art provided no motivation for a person of ordinary skill in the art to change them.

Specifically, Mylan has failed to give a reason why a person of ordinary skill would have selected the elements that Mylan found in two non-darunavir references (the Kim 2001 Article and the Tung patent) and combined those elements with known methods for making darunavir. The only reason to do so would be based on hindsight. Mylan did not even seek to prove a reason or motivation to combine references, but rather argued that it did "not need to prove an independent motivation" under *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007), because evidence of motivation is not required when an obviousness case involves a combination of references known to people of skill in the art. Tr. 2555:8-2557:1 (closing argument). Such a reading of *KSR* is incorrect.

54

**FOR PUBLICATION**

The Federal Circuit has repeatedly rejected arguments that *KSR* eliminated the need to prove a reason or motivation to combine references. As the Federal Circuit has emphasized, "[a] reason for combining disparate prior art references is a critical component of an obviousness analysis." *InTOUCH Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1351 (Fed. Cir. 2014). *See also Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1292 (Fed. Cir. 2012) ("The challenger of the patent must show by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." (citation omitted)); *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (same). The Federal Circuit has clearly written that the *KSR* Court "acknowledged the importance of identifying 'a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does' in an obviousness determination." *Takeda Chem. Indust., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (quoting *KSR*, 550 U.S. at 418). Under *KSR*, the reason to combine need not be explicit in the prior art, but there must be a reason. *KSR*, 550 U.S. at 418-19. In fact, since *KSR*, the Federal Circuit has rejected obviousness defenses for failure to provide a reason or motivation to combine references. *See, e.g., InTOUCH Techs.*, 751 F.3d at 1349 (reversing obviousness determination where expert "did not explain what reason or motivation one of ordinary skill in the art at the time of the invention would have had to place these pieces together"); *ActiveVideo*, 694 F.3d at 1328 (affirming finding of nonobviousness where defendant's expert "fail[ed] to explain why a person of ordinary skill in the art would have combined elements from specific references").

A00058

**FOR PUBLICATION**

Mylan also had the burden of showing by clear and convincing evidence that a person of ordinary skill in the art would have had a "reasonable expectation of success" in making that combination of references. *See Otsuka,* 678 F.3d at 1292; *Cyclobenzaprine,* 676 F.3d at 1069. Mylan failed to meet that burden. The inventors of the '411 Patent solved problems that the prior art did not even recognize, let alone solve. The inventors' identification of those problems and their novel solutions were nonobvious contributions. As the Federal Circuit recently observed, "an invention can often be the recognition of a problem itself." *Leo Pharm. Prods.,* 726 F.3d at 1353. The solutions chosen by the inventors went against conventional wisdom, adding both time and expense to the process by separating one step into two.

Mylan's theory is based on hindsight, and its argument that a person of ordinary skill would have selected boc from the Kim 2001 Article and BNPC from the Tung patent, and then combined those teachings with aspects of the darunavir art, is "hindsight reconstruction" of the invention that the Federal Circuit condemns. *In re NTP, Inc.,* 654 F.3d 1279, 1299 (Fed. Cir. 2011). Evidence of secondary considerations helps courts "avert the trap of hindsight." *Leo Pharm. Prods.,* 726 F.3d at 1358 (citation omitted). The relevant secondary considerations here, including unexpected results of improved yield and purity, weigh against a finding of obviousness.

Considering all of the *Graham* factors, this Court finds that Mylan has failed to establish its obviousness defense by clear and convincing evidence.

ii. Enablement and Written Description under 35 U.S.C. § 112

Mylan also raises enablement and written description defenses under 35 U.S.C. § 112, ¶ 1. Claim 1 of the '411 Patent (from which claim 13 depends) recites a process for making darunavir (identified by its chemical structure) "or an addition salt, thereof." Mylan's theory is that one of

56

**FOR PUBLICATION**

ordinary skill in the art would need undue experimentation to make a salt of darunavir and, for that reason, the patent was not enabled. Tr. 2560:7-11 (closing argument).

Mylan did not meet its burden of showing that practicing claim 13 would require undue experimentation. Both Dr. Reider and Dr. Laird agreed that a person of ordinary skill in the art knew how to make salts and that the '411 Patent gives many examples. *See, e.g.*, Reider Tr. 2080:11-16 ("Q. And did one of ordinary skill in the art know how to make a salt of darunavir from the disclosure? A. Yes. An addition salt, frankly, [is] just that: You add two things together to make the salt. You take your base and an acid, you mix them together. That's how you make a salt. Q. Are there multiple salts disclosed in the patent? A. There are."); Laird Tr. 1513:8-14 ("Q. Those with skill in the art know how to make salts; correct? A. Yes. . . . Q. The specification gives many examples; correct? A. It does, yes."); *see also* DTX 13 ('411 Patent) at cols. 16:64-17:26 (disclosing dozens of salts). As part of his work in this case, Dr. Reider reviewed experiments conducted by Tibotec creating seven darunavir salts, including hydrobromide, hydrochloride, the sulfate, the methane sulfonate, and the ethane sulfonate. Reider Tr. 2085:3-8.

Mylan's main argument was that the patent did not enable making pharmaceutically useful addition salts of darunavir. Laird Tr. 1444:14-19. This argument has no substance. First, Dr. Reider credibly testified without contradiction that although the salt forms of darunavir fabricated by Tibotec were admittedly not as good as the ethanolate form, they could still be put into a capsule and given to a patient if there was nothing else available. This is what Merck did when it could not formulate its ethanolate salt of Crixivan into a tablet, and it provided benefits to AIDS patients. Reider Tr. 2080:19-2081:5. For that reason, the '411 Patent does enable the manufacture of pharmaceutically useful salts. But more importantly, Mylan's premise is wrong. Claim 13 does not require a pharmaceutically useful salt, only a salt. As the patent teaches, there are many uses

57

**FOR PUBLICATION**

for darunavir salts that do not require that the salt be pharmaceutically useful. The patent states that "salts having a pharmaceutically unacceptable counter-ion may also find use, for example, in the preparation or purification of a pharmaceutically acceptable compound of the present invention." DTX 13 ('411 Patent) at col. 16:58-62. Non-pharmaceutically acceptable salts, used in a manufacturing process, can provide a "tremendous improvement in purity, chirality, and control." Reider Tr. 2081:9-2082:9. The '411 Patent therefore teaches that "[a]ll salts, whether pharmaceutically acceptable or not, are included within the ambit of the present invention." DTX 13 ('411 Patent) at col. 16:62-63; Reider Tr. 2081:6-8.

The undisputed evidence shows that those of skill in the art were able to make salts of darunavir based on the disclosures in the '411 Patent, and Mylan failed to demonstrate by clear and convincing evidence that a person of ordinary skill in the art, reading the '411 Patent, would not be able to make an addition salt of darunavir by known methods.

Finally, Mylan argues that the '411 Patent fails the written description requirement. It argues that for the same reasons regarding enablement, the inventors were not in possession of processes for the preparation of addition salts of darunavir. Joint Proposed Findings of Fact ¶ D730. And for the same reasons declared by the Court regarding enablement, this argument is rejected. Trial evidence shows that the inventors of the '411 Patent *were* in possession of processes for the preparation of addition salts. The written description requirement is met. Second, Mylan asserted only in closing arguments that the BNPC element of claim 13 is not supported by the patent's written description because "[t]here's no direction in the patent to single out BNPC as a coupling reagent." Tr. 2559:3-4 (closing argument). That assertion is wrong. BNPC is expressly identified in the specification (col. 15:48), is used in experimental Example 8 and is claimed in claim 13. That establishes that Tibotec was in possession of the invention that is claimed. Mylan

58

A00061

**FOR PUBLICATION**

did not present any trial evidence in support of this challenge and, as a result, failed to demonstrate it.

The Court finds that the '411 Patent is valid and rejects Mylan's enablement and written description arguments.

  D. The '645 Patent

    i. Obviousness

      1. Level of Ordinary Skill in the Art

Janssen and Lupin offered separate definitions for a person having ordinary skill in the art. Dr. Allan Myerson, on behalf of Janssen, said that a person of ordinary skill in the art would have had a bachelor's degree in chemistry or related disciplines with three or more years of experience, or a master's degree in the same field with two or more years of experience, or a Ph.D. in the same field with no additional experience. Myerson Tr. 1780:11-18. Dr. Zaworotko, on behalf of Lupin, opined that a person of ordinary skill in the art would have a Ph.D. in chemistry or a related discipline and several years of experience, or a bachelor's or master's degree and specific training in the area of crystallization. Zaworotko Tr. 1592:3-20. The Court finds either of these definitions satisfactory and that regardless of which is chosen, the analysis herein would be the same. Dr. Myerson and Dr. Zaworotko each stated that their opinions on validity did not depend on the definition of the level of ordinary skill in the art and would be the same under either side's definition. Myerson Tr. 1780:19-23; Zaworotko Tr. 1592:21-1593:3. The Court adopts Dr. Myerson's broader definition of a person of ordinary skill in the art which the trial evidence has shown to be pragmatically realistic.

A00062

**FOR PUBLICATION**

2. Scope and Content of the Prior Art

Janssen asserts that the prior art for the '645 Patent includes two references, summarized below, disclosing the darunavir compound:

**The Searle '775 Patent (PTX 9):** The Searle '775 Patent is listed on the '645 Patent's cover page as a reference that the Patent Examiner considered, and the specification incorporates it by reference. PTX 1 ('645 Patent) at col. 1:49-55. The '775 Patent suggests various formulations for the compounds it discloses. *See* PTX 9 at col. 216:23-217:53. Those possible formulations include "salts," *id.* at col. 216:23-26, "esters," *id.* at col. 218:12-22, "prodrugs," *id.* at 217:54-65, "injectable aqueous or oleaginous suspensions" and other "liquid dosage forms," *id.* at col. 217:16-19, 217:46-50. Salts, esters and prodrugs are also claimed in the '775 Patent. Zaworotko Tr. 1685:21-1686:1; PTX 9 at col. 218:12-22. Ethanolates and solvates are not among the numerous formulations for darunavir that the '775 Patent teaches and suggests. Myerson Tr. 1902:4-13.

**The Ghosh 1998 Article (DTX 1180):** The Ghosh 1998 Article is listed on the '645 Patent's cover page as a reference that the Patent Examiner considered, and the specification incorporates it by reference. PTX 1 ('645 Patent) at col. 1:49-55. The Ghosh 1998 Article does not describe any formulation for any of the compounds it discusses. *See* Myerson Tr. 1902:4-13.

To support its obviousness argument, Lupin also relies on various references that relate generally to: solid-state screens; the use of ethanol as a solvent; and crystalline forms of salts or intermediates of other protease inhibitors. *See generally* Joint Proposed Findings of Fact ¶¶ D836-80. None of those references mentions darunavir, or describes or suggests a solvate of darunavir, and none of them provides any guidance on the conditions needed to form an ethanolate solvate of darunavir.

60

**FOR PUBLICATION**

3.  Differences between the Asserted Claims and the Prior Art

Nothing in the prior art taught or suggested that darunavir could be made in an ethanolate form or that an ethanolate form of darunavir would be desirable. To the extent that the prior art discussed darunavir, it suggested other formulations, like salts, esters, and prodrugs, and did not suggest a solvate or ethanolate form. In addition, solvates are relatively rarely used for pharmaceutical products and there is an aversion to using them when it can be avoided. Furthermore, solvate formation is very unpredictable. The art did not provide a basis for a reasonable expectation that an ethanolate of darunavir could be created, and if it could be created, there was no teaching in the art of the combination of conditions that would be needed to create it. And if it were possible to find the right combinations to create a solvate of darunavir, the prior art offered no reason to expect that it would exist in a 1:1 ratio of darunavir to ethanol or have properties that would make it work as a pharmaceutical composition.

At trial, Lupin's expert Dr. Zaworotko presented a "five-step pathway" to obviousness, which purportedly leads to the conclusion that claim 4 of the '645 Patent would have been obvious to a person of ordinary skill. The Court finds that such a path is ended before started.

The first step in Dr. Zaworotko's "Obviousness Pathway" was that the "[d]arunavir molecule [was] known before 2002." Zaworotko Tr. 1594:2-9. The Searle '775 Patent and the Ghosh 1998 Article both describe darunavir, and the Patent Examiner considered both references. The Ghosh 1998 Article does not suggest any formulation of darunavir, and the '775 Patent suggests numerous formulations (e.g. salts, esters and prodrugs), but does not mention solvates or an ethanolate. Although darunavir was known in the art, such does not establish this first step. Dr. Zaworotko explained, "the first step in [his] pathway" was an assertion that "darunavir was a known molecule and . . . [was] a compound of interest" by 2002, meaning that a person of ordinary

61

**FOR PUBLICATION**

skill in the art would have been interested in making a formulation of darunavir out of the millions

of possible compounds known in 2002. *Id.* at 1595:4-9. Demonstrating that darunavir was a

compound of interest in 2002 was *the* essential part of Lupin's burden in alleging obviousness.

*Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1291 (Fed. Cir. 2012) ("[W]hether a new

chemical compound would have been *prima facie* obvious over particular prior art compounds

ordinarily follows a two-part inquiry. First, the court determines whether a chemist of ordinary

skill would have selected the asserted prior art compounds as lead compounds, or starting points,

for further development efforts."); *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361-62

(Fed. Cir. 2011); *Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008)

("[P]ost *KSR*, a prima facie case of obviousness for a chemical compound still, in general, begins

with the reasoned identification of a lead compound."). As Dr. Zaworotko agreed, "[i]f the person

of [ordinary] skill wouldn't have had any motivation to work on darunavir, then they certainly

wouldn't have found any new crystal forms of it . . . ." Zaworotko Tr. 1682:5-10.

Lupin failed to show that darunavir would have been a compound of interest in 2002. Dr.

Zaworotko asserted that darunavir would have been a "compound of interest" because it "was in

clinical trials as of late 2001." Zaworotko Tr. 1595:18-23; *see* Stoffels Tr. 98:7-17. Earlier, this

Court had relied on this proposition to deny summary judgment. *See* Summ. J. Op. at 16. But that

argument evidentially collapsed at trial. Although darunavir was in clinical trials in 2002, that fact

was highly confidential and could not have provided a motivation to anyone outside of Tibotec to

select darunavir for formulation. As Dr. Stoffels explained, the clinical trials on darunavir were

kept so secret that Tibotec provided the initial results to Johnson & Johnson in 2002 only under a

confidentiality agreement. Stoffels Tr. 98:15-25. Dr. Reider, the former Vice President of Process

Development at Merck, confirmed that secrecy about drugs under development is the norm in the

A00065

**FOR PUBLICATION**

industry because the pharmaceutical industry is highly competitive and the pharmaceutical companies "do not necessarily share all of their . . . successes and their secrets" with their competitors. Reider Tr. 1993:14-24. Because clinical trials are not always successful, pharmaceutical companies also keep them secret because they do not want to raise the expectations of the marketplace and the patient population prematurely. *Id.* at 1993:20-1994:5.

Lupin needed to point to something in the public record or in the prior art reporting that darunavir was in clinical trials as of the '645 Patent's priority date of May 16, 2002 in order to show that darunavir would have been a compound of interest. Lupin failed—Tibotec's development of darunavir and its clinical trials were secret in 2002. The only mention in the prior art of clinical trials of darunavir was a single sentence in a lengthy article by Dr. Yoshimura. The article is about TMC 126, the compound preferred by Dr. Ghosh and Dr. Erickson, which is also known as UIC 94-003. The last sentence of the article reads: "A potent analog of UIC 94-003, TMC 114, with a similar resistance profile, is currently undergoing clinical trials. . . ." DTX 621 (Yoshimura 2001 Article) at 0621. But this sentence provides no relevant information to one of skill in the art. There is no clue in the article, or anywhere else in the prior art, what TMC 114 is. The "TMC" designations were Tibotec's "internal code name[s]" for compounds, Stoffels Tr. 142:10-12, and TMC 114 was Tibotec's "internal identifier" for darunavir. *Id.* at 128:11-15; *see* Wigerinck Tr. 359:20-25. Darunavir is not even specifically identified. The designation does not permit any third party to know the compound's chemical structure and so could not possibly provide a motivation for anyone to attempt to crystallize TMC 114. Absent public notice that darunavir was in clinical trials, Lupin's "compound of interest" theory vanishes—and with it Lupin's obviousness challenge. This Court denied summary judgment on this issue to give Lupin the opportunity to prove its case, and Lupin did not.

63

**FOR PUBLICATION**

The evidence adduced at trial shows that Tibotec selected darunavir as a compound of interest based on its own proprietary data and research, not from any publicly available literature. The Court finds that Lupin has not provided clear and convincing evidence of anything in the prior art which would have made darunavir a compound of interest. With that failure, Lupin's obviousness case fails.

By all rights, the analysis of Lupin's five-step "Obviousness Pathway" ends. Lupin failed to establish the prerequisite—the sine qua non—that darunavir was a compound of interest in 2002. This path has no beginning. To repeat, passage is ended before begun. Lupin is attempting to leap over its shadow, a futile effort. Even briefly surveying the remainder of the proffered pathway leads the Court to conclude that steps 2-5 are meritless. Particularly so since Lupin's main pathway guide, its expert Dr. Zaworotko, at trial expressed a material opinion diametrically opposed to one he had earlier published. Such contradiction was not inadvertent. Specifically, on cross-examination, Dr. Zaworotko stated: "the only data I recall was that darunavir crystallizes from isopropanol very readily. . . . I've seen no evidence that suggests that darunavir is hard to crystallize. Seen no data, experimental data." Zaworotko Tr. 1715:25-1716:11. Dr. Zaworotko was then shown a chapter in a book he had edited that specifically describes darunavir ethanolate as "unusual." *See* PTX 842A (Organic Crystal Engineering) at 75. Upon questioning from this Court, Dr. Zaworotko conceded that he agreed with the paragraph containing that assertion "in its entirety." Zaworotko Tr. 1717:18-1719:5. In so doing, Dr. Zaworotko agreed that darunavir ethanolate is "an unusual crystal form," one of "very few" ethanolates on the market and that a skilled artisan would have had an "aversion" to attempting to develop an ethanolate of darunavir because of the many difficulties and drawbacks to be expected. Specifically, one of skill would have no reasonable expectation of success in developing an ethanolate form suitable for

64

A00067

**FOR PUBLICATION**

pharmaceutical composition, as required by claim 4, because solvates are "prone to solvent loss" on standing and with it, a "loss of chemical stability." PTX 842A (Organic Crystal Engineering) at 75. Darunavir ethanolate is one of "very few" ethanolates, and its discovery could not have been expected. Zaworotko Tr. 1717:18-1719:5 (agreeing with the contents of the paragraph in PTX 842A at 75); *see also* Myerson Tr. 1825:17-25. The advice of Defendant's expert as a pathway guide is not credible.

4. Secondary Considerations

a. Commercial success

Janssen again supports this secondary consideration by asserting that Prezista is "the number-one selling protease inhibitor," Leffler Tr. 2311:22-2312:3, with worldwide sales in 2013 of more than $1.6 billion and U.S. sales of more than $800 million. *Id.* at 2288:21-24, 2311:9-15; Stoffels Tr. 112:12-14.

And again, Lupin argues that there is no nexus between the alleged evidence of secondary considerations and the '645 Patent. Lupin puts forth the same arguments as to the '645 Patent with regard to nexus as it did for the '015 Patent (i.e., physicians do not prescribe Prezista based on the fact that the darunavir active pharmaceutical ingredient is in the ethanolate form; there is no clinical evidence that attributes the benefits of Prezista to the ethanol solvate of darunavir as opposed to the darunavir molecule itself; Prezista is always used in combination therapy, etc.). Again, this Court is unpersuaded by Lupin's arguments.

Prezista is a pharmaceutical composition of a 1:1 ethanolate form of darunavir, exactly as claimed in the '645 Patent. *See* DTX 623 (Highlights of Prescribing Information for Prezista) at PREZ05142289 (describing Prezista as "[darunavir] monoethanolate"). That Prezista is exactly what is claimed "trigger[s] a presumption of nexus between the drug's success and the claimed

**FOR PUBLICATION**

invention . . . ," *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F. Supp. 2d 1363, 1372 (Fed. Cir. 2013). Lupin has not overcome that presumption. It is undisputed that the formulation of a molecule "can have a significant impact on . . . the [bio]availability of [a] drug compound . . . ," Stoffels Tr. 143:7-10, and that the formulation of Prezista "[a]bsolutely" matters for its success, *id.* at 102:16-17, and has been "important" to that success, Myerson Tr. 1832:5-1833:1. It is quite logical that a drug's formulation can be critical to its commercial success: "You have to deliver [a drug] molecule to people, and you have to deliver it in a way that they comply, that they take it every day, and you have to deliver it in a way that you can manufacture." *Id.* at 1832:13-1833:1. "[Y]ou can have a good molecule, and if you can't formulate it, it's not going to be very useful, or if you formulate it in a way that people don't want to take, it will be less useful." *Id.*

The record provides examples of AIDS drugs that did not succeed because of formulation problems. *See* Zingman Tr. 850:7-25 (discussing amprenavir's poor bioavailability, poor solubility and high pill burden); Myerson Tr. 1833:6-11 (same); PTX 282 ('989 Patent) at col. 1:32-54 (same); Stoffels Tr. 142:7-143:25, 102:9-15, 81:23-83:5 (discussing Intelence's "high pill burden"); Zingman Tr. 847:11-18 (discussing ritonavir's instability); Myerson Tr. 1833:12-21 (same); Zaworotko Tr. 1601:14-1602:1. In contrast to these examples, Prezista is available in a stable, bioavailable formulation that allows for once-daily dosing for some categories of patients and twice daily dosing for others. DTX 623 (Highlights of Prescribing Information for Prezista) at PREZ05142265. This favorable dosage regimen has contributed to Prezista's success. Falcon Tr. 2487:10-12, 2485:8-10.

Prezista has only been sold in the ethanolate formulation that is claimed in the '645 Patent. Wigerinck Tr. 335:19-336:5. The '645 invention is "an inextricable and essential part of what doctors are prescribing" when they prescribe Prezista. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 876

66

**FOR PUBLICATION**

F. Supp. 2d 295, *416-17 (S.D.N.Y. 2012), *aff'd*, 723 F.3d 1363 (Fed. Cir. 2013), *cert. granted on other issues*, 134 S. Ct. 1761 (Mar. 31, 2014) (No. 13-854). Prezista's success "is attributable to the medical benefits of its active ingredient, including its method of administration, [and] bioavailability . . . ." *Roche Palo Alto LLC v. Ranbaxy Labs., Ltd.*, No. 06-2003, 2009 WL 3261252, at *27 (D.N.J. Sept. 30, 2009).

The Court finds that the secondary consideration of commercial success weighs against a finding of obviousness.

### b. Unexpected Results

Janssen asserts that before the '645 invention, persons of ordinary skill in the art would not have expected a solvate of darunavir to be suitable for use as a pharmaceutical composition. "[G]enerally the pharmaceutical industry always prefers to use non-solvated forms where possible." Myerson Tr. 584:16-19. "[S]olvates can be prone to solvent loss," leading to "undesirable changes" including "loss of chemical stability." Zaworotko Tr. 1717:18-1719:5 (agreeing with PTX 842A (Organic Crystal Engineering) at 75). This helps explain the "aversion" to using solvates in pharmaceutical products and is one reason why there are "very few examples . . . [of] actual solvates in approved products." *Id.* (agreeing with PTX 842A (Organic Crystal Engineering) at 75).

Janssen maintains that darunavir ethanolate has unexpected properties that enable its formulation as a drug product, in particular its "stability, particularly under heat" and "a very high desolvation temperature," that are "really unexpected" for solvates in general and for channel solvates in particular. Myerson Tr. 1836:24-1837:7. Janssen repeats that darunavir ethanolate has unexpectedly good bioavailability. In seeking approval for its ANDA products, Mylan represented to the FDA that its amorphous darunavir is bioequivalent to darunavir ethanolate. Myerson Tr.

67

**FOR PUBLICATION**

1847:8-11; DTX 1127 (Mylan's Request for Waiver of In-vivo BA/BE Studies). This is unexpected because "generally, amorphous forms have higher solubility and dissolution rate than crystalline forms," which means they generally demonstrate better bioavailability. Myerson Tr. 1847:12-14.

Lupin argues that as of May 2002, it would have been reasonable for a person of ordinary skill in the art looking to crystallize darunavir from ethanol to expect that a darunavir ethanolate could form. Zaworotko Tr. 1633:4-15, 1644:16-22. Lupin also contends that as of 2002, a person of ordinary skill in the art would have arrived at the reasonable expectation by reviewing the published literature and observing that most ethanolates occur in a 1:1 ratio. Zaworotko Tr. 1634:15-1635:16. Lupin also claims that it would not have been surprising that different darunavir drug materials can produce medicines that are bioequivalent. Zaworotko Tr. 1640:21-23. As support, Lupin argues that the differences in properties among different solvates and polymorphs of a molecule—including solubility and bioavailability—are minor and would not impact the performance of the medicine. *Id.* at 1640:21-1641:1, 1641:12-21, 1728:23-1729:21.

This Court finds that Janssen's arguments regarding unexpected results are persuasive and adopts its reasoning to conclude that the secondary consideration of unexpected results weighs against a finding of obviousness. Lupin's argument, based on Dr. Zaworotko's testimony that it would not have been surprising for a channel solvate to perform well in a pharmaceutical formulation, is unconvincing. This Court finds Dr. Zaworotko's testimony has no credibility as to this issue given his general agreement with statements to the contrary in Organic Crystal Engineering. *See* Zaworotko Tr. 1717:18-1719:5 (agreeing with PTX 842A (Organic Crystal Engineering) at 75).

68

**A00071**

**FOR PUBLICATION**

### c. Praise and industry acceptance

Again, Janssen asserts that Prezista has received widespread praise, including the highest possible recommendation in the guidelines promulgated by the U.S. Department of Health and Human Services, and its industry acceptance is reflected by the fact that it is the leading protease inhibitor.

Lupin puts forth the same lack of nexus arguments as it did with regard to commercial success. For the same reasons discussed earlier, the Court finds a causal nexus between claim 4 of the '645 Patent and the praise and industry acceptance of Prezista, and that these secondary factors also weigh against a finding of obviousness.

### d. Copying

Janssen asserts that Lupin copied the '645 invention. Myerson Tr. 1847:15-24.

Again Lupin responds that in the context of Hatch-Waxman cases, the Federal Circuit has deemed evidence of copying by generic manufacturers to be "not probative of nonobviousness because a showing of bioequivalence is required for FDA approval." *Bayer*, 713 F.3d at 1377. Again Lupin is correct, and as such the Court does not consider this secondary consideration of nonobviousness.

### 5. Conclusion: The '645 Patent was not obvious

Lupin has not met its burden to prove by clear and convincing evidence that the invention of claim 4 of the '645 Patent would have been obvious to a person of ordinary skill in the art. Lupin has failed to demonstrate by clear and convincing evidence that a person of ordinary skill in the art would have selected darunavir as a lead compound or compound of interest for formulation. It follows then that the remaining steps of Lupin's "Obviousness Pathway" are substantively irrelevant.

69

**FOR PUBLICATION**

The relevant secondary considerations, commercial success, unexpected results, praise and industry acceptance, all weigh against a finding of obviousness.

Considering the *Graham* factors, this Court finds that Lupin has not met its burden to demonstrate by clear and convincing evidence that the invention of claim 4 of the '645 Patent would have been obvious to a person of ordinary skill in the art.

ii. Enablement and Written Description under 35 U.S.C. § 112

Lupin's expert Dr. Philip Gould raised enablement and written description defenses for the '645 Patent. These defenses for the '645 Patent are directed at the "carrier" limitations in claim 4, which recite that the "inert carrier is a pharmaceutically acceptable carrier." PTX 1 ('645 Patent) at col. 30:36-42.

On direct examination, in testimony presumably aimed at Lupin's obviousness defense, Dr. Gould testified that the '645 Patent's specification provides examples of "suitable inert carriers." Gould Tr. 1276:5-9; *see* PTX 1 ('645 Patent) at col. 14:55-58. He also agreed that inert carriers for pharmaceutical compositions were known in the prior art, including in the '775 Patent, which discloses and claims the darunavir compound, and identifies acceptable inert carriers for the compounds it discloses. Gould Tr. 1271:20-1272:18; *see* DTX 5 ('775 Patent) at col. 217:36-44. Dr. Gould stated that nothing more than "[r]outine experimentation" would be needed for a person of ordinary skill in the art to "prepare the claimed composition that contains an ethanol solvate of the drug and carrier." Gould Tr. 1271:10-15. He also said that the disclosures in the patent and the prior art would have given a person of ordinary skill "a reasonable likelihood of successfully using an inert carrier with an ethanol solvate form of [darunavir] as disclosed in claim 4 of the '645 patent . . . ." *Id.* at 1272:19-25. Dr. Gould asserted that these opinions "wouldn't change" when

70

**FOR PUBLICATION**

claim 4's additional requirement that "the inert carrier is a pharmaceutically acceptable . . . carrier" is taken into account. *Id.* at 1273:1-6.

After eliciting that testimony from Dr. Gould, Lupin's counsel then asked him about Lupin's invalidity defense under section 112. Gould Tr. 1273:7-8. At that point, Dr. Gould offered opinions that are contradicted by the opinions discussed above. He opined that the patent and prior art do not provide sufficient information to allow a person of ordinary skill to select and make an inert carrier that would provide "special formulation properties" and "positive influences" such as good bioavailability—which, as he previously testified, are not requirements of the claim, *id.* at 1271:3-5—and that claim 4 accordingly is invalid for failure to meet the enablement and written description requirements. *Id.* at 1273:23-1278:2.

This Court finds that the internal contradictions in Dr. Gould's testimony raise serious concerns about his credibility as a witness. But even apart from those concerns, his opinions on enablement and written description cannot withstand scrutiny. Dr. Gould was correct when he testified that claim 4 does not require any "formulation properties" or "desired outcomes" for the "inert carrier" or the claimed "composition." *Id.* at 1271:3-5. The carrier only needs to be "inert" and "pharmaceutically acceptable." PTX 1 ('645 Patent) at col. 30:36-42. Nothing more is required. In the absence of such requirements in the claim, the specification's disclosure of "[e]xamples of suitable inert carriers," PTX 1 at col. 14:55-58, together with the knowledge of persons skilled in the art, is more than sufficient to satisfy the enablement requirement. The patent adequately describes and enables these claim limitations. As Dr. Myerson credibly testified, "the patent discloses the ethanolate solvate in a ratio of one to one. It discloses pharmaceutically acceptable inert carriers. If one of ordinary skill wanted to, they could just take the inert carrier and the active ingredient and fill them into a capsule and they'd have a pharmaceutical formulation

71

A00074

**FOR PUBLICATION**

to make the claim." Myerson Tr. 1829:4-24. In the initial part of his testimony, Dr. Gould agreed.
Gould Tr. 1258:7-10, 1276:5-9, 1271:10-1273:6.

Dr. Gould's testimony on obviousness is sufficient to defeat his testimony on enablement
and written description. Dr. Gould explained that a person of ordinary skill in the art would know
how to use the "suitable carriers" identified in the '645 Patent specification in a pharmaceutical
formulation, Gould Tr. 1294:25-1295:5; that "suitable pharmaceutical carriers or excipients as
disclosed in the art are very common and frequently used by formulators for direct compression
products," *id.* at 1295:6-10; and that "the preparation of tablets using these excipients are well
described in standard texts which teach their suitability for tablet formulation and give standard
ranges of these materials that are frequently employed," *id.* at 1295:13-19. He also agreed that
"well used references," such as the Remington and Martindale references, teach the use of inert
carriers. *Id.* at 1296:14-21. Consistent with Dr. Gould's testimony, the specification provides all
the detail one of skill in the art would need to practice the invention and to demonstrate that the
inventors were in possession of the claimed invention. As such, on the evidence presented, Lupin
has not met its burden of proving by clear and convincing evidence that claim 4 of the '645 Patent
is invalid for failure to satisfy the enablement or written description requirements.

### III. Remedies

Janssen seeks three types of relief in this case. With regard to all patents-in-suit, Janssen
seeks a declaration that Defendants' ANDA products infringe (or will infringe) valid claims of the
asserted patents. Pre-Trial Order at 15-17. As to the '015 and '411 Patents, the infringement has
not yet occurred and Janssen seeks a declaratory judgment under the Declaratory Judgments Act,
28 U.S.C. 2201(a). As to the '645 Patent, Lupin's filing of its ANDA constitutes an act of

A00075

**FOR PUBLICATION**

infringement under the Hatch-Waxman Act and Janssen seeks both a judgment of infringement

and declaratory relief.

Second, with respect to all patents-in-suit, Janssen seeks a permanent injunction barring

Defendants from importing into the United States their ANDA products and selling them. Pre-

Trial Order at 15-17.

Third, as to the '645 Patent, Janssen seeks an order under 35 U.S.C. § 271(e)(4)(A) that

the effective date of any FDA approval of Lupin's ANDA be no earlier than the day after the

expiration of the '645 Patent and any associated exclusivity. *Id.* at 16.

At the close of Janssen's case-in-chief, Defendants moved for judgment under Federal Rule

of Civil Procedure 52(c), arguing that Janssen had failed to show it was entitled to any permanent

injunction. Tr. 2269:1-2270:21. The Court reserved judgment on the motion, Tr. 2273:12, and

directed the parties to submit briefing on the issue, Tr. 2358:5-9, which the parties did, *see* ECF

Nos. 840, 841. Defendants' Rule 52(c) motion overlaps with the issues the Court must decide

regarding Janssen's entitlement to the permanent injunction remedies it seeks. As such, the Court's

rulings regarding permanent injunctions also resolve the 52(c) motion. As will be seen,

Defendants' Rule 52(c) motion is denied.

    A. The '015 Patent

        i. Declaratory Judgment that the '015 Patent is Not Invalid and is Infringed
           by Lupin

This Court previously granted summary judgment to Plaintiffs that the importation, offer

to sell, sale, or use of Lupin's ANDA Products would infringe claim 1 of the '015 Patent under 35

U.S.C. § 271(g). Summ. J. Op. at 49-59. At trial, Lupin failed to prove by clear and convincing

evidence that claim 1 of the '015 Patent is invalid as obvious under 35 U.S.C. § 103, *see supra*

Section II(B)(i)(5) or invalid as non-enabled under 35 U.S.C. § 112, ¶ 1, *see supra* Section II(B)(ii).

**A00076**

**FOR PUBLICATION**

As a consequence, Janssen is entitled to a declaratory judgment that claim 1 of the '015 Patent is not invalid and that importing, selling, offering to sell, or using the generic darunavir tablets described in Lupin's ANDA would constitute infringement of the '015 Patent under 35 U.S.C. § 271(g). *See* Pre-Trial Order at 16.

> ii. Permanent Injunction Barring Lupin from Importing or Selling its ANDA Products Before the '015 Patent Expires

Janssen also seeks a permanent injunction enjoining Lupin from commercially manufacturing, selling or offering for sale, using, or importing the generic darunavir tablets described in Lupin's ANDA in the United States, or any darunavir product that includes a bis-THF component made by any colorable variation of the process used to make Lupin's ANDA products, until after the expiration date of the '015 Patent. Pre-Trial Order at 17.

In *eBay Inc. v. MercExchange, LLC* the Supreme Court confirmed that the traditional four factor test for obtaining a permanent injunction applies in this context. 547 U.S. 388, 391 (2006). In doing so, the Court rejected "categorical rule[s]" concerning the granting or denying of injunctive relief, and held that the "decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *Id.* at 393, 394. Here Janssen must demonstrate

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

74

**FOR PUBLICATION**

*Id.* at 391. Lupin makes a series of arguments that Janssen has failed to establish that it is entitled to a permanent injunction based on Lupin's infringement of the '015 Patent.[5] The Court concludes, however, that Janssen has satisfied its burden and that an injunction is warranted.

### 1. Irreparable Injury

After *eBay*, "there is no presumption of irreparable harm upon a finding of patent infringement." *Apple Inc. v. Samsung Elecs. Co.* (*Apple III*), 735 F.3d 1352, 1359 (Fed. Cir. 2013). "[T]o satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co.* (*Apple II*), 695 F.3d 1370, 1374 (Fed. Cir. 2012). The "irreparable harm and causal nexus inquiries" are "inextricably related concepts," but they "may be separated for the ease of analysis." *Id.* The Federal Circuit has now made clear that "the causal nexus requirement is part of the irreparable harm factor. Without a showing of causal nexus, there is no relevant irreparable harm. In other words, there cannot be one without the other." *Apple III*, 735 F.3d at 1363. As suggested by the Circuit, the Court addresses each aspect of the irreparable injury inquiry separately.

### a. Irreparable Harm

"Irreparable injury encompasses different types of losses that are often difficult to quantify . . . ." *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344 (Fed. Cir.

---

[5] Mylan's and Lupin's arguments regarding Janssen's entitlement to permanent injunctive relief on the three patents at issue substantially overlap, so the Court sets out its analysis in greatest detail here, and will refer to this section in its analysis of the '411 and '645 Patents. In addition, Mylan's and Lupin's arguments in the parties' joint proposed findings are the same as those in their Rule 52(c) motion. The Court refers to those made in the joint proposed findings for ease of reference.

**A00078**

**FOR PUBLICATION**

2013). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930-31 (Fed. Cir. 2012). A showing of lost market share and sales can support a finding of irreparable harm. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1154 (Fed. Cir. 2011); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011). A patentee can also demonstrate irreparable harm from a diminished ability to invest in research and development. *See Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996); *AstraZeneca LP v. Apotex, Inc.*, 623 F. Supp. 2d 579, 612-13 (D.N.J. 2009), *supplemented*, 623 F. Supp. 2d 615 (D.N.J. 2009), *aff'd*, 633 F.3d 1042 (Fed. Cir. 2010). In addition, "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics*, 717 F.3d at 1345; *see also Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude." (citation omitted)).

The Court finds that Janssen has demonstrated that it will suffer irreparable harm from Lupin's infringement in the form of lost sales, price erosion, research and development ability, and having to compete directly with an infringing competitor.

With respect to lost sales, Defendants' economics expert, Dr. Leffler, stated that Prezista prescriptions in the United States generated over $800 million last year. Leffler Tr. 2310:6-15. Janssen presented the testimony of Jessica Martori, Lupin's senior manager of portfolio development, regarding "the projected market share or market potential of Lupin's ANDA products." Martori Tr. 2256:7-22. Ms. Martori testified that in the first year of the launch of its

76

A00079

**FOR PUBLICATION**

generic product, 98 percent of the market would be generic, followed by 100 percent every year thereafter. *Id.* at 2259:21-25. Janssen has clearly demonstrated that it would lose virtually all, if not all, of its sales to Lupin, *Accord Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009) ("To the extent that failing to grant a preliminary injunction would permit Crane to drop its prices in order to drive AMS out of the market entirely, this might support a finding of irreparable harm sufficient to warrant a preliminary injunction.").[6]

There is also ample evidence that entry by Lupin would lead to price erosion.

*See also* Martori Tr. 2261:6-7 ("Because once the generics launch, they take a majority of the brand business away, and they lower price.").

In addition, Janssen presented the testimony of Dr. Stoffels, the chief scientific officer of Johnson & Johnson, who is responsible for all product development. Stoffels Tr. 63:3-65:25. Dr. Stoffels testified that out of every hundred dollars of Prezista sales, twenty-two are reinvested into new research and development. *Id.* at 115:22-116:1. Based on his estimate that Janssen would lose 70 to 80 percent of its sales upon a generic launch, Dr. Stoffels stated there would be a "few hundred million dollars less to be invested in R&D for new drugs and new products." *Id.* at 116:12-14. This testimony is unrebutted, and the Court finds that the loss represented by 22 percent of Prezista sales is a significant harm to Janssen's research and development efforts.

---

[6] Any objection by Lupin that the _____ testimony show that Janssen will lose this amount of sales to a generic, but not necessarily to Lupin, is misplaced. The testimony shows that sales will be lost upon generic entry, which supports the conclusion that the same loss would occur if Lupin were the only generic to enter. The happenstance that other generics might also enter does not change this conclusion. *See Robert Bosch LLC*, 659 F.3d at 1154 ("While the party seeking an injunction bears the burden of showing lost market share, this showing need not be made with direct evidence.").

77

**FOR PUBLICATION**

Finally, there is no question that Lupin would be Janssen's direct competitor upon launching its generic products, which the Court has already found would be made by a process that would infringe Janssen's valid patent. This also supports a finding of irreparable harm. *Douglas Dynamics*, 717 F.3d at 1345; *Presidio Components*, 702 F.3d at 1363; *see also Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1171 (Fed. Cir. 2014) ("Trebro and FireFly are direct competitors selling competing products in this market. Thus, the record strongly shows a probability for irreparable harm.").

The Court finds that these four circumstances—lost sales, price erosion, diminished research and development assets, and having to compete directly with an entity selling a product made by an infringing process—together demonstrate that Janssen will be irreparably harmed absent an injunction. As next explained, there is a causal nexus between the irreparable harm and Lupin's infringement.

b.    Causal Nexus

The Federal Circuit has recently emphasized the causal nexus aspect of the irreparable injury inquiry in a series of appeals between Apple, Inc. and Samsung Electronics Co., Ltd. *See Apple Inc. v. Samsung Elecs. Co.* (*Apple I*), 678 F.3d 1314 (Fed Cir. 2012); *Apple II; Apple III.* "[T]he causal nexus requirement is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition . . . . The former type of harm may weigh in favor of an injunction, whereas the latter does not." *Apple III*, 735 F.3d at 1361. "[T]he purpose of the causal nexus requirement is to show that the patentee is irreparably harmed *by the infringement.*" *Id.* at 1363. This requirement "reflects general tort principles of causation and applies equally to the preliminary and permanent injunction contexts." *Id.* at 1361.

78

**FOR PUBLICATION**

1) The *Apple* Cases

The *Apple* cases involved whether Apple was entitled to an injunction based on Samsung's

infringement of a select few patents incorporated into "complex, multi-featured smartphones and

tablets." *Id.* at 1363. In this context, the court explained:

> [I]t may very well be that the accused product would sell almost as well without
> incorporating the patented feature. And in that case, even if the competitive injury
> that results from selling the accused device is substantial, the harm that flows from
> the alleged infringement (the only harm that should count) is not. . . . [T]he causal
> nexus inquiry . . . informs whether the patentee's allegations of irreparable harm
> are pertinent to the injunctive relief analysis, or whether the patentee seeks to
> leverage its patent for competitive gain beyond that which the inventive
> contribution and value of the patent warrant. . . . The relevant question is not
> whether there is some causal relationship between the asserted injury and the
> infringing conduct, but to what extent the harm resulting from selling the accused
> product can be ascribed to the infringement. . . . The patentee must rather show that
> the infringing feature drives consumer demand for the accused product.

*Apple II*, 695 F.3d at 1374-75. The Circuit also discussed other recent decisions in which it had

not addressed the causal nexus requirement in detail. Those cases "involved relatively simple

products—at least in the sense that they had a small number of features when compared to the

complex, multi-featured smartphones and tablets at issue." *Apple III*, 735 F.3d at 1362. The court

made clear that "the causal nexus requirement applies regardless of the complexity of the products.

It just may be more easily satisfied (indeed, perhaps even conceded) for relatively 'simple'

products." *Id.*

The Circuit made two additional points. The causal nexus inquiry did not mean "Apple

must show that a patented feature is the one and only reason for consumer demand. . . . [R]ather

than show that a patented feature is *the exclusive reason* for consumer demand, Apple must show

some connection between the patented feature and demand for Samsung's products." *Id.* at 1364.

The court stressed that there "might be a variety of ways to make this required showing," such as

"with evidence that a patented feature is one of several features that cause consumers to make their

79

**FOR PUBLICATION**

purchasing decisions," or that the inclusion or exclusion of a patented feature makes a product

significantly more or less desirable. *Id.* As example:

> [A] battery does not necessarily drive demand for a laptop computer simply because
> its removal would render the laptop ineffective as a portable computer. That is
> because consumers often do not choose a laptop based on its battery, and
> presumably at this point, no inventor has a patent covering all laptop batteries.
> Nevertheless, it is indisputable that the ability to carry around a computer without
> having to plug it in is one of the reasons people buy laptops. Thus, if the first person
> to invent a laptop battery had obtained a patent covering all laptop batteries, then it
> would be reasonable to say that the patented invention was a driver of demand for
> laptops.

*Id.* (citation omitted).

Second, the court acknowledged "there may be circumstances where it is logical and

equitable to view patents in the aggregate," such as "where they all relate to the same technology

or where they combine to make a product significantly more valuable." *Id.* at 1365.

### 2) Discussion

Janssen and Lupin argue at length over whether Janssen has demonstrated a causal nexus

between the irreparable harm and Lupin's infringement. Lupin stresses that Janssen has failed to

meet the standard articulated in the *Apple* cases. The Court disagrees, and finds that there is a

causal nexus between the irreparable harm and infringement.

At the outset, the Court rejects an attempt by Janssen to cut the inquiry short. Janssen argues

that "Congress anticipated and addressed the nexus issue" in 35 U.S.C. § 271(g). Janssen's Br. in

Opp'n to Defs.' Mot. for J. on Partial Findings ("Janssen's 52(c) Br.") at 16 (ECF No. 840). That

section provides, "Whoever without authority imports into the United States or offers to sell, sells,

or uses within the United States a product which is made by a process patented in the United States

shall be liable as an infringer." 35 U.S.C. § 271(g). There are two exceptions: a product that is

"materially changed by subsequent processes" and a product that "becomes a trivial and

80

**FOR PUBLICATION**

nonessential component of another product." § 271(g)(1), (2). Janssen argues that the section's legislative history shows that the exceptions "restrict[] the scope of the bill to exclude ultimate products that, because of intervening manufacturing steps, cease to have a *reasonable nexus* with the patented process." Janssen's 52(c) Br. at 16 (quoting S. Rep. No. 100-83, at 36 (1987) (Janssen's emphasis) (quotation marks omitted)). Janssen's argument is that unless one of the exceptions applies, a causal nexus exists. And because this Court found in its summary judgment opinion that neither exception applied, *see* Summ. J. Op. at 54-59, there is a causal nexus in this case.

The Court disagrees. Even giving the one sentence of legislative history the weight Janssen does, the Court fails to see how this resolves the causal nexus inquiry. That section and sentence focus on whether the final imported *product* is related closely enough to the patented *process* to justify a finding of *infringement*. It has nothing to do with the question of *remedy* if infringement is found. The Supreme Court emphasized in *eBay* that "the creation of a right is distinct from the provision of remedies for violations of that right." 547 U.S. at 392. The causal nexus inquiry focusses on the relationship between *irreparable harm* and *infringement*, a separate issue. If the Court adopted Janssen's reasoning, then in every infringement case under section 271(g) the causal nexus requirement would be satisfied, moving trial courts back toward the presumption of injunctive relief that the Supreme Court rejected in *eBay*.

Returning to our inquiry, the Court finds Janssen has demonstrated a causal nexus between Lupin's infringement and the irreparable harm. Lupin's process for making its generic darunavir products infringes the '015 Patent. Summ. J. Op. at 59. The sale of those products would lead directly to the irreparable harms shown—lost sales (*see* Martori Tr. 2259:21-25), price erosion adverse impact on research and development

81

**FOR PUBLICATION**

(*see* Stoffels Tr. 115:22-116:1), and the need to compete directly with an infringing competitor. Without infringing the '015 Patent, Lupin would not be able to make the products proposed in its ANDA. And without an injunction, Lupin would use Janssen's patented process to produce a product that would substantially destroy Janssen's Prezista business.

Lupin attempts to draw parallels between this case and the *Apple* cases to claim that Janssen has not shown a causal nexus. Lupin argues that Janssen "will lose sales if Lupin comes on the market irrespective of whether Lupin's process for making bis-THF . . . did or did not use the '015 patent's process steps." Joint Proposed Findings of Fact ¶ D1118. Lupin points to testimony that doctors and patients care about getting the darunavir molecule into the body, about the number of pills patients have to take, and about the method of using Prezista. Zingman Tr. 861:9-15, 861:25-862:5, 889:25-890:12; Leffler Tr. 2282:10-17, 2284:9-14; Falcon Tr. 2485:8-13. There is also testimony that "there's no evidence that the specific processes in [the '015 and '411] patents is key to the effectiveness of a darunavir-containing combination regimen." Zingman Tr. 862:3-5. Lupin says that Janssen "failed to show (e.g., through a customer survey or comparable market research) that anyone would actually buy Lupin Ltd.'s ANDA products" due to Lupin's use of the '015 Patent's process. Joint Proposed Findings of Fact ¶ D1124. Lupin concludes that Janssen has "put forth no evidence that the claimed, non-prior art elements of the '015 patent are what drive sales or consumer demand." *Id.* ¶ 1126 (emphasis omitted).

First, this case is unlike the *Apple* cases because it does not involve "complex, multi-featured" products. Rather, the Court finds the darunavir products at issue more akin to the "relatively simple products" the Federal Circuit contrasted with the smartphones and tablets in the

82

A00085

**FOR PUBLICATION**

*Apple* cases.[7] *See Apple III*, 735 F.3d at 1362. Indeed, Lupin states that "Prezista contains many desirable features," Joint Proposed Findings of Fact ¶ D1120, but lists only three. By contrast, the several patented features at issue in the *Apple* cases were a "small minority" of the large number of features in those products. *Apple II*, 695 F.3d at 1374. Here this means that the causal nexus inquiry "may be more easily satisfied." *Apple III*, 735 F.3d at 1362.

Lupin's comparison to the *Apple* cases is also misleading in its use of the term "features." In the *Apple* cases, the "features" were attributes of the finished consumer good; they did not concern the process the companies used to make that good. Calling the '015 process a "feature" of the finished darunavir products is inaccurate. This leads to the main problem with Lupin's argument: unlike the case of various features of a finished consumer good, it is not possible to separate the process for making the finished darunavir product from the product itself in evaluating consumer demand and nexus. The *Apple* cases did not deal with a claim of patent infringement of a process to make tablets and smartphones. Were it necessary to show that consumers bought a product because of the process by which it is made, there would be a de facto result of *no* irreparable harm and *no* permanent injunction in patent infringement cases concerning processes. But such a result would run counter to *eBay*. 547 U.S. at 393, 394. And that has not been so in past process patent cases. *See, e.g., Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1386 (Fed. Cir. 2009) (affirming injunction in part based on finding of infringement of process patents under 35 U.S.C. § 271(g)); *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1356 (Fed. Cir. 2006) (affirming district court's award of injunction for infringement of patented process); *accord eBay*, 547 U.S. at 395 (Roberts, C.J., concurring)

---

[7] "Simple" and "complex" refer to the number of features the product has.

A00086

**FOR PUBLICATION**

(noting the "long tradition of equity practice" of courts granting "injunctive relief upon a finding

of infringement in the vast majority of patent cases" because of "the difficulty of protecting a right

to *exclude* through monetary remedies that allow an infringer to *use* an invention against the

patentee's wishes," and explaining that "like cases should be decided alike" and that in exercising

its equitable discretion, a district court should remember that "a page of history is worth a volume

of logic." (citations and quotation marks omitted)); *id.* at 396 (Kennedy, J., concurring) ("To the

extent earlier cases establish a pattern of granting an injunction against patent infringers almost as

a matter of course, this pattern simply illustrates the result of the four-factor test in the contexts

then prevalent. The lesson of the historical practice, therefore, is most helpful and instructive when

the circumstances of a case bear substantial parallels to litigation the courts have confronted

before."). The Court finds this distinction crucial, and does not accept Lupin's comparison of the

'015 *process* with the *features* at issue in *Apple.*[8]

In addition, the Federal Circuit has made clear that the potential for the complete

destruction of a patentee's business with respect to the patented product can make a difference in

the causal nexus inquiry. *See Apple I*, 678 F.3d at 1324 ("The narrow injunction upheld by this

court [in a prior case] served only to protect the patented product from obsolescence . . . . Here, in

contrast, the district court found that the alleged acts of infringement do not threaten to have any

such dramatic effects on the market generally or on Apple's share of that market."). Here, as the

Court has already found, Lupin's infringement would lead to the complete, or nearly complete,

---

[8] Lupin makes two additional arguments. Because Janssen "will purportedly lose sales to Mylan
as readily as to Lupin, . . . it is plainly not any process patented in the '015 Patent that drives
consumer demand." Joint Proposed Findings of Fact ¶ D1135. Second, that the '015 Patent allows
for commercial scale production of bis-THF "does not provide a nexus hook" for the irreparable
harm. *Id.* ¶ D1138. Both of these arguments are based on the premise the Court rejects—that it is
reasonable to equate the *process* at issue here with the *features* at issue in the *Apple* cases.

84

Confidential Information Redacted – Subject to Protective Order

**FOR PUBLICATION**

destruction of Janssen's Prezista business. *See* Martori Tr. 2259:21-25;

Lupin makes an additional argument that Janssen has "failed to show which entity is actually selling in the United States, which corporate entity will lose sales in the United States; or that any person or entity who is a Plaintiff here can be deemed synonymous with the patent holder." Joint Proposed Findings of Fact ¶ D1160. Lupin argues that, as a result, Janssen has not demonstrated that any entity has standing or will suffer any irreparable harm. *Id.* ¶ D1161. But Lupin and Janssen stipulated this issue out of the case in the Pre-Trial Order, which provides that "Janssen," defined as both Janssen R&D Ireland and Janssen Products, L.P., "sells" Prezista. Pre-Trial Order at 2 § 1; 9 ¶ 14. This valid stipulation moots such argument. *See Waldorf v. Shuta*, 142 F.3d 601, 616 (3d Cir. 1998) ("[I]t is a well-recognized rule of law that valid stipulations entered into freely and fairly, and approved by the court, should not be lightly set aside." (citation and quotation marks omitted)).

The Court finds that Janssen has shown irreparable harm that is causally related to Lupin's infringement of the '015 Patent, which weighs in favor of a permanent injunction.

### 2. Inadequacy of Legal Remedies

Janssen must demonstrate that "'remedies available at law, such as monetary damages, are inadequate to compensate' the patentee for the irreparable harm it has suffered." *Apple III*, 735 F.3d at 1368 (quoting *eBay*, 547 U.S. at 391). The Court finds that monetary damages would be inadequate to remedy the harms Janssen will suffer.

The Court notes that a finding of irreparable injury will, in most cases, go hand in hand with a finding that legal remedies are inadequate. *See* Nicholas P. Chan, *Balancing Judicial Misvaluation and Patent Hold-Up: Some Principles for Considering Injunctive Relief After eBay,*

85

Confidential Information Redacted – Subject to Protective Order

**FOR PUBLICATION**

59 UCLA L. Rev. 746, 783 (2012) ("Most courts consider the first two factors interchangeable, and they are usually analyzed together: An injury is irreparable when monetary damages are inadequate to compensate for that injury."). This is such a case.

The record shows that Janssen will not only lose sales and be forced to compete with a direct competitor, but that the competition with its direct competitor will lead directly to the destruction of its Prezista business. Monetary compensation can alleviate some of that loss, but it cannot fully account for the harm of being taken out of the market. Even were Lupin able to satisfy a judgment,[9] "a defendant's *ability* to pay a judgment does not defeat a claim that an award of damages would be an inadequate remedy. Rather, a defendant's ability to pay merely indicates that a court should look to other considerations to determine whether a damages award will adequately compensate the patentee for the harm caused by continuing infringement." *Apple III*, 735 F.3d at 1369. And "[t]here is no reason to believe that [Lupin] will stop infringing, or that the irreparable harms resulting from its infringement will otherwise cease, absent an injunction." *Robert Bosch LLC*, 659 F.3d at 1155. The Court finds that remedies available at law would be inadequate.

3.  Balance of Hardships

The balance of hardships also weighs in favor of granting an injunction. If an injunction is not granted, Janssen will lose its Prezista business. Martori Tr. 2259:21-25;

The evidence clearly demonstrates that Lupin was aware of Janssen's '015 Patent, but chose to develop its infringing products anyway. *See* PTX 124, 125 (correspondence between Tibotec/Johnson & Johnson and Lupin disclosing the '015 Patent in

---

[9] Janssen argues that evidence in the record shows that Lupin's profits from generic sales of its darunavir products would be inadequate to satisfy a damages award for future infringement. *See* Janssen's 52(c) Br. at 12. Janssen has not submitted evidence concerning Lupin's other assets, which might or might not be sufficient to satisfy a judgment.

**FOR PUBLICATION**

response to Lupin's statement that it "propose[d] to start the commercial production of Darunavir

ethanolate bulk drug in near future"). The Federal Circuit has made clear that "One who elects to

build a business on a product found to infringe cannot be heard to complain if an injunction against

continuing infringement destroys the business so elected." *Robert Bosch LLC*, 659 F.3d at 1156

(quoting *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) (quotation

marks omitted)). The Court concludes the balance of hardships weighs in favor of Janssen and

granting an injunction.

### 4. Public Interest

The Court finds that "the public interest would not be disserved by a permanent injunction."

*eBay*, 547 U.S. at 391. The Federal Circuit "has long acknowledged the importance of the patent

system in encouraging innovation. Indeed, the 'encouragement of investment-based risk is the

fundamental purpose of the patent grant, and is based directly on the right to exclude.'" *Sanofi-

Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (quoting *Patlex Corp. v.

Mossinghoff*, 758 F.2d 594, 599 (Fed. Cir. 1985)).

Lupin argues that the public interest will be harmed by precluding generic drugs at lower

prices. *See* Joint Proposed Findings of Fact ¶ D1154 (quoting *In re Barr Labs., Inc.*, 930 F.2d 72,

76 (D.C. Cir. 1991) for the proposition that the Hatch-Waxman Act was designed to "get generic

drugs into the hands of patients at reasonable prices—fast"). But the Federal Circuit recognizes

that "while the statutory framework . . . does seek to make low cost generic drugs available to the

public, it does not do so by entirely eliminating the exclusionary rights conveyed by

pharmaceutical patents. Nor does the statutory framework encourage or excuse infringement of

valid pharmaceutical patents." *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1382 (Fed.

Cir. 2005); *see also Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1363 (Fed. Cir. 2008) ("The

A00090

**FOR PUBLICATION**

patent laws promote . . . progress by offering a right of exclusion for a limited period as an incentive

to inventors to risk the often enormous costs in terms of time, research, and development."

(quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974) (quotation marks omitted)).

The record in this case supports the reasoning behind this statutory framework. Janssen invested

over $1 billion to bring Prezista to market, Stoffels Tr. 112:23-25. And Dr. Stoffels testified that

"if everyone can copy it the year we bring it to market or a few years afterwards, then there is no

way we can justify that type of investment." Stoffels Tr. 113:11-13.

The Court finds that the public interest will not be disserved by granting a permanent

injunction.

\* \* \* \* \*

The Court concludes that Janssen has met its burden to establish its entitlement to

injunctive relief, and grants a permanent injunction enjoining Lupin from commercially

manufacturing, selling or offering for sale, using, or importing the generic darunavir tablets

described in Lupin's ANDA in the United States, or any darunavir product that includes a bis-THF

component made by any colorable variation of the process used to make Lupin's ANDA products,

until after the expiration date of the '015 Patent.

     B.  The '411 Patent

          i.  Declaratory Judgment that the '411 Patent is Not Invalid and is Infringed
            by Mylan

Before trial, this Court granted Janssen's motion for summary judgment that Mylan

infringes the '411 Patent. Summ. J. Op. at 5-8. At trial, Mylan failed to prove by clear and

convincing evidence that claim 13 of the '411 Patent is invalid as obvious under 35 U.S.C. § 103,

*see supra* Section II(C)(i)(5), or invalid as non-enabled under 35 U.S.C. § 112, ¶ 1, *see supra*

Section II(C)(ii).

88

Confidential Information Redacted – Subject to Protective Order

**FOR PUBLICATION**

As a consequence, Janssen is entitled to a declaratory judgment that claim 13 of the '411 Patent is not invalid and that importing, selling, offering to sell, or using the generic darunavir tablets described in Mylan's ANDA would constitute infringement of the '411 Patent under 35 U.S.C. § 271(g). *See* Pre-Trial Order at 15.

> ii.  Permanent Injunction Barring Mylan from Importing or Selling its ANDA Products Before the '411 Patent Expires

Janssen also seeks a permanent injunction enjoining Mylan from commercially manufacturing, selling or offering for sale, using, or importing the generic darunavir tablets described in Mylan's ANDA or made by a process that is a colorable variation of the process claimed in the '411 Patent, until after the expiration date of the '411 Patent. Pre-Trial Order at 15.

The Court finds that Janssen has satisfied the four-factor test reaffirmed in *eBay*, 547 U.S. at 391, and is entitled to the permanent injunction it seeks.

1.  Irreparable Injury

The Court finds that, as with Lupin's infringement of the '015 process patent, Mylan's infringement of the '411 process patent will cause Janssen irreparable injury. Mylan makes largely the same arguments against this conclusion that Lupin does, with small differences, but the result is the same.

a.  Irreparable Harm

If Mylan is not enjoined from bringing its darunavir products made by an infringing process to market, Janssen will suffer the same irreparable harms identified with respect to Lupin and the '015 Patent: lost sales, price erosion, adverse impact on research and development, and having to compete directly with a product made by infringing its process.

89

Confidential Information Redacted – Subject to Protective Order

**FOR PUBLICATION**

The Court concludes that,

Janssen will suffer near total loss of sales due to entry of Mylan's

product made by infringing the '411 Patent.

The infringement will result in a significant loss of funding

for research and development. Stoffels Tr. 115:22-116:1, 116:12-14. Finally, as with Lupin, there

is no question that Mylan and Janssen will be direct competitors, causing Janssen the irreparable

harm of being driven out of the market by a product made by infringing its patented process. *See*

*Douglas Dynamics*, 717 F.3d at 1345; *Presidio Components*, 702 F.3d at 1363.

The Court concludes these findings, taken together, constitute irreparable harm.

b.  Causal Nexus

As with Lupin's infringement of the '015 Patent, the Court finds there is a causal nexus

between Mylan's infringement of the '411 Patent and the irreparable harms.[10] Mylan's process for

making its generic darunavir products infringes the '411 Patent. Summ. J. Op. at 5-8. The sale of

those products would lead directly to the irreparable harm—lost sales

price erosion

adverse impact on research and development (*see* Stoffels Tr. 115:22-116:1), and having to

compete directly with an infringing competitor. Without infringing the '411 Patent, Mylan would

not be able to produce the generics proposed in its ANDA, and without an injunction, it would use

Janssen's patented process to destroy Janssen's Prezista business.

---

[10] In the context of this patent, too, the Court rejects Janssen's argument that Congress addressed
the causal nexus issue in enacting 35 U.S.C. § 271(g). *See supra* Section III(A)(ii)(1)(b)(2).

**FOR PUBLICATION**

Mylan makes essentially identical arguments to those raised by Lupin concerning causal

nexus. Mylan argues that Janssen will "lose sales if Mylan comes on the market irrespective of

whether Mylan's process for making the active pharmaceutical ingredient in Mylan Pharms'

ANDA products did or did not use the '411 patent's process steps," and that consumers will not

care that the '411 process is used when deciding to purchase Mylan's generic products. *See* Joint

Proposed Findings of Fact ¶¶ D1176, 1183-86. The Court rejects these arguments for the same

reasons it rejected Lupin's. *See supra* Section III(A)(ii)(1)(b).

Mylan makes one additional argument. It argues that because Janssen does not practice

claim 13 of the '411 Patent, Janssen "cannot tie Prezista sales" to infringement of that claim. Joint

Proposed Findings of Fact ¶ D1178. But this relies on the same premise the Court rejects—that it

is reasonable to equate the *process* at issue here with the *features* at issue in the *Apple* cases.

Whether Janssen practices the claim should not impact the irreparable injury analysis in any event.

*See Trebro Mfg.*, 748 F.3d at 1171 ("In multiple instances, this court has held that a party that does

not practice the asserted patent may still receive an injunction when it sells a competing product.");

*Presidio Components*, 702 F.3d at 1363 ("[e]ven without practicing the claimed invention, the

patentee can suffer irreparable injury" where there is "[d]irect competition in the same market");

*Briggs & Stratton Corp. v. Chongquing Rato Power Co., Ltd.*, No. 5:13-cv-0316 (LEK), 2013 WL

3972391, at *22 (N.D.N.Y. July 23, 2013) ("The Federal Circuit has made it abundantly clear,

however, that a patentee can demonstrate irreparable harm even if the patentee does not practice

the asserted claims.").[11]

---

[11] The Court again rejects the argument, raised in the '411 context also, that Janssen has not
demonstrated which entity sells Prezista. *See supra* Section III(A)(ii)(1)(b)(2).

91

**A00094**

**FOR PUBLICATION**

The Court finds that Janssen has shown irreparable harm that is causally related to Mylan's infringement of the '411 Patent.

### 2. Inadequacy of Legal Remedies

Consistent with its reasoning in the context of the '015 Patent, the Court finds that remedies available at law would be inadequate to compensate Janssen for Mylan's infringement of the '411 Patent. Mylan and Janssen both agree that the inquiry here is the same as it is in the '015 context. *See* Joint Proposed Findings of Fact ¶¶ D1194, P579. As such, the Court concludes that the harm Janssen would suffer from Mylan's infringement of the '411 Patent cannot be adequately remedied by monetary damages. *See supra* Section III(A)(ii)(2); *Robert Bosch LLC*, 659 F.3d at 1155.

### 3. Balance of Hardships

The Court finds that the balance of hardships weighs in favor of Janssen and of granting an injunction. If an injunction is not granted, Janssen will lose nearly all of its Prezista business.
The Court credits the testimony of Dr. Reider, in conjunction with the European version of the '411 Patent produced from Mylan's files, in determining that Mylan was aware of and copied Janssen's process. *See* Reider Tr. 2047:11-2048:6, 2049:19-25; PTX 143 at MATRIX(Daru) 011139 (showing underlined portion of European version of '411 Patent). The balance of hardships clearly weighs in favor of Janssen. *See supra* Section III(A)(ii)(3); *Robert Bosch LLC*, 659 F.3d at 1156.

### 4. Public Interest

For the same reasons discussed in the context of the '015 Patent, the Court finds that with respect to the '411 Patent the public interest will not be disserved by granting a permanent injunction. *See supra* Section III(A)(ii)(4).

\* \* \* \* \*

92

A00095

**FOR PUBLICATION**

The Court concludes that Janssen has met its burden to establish its entitlement to injunctive relief, and grants a permanent injunction enjoining Mylan from commercially manufacturing, selling or offering for sale, using, or importing the generic darunavir tablets described in Mylan's ANDA or made by a process that is a colorable variation of the process claimed in the '411 Patent, until after the expiration date of the '411 Patent.

C. The '645 Patent

i. Declaratory Judgment that the '645 Patent is Not Invalid and is Infringed by Lupin

Before trial, Lupin stipulated to infringement of claim 4 of the '645 Patent. ECF No. 375. At trial, Lupin failed to prove that claim 4 of the '645 Patent is invalid, either under 35 U.S.C. § 103, *see supra* Section II(D)(i)(5), or § 112, ¶ 1, *see supra* Section II(D)(ii).

As a consequence, Janssen is entitled to judgment that claim 4 of the '645 Patent is not invalid, that Lupin has infringed the '645 Patent under 35 U.S.C. § 271(e)(2)(A) and that the making, using, selling, offering to sell, or importing of the generic darunavir tablets described in Lupin's ANDA would constitute infringement of the '645 Patent under 35 U.S.C. §§ 271(a). ECF No. 375.

ii. Permanent Injunction Barring Lupin from Importing or Selling its ANDA Products Before the '645 Patent Expires

Janssen also seeks a permanent injunction enjoining Lupin from commercially manufacturing, selling or offering for sale, using, or importing the generic darunavir tablets described in Lupin's ANDA, or any colorable variations of the same, until after the expiration date of the '645 Patent and its associated exclusivity. Pre-Trial Order at 17.

The Court finds that Janssen has satisfied the four-factor test for entitlement to a permanent injunction. *See eBay*, 547 U.S. at 391.

93

**FOR PUBLICATION**

### 1. Irreparable Injury

The Court finds that Lupin's infringement of the '645 Patent will cause Janssen irreparable injury as readily as Lupin's infringement of the '015 process patent. The Court takes the two aspects of this inquiry in turn.

#### a. Irreparable Harm

If Lupin is not enjoined from bringing its infringing darunavir products to market, Janssen will suffer the same irreparable harms identified with respect to the '015 Patent: lost sales, price erosion, adverse impact on research and development, and having to compete directly with an infringing product.

As this Court has already found, *see supra* Section III(A)(ii)(1)(a), Lupin's entry of a generic into the market will lead to the loss of Janssen's sales, Martori Tr. 2259:21-25, significant price erosion,                                         adverse impact on research and development, Stoffels Tr. 115:22-116:1, 116:12-14, and being driven out of the market by an infringing product. *See Douglas Dynamics*, 717 F.3d at 1345; *Presidio Components*, 702 F.3d at 1363.

The Court concludes these findings, taken together, constitute irreparable harm.

#### b. Causal Nexus

The Court concludes that there is a causal nexus between Lupin's infringement of the '645 Patent and the irreparable harm. Lupin's darunavir products infringe claim 4 of the '645 Patent. ECF No. 375 (Stipulation). The sale of those products would lead directly to the irreparable harm—lost sales (*see* Martori Tr. 2259:21-25                                price erosion                                adverse impact on research and development (*see* Stoffels Tr. 115:22-116:1), and having to compete directly with an infringing

94

**FOR PUBLICATION**

competitor. Without infringing the '645 Patent, Lupin would not have generics to sell, and without

an injunction, it would use infringing products to destroy Janssen's Prezista business.

Unlike with the two process patents, Lupin's arguments concerning causal nexus have

more bite in the context of the '645 Patent. Lupin is correct to argue that the novel, non-prior art

element of the '645 Patent is that it is darunavir in an ethanolate solvate form. Janssen's witness,

Dr. Myerson, testified that it was the advent of the ethanolate solvate form of darunavir that made

the '645 Patent non-obvious. Myerson Tr. 1875:3-9. And Dr. Zingman testified that doctors do not

prescribe Prezista because of its ethanolate form. Zingman Tr. 889:25-890:2; *see also* Leffler Tr.

2297:3-16 (testifying that "the limited physician surveys I've seen never listed ethanol solvate as

one of the factors that play any role in a physician's prescribing habits"). Lupin also reiterates its

argument that because Janssen would lose sales to Mylan, which does not infringe the '645 Patent,

as easily as to Lupin, Janssen's "damages *from the infringing acts* are zero." Joint Proposed

Findings of Fact ¶ D1214. Lupin thus argues that the ethanolate solvate feature does not drive

demand for the product, meaning there is no causal nexus under the reasoning of the *Apple* cases.

This argument has some appeal, but it yields upon closer scrutiny. As the Court has found,

this case is unlike the *Apple* cases because it does not involve "complex, multi-featured" products,

but rather "relatively simple products" in terms of the number of features. *See Apple III*, 735 F.3d

at 1362. The causal nexus inquiry "may be more easily satisfied" here. *Apple III*, 735 F.3d at 1362.

The Court finds the example provided by the Federal Circuit in *Apple III* concerning a laptop and

laptop battery especially applicable. As in that example, even taking as a given that doctors and

patients do not prescribe or purchase Prezista (or would not prescribe or purchase Lupin's

products) because it is in an ethanolate solvate form, "it is indisputable that the ability to" deliver

darunavir into the body "is one of the reasons people buy" Prezista (indeed, likely the only reason).

95

**FOR PUBLICATION**

*Apple III*, 735 F.3d at 1364. "Thus, if the first person to invent a" way to deliver darunavir into the body in a medicine "had obtained a patent covering" that invention, "then it would be reasonable to say that the patented invention was a driver of demand for" darunavir. *Id.* This example is satisfied in this case. Dr. Wigerinck testified that he and his team at Tibotec eventually succeeded in preparing an ethanolate solvate form of darunavir, that it was the form in which they brought Prezista to market, that he searched for a non-solvated form of darunavir to bring to market without success, and that Tibotec never found something better than the ethanolate solvate form still used in Prezista today. *See* Wigerinck Tr. 332:3-6, 333:3-16, 335:6-336:5, 371:21-372:17, 494:11-495:17. The Court finds that the ethanolate form of darunavir is akin to the laptop battery of the Circuit's example, and can be considered a driver of demand for the product.[12] The causal nexus requirement of the irreparable injury inquiry is satisfied.

The Court adds that Janssen's Prezista business would be substantially destroyed by an infringing competitor, *see* Martori Tr. 2259:21-25

which supports the conclusion that the causal nexus requirement is met. *See supra* Section III(A)(ii)(1)(b)(2).[13]

---

[12] In addition, Dr. Wigerinck testified that he is the inventor on a separate patent covering the hydrate form of darunavir, U.S. Patent No. 8,518,987 B2, Wigerinck Tr. 498:21-499:8, and that Tibotec originally chose to pursue the ethanolate form over the hydrate form because that form was, at the time, difficult or impossible to make, Wigerinck Tr. 509:18-510:9. *See Apple III*, 735 F.3d at 1364 (continuing laptop example and stating that "if a particular patented laptop battery lasts significantly longer than any other battery on the market, then the replacement of that battery with a noninfringing battery might make a laptop less desirable. In that case, it might be reasonable to conclude that the patented battery is a driver of consumer demand for the laptop").

[13] The Court again rejects the argument that Janssen has not demonstrated which entity sells Prezista. *See supra* Section III(A)(ii)(1)(b)(2).

96

**FOR PUBLICATION**

### 2. Inadequacy of Legal Remedies

The Court's analysis of the adequacy of legal remedies is the same with regard to Lupin's infringement of the '645 Patent as to Lupin's infringement of the '015 Patent. The Court finds that legal remedies are an inadequate remedy for Lupin's infringement. *See supra* Section III(A)(ii)(2); *Robert Bosch LLC*, 659 F.3d at 1155.

### 3. Balance of Hardships

As with the '015 Patent, the Court concludes that the balance of hardships clearly weighs in favor of Janssen with respect to the '645 Patent. *See supra* Section III(A)(ii)(3); *Robert Bosch LLC*, 659 F.3d at 1156. In addition, the practical effect of this injunction does not impose any hardship on Lupin because, as explained later, the Court is directing the FDA not to approve Lupin's ANDA until after the expiration of the '645 Patent. *See infra* Section III(C)(iii).

### 4. Public Interest

The Court finds that the public interest will not be disserved by granting a permanent injunction enjoining Lupin from selling products that infringe the '645 Patent. *See supra* Section III(A)(ii)(4). This has no practical effect on the public, since the Court is also directing the FDA not to approve Lupin's ANDA until after the expiration of the '645 Patent. *See infra* Section III(C)(iii).

\* \* \* \* \*

The Court concludes that Janssen has met its burden to establish entitlement to injunctive relief, and grants a permanent injunction enjoining Lupin from commercially manufacturing, selling or offering for sale, using, or importing the generic darunavir tablets described in the Lupin ANDA, or any colorable variations of the same, until after the expiration date of the '645 Patent and its associated exclusivity.

97

**FOR PUBLICATION**

iii. An Order under 35 U.S.C. § 271(e)(4)(A)

Janssen also is entitled to an order under 35 U.S.C. § 271(e)(4)(A) directing the FDA not

to approve Lupin's ANDA until after the expiration of the '645 Patent and the associated period

of pediatric exclusivity.

Section 271(e)(4)(A) provides that upon a finding of infringement in Hatch-Waxman cases

"the court *shall* order the effective date of any approval . . . to be a date which is not earlier than

the date of the expiration of the patent which has been infringed." 35 U.S.C. § 271(e)(4)(A)

(emphasis added). Under this provision, an order under section 271(e)(4)(A) is mandatory upon a

finding of infringement of a valid patent.

As the Federal Circuit has explained, "[i]f the patent holder proves infringement of a valid

patent resulting from the filing of an ANDA, section 271(e)(4) provides three remedies." *In re*

*Omeprazole Patent Litig.*, 536 F.3d 1361, 1367 (Fed. Cir. 2008). "Subparagraphs (B) and (C)

provide the typical remedies for infringement: injunctive relief and damages." *Id.*

> Subparagraph (A) . . . provides an additional type of relief after a finding of
> infringement under section 271(e)(2) by *requiring* the district court to "order the
> effective date of any approval of the drug . . . involved in the infringement to be a
> date which is not earlier than the date of the expiration of the patent which has been
> infringed."

*Id.* (emphasis added) (quoting 35 U.S.C. § 271(e)(4)(A)). *See also In re Rosuvastatin Calcium*

*Patent Litig.*, 703 F. 3d 511, 515 (Fed. Cir. 2012) (where infringement is proven and "[a] challenge

to the patent fails, the *ANDA cannot be approved* until expiration of the patent" (emphasis added)).

In the face of this clear authority, Lupin's reliance on a single district court decision for the

proposition that this form of relief is discretionary is way off mark. *See* Joint Proposed Findings

of Fact ¶ D1202 (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1045,

1052 (N.D. Ill. 2003)). This is especially so given that the Federal Circuit declared the issue of

98

A00101

**FOR PUBLICATION**

relief "moot" on appeal after invalidating the patent. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F. 3d 1331, 1346 (Fed. Cir. 2005).

Because Lupin's ANDA products infringe claim 4 of the '645 Patent, and that claim is valid, this Court will enter an order under 35 U.S.C. § 271(e)(4)(A) directing the FDA not to approve Lupin's ANDA until after the expiration of the '645 Patent and any associated period of pediatric exclusivity.

D. Janssen's Request for an Additional Notification Provision

Janssen also requests that the Court include an order requiring Defendants to give Janssen and the Court 180 days' advance notice if either of them believes it can import and sell generic versions of darunavir that do not infringe the relevant patent(s). *See* Joint Proposed Findings of Fact ¶¶ P592-97. Janssen states that this notice is required because without it Janssen could not tell whether the products sold would infringe the '015 or '411 process patents, in particular. *Id.* ¶¶ P594-95. Janssen claims that Janssen and the Court will not have any way of making this determination and that "the Court's contempt powers will be a hollow sanction if the Court and Janssen are denied the information necessary to determine whether defendants are in compliance with the Court's orders." *Id.* ¶ P596.

The Court finds it unnecessary to impose the notification requirement Janssen requests. Janssen advances one case to support this remedy, *see Tivo Inc. v. Echostar Corp.*, 646 F.3d 869, 879 (Fed. Cir. 2011), but there the district court had imposed a notification requirement only after finding the defendant in contempt of the court's previous order. The Court will not presume that Lupin or Mylan will violate this Court's orders. The existing statutory regime should continue to adequately protect Janssen, just as it did in the events leading up to its successfully preserving its rights and obtaining relief in this case.

99

**FOR PUBLICATION**

The Court denies Janssen's request for an additional notification remedy.

**IV. Conclusion**

For the reasons set forth, this Court enters judgment: (1) that Lupin infringes claim 1 of the '015 Patent and claim 4 of the '645 Patent; (2) that Mylan infringes claim 13 of the '411 Patent; (3) that the asserted claims are not invalid; and (4) that Janssen is awarded the injunctive, declaratory and regulatory relief that it requested. Defendants' motion for judgment on partial findings of no remedy, ECF No. 841, and Lupin's motion for judgment on partial findings of invalidity due to lack of enablement of claim 1 of the '015 Patent, ECF No. 843, are both denied. An appropriate order follows.

August 14, 2014

/s/ **William H. Walls**
United States Senior District Judge

100

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JANSSEN PRODUCTS, L.P. et al.,

                    Plaintiffs,

        v.

LUPIN LIMITED et al.,

                    Defendants.

**ORDER**

Civ. No. 2:10-cv-05954 (WHW)

**FILED UNDER SEAL**

## Walls, Senior District Judge

It is on this 12th day of March, 2014,

**ORDERED** that:

(1) Plaintiff's motion for summary judgment of infringement of the '411 Patent (ECF No. 523) is GRANTED;

(2) Plaintiff's motion for summary judgment on the validity of the '645 Patent (ECF No. 527) is DENIED;

(3) Plaintiff's motion for summary judgment of infringement of the '015 and '408 Patents (ECF No. 534) is GRANTED in part and DENIED in part;

(4) Teva's motion for summary judgment of non-infringement of the '645 Patent (ECF No. 525) is DENIED;

(5) Mylan's motion for summary judgment of non-infringement of the '645 Patent (ECF No. 539) is DENIED;

(6) Lupin and Teva's motion for summary judgment of non-infringement of the '015 and '408 Patents (ECF No. 531) is DENIED.

                                  **/s/ William H. Walls**
                                  United States Senior District Judge

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JANSSEN PRODUCTS, L.P., et al.,

                  Plaintiffs,

v.

LUPIN LIMITED, et al.,

                  Defendants.

:
:
:
:
:
:
:
:
:
:
:

**OPINION**

Civ. No. 2:10-cv-05954 (WHW)

**FILED UNDER SEAL**

### Walls, Senior District Judge

Plaintiffs Janssen Products, L.P. and Janssen R&D Ireland (collectively, "Janssen" or "Janssen Plaintiffs") move for summary judgment of infringement of U.S. Patent No. 7,772,411 B2 (the "'411 Patent"). Defendants Mylan Pharmaceuticals, Inc. and Mylan Inc. (collectively, "Mylan") oppose. Janssen also moves for summary judgment on the validity of U.S. Patent No. 7,700,645 B2 (the "'645 Patent"). Lupin Limited and Lupin Pharmaceuticals, Inc. (collectively, "Lupin"), Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd. (collectively, "Teva") and Mylan (all collectively, "Defendants") oppose, and Defendants Teva and Mylan also move for summary judgment of non-infringement of the claims of the '645 Patent, which Janssen opposes. Janssen further moves for summary judgment of infringement of U.S. Patent Nos. 7,126,015 B2 (the "'015 Patent") and 7,595,408 B2 (the "'408 Patent"). Defendants oppose, and Defendants Lupin and Teva also move for summary judgment of non-infringement of the claims of the '015 Patent and the '408 Patent, which Janssen opposes. The motions have been decided from the written submissions of the parties under Federal Rule of Civil Procedure 78. Janssen's

motion for summary judgment of infringement of the '411 Patent is granted. Janssen's motion for summary judgment on the validity of the '645 Patent is denied. Janssen's motion for summary judgment of infringement of the '015 and '408 Patents is granted in part and denied in part. Teva's motion for summary judgment of non-infringement of the '645 Patent is denied. Mylan's motion for summary judgment of non-infringement of the '645 Patent is denied. Lupin and Teva's motion for summary judgment of non-infringement of the '015 and '408 Patents is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This consolidated action arises out of Defendants having filed Abbreviated New Drug Applications ("ANDAs") with the Food and Drug Administration (the "FDA") seeking approval to sell generic versions of Janssen's highly successful HIV drug PREZISTA® (also known by its compound name, darunavir) 75 mg, 150 mg, 300 mg, 400 mg, and 600 mg products. *Markman* Op. at 1-2 (ECF No. 477). Janssen sued the various Defendants after receiving notice that they had submitted these ANDAs to the FDA.

The '411 Patent is directed to a process for manufacturing the compound (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl(1S,2R)-3-[[(4-aminophenyl)sulfonyl](isobutyl)amino-1-benzyl-2-hydroxypropyl-carbamate, also known as darunavir, the drug in both PREZISTA® and Mylan's generic version of PREZISTA®. Mylan's Opp'n to Janssen's Mot. for Summ. J. on '411 Patent at 3-4 (ECF No. 588). The '645 Patent claims the ethanolate form of the drug that Janssen developed and sells as PREZISTA®. Janssen's Br. in Support of Summ. J. on '645 Patent at 2 (ECF No. 528). Both the '015 Patent and the '408 Patent claim processes for manufacturing bis-THF, a chemical structure or moiety that is part of the darunavir molecule. Janssen's Br. in Support of Summ. J. on '015, '408 Patents at 2 (ECF No. 535).

2

On September 15, 2011, this Court consolidated the patent infringement actions brought by the Janssen Plaintiffs for the purposes of pretrial proceedings and trial. ECF No. 71. The Court held its *Markman* claim construction hearing on October 1, 2013, and on October 9, 2013, issued its *Markman* opinion construing the claim terms and phrases needing construction as identified by the parties. ECF No. 477. On November 22, 2013, Janssen filed three separate motions for summary judgment: one for infringement of the claims of the '411 Patent, ECF No. 524, one for the validity of the '645 Patent, ECF No. 528, and one for the infringement of the '015 Patent and the '408 Patent, ECF No. 535. That same day, Defendants Teva and Mylan filed separate motions for summary judgment of non-infringement of the '645 Patent, ECF Nos. 525, 540, and Defendants Lupin and Teva jointly filed a motion for summary judgment of non-infringement of the claims of the '015 Patent and the '408 Patent, ECF No. 533. Oppositions to all of those motions were filed on December 23, 2013, ECF Nos. 579, 588, 595, 600, 608, 609, and replies were filed on January 15, 2014, ECF Nos. 655, 656, 657, 659, 662, 664.

## STANDARD OF REVIEW

The same summary judgment standard applies to motions involving patent claims as applies to motions involving other types of claims. *See, e.g.*, *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795-96 (Fed. Cir. 1990); *Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.*, 853 F.2d 1557, 1560-61 (Fed. Cir. 1988), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute between the parties must be both genuine and material to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A

3

disputed fact is material where it would affect the outcome of the suit under the relevant substantive law. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A dispute as to a material fact is genuine where a rational trier of fact could return a verdict for the non-movant. *Id.* The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Beard v. Banks*, 548 U.S. 521, 529 (2006). If the movant carries this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott*, 550 U.S. at 380 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249. Each party must support its position by "citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The determination of patent infringement is a two-step process: "first, the scope of the claims are determined as a matter of law, and second, the properly construed claims are compared to the allegedly infringing device to determine, as a matter of fact, whether all of the limitations of at least one claim are present, either literally or by a substantial equivalent, in the accused device." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002); *accord, e.g.*, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed. Cir. 2002). "[S]ummary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

4

## DISCUSSION

### I.    The '411 Patent: Janssen's Motion for Summary Judgment of Infringement

The '411 Patent provides "a new process for the synthesis of compound of forumula (6)

[*i.e.*, darunavir]." Janssen's Br. in Support of Summ. J. on '411 Patent at 2 (ECF No. 524). More

specifically, the '411 Patent "provides a convenient process for the production of compound of

formula (6) and intermediates . . . thereof at industrial scale." *Id.* The '411 Patent is made up of

eighteen claims, and Janssen accuses Mylan of infringing claims 1, 2, 4, 6-10, 13, 15 and 18. Claim

1, which is the only independent claim, reads:

> 1.    A process for preparing compound of formula (6), [graphic depiction of darunavir]
> Or an addition salt, thereof; comprising:
> (i)    introducing an isobutylamino group in compound of formula (1), [graphic depiction of formula 1]
> wherein
> PG represents an amino-protecting group;
> R(sub 1) is hydrogen or C(sub 1-6)alkyl;
> (ii)    introducing a p-nitrophenylsulfonyl group in the resultant compound step(i);
> (iii)    reducing the nitro moiety of the resultant compound of step (ii);
> (iv)    deprotecting the resulting compound of step (iii); and
> (v)    coupling the resultant compound of step (iv) with a (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl derivative.

Decl. of Eugene M. Gelernter ("Gelernter Decl.") Ex. 1 at col. 23:10-51 ('411 Patent). The other

asserted claims are dependent claims that depend from claim 1, directly or indirectly. Janssen's

Br. in Support of Summ. J. on '411 Patent at 4 (ECF No. 524). As a result, they "incorporate by

reference all the limitations" of claim 1 and "specify . . . further limitation[s] of the subject matter

claimed." 35 U.S.C. § 112(d), (e).

Janssen and Mylan disagreed about how the term "compound of formula (6)" was to be

construed. At the *Markman* hearing, Janssen proposed a construction of "compound of formula

(6)" as meaning darunavir, while Mylan argued that "compound of formula (6)" should be

A00135

construed to mean a "crystalline form of darunavir." This Court agreed with Janssen and adopted

its proposed construction of "compound of formula (6)" as meaning darunavir. *Markman* Op. at

11 (ECF No. 477). Based on that claim construction, Janssen now moves for summary judgment

of infringement of the '411 Patent against Mylan. Janssen's summary judgment motion is granted.

### a. Janssen's Arguments in Support of Summary Judgment

Janssen claims that applying the claim construction that this Court has

adopted—"compound of formula (6)" as meaning darunavir—it is undisputed that the process

Mylan uses to manufacture darunavir meets every limitation of each of the asserted claims of the

'411 Patent. Janssen's Br. in Support of Summ. J. on '411 Patent at 10 (ECF No. 524). Janssen

argues that Mylan has no infringement defense under this Court's claim construction, and the only

infringement defense that Mylan ever raised in this case, both in its non-infringement contentions

and in its expert's report, was an assertion that its process for making darunavir would not infringe

if the term "compound of formula (6)" in claim 1 was construed to mean "crystalline form of

darunavir" because Mylan's generic product is amorphous darunavir, rather than crystalline. *Id.* at

11. Accordingly, Janssen argues that Mylan's assertion that its ANDA Products "contain darunavir

(amorphous)" has "no bearing on infringement because the claims, as construed by the Court, are

directed to a process for making darunavir, not a process for making darunavir in a crystalline

form." *Id.*

### b. Mylan's Arguments in Opposition to Summary Judgment

Mylan opposes Janssen's motion by arguing that genuine issues of material fact exist for

trial as to any infringement of the '411 Patent. Mylan states that Janssen's arguments in support of

its motion for summary judgment "ignore well-established estoppel and disclaimer doctrines that

are triggered by, and which the Court should consider in connection with, an infringement

6

analysis." Mylan's Opp'n to Summ. J. on '411 Patent at 1 (ECF No. 608). Mylan contends that to this end, there is a dispute over whether Mylan's products are amorphous or crystalline in form, and if the Court determines that they are amorphous in form, Mylan cannot infringe the asserted claims of the '411 Patent, even given this Court's construction of the term "compound of formula (6)." *Id.* at 1-2. Mylan supports this argument by asserting that during prosecution of the '411 Patent, "Janssen amended then-pending claims to unequivocally disclaim claim scope directed to methods of preparing amorphous darunavir," and that as a result, "Janssen is estopped at least from arguing that any amorphous product, including Mylan Pharms' ANDA Products, infringe the asserted claims of the '411 patent, either literally or under the doctrine of equivalents." *Id.* at 2.

### c. Janssen's Motion for Summary Judgment is Granted

This Court agrees with Janssen that Mylan has no defense to infringement of the asserted claims of the '411 Patent under this Court's claim construction. "The court's construction of the claims often decides the question of infringement . . . ." *Networld, LLC v. Centraal Corp.*, 242 F.3d 1347, 1350 (Fed. Cir. 2001). This Court's construction of the claim term "compound of formula (6)" as meaning darunavir, and not a crystalline form of darunavir, has that effect here, where Mylan's non-infringement contentions and expert testimony depended wholly on this Court adopting its proposed claim construction. All of Mylan's non-infringement arguments in opposition to Janssen's motion are based on the proposition that Janssen has "disclaim[ed] claim scope directed to methods of preparing amorphous darunavir." Mylan's Opp'n to Summ. J. on '411 Patent at 2 (ECF No. 608); *see id.* 9, 11. This Court heard those arguments from Mylan during claim construction, and dealt with them explicitly in its claim construction opinion. *See Markman* Op. at 9-14 (ECF No. 477). The Court rejected those arguments and adopted Janssen's proposed construction. *See id.* As such, there is no factual issue to preclude summary judgment for Janssen

7

on Mylan's infringement of the '411 Patent. Even if this Court were to determine, as Mylan wishes,

that its ANDA products contain amorphous darunavir, that determination would have no effect on

Mylan's infringement of the '411 Patent, which this Court held claims a process for producing

"compound of formula (6)" and not a crystalline form of that compound. Because it is undisputed

that Mylan meets every limitation of each of the asserted claims of the '411 Patent when producing

darunavir for use in its ANDA products, Janssen's motion for summary judgment is granted. To

the extent Mylan argues that Janssen is barred from relying on the doctrine of equivalents as a

theory of infringement, such arguments are irrelevant to this motion. Janssen moves for summary

judgment only on a literal infringement theory, and summary judgment of literal infringement is

granted by this Court. The doctrine of equivalents is inapposite.

## II.    The '645 Patent

The '645 Patent is made up of eight claims, and Janssen accuses Defendants of infringing

all eight. Janssen's Br. in Support of Summ. J. on '645 Patent at 2 (ECF No. 528). Claim 1 is a

representative claim, and it recites "[a]n ethanolate solvate of the compound [known as darunavir],

in which the ratio of compound to ethanol is about 1:1." Decl. of Irena Royzman in Support of

Janssen's Mot. for Summ. J. on the Validity of the '645 Patent ("Royzman Decl.") Ex. 1 at col.

29:62-67 ('645 Patent). The remaining claims recite:

> (2) A solvate having the formula: [graphic depiction of darunavir].
> (3) A composition comprising an ethanolate solvate of the compound [known as darunavir], in which the ratio of compound to ethanol is about 1:1, and an inert carrier.
> (4) The composition of claim 3 wherein the inert carrier is a pharmaceutically acceptable carrier.
> (5) The composition of claim 4 wherein the pharmaceutically acceptable carrier is a solid inert carrier.
> (6) A composition comprising a solvate having the formula: [graphic depiction of darunavir] and an inert carrier.
> (7) The composition of claim 6 wherein the inert carrier is a pharmaceutically acceptable earner [sic].

8

(8) The composition of claim 7 wherein the pharmaceutically acceptable carrier is a solid inert carrier.

*Id.* at col. 30:1-65.

In its *Markman* opinion, this Court construed "solvate" to mean "a crystal form that contains either stoichiometric or non-stoichiometric amounts of solvent." *Markman* Op. at 5 (ECF No. 477). An ethanolate solvate is a solvate in which the solvent is ethanol. Janssen's Br. in Support of Summ. J. on '645 Patent at 2 (ECF No. 528).

### a. Janssen's Motion for Summary Judgment on Validity of the '645 Patent

Janssen now moves for summary judgment as to the validity of the '645 Patent. Defendants have asserted that the '645 Patent is invalid as obvious. In addition, Mylan and Lupin (but not Teva) have asserted that claims 1-2 (but not claims 3-8) are anticipated, and that claims 3-8 (but not claims 1-2) fail to meet the written description and enablement requirements. *Id.* at 8. Because Defendants have raised a genuine issue of material fact as to the obviousness of the '645 Patent as of the applicable priority date, Janssen's motion is denied. Because Janssen's motion is denied on those grounds, this Court need not, and will not, address the anticipation, written description and enablement arguments raised by Mylan and Lupin.

Under the patent statute, a "patent is presumed to be valid, 35 U.S.C. § 282 (1994), and this presumption can only be overcome by clear and convincing evidence to the contrary." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).

"[O]bviousness is ultimately a question of law . . . ." *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 990 (Fed. Cir. 2009). That "legal question" is "based on underlying factual determinations," *Unigene Labs., Inc. v. Apotex*, 655 F.3d 1352, 1360 (Fed. Cir. 2011),

A00139

which include: "1) the scope and content of the prior art; 2) the level of ordinary skill in the art;[1] 3) the differences between the claimed invention and the prior art; and 4) evidence of secondary factors, also known as objective indicia of nonobviousness." *Id.* "Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination." *Id.* (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)). "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

In addition, an "obviousness determination requires that a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1069 (Fed. Cir. 2012) (citation omitted). Courts must be aware of the "danger of hindsight bias" in an obviousness analysis. *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1320 (Fed. Cir. 2004); *see also KSR*, 550 U.S. at 421; *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966); *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011).

---

[1] Here, the parties do not dispute the characteristics of a person of ordinary skill in the art with respect to the patent-in-suit. That person of ordinary skill in the art would have had a "high level of education (e.g. a Ph.D. in chemistry or a related discipline), several years of training or experience in his or her pertinent field, and an appreciation for the various factors that relate to drug development, including an understanding of crystallization methods, crystallization screening, and characterization of crystalline solids." Royzman Decl. Ex. 7 ¶ 69 (Zaworotko Opening Report). In the alternative, "one of ordinary skill in the art could have a slightly lower education level ('the equivalent of a senior graduate student with a Bachelor's or Master's degree in chemistry or a related discipline') along with other qualifications discussed above." Janssen's Br. in Support of Summ. J. on '645 Patent at 16 (ECF No. 528) (quoting Royzman Decl. Ex. 7 ¶ 69).

A00140

### (i) Janssen's Arguments in Support of Summary Judgment

Janssen argues that Defendants' obviousness argument is completely based on hindsight, and that the asserted claims in the '645 Patent require an ethanolate of darunavir where the ratio of compound to ethanol is about 1:1—an invention that Janssen claims was not known in the prior art. Janssen's Br. in Support of Summ. J. on '645 Patent at 16 (ECF No. 528). Janssen argues that there were many prior art references on potential protease inhibitors, and that those references included U.S. Patent No. 6,248,775 (the "'775 Patent") and Arun K. Ghosh et al., *Potent HIV Protease Inhibitors Incorporating High-Affinity P2-Ligands and (R)-Hydroxyethylamino Sulfonamide Isotere,* 8 Bioorganic & Medicinal Chemistry Letters 687-90 (1998) (the "Ghosh 1998 Article"), both of which the '645 Patent incorporated by reference, and neither of which disclosed a solvate or ethanolate of darunavir. Janssen's '645 Statement of Facts ¶ 20 (ECF No. 528-1). Instead, Janssen claims that the "prior art taught that there was no way to predict whether a given compound will form a solvate." Janssen's Br. in Support of Summ. J. on '645 Patent at 17 (ECF No. 528). To illustrate, Janssen cites to prior art for the '645 Patent, specifically Teva's U.S. Patent No. 6,861,426 (the "'426 Patent"), which states:

> Solid-state chemistry of a crystal cannot predict[] whether an organic solvent can incorporate into the crystal. The manner in which s[o]lvation of a crystal may occur is also unpredictable. *There are no rules [that] exist that allow prediction of whether a compound will exist as solvated forms* of an organic solvent.

*Id.*

Janssen also argues that the '645 Patent was not obvious because there was no reason to select darunavir as a lead compound. "A lead compound . . . is 'a compound in the prior art that would be most promising to modify in order to improve upon . . . its activity . . . ." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1291 (Fed. Cir. 2012) (quoting *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1358 (Fed. Cir. 2007)). An obviousness analysis for a patent

11

on a new chemical compound must address "whether a chemist of ordinary skill would have selected the asserted prior art compounds as lead compounds, or starting points, for further development efforts." *Otsuka*, 678 F.3d at 1291.

Janssen argues that at the time of the applicable priory date,[2] "all aspects of the HIV life cycle were under investigation as potential targets for therapeutics," Janssen's '645 Statement of Facts ¶ 21 (ECF No. 528-1); Royzman Decl. Ex. 4 at 85:3-6 (Marshall Dep.), researchers were investigating many potential treatments (entry inhibitors, viral co-receptor antagonists, viral fusion inhibitors, reverse transcriptase inhibitors, and protease inhibitors), Janssen's Br. in Support of Summ. J. on '645 Patent at 19 (ECF No. 528), and that "[m]any groups of researchers were working on potential protease inhibitors and there was vast literature on the subject," *id.* According to Janssen, Defendants and their experts engage in hindsight reconstruction of the invention by using the patent-in-suit as a guide and focusing on two references (the '775 Patent and the Ghosh 1998 Article) that the '645 Patent identifies as disclosing darunavir, Royzman Decl. Ex. 1 at col. 1:49-55 ('645 Patent). Janssen asserts that without hindsight, "a person of ordinary skill would not have focused on the '775 Patent and the Ghosh 1998 Article, and those references would not have given such a person reason to focus on darunavir, rather than other compounds, as a 'starting point[ ], for further development efforts.'" Janssen's Br. in Support of Summ. J. on '645 Patent at 20 (ECF No. 528) (quoting *Otsuka*, 678 F.3d at 1291).

Finally, Janssen argues that there would have been no reason to try to create an ethanolate of darunavir, and no "reasonable expectation of success" in doing so. *Id.* at 23 (quoting *Otsuka*, 678 F.3d at 1292). Janssen asserts that the '775 Patent and the Ghosh 1998 Article do not provide any reason to try to create a solvate or ethanolate of darunavir, where the Ghosh 1998 Article "does

---

[2] All parties agree that May 16, 2002 is the relevant date for assessing the validity of the '645 Patent. *See* Janssen's Br. in Support of Summ. J. on '645 Patent at 4 (ECF No. 528).

12

not describe any formulation for any compound," and the '775 Patent "has an extensive discussion of possible solid and non-solid formulations for the disclosed compounds, without mentioning solvates or ethanolates." *Id.* Janssen states that without hindsight, "there would have been no reason to view a solvate or ethanolate of darunavir as desirable in any way," especially given the literature—including articles written by Defendants' proposed expert Dr. Zaworotko—discouraging the use of solvate forms because of their lower stability. *Id.* at 24. And Janssen states that even if Defendants could show that a person of ordinary skill had reason to try to create a solvate or ethanolate of darunavir, they still could not show by clear and convincing evidence that such a person would have had a "reasonable expectation of success" in doing so due to the "unpredictability of the chemical arts" and the notorious unpredictability of solvate formation. *Id.* at 24-25.

### (ii)    Lupin and Mylan's Arguments in Opposition to Summary Judgment

Lupin and Mylan, on the other hand, argue that summary judgment is inappropriate because, at the very least, they raise genuine issues of material fact as to whether the '645 Patent was obvious as a matter of law.

Lupin and Mylan first argue that Janssen ignores the prior art disclosure of darunavir and applies an improper lead compound analysis. According to Lupin and Mylan, once a drug is in clinical trials—as darunavir was by May 2002—it is necessarily a "lead" compound. *See, e.g., Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484 (Fed. Cir. 1997) (explaining how FDA actions, e.g. approval of a drug after clinical trials, would have motivated a skilled person). Lupin and Mylan also assert that Janssen improperly argues that there were other compounds disclosed in the Ghosh 1998 Article and the '775 Patent that showed similar or better potency to darunavir because the Federal Circuit has never mandated proof of a single lead compound. *See, e.g., Altana*

13

*Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1008 (Fed. Cir. 2009) (finding it "rigid" to require that prior art "must point to only a single lead compound for further development efforts" for obviousness); *Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*, 713 F.3d 1369, 1376 (Fed. Cir. 2013) (holding that preference for other options in primary reference was irrelevant). Lupin and Mylan contend that whether the Ghosh 1998 Article or the '775 Patent provided motivation is not an issue to be properly resolved on summary judgment because there is varying expert testimony as to why one would consider darunavir among the compounds commonly set forth in the '775 Patent and the Ghosh 1998 Article.

Second, Lupin and Mylan argue that Janssen ignores the ample motivation in the prior art to prepare a solvated form of darunavir. They state that by May 2002 darunavir was in clinical trials, and as a result was well within the "compound of interest" stage for form screening, and that the FDA and ICH Harmonized Tripartite ("ICH") Guidelines mandated crystal form testing in connection with drug product development—which would have provided ample motivation to a skilled person to conduct crystal form studies on darunavir. Lupin and Mylan's Opp'n to Janssen's Mot. for Summ. J. on '645 Patent at 18 (ECF No. 609). Given that oral dosing (e.g. tablets, capsules) is the most common and preferred dosing approach—which typically involves drugs prepared as solids with a stable pharmaceutical composition—Lupin and Mylan argue that such a preference would naturally apply to darunavir and that FDA guidelines and other literature specifically recognized the need to conduct crystallization screens to meet the goal of stable formulation. *See id.* at 19. Lupin and Mylan argue that such motivation would not change simply because other options (in this case the esters, salts and non-solid formulations disclosed in the '775 Patent) are available.

14

In response to Janssen's argument that "solvate formation is notoriously unpredictable," Lupin and Mylan argue that there was a reasonable expectation that a routine crystallization screen would have produced the 1:1 solvate. Lupin and Mylan state that Janssen's argument "improperly equates a reasonable expectation of success with the ability to predict *a priori* all empirical properties of a crystal, the latter of which requires synthesis and testing." *Id.* at 20. Lupin and Mylan also assert that several statements from references, patent prosecution histories and case law quoted by Janssen as to the unpredictability of solvate formation post-date the filing at issue here and therefore fail to establish the state of the art of solvate formation in 2002. *Id.* at 21. They also state that the prior art "provided guidance through disclosure of numerous ethanol solvates of compounds, and more specifically, APIs in the same class as, and with a similar chemical structure to, darunavir. *Id.* at 22. It follows that, according to Lupin and Mylan, it would have been clear to a skilled person that "preformulation of darunavir required routine crystallization screening of API candidates; that there was a reasonable expectation that hydrates or solvates of darunavir would form; and that ethanolate solvates of compounds (including in the same class as darunavir, and also prepared from ethanol) were known, with some considered preferred embodiments." *Id.* at 22-23. Lupin and Mylan also contend that Janssen's argument that a routine crystallization screen would be complex and contain "an infinite number of combinations of conditions" is contradicted by relevant regulatory guidelines and literature. *See id.* at 25. They cite to the prior art paper Stephen Byrn et al., *Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations*, 12 Pharmaceutical Res. 945 (1995) which explains that the "first step in the polymorphs decision tree is to crystallize the substance from a number of different solvents" including "those used in the final crystallization steps and those used during formulation and processing and may also

15

include water, methanol, ethanol, propanol, isopropanol, acetone, acetonitrile, ethyl acetate, hexane and mixtures if appropriate." *Id.* at 25-26.

Finally, Lupin and Mylan argue that the formulation elements of claims 3-8 of the '645 Patent are obvious. They state that while Janssen admits in its brief that these formulation elements are obvious, Janssen argues that once darunavir ethanolate was prepared, a skilled person would not have reasonably expected that it would have utility for use in a pharmaceutical product. *Id.* at 27-28. Lupin and Mylan argue that these generalized statements do not suggest that a skilled person would have been discouraged from, or otherwise avoided, employing a solvated form in a pharmaceutical composition, and that by 2002 solvates were routinely considered when evaluating API crystalline forms for pharmaceutical product development and were employed in numerous products. *Id.* at 28.

### (iii)    Janssen's Motion for Summary Judgment is Denied

Janssen argues that the '645 Patent was not obvious because there was no reason for a person of ordinary skill in the art to select darunavir as a compound to attempt to modify or improve. The Court cannot accept this argument and finds that Lupin and Mylan have, at the very least, established that there is a genuine issue of material fact as to whether that is true. It is not disputed that the Ghosh 1998 Article and the '775 Patent disclosed the compound of darunavir long prior to the filing date of the '645 Patent. *See* Janssen's Br. in Support of Summ. J. on '645 Patent at 17 (ECF No. 528); Lupin and Mylan's Opp'n to Janssen's Mot. for Summ. J. on '645 Patent at 14 (ECF No. 609). As Lupin and Mylan have established, by the priority date of the '645 Patent—May 2002—darunavir was in clinical trials, making it a compound that would likely motivate a skilled person to perform further development efforts. *See Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484 (Fed. Cir. 1997) (explaining how FDA actions, e.g. approval of

16

drug after clinical trials, would have motivated a skilled person). Janssen's proposed expert, Dr. Steven Young, even testified that a compound becomes a compound of interest "at the point where you must make a decision to do toxicology studies, preformulation studies, [and] scaleup clinical trials." Lupin and Mylan's Combined '645 Statement of Material Facts ¶¶ 90-93 (ECF No. 611). As a matter of logic, a person of ordinary skill in the art interested in the development of an HIV protease inhibitor certainly could have been motived to select darunavir—a compound called out for its beneficial properties in more than one prior art reference and which had proceeded to clinical trials—as a compound on which to perform further development efforts. Janssen's argument that there were other compounds disclosed in the Ghosh 1998 Article and the '775 Patent that showed similar or better potency to darunavir is irrelevant. *See Altana Pharma AG*, 566 F.3d at 1008 (finding it "rigid" to require that "prior art must point to only a single lead compound for further development efforts" for obviousness); *Bayer*, 713 F.3d at 1376 (holding that proof of obviousness did not require that something be the most "preferred, or most desirable," choice and that preference for other options in primary reference was irrelevant).

Janssen also argues that, without hindsight, there would have been no reason in the art to "modify darunavir" to try to "create an ethanolate of darunavir." Janssen's Br. in Support of Summ. J. on '645 Patent at 17, 23-24 (ECF No. 528). Again, Lupin and Mylan raise a genuine issue of material fact as to whether that is true.

Lupin and Mylan first point out that the FDA and ICH guidelines "mandated crystal form testing in connection with drug product development" and that these guidelines would have provided ample motivation to the skilled person to conduct crystal form studies of darunavir. Lupin and Mylan's Opp'n to Janssen's Mot. for Summ. J. on '645 Patent at 18 (ECF No. 609); *see also* Decl. of Michael J. Zaworotko, Ph.D. ("Zaworotko Decl.") ¶ 102; *Allergan, Inc. v. Sandoz Inc.*,

17

726 F.3d 1286, 1291 (Fed. Cir. 2013) (recognizing that "[t]he potential for FDA approval also may properly be considered . . . in determining whether one of ordinary skill would be motivated to develop a drug product"). Lupin and Mylan assert that because oral dosing is the most common and preferred dosing approach, skilled persons would routinely engage in solid-state form selection in order to address this need. Lupin and Mylan's Opp'n to Janssen's Mot. for Summ. J. on '645 Patent at 19 (ECF No. 609). Lupin and Mylan's proposed expert stated that FDA guidelines and other literature specifically recognized the need to conduct routine crystallization screens to meet the goal of stable formation. Zaworotko Decl. ¶ 109.[3] Their proposed expert also points to prior art references indicating that varying solvent systems would be used in these routine crystallization screens, including ethanol, which had been identified in some prior art as, next to water, "the most useful solvent in pharmacy." *Id.* ¶¶ 112-17, 147-48. For at least these reasons, Lupin and Mylan have raised genuine issues of material fact as to whether a person skilled in the art would be motivated to create an ethanolate of darunavir.

Finally, Janssen argues that the '645 Patent is not obvious because a person skilled in the art would not have had a reasonable expectation of success in creating an ethanolate of darunavir. In order for a patent to be found obvious, it is necessary that a person of ordinary skill in the art would have "perceived a reasonable expectation of success in making the invention in light of the prior art." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d at 1069. "[T]he expectation of success need only be reasonable, not absolute." *Pfizer*, 480 F.3d at 1364. The bulk of Janssen's argument as to why the '645 Patent is not obvious is based on its

___

[3] *See also* Stephen Byrn et al., *Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations*, 12 Pharmaceutical Res. 945, 946 (1995) (providing a sequence of decision trees and flowcharts to be followed in order to implement FDA and ICH directives to investigate the existence of solvates of an API, and stating "the first step in the polymorphs decision tree is to crystallize the substance from a number of different solvents," including ethanol).

18

contention that regardless of any motivation a skilled person may have had to select darunavir as a compound of interest, and regardless of whether a skilled person would have been motivated to create an ethanolate of darunavir, Lupin and Mylan cannot meet their burden of showing that a person of ordinary skill in the art in May 2002 would have had a reasonable expectation of success in creating an ethanolate of darunavir due to the unpredictability of the art of solvate formation. But the Court is not persuaded. Lupin and Mylan have raised genuine issues of material fact as to whether a skilled person would have had such a reasonable expectation.

As an initial matter, Janssen's contentions about the unpredictability of the art of solvate formation are too generalized to necessarily apply to the specific facts of this case and therefore cannot support a grant of summary judgment on this specific patent. Lupin and Mylan argue, with support from their proposed expert, that a skilled person would have had a reasonable expectation of success in forming a 1:1 solvate where there was literature in May 2002 that reported "that a molecule will more likely form hydrates or solvates if the structure had several hydrogen bond donors and acceptors (since the water and solvents in hydrates and solvates frequently form hydrogen bonds with the molecule during crystallization.) . . . Darunavir is such a structure." Lupin and Mylan's Opp'n to Janssen's Mot. for Summ. J. on '645 Patent at 22 (citing Zaworotko Decl. ¶¶ 150, 168). Lupin and Mylan's proposed expert, Dr. Zaworotko, further stated that "by 2002, there was more than enough data on ethanolates in the [Cambridge Structural Database ("CSD")] (at least 347 structures before 2002) for a person of ordinary skill in the art to draw statistically valid conclusions about whether there is a reasonable expectation concerning 1:1 stoichiometry." Zaworotko Decl. ¶ 51. He also noted "that ethanolates are a special subset of solvates,

19

because . . . the hydrogen bonding capabilities of ethanol specifically promote structures of 1:1 stoichiometry of the type exhibited by darunavir monoethanolate." *Id.*[4]

Lupin and Mylan also contend that the prior art provided guidance through disclosure of numerous ethanol solvates of compounds, and more specifically, APIs in the same class as, and with similar chemical structures to, darunavir. Lupin and Mylan's Opp'n to Janssen's Mot. for Summ. J. on '645 Patent at 22 (ECF No. 609). That such ethanol solvates of compounds similar to darunavir existed would indicate to the skilled person the likelihood that darunavir would likewise become an ethanol solvate. Such contention is supported by their proposed expert, Dr. Zaworotko, and his references to the prior art, including for the compound amprenavir. *See* Zaworotko Decl. ¶¶ 151-53.

Janssen makes much of several statements regarding the unpredictability of solvate formation, including a statement by Teva in an earlier patent application that "no rules exist that allow prediction of whether a compound will exist as solvated forms of an organic solvent," and the fact that Lupin and Mylan's proposed expert stated that he did not disagree with that proposition. *See id.* ¶ 138. However, Dr. Zaworotko makes the logical counterargument that "that does not mean that one of the ordinary skill in the art works on a blank slate and has no direction whatsoever. It is quite the contrary." *Id.* ¶ 139. Instead he contends that "a person of ordinary skill in the art would have looked to the trends exhibited by similar classes of compounds in the CSD and, based on such trends, would have conducted an appropriate crystallization screen." *Id.*

---

[4] "A person of ordinary skill in the art would have known that a 1:1 ratio of compound to solvate was the most common ratio seen in published structures of ethanolate solvate." Zaworotko Decl. ¶ 167. *See also id.* ¶ 168 ("Due in large part to the complementary nature of the single hydrogen bond donor and single hydrogen bond acceptor available on ethanol . . . a 1:1 ratio between ethanol and the API candidate, here darunavir, must arise from this alternating arrangement. In other words a compound, such as darunavir, that forms an ethanolate solvate, is predisposed by its chemical structure to form a solvate with 1:1 stoichiometry.").

20

While Janssen raises evidence and expert testimony that contradicts the opinions of Lupin and Mylan's proposed expert, Dr. Zaworotko, this Court cannot weigh conflicting evidence nor evaluate the credibility of those experts during summary judgment proceedings and must wait to do so at trial. *See Fed. Labs. v. Barringer Research*, 696 F.2d 271, 274 (3d Cir. 1982) ("[A] court may not . . . resolve 'disputed and relevant factual issues on conflicting affidavits of qualified experts[,]' [n]or is it at liberty to disbelieve the good faith statements of experts contained in depositions or affidavits and presented by the non-moving party.") (quoting *Ethyl Corp. v. Borden, Inc.*, 427 F.2d 206, 210 (3d Cir. 1970));[5] *see also Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed. Cir. 1998) ("In determining the propriety of summary judgment, credibility determinations may not be made, and the evidence must be viewed favorably to the non-movant, with doubts resolved and reasonable inferences drawn in the non-movant's favor.").[6] Rather, it is enough to defeat summary judgment that Lupin and Mylan and their proposed expert have raised genuine issues of material fact as to what a skilled person would have reasonably expected in May 2002.

As to claims 3-8, which contain certain formulation elements not found in claims 1-2, Janssen argues that defendants cannot meet the "burden of showing that a skilled person would have had a reasonable expectation that an ethanolate of darunavir, if made, would have properties that make it useful as a pharmaceutical product," because "solvates . . . tend to exhibit lower

---

[5] The Federal Circuit reviews a "district court's grant or denial of summary judgment under the law of the regional circuit." *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011).

[6] For this reason, the Court cannot take as true experts' findings and conclusions, as Janssen suggests, from the district court's opinion in *In re Armodafinil Patent Litig.*, 939 F. Supp. 2d 456 (D. Del. 2013), which was written after a full trial on the merits. In *Armodafinil*, the district court weighed the credibility of experts from both sides in making its determination as to the skilled person's reasonable expectation of success. 939 F. Supp. 2d at 460 n.3, 471, 476-77, 479, 481, 483, 485, 491, 492, 494, 497. Such an evaluation of credibility is not appropriate on summary judgment.

21

stability than other forms." Janssen's Br. in Support of Summ. J. on '645 Patent at 32 (ECF No. 528). However, as Lupin and Mylan point out, this generalized statement does not necessarily mean that a skilled person would have been discouraged from or avoided employing a solvated form in a pharmaceutical composition and, by 2002, solvates were routinely considered when evaluating API crystalline forms for pharmaceutical product development and were employed in various products. Zaworotko Decl. ¶¶ 214-16; Decl. of Philip Gould ("P. Gould Decl.") ¶¶ 92-99 (ECF No. 605).

The Court finds that Lupin and Mylan have raised genuine issues of material fact as to the obviousness of the '645 Patent. Specifically, Lupin and Mylan have shown that genuine issues of material fact exist as to whether a person of ordinary skill in the art would have considered darunavir a "compound of interest" as of May 2002, whether a person of ordinary skill in the art would have been motivated to create an ethanolate of darunavir, and whether such a skilled person would have had a reasonable expectation of success in doing so. Janssen's motion for summary judgment on validity of the '645 Patent is denied.

### b. Teva's Motion for Summary Judgment of Non-Infringement

Teva moves for summary judgment that the products that are the subject of Teva's ANDA No. 202-118 do not infringe any asserted claim of the '645 Patent under the doctrine of equivalents.[7] Teva argues that because it is undisputed that the claims of the '645 Patent literally claim darunavir ethanolate and not darunavir hydrate, and because it is undisputed that Teva's ANDA products do not contain darunavir ethanolate, Janssen's arguments as to infringement of the '645 Patent fail as a matter of law. Teva's motion for summary judgment of non-infringement of the '645 Patent is denied.

---

[7] Janssen has not asserted literal infringement of any of the claims against Teva. Teva's Br. in Support of Summ. J. on '645 Patent at 1 (ECF No. 525).

22

Under the doctrine of equivalents, as for literal infringement, the patentee bears the burden of proving infringement by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). If there is no literal infringement, the patent owner may establish infringement under the doctrine of equivalents only if the patent owner can show "that the accused product contain[s] each limitation of the claim or its equivalent." *Eagle Comtronics, Inc. v. Arrow Comm. Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997) (noting that because each limitation contained in a patent claim is material to defining the scope of the patented invention, a doctrine of equivalents analysis must be applied to individual claim limitations, not to the invention as a whole). "An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Id.* "Relevant to the insubstantial differences inquiry is whether the missing element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation." *Id.* (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)).

"However, there are limits to the application of the doctrine of equivalents aside from the question of insubstantiality of the differences." *Id.* Teva argues that two such limitations are applicable in this case. One is that subject matter disclosed in a patent's specification but not claimed cannot be recaptured under the doctrine of equivalents and is rather dedicated to the public. *See, e.g., Johnson & Johnston Assocs., Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc); *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1331 (Fed. Cir. 2004); *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1357-58 (Fed. Cir. 2004). This is known as the disclosure-dedication rule.

23

The second limitation on the doctrine of equivalents that Teva argues is applicable here is the doctrine of prosecution history estoppel. "Prosecution history estoppel . . . preclud[es] a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002) (quoting *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1577-78 (Fed. Cir. 1997)). Prosecution history estoppel may apply to a narrowing amendment made to satisfy any requirement of patent law, including the utility, novelty and nonobviousness requirements of 35 U.S.C. §§ 101-103, respectively, and the written description, enablement and best mode requirements of 35 U.S.C. § 112. *Festo*, 535 U.S. at 736-37. "A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim." *Id.* at 740. A patentee "bear[s] the burden of showing that the amendment does not surrender the particular equivalent in question." *Id.*

### (i) Teva's Arguments in Support of Summary Judgment

In its motion for summary judgment, Teva argues that its darunavir hydrate products cannot, as a matter of law, be considered an equivalent of the claimed darunavir ethanolate because both of these limitations apply.

First, Teva argues that the dedication-disclosure rule applies here because darunavir hydrate was disclosed but not claimed in the '645 Patent, and as a result the '645 Patent cannot capture Teva's darunavir hydrate products. Teva's Br. in Support of Summ. J. on '645 Patent at 11-15 (ECF No. 525). To support this argument, Teva first says that there is no dispute that the '645 Patent discloses darunavir hydrate because, for example, it states that the invention disclosed

24

therein "concerns pseudopolymorphic[8] forms of compound of formula $(X)^9$ for the preparation of pharmaceutical formulations," Teva's '645 Statement of Material Facts ¶ 31 (ECF No. 525-2), and specifies that "[p]referred pseudopolymorphs are pharmaceutically acceptable solvates, such as hydrate and ethanolate." *Id.* ¶ 33. The patent further states that "[s]everal pseudopolymorphs are exemplified in this application and include Form A (ethanolate), Form B (hydrate)," *id.*, and notes that the ratio of compound to solvent "may range between (5:1) and (1:5)," *id.* ¶ 34. Teva states that the '645 Patent thus discloses a range of hydrates that encompasses darunavir hydrate (1:2.5), which is the active pharmaceutical ingredient ("API") in Teva's ANDA products. Teva's Br. in Support of Summ. J. on '645 Patent at 12 (ECF No. 525).

Teva also asserts that there is no dispute that darunavir hydrate is not claimed in the '645 Patent, and that every claim of the '645 Patent is limited to darunavir ethanolate, which Teva points out was conceded by Janssen's own expert, Dr. Myerson. *Id.* at 12; Teva's '645 Statement of Material Facts ¶¶ 35-36 (ECF No. 525-2). Accordingly, Teva argues that because darunavir hydrate is subject matter that is disclosed but not claimed in the '645 Patent, darunavir hydrate cannot infringe the claims of the '645 Patent directed to darunavir ethanolate under the doctrine of equivalents.

Second, Teva argues that the doctrine of prosecution history estoppel bars Janssen from recapturing darunavir hydrate within the scope of equivalents of the claims. Teva's Br. in Support of Summ. J. on '645 Patent at 16-21 (ECF No. 525). Teva asserts that because a "patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim," *Festo*, 535 U.S. at 740, and

---

[8] A "pseudopolymorph" is another term for solvate. *See* Teva's Br. in Support of Summ. J. on '645 Patent at 5 n.6 (ECF No. 525).

[9] "Compound of Formula (X)" refers to darunavir.

25

because it is undisputed that Janssen narrowed the scope of the claims during the prosecution of the application that issued as the '645 Patent, Janssen is now estopped from asserting that darunavir hydrate is the equivalent of darunavir ethanolate. Teva's Br. in Support of Summ. J. on '645 Patent at 16 (ECF No. 525).

To support this argument, Teva asserts that the original claim 1 of what eventually issued as the '645 Patent encompassed darunavir hydrate as well as other solvates of darunavir. Teva's '645 Statement of Material Facts ¶ 40 (ECF No. 525-2). In August of 2007, the Patent Examiner issued an Office Action restricting the claims of the original application, stating that "[e]ach pseudomorph is a distinct compound with independent and distinct chemical identity . . .," and requiring Janssen to select claims to either a particular solvate of darunavir or claims to darunavir hydrate. *Id.* ¶ 41. According to Teva, in responding to that restriction requirement, Janssen elected to pursue claims to solvates of darunavir, but did not amend claim 1. *Id.* ¶¶ 42, 44. In January of 2008, the Examiner issued another Office Action rejecting several of the pending claims, including claim 1, under 35 U.S.C. § 112, again writing that every solvate has its "own chemical identity." *Id.* ¶ 47. Janssen subsequently cancelled claim 1 and introduced new claim 19, which was limited to darunavir ethanolate Form A. *Id.* ¶ 48. Teva argues that Janssen made that amendment in order to overcome the Examiner's substantive § 112 rejection, and that a "patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112." *Festo*, 535 U.S. at 737. Based on all of this evidence, Teva claims that Janssen cannot rebut the presumption that it relinquished coverage of darunavir hydrate. Teva's Br. in Support of Summ. J. on '645 Patent at 17-21 (ECF No. 525).

26

### (ii)    Janssen's Arguments in Opposition to Summary Judgment

Janssen responds that neither the dedication-disclosure rule nor the doctrine of prosecution history estoppel are applicable, and it follows that summary judgment of non-infringement cannot be granted for Teva. Instead, Janssen asserts that at trial, it will present "overwhelming evidence that Teva's darunavir hydrate (1:2.5) is equivalent to the claimed darunavir ethanolate (1:1) in all relevant respects," and that it "will show that there is no substantial difference between Teva's darunavir hydrate (1:2.5) and the claimed darunavir ethanolate (1:1), and will demonstrate that they perform substantially the same function, in substantially the same way, to achieve substantially the same result." Janssen's Opp'n to Teva's Mot. for Summ. J. on '645 Patent at 4 (ECF No. 600).

First, Janssen argues that the dedication-disclosure rule does not apply to this case and is therefore not a bar to Janssen's claim of infringement against Teva via the doctrine of equivalents. Janssen argues that Teva mistakenly relies on *Johnson & Johnston*, 285 F.3d 1046, for the proposition that the '645 Patent discloses subject matter that it fails to claim, and therefore that subject matter is dedicated to the public. Janssen claims that this case is more like *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950) ("*Graver Tank II*"), which *Johnson & Johnston* distinguished. Janssen contends that in *Graver Tank II*, the patentee sought claims on the alleged equivalent in its application for the patent-in-suit, and because it had actually claimed that equivalent subject matter, there was no dedication to the public even where those particular claims were later held invalid. 339 U.S. at 612, 616, 618. In contrast, the patentee in *Johnson & Johnston* did not claim the equivalent subject matter, and *Johnson & Johnston* held that "when a patent drafter discloses but declines to claim [the allegedly equivalent] subject matter . . . this action dedicates that unclaimed subject matter to the public," and the patentee may not rely on the

27

"doctrine of equivalents to recapture [the] subject matter deliberately left unclaimed . . . ." 285

F.3d at 1054. Janssen points out that in *Johnson & Johnston*, the Federal Circuit was very explicit

in distinguishing *Graver Tank II* on these grounds. *See Johnson & Johnston*, 285 F.3d at 1053.

Janssen argues that the facts in this case are closer to *Graver Tank II* than to *Johnson &*

*Johnston* because Janssen, like the patentee in *Graver Tank II*, applied for claims in the patent-in-

suit encompassing the alleged equivalent. Janssen contends that the fact that it later received a

restriction requirement and made an election pursuant to that requirement that it would "pursue

[claims encompassing the alleged equivalent] in a divisional application" does not change the fact

that as in *Graver Tank II*, it initially applied for claims encompassing the alleged equivalent and

as a result it did not dedicate anything to the public. Janssen also asserts that Teva, in its brief

supporting its motion for summary judgment, "concedes (correctly) that darunavir hydrate is 'not

technically dedicated to the public.'" Janssen's Opp'n to Teva's Mot. for Summ. J. on '645 Patent

at 16 (ECF No. 600).

Janssen also argues that the dedication-disclosure rule does not apply to this case because

the '645 Patent does not identify darunavir hydrate (1:2.5) as an alternative to darunavir

monoethanolate. Janssen reminds that the Federal Circuit has recognized limits on the dedication-

disclosure doctrine, and that the doctrine "does not mean that any generic reference in a written

specification necessarily dedicates all members of the particular genus to the public." *Sandisk*

*Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1363 (Fed. Cir. 2012) (citation omitted). Rather,

"before unclaimed subject matter is deemed to have been dedicated to the public, that unclaimed

subject matter"—even if described in the patent specification—"must have been identified by the

patentee as an alternative to a claim limitation." *Id.* at 1363-64 (citation omitted). Conversely,

Janssen explains that "dedication does not apply where the defendant 'has not pointed to parts of

28

the [asserted] patent where the inventors identify [the alleged equivalent] as an unclaimed alternative [for the claim limitation].'" Janssen's Opp'n to Teva's Mot. for Summ. J. on '645 Patent at 24 (ECF No. 600) (quoting *Pfizer*, 429 F.3d at 1379). Janssen states that the '645 Patent discloses the "genus" of hydrates of darunavir, but it does not identify the particular "species" of darunavir hydrate (1:2.5) "as an alternative" to the claimed darunavir ethanolate (1:1), and as a result the dedication-disclosure doctrine cannot be applied to this case.

Second, Janssen argues that prosecution history estoppel is equally inapplicable. According to Janssen, Teva's estoppel theory is that amendments during prosecution of the '645 Patent removed darunavir hydrate from the claims' literal scope for reasons of patentability. Janssen responds that this theory misreads the prosecution history because Teva cannot (and does not) contend that Janssen's election in response to a restriction requirement was an amendment for substantial reasons of patentability, needed to trigger amendment-based estoppel under *Festo*, 535 U.S. 722. Janssen asserts that non-elected subject matter, e.g., darunavir hydrate, was withdrawn from the literal scope of the claims by Janssen's election of darunavir ethanolate, so that later amendments cannot be a disclaimer of that subject matter under *Festo*.

Under *Festo*, "prosecution history estoppel does not arise in every instance when a patent application is amended," but rather it comes into play where claims are narrowed by amendment "for a substantial reason relating to patentability." 535 U.S. at 735. Where this requirement is met, the amendment is presumed to disclaim "the territory between the original claim and the amended claim." *Id.* at 740. Janssen argues that based on this standard, and because a restriction requirement is not considered a rejection based on patentability, *see* Janssen's Opp'n to Teva's Mot. for Summ. J. on '645 Patent at 28 (ECF No. 600) (citing cases), Janssen's election of darunavir ethanolate

29

rather than darunavir hydrate was not an amendment to the claims "for a substantial reason related to patentability" and did not trigger *Festo*.

Janssen also argues that Teva's theory of prosecution history estoppel relies on amendments made after the election of darunavir ethanolate, in response to later substantive rejections by the examiner, and is flawed. According to Janssen, darunavir hydrate did not reside in "the territory between the original claim and the amended claim," *Festo*, 535 U.S. at 740, because, before the amendments in question, Janssen's election had the effect of "withdraw[ing] from further consideration" any claims "to the invention or inventions not elected," 37 C.F.R. § 1.142(b).[10] After Janssen made its election, the examiner "acknowledged" Janssen's election and "made [the restriction requirement] FINAL." Decl. of Jason S. Gould in Opp'n to Teva's Mot. for Summ. J. on '645 Patent ("J. Gould '645 Decl.") Ex. 2 at PREZ00012745 (Prosecution history of the '645 Patent) (ECF No. 601). As a result of this election, Janssen contends that all non-elected subject matter was "restricted and removed" from the claims' literal scope under the applicable regulations. *Geneva Pharms., Inc. v. GlaxoSmithKline, PLC*, 349 F.3d 1373, 1379 (Fed. Cir. 2003). It follows that any further amendments made by Janssen after that point would apply only to subject matter that resides in "the territory between the original claim and the amended claim," *Festo*, 535 U.S. at 740, and with the removal by election, darunavir hydrate was not within that territory.

Finally, Janssen responds to what it calls Teva's "vitiation argument," at the end of Teva's opening brief:

> [A] finding that Janssen did not disclaim hydrate amounts to a finding that darunavir "containing ethanol" is equivalent to darunavir "not containing

---

[10] The applicable regulation, 37 C.F.R. § 1.142(b) reads: "Claims to the invention or inventions not elected, if not canceled, are nevertheless withdrawn from further consideration by the examiner by the election, subject however to reinstatement in the event the requirement for restriction is withdrawn or overruled."

30

> ethanol"—a finding that would eliminate the "ethanolate" claim element in its
> entirety . . . .

Teva's Br. in Support of Summ. J. on '645 Patent at 21 (ECF No. 525). Vitiation comes into play

when applying the doctrine of equivalents would "eliminate that [claim] element in its entirety."

*Warner-Jenkinson*, 520 U.S. at 29. Janssen argues that Teva's vitiation argument is foreclosed by

*Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349 (Fed. Cir. 2012), when the Federal Circuit rejected

this "binary" approach as contrary to the fundamental nature of the doctrine of equivalents by

stating:

> Courts should be cautious not to shortcut th[e] inquiry [on whether an alleged
> equivalent performs substantially the same function/way/result as a claim
> limitation] by identifying a "binary" choice in which an element is either present or
> "not present." . . . . [T]he doctrine of equivalents, by definition, recognizes that an
> element is missing that must be supplied by the equivalent substitute. If mere
> observation of a missing element could satisfy the vitiation requirement, this
> "exception" would swallow the rule.

*Id.* at 1356-57. Janssen asserts that the proper approach "requires a court to examine the

fundamental question of whether there is a genuine factual issue that the accused device, while

literally omitting a claim element, nonetheless incorporates an equivalent structure," and that it is

error to conclude that a claim element is entirely missing if "a reasonable jury could find that [the

alleged equivalent] represents an *insubstantial difference* from [the claim element]." *Id.* at 1357

(emphasis in original). Janssen argues that because there is an "insubstantial difference" between

darunavir hydrate (1:2.5) and darunavir ethanolate (1:1)—which this court must accept as true at

this stage in the proceedings—Teva cannot win summary judgment of non-infringement based on

its "vitiation argument." Janssen's Opp'n to Teva's Mot. for Summ. J. on '645 Patent at 34-36

(ECF No. 600).

31

### (iii)   Teva's Motion for Summary Judgment is Denied

This Court agrees with Janssen that neither the dedication-disclosure rule nor the doctrine of prosecution history estoppel can necessarily bar Janssen's claim of infringement against Teva via the doctrine of equivalents. As a result, Teva's motion for summary judgment of non-infringement is denied.

First, as to the dedication-disclosure rule, this Court finds that the facts presented in this case are more similar to those of *Graver Tank II* than those of *Johnson & Johnston*. Like the patentee in *Graver Tank II*, Janssen sought claims on the alleged equivalent, darunavir hydrate, in its application for the patent-in-suit. *See* J. Gould '645 Decl. Ex. 6 at 7 (Teva's Non-Infringement Contentions) (ECF No. 601) (stating that Janssen "originally attempted to claim a darunavir hydrate."); *Id.* Ex. 7 at 12 (Teva Para. IV letter for the '645 Patent) ("During the prosecution leading to the '645 patent, the applicants initially presented claims to both ethanol solvates and hydrates of darunavir."). In contrast, the patentee in *Johnson & Johnston* did not seek claims on the alleged equivalents in its patent application, and on those facts, the Federal Circuit held that "[w]hen a patent drafter discloses but declines to claim [the allegedly equivalent] subject matter, this action dedicates that unclaimed subject matter to the public," and the patentee may not rely on the "doctrine of equivalents to recapture [the] subject matter *deliberately left unclaimed.*" 285 F.3d at 1054 (emphasis added). The Federal Circuit made sure to distinguish its holding in *Johnson & Johnston* from the holding in *Graver Tank II*, relying on the significant distinction that in *Graver Tank II*, "the patentee had claimed the 'equivalent' subject matter, even if the Court eventually held the relevant claims too broad." *Id.* at 1053.[11]

---

[11] *See also id.* at 1060 (Dyk, J., concurring) (stating that *Graver Tank II* was "distinguishable on its facts because the equivalent subject matter in the case . . . was also claimed," and explaining "the consistency of its rule with *Graver Tank II* on the ground that 'the patentee had claimed the 'equivalent' subject matter, even if the Court eventually held the relevant claims too broad.'

32

Here, Janssen claimed the equivalent subject matter in its initial patent application, and the patent examiner later required Janssen to restrict its claims and to select one invention, which Janssen did by electing to pursue only darunavir ethanolate in that particular application. That circumstance makes this case more analogous to the situation in *Graver Tank II* than that in *Johnson & Johnston. See, e.g., Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1107 (Fed. Cir. 1996) (stating "by filing claims in the patent *application* that encompassed [a broader embodiment] . . ., the patentee could not be said to have dedicated such an embodiment of the invention to the public") (emphasis added); *Rosby Corp. v. Stoughton Trailers, Inc.*, 2003 WL 22232802, at \*7-8 (N.D. Ill. Sept. 24, 2003) (rejecting the dedication to the public argument where the patentee, like the patentee in *Graver Tank II*, filed an application with claims that literally encompassed the alleged equivalent and those claims were rejected during prosecution and did not become part of the issued patent).

The Federal Circuit's decision in *Johnson & Johnston* was based on principles that do not apply to the present case. The Federal Circuit's rationale in *Johnson & Johnston* was based in part on the principle that "allowing coverage of subject matter deliberately left unclaimed would conflict with the primacy of the claims in defining the scope of the patentee's exclusive right." *Rosby*, 2003 WL 22232802, at \*7 (citing *Johnson & Johnston*, 285 F.3d at 1054). Here, there is no subject matter "deliberately left unclaimed" because Janssen indeed did claim darunavir hydrate in its patent application. *See* J. Gould '645 Decl. Ex. 6 at 7 (Teva's Non-Infringement Contentions)

---

. . . . The patentee has control over the drafting of the claims, and if he discloses but omits to claim certain subject matter, he will be held to have waived the right to recapture the disclosed matter under the doctrine of equivalents, and to have dedicated it to the public. No such waiver occurs where, as in *Graver Tank II*, the patentee actually claimed the subject matter, even if the particular claims are later held invalid. . . . Thus, the majority concludes, and I agree, that *Graver Tank II* is distinguishable on its facts because the equivalent subject matter in that case (if disclosed) was also claimed.").

33

(ECF No. 601) (stating that Janssen "originally attempted to claim a darunavir hydrate."); *Id.* Ex. 7 at 12 (Teva Para. IV letter for the '645 Patent) ("During the prosecution leading to the '645 patent, the applicants initially presented claims to both ethanol solvates and hydrates of darunavir."). Claiming such subject matter in a patent application cannot be the "species of conscious waiver" contemplated by the dedication-disclosure rule. *See Johnson & Johnston*, 285 F.3d at 1060 (Dyk, J., concurring) ("I understand the majority to say that the dedication rule is a species of conscious waiver. . . . No such waiver occurs where, as in *Graver Tank II*, the patentee actually claimed the subject matter, even if the particular claims are later held invalid.").

The Federal Circuit also based its *Johnson & Johnston* holding on the principle that "a patentee cannot narrowly claim an invention to avoid prosecution scrutiny by the [Patent and Trademark Office ("PTO")] and then later impermissibly broaden their claim through the doctrine of equivalents." *Id.* (citing *Johnson & Johnston*, 285 F.3d at 1054). Again, Janssen did not narrowly claim an invention to avoid prosecution scrutiny by the PTO. Instead, Janssen originally applied for a patent for both ethanol solvates and hydrates of darunavir, *see* J. Gould '645 Decl. Ex. 7 at 12 (Teva Para. IV letter for the '645 Patent), but was limited to only ethanol solvates. There was no attempt by Janssen to "end-run" around the prosecution process to secure claims with potentially broad equivalents. *Rosby*, 2003 WL 22232802, at *8.[12] On these facts, the Court finds that Janssen did not dedicate darunavir hydrate to the public.

---

[12] In its reply brief, Teva argues that *Graver Tank II* and *Rosby* are inapplicable because "in each of those cases the alleged equivalent was either claimed in the issued patent or claims to the alleged equivalent were subjected to substantive examination by the PTO." Teva's Reply Br. in Support of Summ. J. on '645 Patent at 5 (ECF No. 656). The Court is unpersuaded by that distinction and sees no reason to limit the holdings of *Graver Tank II* and *Rosby* so strictly. The rationale applied by the courts in those cases applies with the same force in this case where the patentee claimed the equivalent subject matter in its original application.

34

This Court also agrees with Janssen that prosecution history estoppel does not bar Janssen from relying on the doctrine of equivalents in its infringement action. Under *Festo*, amendment-based prosecution history estoppel is triggered where claims are narrowed by amendment "for a substantial reason relating to patentability." 535 U.S. at 735. The initial Office Action included a restriction requirement and no rejections relating to patentability.[13] The Office Action required the applicant to "elect a single invention to which the claims must be restricted." J. Gould '645 Decl. Ex. 2 at PREZ00012766 (Prosecution History of the '645 Patent) (ECF No. 601). The Office Action stated that the restriction requirement was issued for reasons of administrative convenience, to reduce the burden on the examiner in searching for relevant prior art:

> Each pseudo[poly]morph is a distinct compound with independent and distinct chemical identity . . . for which independent and separate searches must be conducted . . . . To make [an] enormous search of each chemical identity encompassed by the claims in one application would be extremely burdensome.

---

[13] A restriction requirement is distinct from a rejection relating to patentability. "Restriction is the practice of requiring an applicant to elect a single claimed invention . . . for examination when two or more independent inventions and/or two or more distinct inventions are claimed in an application." Manual of Patent Examining Procedures ("MPEP") § 802.02 (8th ed. 2012). "A restriction requirement is not a rejection" of a patent application. *Howmedica Osteonics Corp. v. DePuy Orthopaedics, Inc.*, No. 11-cv-6498 (SDW), 2013 WL 3455727, at *25 (D.N.J. July 9, 2013) (quoting *Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, No. C-97-040203 (CRB), 2000 WL 34204509, at *15 (N.D. Cal. Feb. 28, 2000)); *Cardiac Sci., Inc. v. Koninklijke Philips Elecs. N.V.*, 466 F. Supp. 2d 1150, 1165 (D. Minn. 2006) ("[A] restriction is not the same as a rejection.") (citing *In re Hengehold*, 58 C.C.P.A. 1099, 440 F.2d 1395, 1402-03 (1971)). While a "rejection" reflects a preliminary or final determination that the subject matter as claimed "is considered unpatentable," MPEP § 706.1, a restriction requirement does not involve any such determination. Rather, requirements are issued "primarily for administrative convenience," *i.e.*, "to ease the burden [on the examiner] of examining [the relevant] subject matter." *Transco Prods., Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 558, 559 (Fed. Cir. 1994); *see also Applied Materials, Inc. v. Advanced Semi. Materials, Inc.*, 98 F.3d 1563, 1568 (Fed. Cir. 1996) ("restriction practice" serves the "purpose of examination convenience"). A restriction requirement is certainly not a per se indication that a claim fails to meet any of the requirements of patentability, particularly as in this case where the examiner indicated that the restriction requirement was issued for administrative purposes. *See* J. Gould '645 Decl. Ex. 2 at PREZ00012766 (Prosecution History of the '645 Patent).

35

*Id.* At that point, Janssen elected darunavir ethanolate and removed the subject matter of darunavir hydrates from the application, indicating that it would pursue such subject matter in a divisional application.

The examiner's second Office Action indicated that Janssen's election of darunavir ethanolate was "acknowledged" and "made FINAL." *Id.* Ex. 2 at PREZ00012745 (Prosecution History of '645 Patent). The second Office Action then went on to reject the pending claims for reasons relating to patentability, but at the point of that rejection, hydrates were restricted out of all pending claims and only darunavir ethanolate was at issue. With the non-elected subject matter withdrawn, the subject matter that remained post-election was only the elected subject matter. *See* 37 C.F.R. § 1.142(b); *Geneva Pharms.*, 349 F.3d at 1379 (quoting § 1.142); *Helfix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1348 (Fed. Cir. 2000) ("Claims to the non-elected invention(s) are withdrawn from consideration . . . .") (citing § 1.142(b)). Any amendments or narrowing that happened after the initial election of darunavir ethanolate cannot be a surrender of darunavir hydrate. In other words, any disclaimer would only apply to subject matter that resides in "the territory between the original claim and the amended claim," *Festo*, 535 U.S. at 740, and with the withdrawal by election, darunavir hydrate was not within that territory and not surrendered by any later claim amendments.

Because this Court finds that neither the dedication-disclosure rule nor the doctrine of prosecution history estoppel[14] bars Janssen from pursuing infringement claims based on the

---

[14] As to Teva's "vitiation argument," *see* Teva's Br. in Support of Summ. J. on '645 Patent at 21 (ECF No. 525), the Court agrees with Janssen that the proper approach "requires a court to examine the fundamental question of whether there is a genuine fact issue that the accused device, while literally omitting a claim element, nonetheless incorporates an equivalent structure," and whether that alleged equivalent "represents an *insubstantial difference*" from the claim element, *Deere & Co.*, 703 F.3d at 1357 (emphasis in the original), which cannot properly be decided on summary judgment here.

36

doctrine of equivalents, Teva's motion for summary judgment of non-infringement of the '645 Patent is denied.

### c. Mylan's Motion for Summary Judgment of Non-Infringement

Mylan moves for summary judgment that the products that are the subject of Mylan's ANDA No. 202-136 do not infringe any asserted claim of the '645 Patent. Mylan argues that based on this Court's construction of the term "solvate," each of the asserted claims of the '645 Patent requires a specific "crystal form" of darunavir, namely an ethanolate "solvate" in which the ratio of compound to ethanol is about 1:1. Mylan's Br. in Support of Summ. J. on '645 Patent at 1 (ECF No. 540). Based on this construction, Mylan argues that Janssen's infringement action must fail as a matter of law because Janssen cannot meet its burden to show that Mylan's ANDA products contain this "crystal form," nor can it show that it is entitled to the injunctive relief it seeks. *Id.* Mylan's motion for summary judgment of non-infringement of the '645 Patent is denied.

### (i) Mylan's Arguments in Support of Summary Judgment

Mylan first argues that its ANDA specification indisputably requires preparing and using amorphous darunavir as the active pharmaceutical ingredient ("API") in Mylan's ANDA products, not "a crystal form" as required under the '645 Patent claims. *Id.* at 1, 15-18. Mylan claims that Janssen does not seriously dispute this fact, and that testing data submitted to the FDA in connection with Mylan's ANDA and the Drug Master File ("DMF") referenced therein demonstrate that Mylan conforms to these specifications. *Id.* According to Mylan, under Federal Circuit precedent, when the ANDA specification directly addresses the infringement question (as Mylan claims its does), it is presumed true, binding on the ANDA applicant, and thus mandates a finding of no literal infringement. *Id.* (citing *Bayer AG v. Elan Pharm. Research Corp.,* 212 F.3d

37

1242, 1249 (Fed. Cir. 2000) (granting summary judgment of non-infringement based on ANDA specification).[15]

Second, Mylan argues that Janssen cannot meet its burden under theories that only assume small quantities of the claimed crystal form are present in the darunavir API employed in Mylan's ANDA products. *Id.* at 2, 18-21. Mylan supports this contention by pointing to the fact that Janssen's proposed expert, Dr. Luk, has allegedly conceded that his own testing on the API fails to show the presence of the claimed crystal form, and Mylan states that without such experimental evidence, Janssen offers no more than "theoretical speculation raising, at best, a metaphysical doubt as to the material facts" that cannot defeat summary judgment. *Id.* (quoting *Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1054 (Fed. Cir. 2001)).

Third, Mylan contends that Janssen cannot meet its burden by claiming it found trace quantities of ethanol in some but not all of Mylan's ANDA products. *Id.* While Janssen argues that the only reasonable source of such ethanol must be darunavir as a 1:1 ethanolate solvate, Mylan claims this is mere speculation that cannot support an infringement claim. *Id.* Mylan points out that Janssen's proposed expert, Dr. Luk, allegedly admitted that his testing had not controlled for the presence of ethanol in other, non-darunavir ingredients in Mylan's ANDA products. *Id.* at 2, 22-23; Mylan's '645 Statement of Material Facts ¶¶ 130-31 (ECF No. 540-1). According to Mylan, it follows that even if it is assumed that Janssen identified some trace amounts of ethanol, it has failed to satisfy its burden by showing "that no other component of the mixture" could produce the "peak" Janssen assigns to the ethanol. Mylan's Br. in Support of Summ. J. on '645 Patent at 2 (ECF No. 540) (quoting *Roche Palo Alto LLC v. Ranbaxy Labs., Ltd.*, No. 06-cv-2003(FLW), 2009 WL 3261252, at *36 (D.N.J. Sept. 30, 2009)). Mylan finds this "particularly problematic" in light

---

[15] Unlike Teva, Janssen does assert literal infringement against Mylan.

38

of Dr. Luk allegedly admitting that he assumed that the 1:1 ethanol solvate is the only existing form of darunavir, which Mylan claims is at odds with the '645 Patent disclosures, Janssen's claim construction arguments, and Janssen's own publication. *Id.*

Fourth, Mylan argues that Janssen cannot meet its burden on remedies. To secure injunctive relief, which Janssen seeks here, it must show it will suffer "irreparable harm" and that a "sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple, Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). Mylan argues that Janssen cannot do so because even Janssen's proposed experts "admit there is no evidence that Mylan intends on selling, or that anyone will purchase, Mylan Pharms' [sic] ANDA Products based on its darunavir ethanolate content, let along based on hypothesized, undetectable quantities of 1:1 darunavir ethanolate crystals." Mylan's Br. in Support of Summ. J. on '645 Patent at 3 (ECF No. 540).

Finally, Mylan argues that Janssen's complaint and contentions that Mylan is responsible for indirect infringement and infringement under the doctrine of equivalents are without merit. *Id.* at 27-28. Mylan argues that Janssen's infringement experts have failed to offer any opinions or evidence on these theories, and as a result they must be rejected. *Id.* at 28.

### (ii)    Janssen's Arguments in Opposition to Summary Judgment

Janssen argues that it raises genuine issues of material fact which require this Court to deny Mylan's motion. First, Janssen points out what it claims Mylan's motion "barely mentions," which is that "Mylan undisputedly uses ⬛⬛⬛⬛⬛⬛⬛⬛ during its manufacturing process. It does so in order to make sufficiently pure product on a commercial scale," and after making that ⬛⬛⬛⬛⬛⬛⬛ "Mylan attempts to eliminate the patented product" to create darunavir amorphous. Janssen's Opp'n to Mylan's Mot. for Summ. J. on '645 Patent at 1 (ECF No. 588).

39

Confidential Information Redacted - Subject to Protective Order

Janssen contends that the parties' expert witnesses "vigorously dispute" whether Mylan is capable of removing all of the infringing darunavir ethanolate (1:1) from its ANDA products. *Id.* at 1-2.

In reply to Mylan's argument that because its ANDA and DMF "require" that its ANDA products "contain amorphous darunavir, not darunavir ethanolate," Mylan does not infringe the '645 Patent as a matter of law, Mylan's Br. in Support of Summ. J. on '645 Patent at 15, 17 (ECF No. 540), Janssen asserts that Mylan's ANDA does not require the absence of darunavir ethanolate, but rather allows it to be present. Janssen supports this argument by pointing to Mylan's ANDA, which defines its API as "darunavir," not as "amorphous darunavir," and that the product definition does not require any specific form of darunavir. Janssen's Opp'n to Mylan's Mot. for Summ. J. on '645 Patent at 7 (ECF No. 588). Janssen also states that Mylan's manufacturing specifications allow for                                            and that this amount of ethanol, if in the form of darunavir ethanolate (1:1), would correspond to Mylan's API being composed of about 7 percent darunavir ethanolate (1:1). *Id.* at 7-8. Janssen further points out that while Mylan's specifications require the polymorphic forms of its API to be "concordant with X-ray powder diffraction data of Darunavir standard," which provides that before release, powder x-ray diffraction ("PXRD") testing must show Mylan's API to be "amorphous in nature," this specification actually allows darunavir ethanolate (1:1) to be present because the PXRD testing has a limit of detection for darunavir ethanolate (1:1) of approximately         *Id.* at 8. Thus, Janssen asserts that "the requirement that Mylan's API be amorphous as measured by PXRD testing does not exclude the presence of darunavir ethanolate (1:1)." *Id.* at 9. Based on these assertions, Janssen argues that where the ANDA specifications do not determine whether the infringing product is present or not, courts must look beyond the ANDA and consider "'all of the relevant evidence.'" *Id.* at 17 (quoting *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1568 (Fed.

40

Cir. 1997)). Janssen argues that the cases Mylan cites, where an ANDA "defines its product in a way that directly addresses the question of infringement" and therefore that definition controls the infringement inquiry, are inapposite here because, according to Janssen, Mylan's ANDA specifications do not require the absence of darunavir ethanolate. As a result, Janssen asserts that Mylan is not entitled to summary judgment based on its ANDA specifications, and that the Court must consider not just the ANDA itself, but also "'the materials submitted by [the ANDA applicant] to the FDA, and other pertinent evidence provided by the parties.'" *Pfizer, Inc. v. Teva Pharms. U.S.A., Inc.*, 882 F. Supp. 2d 643, 710 (D. Del. 2012) (quoting *Glaxo*, 110 F.3d at 1567-70).

Janssen disputes Mylan's characterizations of its infringement theories as "theoretical speculation" and "metaphysical doubt" which fall short of raising genuine issues of material fact. Instead, Janssen points to two bodies of expert evidence to show that darunavir ethanoloate (1:1) remains in Mylan's ANDA products that it wishes to market in the United States: (1) analysis of Mylan's manufacturing process, and (2) analytical testing of product samples.

Janssen argues that its experts rely on a great deal of "specific authority" for their opinions regarding Mylan's inability to remove all the                    from its final ANDA products, including Mylan's manufacturing documents, deposition testimony, and scientific literature concerning                    *See* Janssen's Counterstatement of Material Facts in Opp'n to Mylan's Mot. for Summ. J. on '645 Patent (ECF No. 588-2); Decl. of Shen Luk ("Luk Decl.") Ex. B ¶¶ 43-47 (Luk Opening) (ECF No. 593); *id.* Ex. C ¶¶ 9-23 (Luk Reply); Decl. of Paul Reider ("Reider Decl.") Ex. B ¶¶ 37-44, 55-59 (Reider Reply) (ECF No. 591). Janssen points out that Dr. Luk also refers to a standard text in the field, Joel Bernstein, et al., Polymorphism in Molecular Crystals, Oxford: Clarendon Press (2002), "which confirms that crystalline forms, once

41

introduced during manufacture, are typically impossible to eliminate." Luk Decl. Ex. C ¶ 12 (Luk Reply) (ECF No. 593). And Dr. Reider, "who has been the head of industrial-scale chemical manufacturing at two major pharmaceutical companies (Merck and Amgen)," analyzed Mylan's process documents and concluded "based on his industry experience and the literature on darunavir ethanolate (1:1) that Mylan's processes are 'incapable of eliminating' all of the

from Mylan's products." Janssen's Opp'n to Mylan's Mot. for Summ. J. on '645 Patent at 22-23 (ECF No. 588) (quoting Reider Decl. Ex. B ¶¶ 39-43, (Reider Reply) (ECF No. 591)). Janssen asserts that because the Court cannot weigh evidence and evaluate the credibility of experts at the summary judgment stage, Janssen's manufacturing evidence is alone a sufficient reason to deny summary judgment.

Janssen next contends that its analytical testing of Mylan's ANDA tablets performed by Dr. Luk also precludes summary judgment. Dr. Luk concluded that

in some of Mylan's ANDA samples. *Id.* at 11 (quoting Luk Decl. Ex. C ¶ 52 (Luk Reply) (ECF No. 593)). Janssen asserts that Dr. Luk arrived at this conclusion by comparing TGA/MS data for Mylan's ANDA products with TGA data in Figure 16 of the '645 Patent, which discloses that darunavir ethanolate (1:1) has a distinctive and characteristic TGA pattern. Luk Decl. Ex. B ¶¶ 60-74 (Luk Opening) (ECF No. 593); *id.* Ex. C ¶¶ 48-52 (Luk Reply). While Mylan criticizes Dr. Luk's methodology and conclusions, Janssen states that such criticisms "are the paragon of a factual dispute unsuitable for summary judgment." Janssen's Opp'n to Mylan's Mot. for Summ. J. on '645 Patent at 27 (ECF No. 588).

For example, Mylan asserts that Dr. Luk's TGA/MS analysis "is based on nothing more than an assumption" that the                    is in the form of darunvair ethanolate (1:1).

42

Mylan's Br. in Support of Summ. J. on '645 Patent at 12, 22 (ECF No. 540). Janssen claims that

this is wrong, and in fact "Dr. Luk uses TGA data exactly as it is used in Figure 16 of the '645

Patent—to identify the presence of darunavir ethanolate (1:1), which has a distinctive and

characteristic TGA pattern that is inconsistent with the detected ethanol being in any other known

form." Janssen's Opp'n to Mylan's Mot. for Summ. J. on '645 Patent at 27 (ECF No. 588) (citing

Luk Decl. Ex. B ¶¶ 60-74 (Luk Opening) (ECF No. 593); *id.* Ex. C ¶¶ 48-52 (Luk Reply)). As

another example, Janssen contends that Mylan is also incorrect to argue that Dr. Luk's inability to

detect darunavir ethanolate (1:1) using testing methods besides TGA/MS somehow undermines

his TGA/MS results. *See* Mylan's Br. in Support of Summ. J. on '645 Patent at 12, 21-22 (ECF

No. 540). Janssen points out that Dr. Luk explains in his report that it is perfectly logical that

darunavir ethanolate (1:1) would be found through TGA/MS but not other tests, as TGA/MS is

highly sensitive and is capable of detecting darunavir ethanolate (1:1) below the limits of detection

of the other methods. Luk Decl. Ex. B ¶¶ 49-54, 71 (Luk Opening) (ECF No. 593).

Janssen next argues that, contrary to Mylan's assertions, it can meet its burden on remedies

and therefore summary judgment should not issue for Mylan. While Mylan argues that Janssen

cannot meet its burden of showing irreparable harm, which is required for injunctive relief, and

therefore that summary judgment is appropriate, Janssen points out that upon a finding of

infringement, Janssen would be entitled to a mandatory order under 35 U.S.C. § 271(e)(4)(A)

directing the FDA not to approve Mylan's ANDA until the expiration of the '645 Patent and its

associated exclusivity. Janssen therefore argues that to the extent Janssen raises a genuine issue of

material fact with regard to infringement, it also does so as to remedy. The injunctive relief that

Mylan refers to, as provided for in 35 U.S.C. § 271(e)(4)(B), is a "typical" permanent injunction,

as is potentially available in all patent cases. Janssen contends there is a genuine dispute as to its

43

entitlement to such an injunction because there is a "clear nexus" between Mylan's use of darunavir ethanolate (1:1) and the irreparable harm (i.e., market share and revenue loss) to Janssen that would result from the approval of Mylan's ANDA.

Finally, in response to Mylan's arguments as to infringement under the doctrine of equivalents and indirect infringement, Janssen contends that summary judgment for Mylan on either is not warranted. First, Janssen states that since it contends that darunavir ethanolate (1:1) is literally present in Mylan's ANDA products, and since Mylan has not disputed that all the other elements of the '645 Patent are literally met, Janssen relies only on theories of literal infringement rather than infringement under the doctrine of equivalents, making the issue of infringement under the doctrine of equivalents moot at this time. As to Janssen's indirect infringement allegations against Mylan, Inc., the parent company of the ANDA holder Mylan Pharmaceuticals, Inc., Janssen states that Mylan's argument that Janssen has not established any "underlying" direct infringement of the claims of the '645 Patent necessarily fails because Janssen has presented compelling evidence of direct infringement. *See* Janssen's Opp'n to Mylan's Mot. for Summ. J. on '645 Patent at 39-40 (ECF No. 588).

### (iii) Mylan's Motion for Summary Judgment is Denied

This Court agrees with Janssen that it has raised genuine issues of material fact as to whether Mylan's ANDA products infringe the '645 Patent, and as a result Mylan's motion for summary judgment of non-infringement of the '645 Patent is denied.

As an initial matter, it is important to recognize that the Federal Circuit has "rejected the proposition" that "'trace amounts' of a patented compound" are non-infringing, even where such a holding might "'place potential infringers in the untenable position of never knowing whether their product infringes because even a single undetectable [molecule] would infringe.'" *Organic*

44

*Seed Growers and Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1356 (Fed. Cir. 2013) (quoting

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1335, 1339-40 (Fed. Cir. 2005)); *see*

*also Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1299 (Fed. Cir. 2009) (noting that de minimis

infringement can still be infringement); *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1353-

54 (Fed. Cir. 2000) (Rader, J., concurring) ("[T]his court has not tolerated the notion that a little

infringement—de minimis infringement—is acceptable infringement or not infringement at all.").

If Janssen is able to raise a genuine issue of material fact as to *any* infringement of the '645 Patent,

even if only based on the smallest trace amounts of darunavir ethanolate (1:1), that is enough to

defeat Mylan's motion for summary judgment of non-infringement. Because this Court finds that

Janssen has raised such genuine issues of material fact, as discussed below, Mylan's motion is

denied.

     The Court finds that Mylan's argument that it does not infringe the '645 Patent as a matter

of law because its ANDA products "contain amorphous darunavir, not darunavir ethanolate" is not

persuasive because Mylan's ANDA does not *require* the absence of darunavir ethanolate, but

rather potentially allows it to be present at some level. *See* Decl. of Aron Fischer in Opp'n to

Mylan's Mot. for Summ. J. on '645 Patent ("Fischer Decl.") Ex. 8 (Mylan ANDA Section 2.3.S

Drug Substance (MYLAN(Daru)000127)); *id.* Ex. 10 at 296 (Dep. of Dr. Buckton); *see also*

Janssen's Opp'n to Mylan's Mot. for Summ. J. on '645 Patent at 8-9 (ECF No. 588). For this

reason, the cases that Mylan relies on in its brief, *see* Mylan's Br. in Support of Summ. J. on '645

Patent at 15-17 (ECF No. 540), are distinguishable from the present one. For example, Mylan

relies on *In re Brimonidine Patent Litig.*, 643 F.3d 1366, 1377-78 (Fed. Cir. 2011), where the

Federal Circuit held that the ANDA mandated a finding of non-infringement because the parties

"agree[d] that the highest pH at which Exela requests permission to manufacture and sell its

45

Confidential Information Redacted – Subject to Protective Order

proposed product is 6.7," and the claim required "a pH of 7.0 or greater." Mylan also relies on

*Bayer*, 212 F.3d at 1246, 1249, where the court held that the ANDA mandated a finding of non-

infringement when the patent claim required "crystals with a specific surface area of 1.0 to 4 $m^2/g$"

but the ANDA required the specific surface area "to be 5 $m^2/g$ or greater." Here, however, Mylan's

ANDA does not directly address infringement of the '645 Patent because it does not foreclose the

presence of darunavir ethanolate (1:1) in its ANDA products. *See supra* at 35-37. When "the

ANDA specification *does not* 'directly address the issue of infringement,'" "strict reliance on the

ANDA content is not applicable." *EKR Therapeutics, Inc. v. Sun Pharm. Indus.*, 633 F. Supp. 2d

187, 199 (D.N.J. 2009) (quoting *Bayer*, 212 F.3d at 1250) (emphasis in original). In "the absence

of a specification directly addressing the question of infringement," the court is directed to consider

not just the ANDA itself, but also "'the materials submitted [by the ANDA applicant] to the FDA,

and other pertinent evidence provided[] by the parties.'" *Pfizer*, 882 F. Supp. 2d at 710 (quoting

*Glaxo*, 110 F.3d at 1570). Because Mylan's ANDA does not directly address the issue of

infringement, the Court must consider the other evidence submitted by the parties and determine

if such evidence raises a genuine issue of material fact to defeat summary judgment.

Mylan argues that even if evidence beyond the ANDA is considered, Mylan is still entitled

to summary judgment because Janssen's infringement theories are based on "theoretical

speculation" and "metaphysical doubt" that do not raise a genuine issue of material fact. Janssen

supports its infringement theories by relying on two bodies of expert evidence to show that

darunavir ethanolate (1:1) remains in Mylan's ANDA products: (1) analysis of Mylan's

manufacturing process, and (2) analytical testing of product samples. This Court finds that Janssen

raises a genuine issue of material fact as to the possibility of

and as to whether Mylan's ANDA products actually contain

46

darunavir ethanolate. Janssen's proposed experts, Dr. Luk and Dr. Reider, both have experience in the relevant field. *See* Luk Decl. Ex. A (Luk Curriculum Vitae) (ECF No. 593); Reider Decl. Ex. A (Reider Curriculum Vitae) (ECF No. 591). As to Janssen's manufacturing-process evidence, its proposed experts rely on Mylan's manufacturing documents, deposition testimony and scientific literature in forming their opinion that                    cannot be fully removed from Mylan's ANDA products, and both experts clearly explain the basis for that opinion. *See* Janssen's Counterstatement of Material Facts in Opp'n to Mylan's Mot. for Summ. J. on '645 Patent (ECF No. 588-2); Luk Decl. Ex. B ¶¶ 43-47 (Luk Opening) (ECF No. 593); *id.* Ex. C ¶¶ 9-23 (Luk Reply); Reider Decl. Ex. B ¶¶ 37-44, 55-59 (Reider Reply) (ECF No. 591). As to Dr. Luk's analytical testing data of Mylan's ANDA samples, Dr. Luk conducted TGA/MS testing, explaining his methodology in detail, and found that it "confirms the presence of darunavir ethanolate (1:1)" in Mylan's ANDA samples. Luk Decl. Ex. C ¶ 52 (Luk Reply) (ECF No. 593); *see id.* Ex. B ¶ 71 (Luk Opening). These asserted facts are sufficiently specific to defeat Mylan's motion for summary judgment.

While it may be the case that Mylan's experts have valid and persuasive criticisms as to the accuracy and reliability of these expert opinions, a "court may not . . . resolve 'disputed and relevant factual issues on conflicting affidavits of qualified experts[,]' [n]or is it at liberty to disbelieve the good faith statements of experts contained in depositions or affidavits and presented by the non-moving party." *Fed. Labs.*, 696 F.2d at 274 (quoting *Ethyl Corp. v. Borden, Inc.*, 427 F.2d 206, 210 (3d Cir. 1970); *see also Metro. Life Ins. Co. v. Bancorp. Servs., L.L.C.*, 527 F.3d 1330, 1338-39 (Fed. Cir. 2008) (noting that "[r]esolving such credibility disputes [between experts] . . . is not appropriate on summary judgment and finding that "conflict in [expert] declarations created a genuine issue of material fact that made summary judgment inappropriate").

47

Confidential Information Redacted – Subject to Protective Order

Because there remain disputed genuine issues of material fact as to Mylan's ANDA products' infringement of the '645 Patent, and because weighing evidence and evaluating credibility are not proper at this stage of the proceedings, Mylan's motion for summary judgment of non-infringement of the '645 Patent is denied.

As to Mylan's argument that Janssen cannot meet its burden on remedies and therefore Mylan is entitled to summary judgment, *see* Mylan's Br. in Support of Summ. J. on '645 Patent at 23-27 (ECF No. 540), it is not persuasive. If Mylan's ANDA products are found to infringe the '645 Patent, Janssen is potentially entitled to a remedy under 35 U.S.C. § 271(e)(4)(A) directing the FDA not to approve Mylan's ANDA until the expiration of the '645 Patent and its associated exclusivity. And as to Mylan's motion for summary judgment on Janssen's request for a permanent injunction, there is a genuine dispute as to whether Janssen could establish irreparable harm or a causal nexus between the alleged harm and the alleged infringement. Mylan's argument that because only trace or undetectable amounts of darunavir ethanolate (1:1) are present in its ANDA products Janssen cannot establish the "nexus" between Mylan's infringement and Janssen's harm as required by *Apple*, 695 F.3d at 1374 is not persuasive on a motion for summary judgment when there are factual disputes as to whether the amount of daruavir ethanolate (1:1) present in the products is due to Mylan's                               in its manufacture and what that means for the purity and efficacy of its product, and where loss of market share and revenue loss have been found to establish irreparable harm. *See, e.g., Abbott Labs.*, 544 F.3d at 1361-62. This Court finds that Mylan is not entitled to summary judgment on Janssen's request for a permanent injunction.[16]

---

[16] This Court denies Mylan's motion for summary judgment with regard to infringement under the doctrine of equivalents (which Janssen has not relied on). And this Court denies summary judgment as to indirect infringement against Mylan, Inc. because fact issues remain, as discussed earlier, as to whether any "underlying" direct infringement of the claims of the '645 Patent occurs.

48

## III.   The '015 and '408 Patents

Both the '015 Patent and the '408 Patent "claim processes for manufacturing bis-THF, a chemical structure or moiety that is part of the darunavir molecule." Janssen's Br. in Support of Summ. J. on '015, '408 Patents at 2 (ECF No. 535).

Lupin and Teva move for summary judgment that the products that are the subject of Teva's ANDA No. 202-118 and Lupin's ANDA No. 202-073 do not infringe any asserted claim of the '015 or '408 Patents. Both Lupin and Teva assert that the product of the processes recited in the asserted claims of these patents is materially changed by subsequent processes before importation into the United States and therefore does not infringe under 35 U.S.C. § 271(g)(1).

Janssen moves for summary judgment that Lupin and Teva do infringe the '015 Patent and the '408 Patent. Specifically, Janssen seeks summary judgment that both Lupin and Teva infringe claims 1, 2, 18 and 19 of the '015 Patent; that Lupin also infringes claims 1-4, 16-17, and 19-20 of the '408 Patent; and that Teva infringes claims 1-4, 7-10, 15-17 and 19-20 of the '408 Patent.[17] Janssen argues that the product of the processes recited in the asserted claims are not materially changed by subsequent processes before being imported into the United States, and as a result it infringes the '015 and '408 Patents under 35 U.S.C. § 271.[18]

Lupin and Teva's motion for summary judgment is denied. Janssen's motion for summary judgment is granted in part and denied in part. Janssen's motion for summary judgment against Lupin and Teva is granted as to the asserted claims of the '015 Patent. Janssen's motion for

[17] Janssen has also asserted claims 5-8, 10, 11, 13 and 15 of the '408 Patent against Lupin, and claims 5 and 6 of the '408 Patent against Teva, but does not seek summary judgment on those claims. Janssen's Br. in Support of Summ. J. on '015, '408 Patents at 1 (ECF No. 535).

[18] While the Patent Act expressly prohibits a party from evading a U.S. process patent simply by moving manufacture off-shore, 35 U.S.C. § 271(g), the statute also states that a product "made by a patented process" is "not considered to be so made" if "it is materially changed by subsequent processes." *Id.* § 271(g)(1).

49

summary judgment against Lupin as to claims 1 and 2 of the '408 Patent is granted. Janssen's motion for summary judgment against Teva as to claims 1 and 7-10 of the '408 Patent is granted. Janssen's motion for summary judgment against Lupin as to claims 3, 4, 16, 17, 19 and 20 of the '408 Patent, and against Teva as to claims 2-4, 15-17, 19 and 20 of the '408 Patent, is denied.

### a. Lupin and Teva's Arguments Regarding Material Change

Lupin and Teva argue that the product of the processes claimed in the '015 and '408 Patents—bis-THF—is materially changed by subsequent processes used to make the darunavir that is used in the ANDA products that Lupin and Teva ultimately import into the United States, and as a result there can be no infringement under 35 U.S.C. § 271(g). Lupin and Teva assert that in evaluating the applicability of the § 271(g)(1) exception, courts look "to the substantiality of the change between the product of the patented process and the product that is being imported." *Eli Lilly & Co. v. American Cyanamid Co.*, 82 F.3d 1568, 1573 (Fed. Cir. 1996). And that in "the chemical context, a 'material' change in a compound is most naturally viewed as a significant change in the compound's structure and properties." *Id.*

To support their argument, Lupin and Teva identify three inquiries as being particularly relevant to courts as to the question of whether there has been a substantial change to the structure and properties of the product of a patented process before importation. *See* Lupin and Teva's Br. in Support of Summ. J. on '015, '408 Patents at 14-26 (ECF No. 533).

The first inquiry Lupin and Teva identify is whether the "basic utility" and/or biological activity of the imported product is different from the product of the claimed process. *Id.* at 14-19; *see, e.g., Lilly*, 82 F.3d at 1577; *Genentech, Inc. v. Boehringer Mannheim GmbH*, 47 F. Supp. 2d 91, 107, 109 (D. Mass. 1999). Lupin and Teva argue that darunavir and bis-THF have substantially different utilities, both in the biological activity of the compounds and the purposes for which they

50

are used. With respect to biological activity, they claim that there is no dispute that darunavir is effective as a protease inhibitor, while bis-THF alone has no protease inhibition activity. *See* Lupin and Teva's Br. in Support of Summ. J. on '015, '408 Patents at 15 (ECF No. 533). They further assert that in comparing the utility of the product of the process with that of the imported product, courts also consider whether the product of the patented process can be used for purposes other than making the imported product. *Id.* at 18; *see, e.g., Lilly*, 82 F.3d at 1577; *Flexsys Am. v. Kumho Tire U.S.A.*, 726 F. Supp. 2d 778, 801-02 (N.D. Ohio 2010). Lupin and Teva contend that bis-THF can be used for a variety of other purposes besides synthesizing darunavir—such as making a variety of anti-viral drugs, making other protease inhibitors besides darunavir, and making pesticides and opioid analgesics—which further demonstrates the differences in utility between bis-THF and darunavir. Lupin and Teva's Br. in Support of Summ. J. on '015, '408 Patents at 19 (ECF No. 533).

The second inquiry Lupin and Teva identify is whether the chemical structure and properties of the imported product are different from the product of the patented process. *Id.* at 19-23; *see, e.g., Lilly*, 82 F.3d at 1573; *Flexsys*, 726 F. Supp. 2d at 801-02. Lupin and Teva argue that here, it is undisputed that the chemical structure of darunavir is different from the chemical structure of bis-THF, "and that the difference in the structure results in significant differences in the physical and chemical properties of the two compounds." Lupin and Teva's Br. in Support of Summ. J. on '015, '408 Patents at 20 (ECF No. 533). Lupin and Teva include several charts in their brief in support of their motion for summary judgment that demonstrate those differences, one comparing physical properties, *see id.* at 21, and the other comparing chemical properties, *see id.* at 22.

51

And the third inquiry Lupin and Teva identify is whether the processing steps to convert the product of the patented process into the imported product are "complex." Lupin and Teva's Br. in Support of Summ. J. on '015, '408 Patents at 24-27 (ECF No. 533); *see, e.g., Lilly,* 82 F.3d at 1573. Lupin and Teva point to *Eli Lilly & Co. v. Am. Cyanamid Co.,* where the Federal Circuit cited to the legislative history of Section 271(g)(1) in holding that the product of the patented process was materially changed because producing the imported product from the product of the patented process "require[d] four distinct steps" wherein "the conversion process . . . involve[d] considerably more than the removal of a protective group." *Lilly,* 82 F.3d at 1570, 1573. Lupin and Teva state that as in *Lilly,* "the multiple process steps required to form darunavir API from bis-THF are synthetically complex and do not involve the formation of simple derivatives such as salts or esters, or the addition of small one- or two-carbon groups like methyl or ethyl." Lupin and Teva's Br. in Support of Summ. J. on '015, '408 Patents at 25 (ECF No. 533). Rather, Lupin and Teva contend that forming darunavir from bis-THF is quite complicated,

*See id.* at 25-26; Lupin and Teva's Statement of Material Facts ¶¶ 61-68 (ECF No. 533-2).

### b. Janssen's Arguments Regarding Material Change

Janssen asserts that although darunavir has other chemical components, "bis-THF is present in darunavir, intact, with the same characteristics and structure it has as a standalone molecule." Janssen's Br. in Support of Summ. J. on '015, '408 Patents at 2 (ECF No. 535). Janssen argues that Lupin and Teva's position as to bis-THF being "materially changed" is untenable, and is foreclosed by the patent statute itself. Janssen supports this argument by pointing out that in addition to the "material change" language, the statute recognizes another exception to infringement: where the product of the patented process is a "trivial and nonessential component

52

of another product." 35 U.S.C. § 271(g)(2). Janssen asserts that by including this statutory exclusion, "Congress made clear that a component that is *not* 'trivial and nonessential' *can* infringe under section 271(g)—even if it is incorporated into a larger product that includes other components as well." Janssen's Br. in Support of Summ. J. on '015, '408 Patents at 3 (ECF No. 535). Because Lupin and Teva do not argue that bis-THF is a "trivial and nonessential component," but rather that by virtue of being incorporated into darunavir, bis-THF is "materially changed," Janssen contends that Lupin and Teva's theory "stands the statutory scheme on its head" because a "product of a patented process is not exempt from infringement merely because it is affixed to or incorporated into a larger product." *Id.* Janssen asserts that if Lupin and Teva's theory were correct, there would be no need for the statutory exemption of "trivial and nonessential" components. *Id.*

In further support of its argument, Janssen also claims that a process patent's disclosure of its intended purpose is an important factor in the Section 271(g) analysis. *Id.* at 24; *see, e.g., Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1561 (Fed. Cir. 1996); *OKI Am., Inc. v. Advanced Micro Devices, Inc.*, No. C 04-03171 CRB, 2006 WL 2711555, at *13-14 (N.D. Cal Sept. 21, 2006). Janssen argues that here, both the '015 Patent and the '408 Patent explicitly state that bis-THF "is an important pharmacological moiety present in the structure of retroviral protease inhibitors" including specifically darunavir, and that bis-THF "prepared according to the present invention" can be used "in the chemical synthesis of said protease inhibitor." Janssen's '015, '408 Statement of Facts ¶¶ 11-12. Janssen contends that Lupin and Teva perform the processes described in Janssen's patents, and then use the bis-THF made by those processes for the purpose that the patents identify—making darunavir. Janssen's Br. in Support of Summ. J. on '015, '408

53

Patents at 25 (ECF No. 535). Janssen states that such actions are a clear violation of Section 271(g) and that Lupin and Teva's "material change" defense should be rejected as a matter of law. *Id.*

### c. Janssen's Motion for Summary Judgment is Granted In Part

Summary judgment is appropriate as to the infringement of the '015 Patent and certain claims of the '408 Patent because the material facts that underlie the parties' motions for summary judgment as to those claims are undisputed.[19] It is undisputed that,

The parties present the Court with an issue of law: whether Lupin and Teva's production of bis-THF according to Janssen's patented processes, and the subsequent importation into the United States of darunavir that contains that bis-THF, infringes the '015 and '408 Patents under 35 U.S.C. § 271(g), or whether bis-THF is "materially changed" by its incorporation into darunavir, and therefore no infringement occurs. This Court finds that                Lupin and Teva will infringe the '015 and '408 Patents when they import darunavir that includes bis-THF made by the patented processes into the United States.

Section 271(g) was enacted to prevent parties from circumventing U.S. process patents by moving their manufacturing operations offshore and then importing goods that contain

---

[19] Teva has stipulated.                          that the bis-THF in their generic products is manufactured using processes covered by the asserted claims of the '015 Patent. Stipulation and Order at 2 (ECF No. 520).

Teva has stipulated that the bis-THF in its generic products is manufactured using processes covered by each element of several claims (claims 1 and 7-10) of the '408 Patent. Stipulation and Order at 2 (ECF No. 520). As to the remaining claims of the '408 Patent at issue in this motion, Teva and Lupin have challenged the sufficiency of Janssen's evidence with respect to claims 2-4, 15-17 and 19-20. *See* Lupin and Teva's Opp'n to Janssen's Mot. for Summ. J. on '015, '408 Patents at 28 (ECF No. 579).

A00184

components made by patented processes into the United States.[20] While U.S. patent laws cannot directly regulate extraterritorial activity, they can—and do—prohibit importation into the United States of products made by processes protected by U.S. patents, unless one of the statutory exceptions applies. Section 271(g) provides two statutory exceptions: (1) where the product of the patented process is "materially changed by subsequent processes; or (2) where the product of the patented process "becomes a trivial and nonessential component of another product." 35 U.S.C. § 271(g)(1)-(2). Lupin and Teva focus their argument on the first of those exceptions—that bis-THF is "materially changed" when it is incorporated into another larger molecule in order to form darunavir. This Court, relying on the overall purpose of the statute, logic and common sense, rather than on any of the broad arguments of the parties described above, finds that bis-THF is not "materially changed" when it is incorporated into the darunavir molecule.

Darunavir is comprised of two distinct chemical structures—(1) bis-THF and (2) a sulfonamide component—that are each synthesized independently of the other before they converge and are joined together to form the darunavir molecule. *See* Decl. of Srikanth K. Reddy in Support of Defs.' Statement of Material Facts Not in Dispute in Support of Defs.' Motion for Summ. J. on '015, '408 Patents ("Reddy Decl."), Ex. 4 at col. 24:21-28:49 ('408 Patent); *id.*, Ex. 13 at CIP00000151 (Cipla process for making darunavir from bis-THF). When bis-THF is added to the rest of the darunavir molecule, bis-THF loses a single hydrogen atom, which allows the bond between the two structures to form. Decl. of Herman Yue in Support of Janssen's Opp'n to Teva

---

[20] *See* S. Rep. 83, 100th Congress, 1st Sess. at 30 (purpose of Section 271(g) is to "protect against the entry into the U.S. marketplace of goods made abroad without authorization from the inventor who has a process patent in this country"); H.R. Rep. No. 60, 100th Congress, 1st Sess. at 3 (noting that, under pre-existing law, "while a domestic manufacturer using the patented process would infringe the process patent, a foreign manufacturer who imports the product would not" and that "the unfettered ability" to import such products "severely diminishes the value of a U.S. process patent").

55

and Lupin's Motion for Summary Judgment of Non-Infringement on '015, '408 Patents ("Yue Decl.") Ex. I ¶¶ 55-56 & n.29 (Aug. 1, 2013 Ganem Report).[21] Other than the loss of that single hydrogen atom, after bis-THF is joined to the remainder of the darunavir molecule, it remains unchanged and intact. *See* Decl. of Paul J. Reider in Support of Janssen's Mot. for Summ. J. on '015, '408 Patents ("Reider Decl.") Ex. B ¶ 41 & n.1 (ECF No. 536).

Lupin and Teva's argument that bis-THF is "materially changed" once it is incorporated into the remainder of the darunavir molecule relies on the premise that a molecule such as darunavir is necessarily an irreducible whole rather than a collection of individual parts. From this premise, they argue that a chemical moiety such as bis-THF is not only materially changed, but is "used up" or ceases to exist, once it is incorporated into another molecule. *See* Lupin and Teva's Br. in Support of Summ. J. on '015, '408 Patents at 9-10 (ECF No. 533). The end result of following such logic is that patents on processes for the production of chemical structures that serve as moieties of pharmaceutical products can never be infringed under Section 271(g). This Court refuses to stretch Section 271(g) so far. Neither the statute and its legislative history, nor common sense, can lead to such a result.

In enacting Section 271(g), Congress sought to protect holders of process patents—including those directed to "pharmaceutical chemicals"—from overseas competitors that make unauthorized use of their patented process. S. Rep. 83, 100th Congress, 1st Sess. at 30. The Senate determined that drugs and other goods that are "made abroad by a process patented in the United States" should not be "allowed to come into the United States to benefit competitors of the process patent-owner," and that by enacting Section 271(g) it sought to "cut off such lines of supply." *Id.*

---

[21] Lupin and Teva do not contend that the loss of a single hydrogen atom itself constitutes a material change. At least one Federal Circuit case has held that the loss of a hydrogen atom as part of a chemical reaction necessary to bind two molecules together was immaterial. *See Amgen*, 580 F.3d at 1376.

56

at 47. If this Court were to adopt the argument of Lupin and Teva, overseas chemical and drug manufacturers could follow methods taught by U.S. process patents with impunity, as long as the product of the patented process was in some way affixed to another molecule. Such a large "loophole" in Section 271(g) was not contemplated by Congress.

Lupin and Teva's argument for why bis-THF should be considered materially changed once it is incorporated into darunavir comes almost exclusively from the reasoning of *Eli Lilly*, 82 F.3d 1568, as well as other cases citing the test from *Eli Lilly*. The *Eli Lilly* plaintiff held a patent on a process for manufacturing a chemical intermediate that could, through a series of reactions, be transformed into the antibiotic cefaclor. *Id.* at 1570-71, 1573. Converting the intermediate to cefaclor required: (i) removing the intermediate's hydroxyl group and replacing it with a chlorine atom; (ii) removing the phenylacetyl group; (iii) adding a phenylglycyl group; and (iv) removing a para-nitrobenzyl carboxylate ester. *Id.* at 1570; *see* Janssen's Br. in Support of Summ. J. on '015, '408 Patents at 23 (ECF No. 535). The Federal Circuit held that the product of the patented process and the final product (cefaclor) were "different in four important structural respects, corresponding to the four discrete chemical steps between the two compounds." *Id.* at 1573. As a result, the product of the patented process was not present in the final product, but was rather transformed into the final product through the removal and addition of various chemical groups, constituting a material change. *Id.*

In its analysis, the Federal Circuit stated that in determining whether there had been a "material change" under 271(g) the appropriate inquiry was to examine "the substantiality of the change between the product of the patented process and the product that is being imported." *Id.* at 1573. Lupin and Teva hammer this statement of the law repeatedly in their briefing and argue that because the product of the patented process (bis-THF) and the product that is being imported into

57

the United States (darunavir) are different in basically every way, the material change exception under Section 271(g) must apply.

While comparing the product of the patented process to the imported product may make sense in the context of *Eli Lilly*, where the product of the patented process underwent structural alteration or transformation, it cannot possibly be the correct inquiry when dealing with a process patent for chemical structures that serve as moieties of pharmaceutical products. If such a comparison were correct, patents on processes for the production of chemical structures that serve as moieties of pharmaceutical products could never be infringed under Section 271(g). Given that such chemical structures are often integral to the efficiency of manufacture and the effectiveness of the pharmaceutical product, as they are in this case, it would defy logic to think that Congress meant to allow process patents to be so easily sidestepped under Section 271(g). Component parts, whether chemical molecules or otherwise, are necessarily different from the larger finished products into which they are incorporated. To ignore that truism and adopt the inquiry from *Eli Lilly* for all process patent cases dealing with chemical structures would thwart Congress's intent in passing Section 271(g).[22] Cases more analogous to the question at issue lead to the result that bis-THF is not considered "materially changed." *See, e.g., Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340 (Fed Cir. 2009) (affirming a finding of infringement in favor of the plaintiff

---

[22] Lupin and Teva also heavily rely on *Flexsys Am.*, 726 F. Supp. 2d 778. *Flexsys* concerned patents that claimed a process for making the chemical compound 4-ADPA. The patents taught the "conversion" of 4-ADPA into other compounds, including 6PPD, through the use of a chemical reaction known as "reductive alkylation." *Id.* at 782-83. The *Flexsys* court found that the alkylation used to convert 4-ADPA into 6PPD resulted in a material change, and Lupin and Teva rely on *Flexsys* for the proposition that adding a structural group to a chemical compound produced by a patented process results in a material change to that compound under Section 271(g). However, this Court does not find this argument persuasive, both because it is not clear that such alkylation necessarily results in a material change, *see Pfizer Inc. v. F&S Alloys & Minerals Corp.*, 856 F. Supp. 808 (S.D.N.Y. 1994), and because the "conversion" of the "intermediate" 4-ADPA into 6PPD as described by the *Flexsys* court seems more analogous to *Eli Lilly* than it is to the present case.

where the product of the patented process was incorporated into another pharmaceutical product); *OKI Am.*, 2006 WL 2711555, at *15 (denying defendant's motion for summary judgment where a wafer cleaned by the patented process underwent a number of "subsequent processing steps" but was not materially changed because the wafer's important characteristics, i.e. lack of debris, were present in the finished product).

For these reasons, Janssen's motion for summary judgment of infringement of the '015 and '408 Patents is granted in part (i.e., as to the stipulated claims).

### d. Claims 2-4, 15-17 and 19-20 of the '408 Patent

Lupin and Teva claim that Janssen is not entitled to summary judgment as to claims 2-4, 15-17, 19 and 20 of the '408 Patent (as to Teva) and claims 3, 4, 16, 17, 19 and 20 of the '408 Patent (as to Lupin) because Janssen has failed to prove infringement of those claims by a preponderance of the evidence. Lupin and Teva state that because Janssen has failed to satisfy its burden of proving that Lupin and Teva's ANDA products are made using the processes set forth in those claims, summary judgment as to those claims must be denied. Specifically, Lupin and Teva argue that Janssen's only evidence of infringement as to these claims is "the *ipsi dixit* of its proposed expert Dr. Reider," Lupin and Teva's Opp'n to Janssen's Mot. for Summ. J. on '015, '408 Patents at 30 (ECF No. 579), and that such statements cannot satisfy Janssen's burden of proving infringement on a motion for summary judgment. Lupin and Teva then point to two places in Dr. Reider's expert report in which he states that the processes used to make Lupin and Teva's ANDA products are "consistent with" processes taught in the '408 Patent. *See id.* at 30-31. Lupin and Teva claim that such language, as well as certain statements by Dr. Reider admitting that there are potentially other ways to come up with such results, indicates that there are other potential

59

processes that could be used besides those disclosed in the '408 Patent, and that claims 3, 4, 16, 17, 19 and 20 therefore do not necessarily infringe the '408 Patent. *Id.*

Janssen, on the other hand, argues that Lupin and Teva have raised these defenses to infringement in an untimely manner. Janssen's Br. in Support of Summ. J. on '015, '408 Patents at 4 (ECF No. 535). Janssen states that an expert witness for Lupin and Teva, Dr. Ganem, has offered a belated opinion that Janssen has failed to identify evidence sufficient to establish infringement of several claims of the '408 Patent. *Id.* at 29. Janssen argues that these contentions should not be considered by this Court because Lupin and Teva forfeited any such argument when they failed to raise it in their non-infringement contentions, which are required under the Local Patent Rules. *Id.* at 29-33. Janssen argues that in the alternative, even if Lupin and Teva's expert's "failure of proof" opinion were considered, Janssen would still be entitled to summary judgment on those claims under 35 U.S.C. § 295[23] because "any alleged gap in Janssen's proof with respect to this issue was occasioned by defendants' systematic refusal to cooperate in Janssen's extensive efforts to obtain discovery concerning the overseas processes used to produce the bis-THF in their products." *Id.* at 5.

As an initial matter, this Court rejects Janssen's argument that Lupin and Teva have raised these defenses to infringement in an untimely manner. Janssen essentially argues, without any legal support, that because Lupin and Teva did not explicitly assert in their non-infringement contentions that Janssen failed to meet its burden of proof, Lupin and Teva are forever precluded from contesting the sufficiency of Janssen's infringement evidence. Such a finding is not possible

---

[23] Section 295 was enacted along with Section 271(g) as part of the Process Patents Amendments Act of 1988. *See* H.R. No. 60, 100th Cong., Sess. 1 at 16-16. Section 295 provides for a presumption of infringement under Section 271(g) where the plaintiff establishes "(1) that a substantial likelihood exists that the product was made by the patented process," and it (2) "has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine."

60

where the "patentee has the burden of proving infringement by a preponderance of the evidence." *Centricut, LLC. v. Esab Group, Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004); *see also ADC Telecomms., Inc. v. Switchcraft, Inc.*, 281 Fed. App'x 989, 992 (Fed. Cir. 2008) (affirming judgment of non-infringement, finding: "[I]t was [plaintiff's] burden as the patentee to introduce preponderant evidence of infringement, rather than [defendant's] burden to present evidence of noninfringement.").

While Janssen is correct that the Local Patent Rules' requirement of non-infringement disclosures was put in place so that defendants had to disclose their basis, if any, for disagreeing that the evidence set forth in plaintiff's contentions establishes infringement, those Rules were never meant to shift the burden of proof away from the patentee or foreclose the accused infringer's ability to contest that the patentee has failed to meet its burden of proof. Nor can this Court see any way in which Janssen has suffered prejudice as a result of Lupin and Teva's submission of Dr. Ganem's report. The purpose of the Local Patent Rules in this District is to "provide all parties with adequate notice and information with which to litigate their cases," *TFH Publ'ns, Inc. v. Doskocil Mfg. Co., Inc.*, 705 F. Supp. 2d 361, 365 (D.N.J. 2010), and Janssen cannot seriously contend that it was not fully aware of that burden, or that Lupin and Teva made explicitly clear that the fact that they had "not submitted contentions addressing the limits of each claim of a process practiced by a third-party entity does not change this burden." Lupin and Teva's Opp'n to Janssen's Mot. for Summ. J. on '015, '408 Patents at 35 (ECF No. 579).

Janssen argues that in the alternative, even if Dr. Ganem's report is to be considered, Janssen is entitled to a presumption of infringement under 35 U.S.C. § 295 because it has (1) established that a substantial likelihood exists that the product was made by the patented process and (2) it has made a reasonable effort to determine the process actually used in the production of

61

the product and was unable to so determine. This Court finds that Janssen is not entitled to Section 295's burden shifting benefits.

Section 295 is aimed at offshore infringers from whom the patentee cannot obtain discovery comparable to that required under the Federal Rules of Civil Procedure. "It allows the patentee to overcome this lack of discovery by demonstrating that the claims have some merit, *i.e.* a substantial likelihood of success, and that the patentee has been thwarted from making a greater showing by the refusal of the defendant to allow discovery." Jeffrey I. D. Lewis & Art C. Cody, *Unscrambling the Egg: Pre-Suit Infringement Investigations of Process and Method Patents*, 84 J. Pat. & Trademark Off. Soc'y 5, 22 (Jan. 2002). The underlying principal is that "the accused infringer is in a far better position to determine the actual manufacturing process than the patentee . . . ." *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1314-15 (Fed. Cir. 2011). "The statute also has a significant punitive element. It provides the trial court with a potent weapon to use against a non-cooperative defendant." *Nutrinova Nurtrition Specialties and Food Ingredients GmbH v. Int'l Trade Comm'n*, 224 F.3d 1356, 1360 (Fed. Cir. 2000).

Janssen has no problem meeting the first element of Section 295. Janssen need not prove infringement to meet the substantial likelihood requirement of Section 295. Rather, Janssen "need only present evidence that would support a reasonable conclusion that the imported product was made by the patented process." *West v. Jewelry Innovations, Inc.*, No. C 07-1812 JF (HRL), 2009 WL 1010848, at *8 (N.D. Cal. Apr. 14, 2009). Janssen has presented such evidence through Dr. Reider's report. *See* Reider Decl. Exs. B, C, D (ECF No. 536).

The second element of Section 295 presents more of a problem for Janssen. It is certainly true that Janssen has made significant efforts to get discovery from Lupin and Teva as to their production of bis-THF. *See* Decl. of Jason S. Gould in Support of Janssen's Mot. for Summ. J. on

62

'015, '408 Patents ¶¶ 3-92 (ECF No. 538) (detailing all of Janssen's efforts to discover the process

by which Lupin and Teva produce the bis-THF that is ultimately used it their darunavir products).

This discovery has been made difficult because Lupin and Teva's suppliers and manufacturers

operate overseas and are not subject to the Federal Rules of Civil Procedure. Janssen contends that

due to Lupin and Teva's relationship with those overseas manufacturers, Lupin and Teva should

be able to obtain the discovery Janssen seeks on the exact process used to manufacture bis-THF,

and that their failure to do so justifies burden shifting under Section 295.

However, it cannot be said that Lupin and Teva have been non-cooperative defendants

thwarting Janssen's efforts to discover this information. As such, the Court does not find this an

appropriate instance to use the "significant punitive element" of Section 295 against Lupin and

Teva. Rather, Lupin and Teva have complied with discovery in this case to the extent they have

been able. In response to numerous requests from Janssen regarding manufacturing processes for

bis-THF, Lupin and Teva responded that they were not in possession or control of such documents,

and that their overseas manufacturers held them. When Janssen moved to compel discovery from

non-party Cipla (India) and Teva in reference to two non-party suppliers,

Magistrate Judge Mannion refused to compel discovery, finding that "the foreign

companies at issue appear to be nothing more than independent contractors that supply Bis-THF."

Sept. 3, 2013 Op. at 4 (ECF No. 439). He went on to observe that "Defendants do not 'control' the

foreign affiliates and an order compelling production of discovery is not appropriate at this

juncture," *id.* at 4-5, and that "these documents appear to be no more 'reasonably available' to

defendants [than to Janssen]," *id.* at 5 n.1. Because based on these findings and the record in the

case it is not clear that the accused infringer is "in a far better position to determine the actual

manufacturing process than the patentee," *Creative Compounds*, 651 F.3d at 1314-15, Janssen is

63

not given the benefit of Section 295's burden shifting. To allow such a shift where the accused

infringers cooperate and comply with discovery requests, but happen to not be in custody or control

of the documents sought, is not just or logical, nor does it comport with the aim and purpose of the

statute.

The question left to be resolved is whether Janssen is, without the benefit of Section 295's

burden shifting, entitled to summary judgment as to claims 2-4, 15-17, 19 and 20, or whether Lupin

and Teva raise genuine issues of material fact that preclude summary judgment as to those claims.

Based on the issues raised in Dr. Ganem's rebuttal expert report, the Court finds that Janssen's

motion for summary judgment as to claims 2-4, 15-17, 19 and 20 of the '408 Patent is denied.

Dr. Ganem's report goes through the claims at issue in the '408 Patent and raises, in detail,

genuine issues of material fact as to why Lupin and Teva's processes do not necessarily infringe

those claims of the '408 Patent. *See* Decl. of Jonathan Hatch ("Hatch Decl.") (ECF No. 537) Ex.

12 ¶¶ 97-100 (Dr. Ganem's Rep.) (claim 2); *id.* ¶¶ 59-63; ¶¶ 101-04 (claim 3); *id.* ¶¶ 64-65; ¶¶

105-07 (claim 4); *id.* ¶¶ 113-14 (claim 15); *id.* ¶¶ 86-87; ¶¶ 115-16 (claim 16); *id.* ¶ 88; ¶ 117

(claim 17); *id.* ¶¶ 89-91; ¶¶ 118-19 (claim 19); *id.* ¶¶ 92-93; ¶¶ 120-21 (claim 20). In each of those

paragraphs, Dr. Ganem identifies either that there is no document or evidence supporting Dr.

Reider's contention, explains alternative methods or processes that could be used in place of those

that Dr. Reider states are "consistent with" the process set forth in the '408 Patent, or otherwise

points out inconsistencies in Dr. Reider's report with the evidence in the record.

Lupin and Teva also raise genuine issues of material fact by pointing to statements by Dr.

Reider himself about the conclusions in his expert report: while Dr. Reider claimed that Lupin and

Teva's ANDA products were "consistent with the                                                      a necessary

element of claims 3, 4, 19 and 20 of the '408 Patent, he also admitted that he had not seen any

64

direct evidence that the ANDA products are made using a step that includes

Lupin and Teva's Statement of Additional Material Facts in Support of Lupin and Teva's Mot. for Summ. J. on '015, '408 Patents ¶ 58 (ECF No. 579-2), and that it is possible to obtain the compound in claim 3 using synthetic techniques that do not involve the claimed

*id.* ¶ 60. Similarly, while Dr. Reider stated that the documents Janssen collected during discovery regarding the processes used to make the ANDA products were "consistent with the crystallization of[sic] compound of formula α-(4) in an alcohol," an element of claim 16 of the '408 Patent, he admitted that both the prior art "and the '408 patent disclose a number of suitable solvents" including non-alcohols that could be used for crystallization in one compound designated formula α-(4). *Id.* ¶ 61.

Based on the record currently before the Court, Lupin and Teva raise genuine issues of material fact as to whether Janssen has met its burden of proof as to claims 2-4, 15-17, 19 and 20 of the '408 Patent.

## CONCLUSION

Janssen's motion for summary judgment of infringement of the '411 Patent is granted. Janssen's motion for summary judgment on the validity of the '645 Patent is denied. Janssen's motion for summary judgment of infringement of the '015 and '408 Patents is granted in part and denied in part. Teva's motion for summary judgment of non-infringement of the '645 Patent is denied. Mylan's motion for summary judgment of non-infringement of the '645 Patent is denied. Lupin and Teva's motion for summary judgment of non-infringement of the '015 and '408 Patents is denied.

March 12, 2014

**/s/ William H. Walls**
United States Senior District Judge

65

**A00195**

**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

JANSSEN PRODUCTS, L.P., et al.,                    :
                                                   :
                              Plaintiffs,          :          **ORDER**
                                                   :
                      v.                           :          Civ. No. 10-5954 (WHW)
                                                   :
LUPIN LIMITED , et al.,                            :
                                                   :
                              Defendants.          :
                                                   :
                                                   :
---

**Walls, Senior District Judge**

     This matter having come before the Court on the Lupin and Mylan Defendants'

Emergency Motion to Modify the August 14, 2014 Injunction Order Pursuant to Federal Rule of

Civil Procedure 60(b),

     It is, on the 7th day of October, 2014

     **ORDERED** that Defendants' Motion is **DENIED**.


                                 **/s/ William H. Walls**
                                 United States Senior District Judge

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JANSSEN PRODUCTS, L.P., et al., | : | |
| | : | |
| Plaintiffs, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 10-5954 (WHW) |
| | : | |
| LUPIN LIMITED, et al., | : | **FILED UNDER SEAL** |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

**<u>Walls, Senior District Judge</u>**

In this patent infringement suit, Defendants Lupin Limited and Lupin Pharmaceuticals, Inc. ("Lupin"), with Defendants Mylan Pharmaceuticals, Inc. and Mylan, Inc. ("Mylan") (collectively, "Defendants"), move under Fed. R. Civ. P. 60(b), or, in the alternative, Rule 59(e), to modify this Court's Injunction Order of August 14, 2014 (ECF No. 944). Plaintiffs Janssen Products, L.P. and Janssen R&D Ireland ("Plaintiffs") oppose Defendants' motion.

Deciding the motion without oral argument under Fed. R. Civ. P. 78, and finding no circumstances that would justify any modification of its Order, this Court denies Defendants' motion.

### FACTUAL AND PROCEDURAL BACKGROUND

Because the facts of the case are presented thoroughly in the Court's recent Opinion, ECF No. 943, the Court will only provide the immediate background here. On August 14, 2014, following a bench trial, the Court issued Opinion, ECF No. 943, and Order, ECF No. 944, finding patent infringement by the Defendants, and granting Plaintiffs' request for a permanent

1

injection barring Defendants from importing into the United States their ANDA products and selling them. ECF No. 944 at ¶¶ 1-4. The Court also issued an order under 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval of Lupin's ANDA be no earlier than the day after the expiration of the '645 Patent and any associated exclusivity. *Id.* at ¶¶ 5-7.

Defendants now move to modify four paragraphs of the Court's Order: 2, 4, 6 and 7. Defendants offer a marked-up revision in their brief, Def.'s Br. at 2-4, which is loosely summarized here. To paragraphs 2 and 4, Defendants would make two changes. *Id.* at 2-3. First, they would add the adjective "commercial" to modify "products." *Id.* Second, they would insert additional references to claim and patent numbers. *Id.* As to paragraphs 6 and 7, Defendants would have the text read that the injunction is related to darunavir tablets "made using darunavir ethanolate in a darunavir/ethanol ratio of approximately 1:1 or any colorable variation thereof." *Id.* at 3-4. Their edited version would also insert the word "commercial" into paragraphs 6 and 7, and add the words, "claim 4," directly after "the expiration of" and before "the '645 Patent." *Id.*

## DISCUSSION

### Standard of Review

Fed. R. Civ. P. 60(b) allows a court to provide relief from a judgment or order when, among other things, "applying the judgment order prospectively is no longer equitable" (subsection (b)(5)), or "for any other reason that justifies relief" (subsection (b)(6)). The Court's power to grant relief under this rule is narrow. "Due to the overriding interest in the finality and repose of judgments, a Rule 60(b) motion is considered extraordinary relief which should be granted only where extraordinary justifying circumstances are present." *Katz v. Twp. of Westfall*, 287 Fed. Appx. 985, 988 (3d Cir. 2008) (quotations and citations omitted).

2

When a party moves for reconsideration under Fed. R. Civ. P. 59(e), the scope will be determined by the basis for the motion, such as a claim that reconsideration is justified by an intervening change in controlling law. *See North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995). The Rule 59(e) motion may not be used to relitigate old matters. *See Gutierrez v. Ashcroft*, 289 F. Supp. 2d 555, 561 (D.N.J. 2003) ("A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden." (citation and quotation omitted)). A motion under Fed. R. Civ. P. 59(e) "must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (citations omitted).

## Standard for Granting a Permanent Injunction

The standard for granting a permanent injunction, and the rationale for doing so in this case, are described in the Court's Opinion. ECF No. 943 at 72-99. In short, a plaintiff must demonstrate (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 393-94 (2006). Ultimately, the "decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *Id.*

Fed. R. Civ. P. 65 governs injunctions, with subsection (d) setting forth specificity requirements. *See Int'l Rectifier Corp. v. IXYS Corp.,* 383 F.3d 1312, 1316 (Fed. Cir. 2004).

3

"The rule requires an injunction to prohibit only those acts sought to be restrained, which in this case are infringement of the patent by the devices adjudged to infringe and infringement by devices no more than colorably different therefrom." *Id.* at 1317. The Federal Circuit further described the requirements of Rule 65:

> In the patent infringement context, this court has rejected as overly broad a permanent injunction that simply prohibits future infringement of a patent . . . . [W]e vacated an injunction that "forever barred" the adjudged infringer from infringing the patent at issue. That injunction failed to satisfy the requirements of Rule 65(d) because it lacked specific terms and a reasonably detailed description of the acts sought to be restrained. Furthermore, the order failed to state which acts constituted infringement or to expressly limit its prohibition to the manufacture, use, or sale of the specific device found to infringe, or devices no more than colorably different from the infringing device. *Id.* at 1316 (internal citations omitted).

35 U.S.C. § 271(g) declares, in relevant part, that "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent."

**Analysis**

It is unnecessary to decide whether Defendants move under Rule 59 or Rule 60. No matter that they are asking the Court to "prevent manifest injustice" under Rule 59(e) or asking for relief under Rule 60 because "applying the judgment order prospectively is no longer equitable," the thrust of their argument is the same: they claim that the injunction is overly broad. They would liken this injunction to the one the Federal Circuit modified in *International Rectifier*. 383 F.3d at 1315-18.

Defendants do not convince the Court that the injunction is too broad, vague or inequitable. The Order uses language from 35 U.S.C. § 271(g), and is modeled after injunctions

4

previously upheld in similar cases. As example, a district court issued this one in a case involving some of the same litigants, and the Federal Circuit upheld it shortly after its decision in *International Rectifier*:

> "[t]he effective date of any approval of Mylan's ANDA product shall be no earlier than the date of the expiration of the '580 patent family. The Defendants are enjoined from making, using, offering to sell, selling within the United States or importing into the United States the fentanyl transdermal patches described in ANDA No. 76–258."

*Alza Corp. v. Mylan Labs., Inc.*, 310 F. Supp. 2d 610, 637 (D. Vt. 2004), *aff'd*, 391 F.3d 1365 (Fed. Cir. 2004). There the language did not include the word "commercial"—which was not necessary—§ 271(g) does not require it—or specify the claim number. Here paragraphs 1, 3 and 5 of the injunction specify which claims are valid and infringed. Paragraphs 2, 4 and 6 complement them by specifying the injunctive remedy ordered by the Court. The injunction plainly details what the infringement was and how it should be restrained. Any reasonable reader would find that such plain, direct language easily satisfies the requirements of Rule 65.

Defendants further contend that the Order enjoins them from importing into the United States, making, using, or selling a product found in claims the patentee voluntarily dismissed with prejudice, thus ignoring *International Rectifier*'s admonition that an injunction should apply only to those devices adjudicated and those no more than colorably different from them. Def.'s Reply at 8; 383 F.3d at 1317. Their interpretation is incorrect. As to the '015 and '411 patents, the injunction is specifically directed to the issues contested at trial. The injunction cites to Lupin's ANDA (ANDA 202073) and Mylan's ANDA (ANDA 202136), the infringing aspects of which were clearly defined in the trial opinion. *See, e.g.,* Dkt. 943 at 5 (specifying the ANDAs at issue); *id.* at 5-6 (defining the claim of the '015 patent at issue); *id.* at 10-11 (defining the claim of the '411 patent at issue). As to the '645 patent, the related sections of the injunction were written in accordance with § 271(e)(4)(A), and properly reference Lupin's ANDA. Dkt. No. 943

5

at 98-99. The injunction makes clear that Lupin is enjoined until the day after the expiration of the '645 patent from the enumerated activities related to the tablets described in the ANDA or "any darunavir product that includes darunavir ethanolate in a darunavir/ethanol ratio of approximately 1:1 or any colorable variation thereof." Order of August 14, 2014 at ¶ 7. The injunction protects the subject matter of the patent; "Prezista is a pharmaceutical composition of a 1:1 ethanolate form of darunavir, exactly as claimed in the '645 Patent." Dkt. No. 943 at 65. With the scope of the injunction clear, specific, and justified by statute, there is no reason to alter the text. "Simply put, we read the injunction to contain the very limitations [the defendant] now seeks." *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1293 (Fed. Cir. 2012) *cert. denied*, 132 S. Ct. 2442 (2012).

**CONCLUSION**

Defendants' motion is denied.


IT IS SO ORDERED:

October 7, 2014

William H. Walls, U.S.D.J.

_____

United States Senior District Judge



U 1908659

# THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

**January 17, 2013**

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *7,700,645*
ISSUE DATE: *April 20, 2010*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R. GRANT
Certifying Officer

DEFs-JT(Daru) 035879
DTX-0001 (Page 1 of 35)

A00336



US007700645B2

(12) **United States Patent**                (10) Patent No.:  **US 7,700,645 B2**
Vermeersch et al.                            (45) Date of Patent:  **Apr. 20, 2010**

(54) **PSEUDOPOLYMORPHIC FORMS OF A HIV PROTEASE INHIBITOR**

(75) Inventors: **Hans Wim Pieter Vermeersch**, Ghent (BE); **Daniel Joseph Christiaan Thoné**, Beerse (BE); **Luc Donné Marie-Louise Janssens**, Malle (BE)

(73) Assignee: **Tibotec Pharmaceuticals Ltd.**, Little Island, Co. Cork (IE)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1320 days.

(21) Appl. No.: **10/514,352**

(22) PCT Filed: **May 16, 2003**

(86) PCT No.: **PCT/EP03/50176**
§ 371 (c)(1),
(2), (4) Date: **Nov. 12, 2004**

(87) PCT Pub. No.: **WO03/106461**
PCT Pub. Date: **Dec. 24, 2003**

(65) **Prior Publication Data**
US 2005/0250845 A1    Nov. 10, 2005

(30) **Foreign Application Priority Data**
May 16, 2002    (EP)    .................................. 02076929

(51) **Int. Cl.**
*A61K 31/353*    (2006.01)

(52) **U.S. Cl.** ..................................... **514/456**; 549/396
(58) **Field of Classification Search** ................. 514/456; 549/396
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,248,775 B1    6/2001  Vazquez et al.

FOREIGN PATENT DOCUMENTS

EP      0715618 B1    6/1996
WO      WO 95/06030 A1    3/1995
WO      WO 99/67417 A2    12/1999

OTHER PUBLICATIONS

Seddon "Pseudopolymorph . . ." Crystal growth & design 4(6)1087 (2004).*
Vermeersch et al. "Pseudo . . ." CA 140:47540 (2003).*
Seddon "Pseudopolymorph: a polemic" Crystal Growth & design 4(6) p. 1087-1087 (2004).*
Kirk-Othmer "Encyclopedia of chemi. tech" v.8, p. 95-147 (2002).*
Braga et al. "Making crystals from . . ." Chem. Commun. p. 3635-3645 (2005).*
Giron D., et al, "Thermal analysis and calorimetric methods in the characterization of polymorphs and solvates," Thermochimica ACTA, Elsevier Science Publishers. Amsterdam, vol. 248, 1995, pp. 1-59.
Borka L, et al., "Crystal polymorphism of pharmaceuticals," ACTA Pharmaceutica Jugoslavica, Savez Farmaceutskih Drustava Jugoslavije, Zagre, Yu, vol. 40, 1990 pp. 71-94.
Ghosh A.K., et al, "Potent HIV protease inhibitors incorporating high-affinity P2-ligands and (R)-(hydroxyethylamino) sulfonamide isostere," Bioorganic & Medical Chemistry Letters, Oxford, GB, vol. 8, No. 6, Mar. 17, 1998, pp. 687-690.
Grunenberg A., et al., "Theoretical derivation and practival application of energy/temperature diagrams as an instrument in preformutation studies of polymorphic drug substances," International Journal of Pharmaceutics 129 (1996) 147-158.
Byrn, S. R, et al., "Solid-State Chemistry of Drugs", Second Edition, 1999, published by SSCI. Inc.. pp. 12-13.
International Search Report dated Mar. 30, 2004 for PCT/EP03/50176.
Seddon, K., Crystal Growth & Design, 4 (6), p. 1087 (2004).

* cited by examiner

*Primary Examiner*—Celia Chang

(57)    **ABSTRACT**

New pseudopolymorphic forms of (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl(1S,2R)-3-[[(4-aminophenyl)sulfonyl](isobutyl)amino]-1-benzyl-2-hydroxypropylcarbamate and processes for producing them are disclosed.

**8 Claims, 18 Drawing Sheets**

Copy provided by USPTO from the PIRS Image Database on 01/10/2013



Figure 1

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035881
**DTX-0001 (Page 3 of 35)**



Figure 2

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035882
DTX-0001 (Page 4 of 35)



Figure 3

Copy provided by USPTO from the PIRS Image Database on 01/10/2013



Figure 4

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035884
DTX-0001 (Page 6 of 35)



Figure 5



Figure 6



Figure 7

Copy provided by USPTO from the PIRS Image Database on 01/10/2013



Figure 8

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

Figure 9



Figure 10





Figure 11

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035889
DTX-0001 (Page 11 of 35)



Figure 12

Copy provided by USPTO from the PIRS Image Database on 01/10/2013



Figure 13

Copy provided by USPTO from the PIRS Image Database on 01/10/2013



Figure 14

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035892
DTX-0001 (Page 14 of 35)

Figure 15



Figure 16



Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035893
**DTX-0001 (Page 15 of 35)**

Figure 17



Figure 18



DEFs-JT(Daru) 035894
**DTX-0001 (Page 16 of 35)**

A00351

Figure 19



Figure 20



Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035895
DTX-0001 (Page 17 of 35)

Figure 21



Figure 22



Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035896
**DTX-0001 (Page 18 of 35)**

Figure 23



Figure 24



Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035897
DTX-0001 (Page 19 of 35)

Figure 25



Figure 26



Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035898
**DTX-0001 (Page 20 of 35)**

US 7,700,645 B2

1

# PSEUDOPOLYMORPHIC FORMS OF A HIV PROTEASE INHIBITOR

This application is the national stage of Application No. PCT/EP03/50176, filed May 16, 2003, which application claims priority from European Patent Application No. 02076929.5, filed May 16, 2002.

## TECHNICAL FIELD

This invention relates to novel pseudopolymorphic forms of (3R,3aS,6aR)-hexahydro-furo[2,3-b]furan-3-yl(1S,2R)-3-[[(4-aminophenyl)sulfonyl](isobutyl)amino]-1-benzyl-2-hydroxypropylcarbamate, a method for their preparation as well as their use as a medicament.

## BACKGROUND OF THE INVENTION

Virus-encoded proteases, which are essential for viral replication, are required for the processing of viral protein precursors. Interference with the processing of protein precursors inhibits the formation of infectious virions. Accordingly, inhibitors of viral proteases may be used to prevent or treat chronic and acute viral infections. (3R,3aS,6aR)-hexahydro-furo[2,3-b]furan-3-yl(1S,2R)-3-[[(4-aminophenyl)sulfonyl](isobutyl)amino]-1-benzyl-2-hydroxypropylcarbamate has HIV protease inhibitory activity and is particularly well suited for inhibiting HIV-1 and HIV-2 viruses.

The structure of (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl(1S,2R)-3-[[(4-phenyl)sulfonyl](isobutyl)amino]-1-benzyl-2-hydroxypropylcarbamate, is shown below:

Formula (X)

Compound of formula (X) and processes for its preparation are disclosed in EP 715618, WO 99/67417, U.S. Pat. No. 6,248,775, and in *Bioorganic and Chemistry Letters*, Vol. 8, pp. 687-690, 1998, "Potent HIV protease inhibitors incorporating high-affinity P₂-ligands and (R)-(hydroxyethylamino) sulfonamide isostere", all of which are incorporated herein by reference.

Drugs utilized in the preparation of pharmaceutical formulations for commercial use must meet certain standards, including GMP (Good Manufacturing Practices) and ICH (International Conference on Harmonization) guidelines. Such standards include technical requirements that encompass a heterogeneous and wide range of physical, chemical and pharmaceutical parameters. It is this variety of parameters to consider, which make pharmaceutical formulations a complex technical discipline.

For instance, and as example, a drug utilized for the preparation of pharmaceutical formulations should meet an acceptable purity. There are established guidelines that define the limits and qualification of impurities in new drug substances

2

produced by chemical synthesis, i.e. actual and potential impurities most likely to arise during the synthesis, purification, and storage of the new drug substance. Guidelines are instituted for the amount of allowed degradation products of the drug substance, or reaction products of the drug substance with an excipient and/or immediate container/closure system.

Stability is also a parameter considered in creating pharmaceutical formulations. A good stability will ensure that the desired chemical integrity of drug substances is maintained during the shelf-life of the pharmaceutical formulation, which is the time frame over which a product can be relied upon to retain its quality characteristics when stored under expected or directed storage conditions. During this period the drug may be administered with little or no risk, as the presence of potentially dangerous degradation products does not pose prejudicial consequences to the health of the receiver, nor the lower content of the active ingredient could cause under-medication.

Different factors, such as light radiation, oxygen, humidity, pH sensitivity in solutions, may influence stability and may determine shelf-life and storage conditions.

Bioavailability is also a parameter to consider in drug delivery design of pharmaceutically acceptable formulations. Bioavailability is concerned with the quantity and rate at which the intact form of a particular drug appears in the systemic circulation following administration of the drug. The bioavailability exhibited by a drug is thus of relevance in determining whether a therapeutically effective concentration is achieved at the site(s) of action of the drug.

Physico-chemical factors and the pharmaco-technical formulation can have repercussions in the bioavailability of the drug. As such, several properties of the drug such as dissociation constant, dissolution rate, solubility, polymorphic form, particle size, are to be considered when improving the bioavailability.

It is also relevant to establish that the selected pharmaceutical formulation is capable of manufacture, more suitably, of large-scale manufacture.

In view of the various and many technical requirements, and its influencing parameters, it is not obvious to foresee which pharmaceutical formulations will be acceptable. As such, it was unexpectedly found that certain modifications of the solid state of compound of formula (X) positively influenced its applicability in pharmaceutical formulations.

## SUMMARY OF THE INVENTION

Present invention concerns pseudopolymorphic forms of compound of formula (X) for the preparation of pharmaceutical formulations. Such pseudopolymorphic forms contribute to pharmaceutical formulations in improved stability and bioavailability. They can be manufactured in sufficient high purity to be acceptable for pharmaceutical use, more particularly in the manufacture of a medicament for inhibiting HIV protease activity in mammals.

In a first aspect, the present invention provides pseudopolymorphs of (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl (1S,2R)-3-[[(4-aminophenyl)sulfonyl](isobutyl)amino]-1-benzyl-2-hydroxypropylcarbamate.

Pseudopolymorphs provided include alcohol solvates, more in particular, C1-C4 alcohol solvates; hydrate solvates; alkane solvates, more in particular, C1-C4 chloroalkane solvates; ketone solvates, more in particular, C1-C5 ketone solvates; ether solvates, more in particular, C1-C4 ether solvates; cycloether solvates; ester solvates, more in particular, C1-C5 ester solvates; and sulfonic solvates, more in particular C1-4 sulfonic solvates, of the compound of formula (X). Preferred pseudopolymorphs are pharmaceutically acceptable solvates, such as hydrate and ethanolate.

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

US 7,700,645 B2

| 3 | 4 |

Particular pseudopolymorphs are Form A (ethanolate), Form B (hydrate), Form C (methanolate), Form D (acetonitrilate), Form E (dichloromethanate), Form F (ethylacetate solvate), Form G (1-methoxy-2-propanolate), Form H (anisolate), Form I (tetrahydrofuranate), Form J (isopropanolate) of compound of formula (X). Another particular pseudopolymorph is Form K (mesylate) of compound of formula (X).

In a second aspect, present invention relates to processes for preparing pseudopolymorphs. Pseudopolymorphs of compound of formula (X) are prepared by combining compound of formula (X) with an organic solvent, water, or mixtures of water and water miscible organic solvents, and applying any suitable technique to induce crystallization, to obtain the desired pseudopolymorphs.

In a third aspect, the invention relates to the use of the present pseudopolymorphs, in the manufacture of pharmaceutical formulations for inhibiting HIV protease activity in mammals. In relation to the therapeutic field, a preferred embodiment of this invention relates to the use of a pharmaceutically acceptable pseudopolymorphic forms of compound of formula (X) for the treatment of an HIV viral disease in a mammal in need thereof, which method comprises administering to said mammal an effective amount of a pharmaceutically acceptable pseudopolymorphic form of compound of formula (X).

The following drawings provide additional information on the characteristics of the pseudopolymorphs according to present invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1, FIG. 2 and FIG. 3 are the powder X-ray diffraction patterns of the Form A (1:1).

FIG. 4 depicts Form A (1:1) in three dimensions with the atoms identified.

FIG. 5 is a comparison of the Raman spectra of Forms A, B, D, E, F, H, (1:1) and the amorphous form at the carbonyl stretching region of 1800-100 cm$^{-1}$ and the region 3300-2000 cm$^{-1}$.

FIG. 6 is a comparison of the expanded Raman spectra of Forms A, B, D, E, F, H, (1:1) and the amorphous form at the carbonyl stretching region of 600-0 cm$^{-1}$.

FIG. 7 is a comparison of the expanded Raman spectra of Forms A, B, D, E, F, H, (1:1) and the amorphous form at the carbonyl stretching region of 1400-800 cm$^{-1}$.

In FIGS. 5, 6, and 7, P1 corresponds to Form A, P18 corresponds to Form B, P19 corresponds to amorphous form, P25 corresponds to Form E, P27 corresponds to Form F, P50 corresponds to Form D, P68 corresponds to Form H, P69 corresponds to Form C, P72 corresponds to Form I, and P81 corresponds to Form G.

FIG. 8 is the Differential Scanning Calorimetric (DSC) thermograph of Form A (1:1).

FIG. 9 is the Infrared (IR) spectrum that reflects the vibrational modes of the molecular structure of Form A as a crystalline product

FIG. 10 is the IR spectrum that reflects the vibrational modes of the molecular structure of Form B as a crystalline product

FIG. 11: IR spectrum of forms A, B, and amorphous form, at spectral range 4000 to 400 cm$^{-1}$.

FIG. 12: IR spectrum of forms A, B, and amorphous form, at spectral range 3750 to 2650 cm$^{-1}$.

FIG. 13: IR spectrum of forms A, B, and amorphous form, at spectral range 1760 to 1580 cm$^{-1}$.

FIG. 14: IR spectrum of forms A, B, and amorphous form, at spectral range 980 to 720 cm$^{-1}$.

In FIGS. 11, 12, 13 and 14, curve A corresponds to Form A, curve B corresponds to Form B, and curve C corresponds to the amorphous form.

FIG. 15: DSC Thermograph curves of Form A (curve D), Form A after Adsorption/Desorption (ADS/DES) (curve E), and Form A after ADS/DES hydratation tests (curve F)

FIG. 16: Thermogravimetric (TG) curves of Form A (curve D), Form A after ADS/DES (curve E), and Form A after ADS/DES hydratation tests (curve F)

FIG. 17: TG curve of Form A at 25° C. under dry nitrogen atmosphere in function of time

FIG. 18: ADS/DES curves of Form A.

FIG. 19: ADS/DES curves of the hydratation test of Form A

FIG. 20: ADS/DES curves of Form B

FIG. 21: IR spectrum of Form K

FIG. 22: Raman spectrum of Form K

FIG. 23: DSC curve of Form K

FIG. 24: TG curve of Form K

FIG. 25: ADS/DES isotherm of Form K, batch 1

FIG. 26: ADS/DES isotherm of Form K, batch 2

## DETAILED DESCRIPTION

The term "polymorphism" refers to the capacity of a chemical structure to occur in different forms and is known to occur in many organic compounds including drugs. As such, "polymorphic forms" or "polymorphs" include drug substances that appear in amorphous form, in crystalline form, in anhydrous form, at various degrees of hydration or solvation, with entrapped solvent molecules, as well as substances varying in crystal hardness, shape and size. The different polymorphs vary in physical properties such as solubility, dissolution, solid-state stability as well as processing behaviour in terms of powder flow and compaction during tabletting.

The term "amorphous form" is defined as a form in which a three-dimensional long-range order does not exist. In the amorphous form the position of the molecules relative to one another are essentially random, i.e. without regular arrangement of the molecules on a lattice structure.

The term "crystalline" is defined as a form in which the position of the molecules relative to one another is organised according to a three-dimensional lattice structure.

The term "anhydrous form" refers to a particular form essentially free of water. "Hydration" refers to the process of adding water molecules to a substance that occurs in a particular form and "hydrates" are substances that are formed by adding water molecules. "Solvating" refers to the process of incorporating molecules of a solvent into a substance occurring in a crystalline form. Therefore, the term "solvate" is defined as a crystal form that contains either stoichiometric or non-stoichiometric amounts of solvent. Since water is a solvent, solvates also include hydrates. The term "pseudopolymorph" is applied to polymorphic crystalline forms that have solvent molecules incorporated in their lattice structures. The term pseudopolymorphism is used frequently to designate solvates (Byrn, Pfeiffer, Stowell, (1999) *Solid-state Chemistry of Drugs*, 2nd Ed., published by SSCI, Inc).

The present invention provides pseudopolymorphs of (3R, 3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl(1S,2R)-3-[[(4-aminophenyl)sulfonyl](isobutyl)amino]-1-benzyl-2-hydroxypropylcarbamate.

In one embodiment pseudopolymorphs are alcohol solvates, more in particular, $C_1$-$C_4$ alcohol solvates; hydrate solvates; alkane solvates, more in particular, $C_1$-$C_4$ chloroalkane solvates; ketone solvates, more in particular, $C_1$-$C_5$ ketone solvates; ether solvates, more in particular $C_1$-$C_4$ ether solvates; cycloether solvates; ester solvates, more in particular $C_1$-$C_5$ ester solvates; or sulfonic solvates, more in particular, $C_1$-$C_4$ sulfonic solvates, of the compound of formula (X). The term "$C_1$-$C_4$ alcohol" defines straight and/or branched chained saturated and unsaturated hydrocarbons having from 1 to 4 carbon atoms substituted with at least a hydroxyl group,

DEFs-JT(Daru) 035900
DTX-0001 (Page 22 of 35)

A00357

US 7,700,645 B2

| 5 | 6 |

and optionally substituted with an alkyloxy group, such as, for example, methanol, ethanol, isopropanol, butanol, 1-methoxy-2-propanol and the like. The term "$C_1$-$C_4$ chloroalkane" defines straight and/or branched chained saturated and unsaturated hydrocarbons having from 1 to 4 carbon atoms substituted with at least one chloro atom, such as, for example, dichloromethane. The term "$C_1$-$C_5$ ketone" defines solvents of the general formula R'—C(=O)—R wherein R and R' can be the same or different and are methyl or ethyl, such as, acetone and the like. The term "$C_1$-$C_4$ ether" defines solvents of the general formula R'—O—R wherein R and R' can be the same or different and are a phenyl group, methyl or ethyl, such as, anisole and the like. The term "cycloether" defines a 4- to 6-membered monocyclic hydrocarbons containing one or two oxygen ring atoms, such as tetrahydrofuran and the like. The term "$C_1$-$C_5$ ester" defines solvents of the general formula R'—O—C(=O)—R wherein R and R' can be the same or different and are methyl or ethyl, such as ethylacetate and the like. The term "$C_1$-$C_4$ sulfonic solvent" defines solvents of the general formula R—SO$_3$H wherein R can be a straight or branched chained saturated hydrocarbon having from 1 to 4 carbon atoms, such as mesylate, ethanesulfonate, butanesulfonate, 2-methyl-1-propanesulfonate, and the like.

Pseudopolymorphs of the present invention, which are pharmaceutically acceptable, for instance hydrates, alcohol solvates, such as, ethanolate, are preferred forms.

Several pseudopolymorphs are exemplified in this application and include Form A (ethanolate), Form B (hydrate), Form C (methanolate), Form D (acetonate), Form E (dichloromethanate), Form F (ethylacetate solvate), Form G (1-methoxy-2-propanolate), Form H (anisolate), Form I (tetrahydrofuranate), Form J (isopropanolate), or Form K (mesylate) of compound of formula (X).

Solvates can occur in different ratios of solvation. Solvent content of the crystal may vary in different ratios depending on the conditions applied. Solvate crystal forms of compound of formula (X) may comprise up to 5 molecules of solvent per molecule of compound of formula (X), appearing in different solvated states including, amongst others, hemisolvate, monosolvate, disolvate, trisolvate crystals, intermediate solvates crystals, and mixtures thereof. Conveniently, the ratio of compound of formula (X) to the solvent may range between (5:1) and (1:5). In particular, the ratio may range from about 0.2 to about 3 molecules of solvent per 1 molecule of compound of formula (X), more in particular, the ratio may range from about 1 to about 2 molecules of solvent per 1 molecule of compound of formula (X), preferably the ratio is 1 molecule of solvent per 1 molecule of compound of formula (X).

Solvates may also occur at different levels of hydration. As such, solvate crystal forms of compound of formula (X) may in addition comprise under certain circumstances, water molecules partially or fully in the crystal structures. Consequently, the term "Form A" will be used herein to refer to the ethanolate forms of compound of formula (X) comprising up to 5 molecules of solvent per 1 molecule of compound of formula (X), intermediate solvates crystals, and the mixtures thereof; and optionally comprising additional water molecules, partially or fully in the crystal structures. The same applies for Form B through Form K. In case a particular "Form A" needs to be denoted, the ratio of solvation will follow the "Form A", for instance, one molecule of ethanol per one molecule of compound (X) is denoted as Form A (1:1).

The X-ray powder diffraction is a technique to characterise polymorphic forms including pseudopolymorphs of compound of formula (X) and to differentiate solvate crystal forms from other crystal and non-crystal forms of compound of formula (X).

As such, X-ray powder diffraction spectra were collected on a Phillips PW 1050/80 powder diffractometer, model Bragg-Brentano. Powders of Form A (1:1), around 200 mg each sample, were packed in 0.5 mm glass capillary tubes and were analysed according to a standard method in the art. The X-ray generator was operated at 45 Kv and 32 mA, using the copper Kα line as the radiation source. There was no rotation of the sample along the chi axis and data was collected between 4 and 60° 2-theta step size. Form A (1:1) has the characteristic two-theta angle positions of peaks as shown in FIGS. 1, 2 and 3 at: 7.04°±0.50, 9.24°±0.5°, 9.96°±0.5°, 10.66°±0.5°, 11.30°±0.5°, 12.82°±0.5°, 13.80°±0.5°, 14.56°±0.5°, 16.66°±0.5°, 17.30°±0.5°, 18.28°±0.5°, 19.10°±0.5°, 20.00°±0.5°, 20.50°±0.5°, 21.22°±0.5°, 22.68°±0.5°, 23.08°±0.5°, 23.66°±0.5°, 25.08°±0.5°, 25.58°±0.5°, 26.28°±0.5°, 27.18°±0.5°, 28.22°±0.5°, 30.20°±0.5°, 31.34°±0.5°, 32.68°±0.5°, 33.82°±0.5°, 39.18°±0.5°, 41.20°±0.5°, 42.06°±0.5°, and 48.74°±0.5°.

In another set of analytical experiments, X-ray single diffraction was applied to Form A (1:1), which resulted in the following crystal configuration, listed in the table below.

TABLE 1

| Crystal Data | |
|---|---|
| Crystal shape | Prism |
| Crystal dimensions | 0.56 × 0.38 × 0.24 mm |
| Crystal color | Colorless |
| Space Group | P 2$_1$ 2$_1$ 2$_1$ orthorhombic |
| Temperature | 293 K |
| Cell constants | a = 9.9882(6) Å |
| | b = 16.1697(8) Å |
| | c = 19.0284(9) Å |
| | alpha (α) = 90° |
| | beta (β) = 90° |
| | gamma (γ) = 90° |
| Volume | 3158.7(3) Å$^3$ |
| Molecules/unit cell (Z) | 4 |
| Density, in Mg/m$^3$ | 1.248 |
| μ (linear absorption coefficient) | 1.340 mm$^{-1}$ |
| F(000) | 1272 |
| Intensity Measurements | |
| Diffractometer | Siemens P4 |
| Radiation | Cu Kα (λ = 1.54184 Å) |
| Temperature | ambient |
| 2θ$_{max}$ | 138.14° |
| Correction | Empirical via Ψ-scans |
| Number of Reflections Measured | Total: 3912 |
| Structure Solution and Refinement | |
| Number of Observations | 3457 [I$^2$ > 2 σ(F$^2$)] |
| Residual (R) | 0.0446 |

The resulting three-dimensional structure of Form A (1:1) is depicted in FIG. 4.

Table 2 shows the atomic coordinates (x 104) and equivalent isotropic displacement parameters (Å$^2$ ×10$^3$) for Form A (1:1). Atoms are numbered as exhibited in FIG. 4. The x, y and z fractional coordinates indicate the position of atoms relative to the origin of the unit cell. U(eq) is defined as one third of the trace of the orthogonalized U$_{ij}$ tensor.

| | x | y | z | U(eq) |
|---|---|---|---|---|
| O1 | 7778(3) | 2944(2) | 9946(1) | 70(1) |
| C2 | 7171(4) | 3513(2) | 9487(2) | 64(1) |
| C3 | 6831(3) | 3046(2) | 8823(2) | 52(1) |
| C3A | 7553(3) | 2411(2) | 8793(2) | 55(1) |
| C4 | 7527(4) | 1533(2) | 8708(2) | 65(1) |
| C5 | 7425(5) | 1241(2) | 9457(2) | 70(1) |
| O6 | 8501(3) | 1642(2) | 9809(1) | 76(1) |
| C6A | 8582(4) | 2416(2) | 9534(2) | 62(1) |

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

US 7,700,645 B2

7

-continued

| | x | y | z | U(eq) |
|---|---|---|---|---|
| O7 | 5533(2) | 2702(1) | 8945(1) | 51(1) |
| O8 | 5168(2) | 2636(1) | 7768(1) | 53(1) |
| C9 | 4791(3) | 2534(1) | 8368(1) | 42(1) |
| N10 | 3590(2) | 2256(1) | 8562(1) | 43(1) |
| C11 | 2638(3) | 1916(2) | 8068(2) | 44(1) |
| C12 | 2223(3) | 1071(2) | 8310(2) | 58(1) |
| C13 | 3381(3) | 501(2) | 8387(2) | 56(1) |
| C14 | 3937(4) | 340(2) | 9038(2) | 67(1) |
| C15 | 4989(5) | −200(2) | 9111(3) | 80(1) |
| C16 | 5494(5) | −581(3) | 8530(3) | 96(2) |
| C17 | 4975(6) | −413(3) | 7881(3) | 98(2) |
| C18 | 3926(5) | 126(2) | 7810(2) | 78(1) |
| C19 | 1423(3) | 2464(2) | 7976(2) | 45(1) |
| O20 | 494(2) | 2112(1) | 7502(1) | 61(1) |
| C21 | 1829(3) | 3307(2) | 7740(2) | 48(1) |
| N22 | 699(3) | 3880(1) | 7721(1) | 49(1) |
| C23 | 521(4) | 4312(2) | 7048(2) | 58(1) |
| C24 | −61(4) | 3785(2) | 6473(2) | 67(1) |
| C25 | −1453(5) | 3497(3) | 6654(2) | 86(2) |
| C26 | −47(7) | 4247(3) | 5779(2) | 102(2) |
| S27 | 510(1) | 4414(1) | 8440(1) | 50(1) |
| O28 | 572(3) | 3860(1) | 9015(1) | 61(1) |
| O29 | −693(2) | 4873(1) | 8345(1) | 65(1) |
| C30 | 1854(3) | 5080(2) | 8509(2) | 50(1) |
| C31 | 1803(3) | 5825(2) | 8159(2) | 54(1) |
| C32 | 2871(4) | 6341(2) | 8195(2) | 56(1) |
| C33 | 4033(4) | 6133(2) | 8564(2) | 51(1) |
| C34 | 4063(4) | 5385(2) | 8909(2) | 59(1) |
| C35 | 2998(4) | 4869(2) | 8883(2) | 56(1) |
| N36 | 5076(3) | 6667(2) | 8596(2) | 72(1) |
| C37 | 1920(10) | 2231(7) | 5258(4) | 232(6) |
| C38 | 1310(10) | 1590(6) | 5564(4) | 191(5) |
| O39 | 1768(4) | 1393(2) | 6249(2) | 141(3) |

Table 3 shows the anisotropic displacement parameters $(\text{Å}^2 \times 10^3)$ for Form A (1:1). The anisotropic displacement factor exponent takes the formula:

$$-2\pi^2[h^2a^{*2}U_{11} + \ldots + 2hka^*b^*U_{12}]$$

| | $U_{11}$ | $U_{22}$ | $U_{33}$ | $U_{23}$ | $U_{13}$ | $U_{12}$ |
|---|---|---|---|---|---|---|
| O1 | 65(2) | 89(2) | 55(1) | −4(1) | −12(1) | −3(1) |
| C2 | 53(2) | 68(2) | 71(2) | −7(2) | −8(2) | −11(2) |
| C3 | 38(2) | 63(2) | 55(2) | 4(1) | −2(1) | −12(1) |
| C3A | 37(2) | 78(2) | 49(1) | 9(1) | 1(1) | −3(2) |
| C4 | 61(2) | 74(2) | 61(2) | −4(2) | −6(2) | 10(2) |
| C5 | 72(3) | 67(2) | 71(2) | 8(2) | −11(2) | −7(2) |
| O6 | 78(2) | 80(2) | 70(1) | 16(1) | −21(1) | −8(2) |
| C6A | 47(2) | 80(2) | 59(2) | 5(2) | −6(2) | −7(2) |
| O7 | 34(1) | 69(1) | 50(1) | 0(1) | −1(1) | −9(1) |
| O8 | 42(1) | 68(1) | 50(1) | 3(1) | 2(1) | −12(1) |
| C9 | 35(2) | 41(1) | 49(1) | 1(1) | −3(1) | 3(1) |
| N10 | 31(1) | 50(1) | 49(1) | −1(1) | 1(1) | −2(1) |
| C11 | 32(2) | 41(1) | 57(1) | −4(1) | 0(1) | −2(1) |
| C12 | 44(2) | 42(1) | 87(2) | 2(1) | 2(2) | −4(1) |
| C13 | 50(2) | 39(1) | 78(2) | 0(1) | 8(2) | 0(1) |
| C14 | 64(2) | 56(2) | 80(2) | 0(2) | 5(2) | 9(2) |
| C15 | 68(3) | 72(2) | 100(3) | 18(2) | 7(2) | 12(2) |
| C16 | 77(3) | 68(2) | 143(4) | 26(3) | 34(3) | 28(2) |
| C17 | 114(4) | 72(2) | 109(3) | −6(2) | 32(3) | 38(3) |
| C18 | 89(3) | 60(2) | 85(2) | −4(2) | 10(2) | 10(2) |
| C19 | 30(2) | 44(1) | 61(1) | −3(1) | −5(1) | −5(1) |
| O20 | 44(1) | 56(1) | 83(1) | −6(1) | −18(1) | −6(1) |
| C21 | 36(2) | 42(1) | 64(2) | 2(1) | −4(1) | −1(1) |
| N22 | 42(1) | 47(1) | 57(1) | 1(1) | 0(1) | 3(1) |
| C23 | 59(2) | 50(1) | 64(2) | 7(1) | −8(2) | 1(2) |
| C24 | 79(3) | 59(2) | 62(2) | 1(1) | −11(2) | 6(2) |
| C25 | 75(3) | 83(2) | 101(3) | 6(2) | −30(3) | −5(2) |
| C26 | 143(5) | 193(3) | 65(2) | 14(2) | −15(3) | −6(3) |
| S27 | 44(1) | 47(1) | 61(1) | 2(1) | 2(1) | 1(1) |
| O28 | 64(2) | 58(1) | 61(1) | 9(1) | 3(1) | −7(1) |
| O29 | 46(1) | 58(1) | 92(2) | −4(1) | 6(1) | 10(1) |
| C30 | 50(2) | 46(1) | 54(1) | 2(1) | 1(1) | 1(1) |

8

-continued

| | $U_{11}$ | $U_{22}$ | $U_{33}$ | $U_{23}$ | $U_{13}$ | $U_{12}$ |
|---|---|---|---|---|---|---|
| C31 | 50(2) | 48(1) | 64(2) | 6(1) | −4(2) | 6(1) |
| C32 | 59(2) | 45(1) | 65(2) | 4(1) | 2(2) | 1(1) |
| C33 | 57(2) | 55(2) | 52(1) | −4(1) | 1(1) | −3(1) |
| C34 | 56(2) | 63(2) | 59(2) | 6(1) | −13(2) | −3(2) |
| C35 | 63(2) | 52(1) | 53(1) | 5(1) | −8(2) | −2(2) |
| N36 | 67(2) | 70(2) | 80(2) | 4(2) | −5(2) | −19(2) |
| C37 | 290(10) | 260(10) | 145(7) | 68(7) | 67(8) | 120(10) |
| C38 | 280(10) | 187(7) | 104(4) | 1(5) | −53(6) | −80(10) |
| O39 | 99(2) | 91(2) | 91(2) | 1(2) | −13(2) | −28(2) |

Raman spectroscopy has been widely used to elucidate molecular structures, crystallinity and polymorphism. The low-frequency Raman modes are particularly useful in distinguishing different molecular packings in crystal. As such, Raman spectra were recorded on a Bruker FT-Raman RFS 100 spectrometer equipped with a photomultiplier tube and optical multichannel detectors. Samples placed in quartz capillary tubes were excited by an argon ion laser. The laser power at the samples was adjusted to about 100 mW and the spectral resolution was about 2 cm⁻¹. It was found that Forms A, B, D, E, F, and H, (1:1) and the amorphous form have the Raman spectra which appear in FIGS. 5, 6, and 7.

In addition, Forms A and B were characterized using a µTATR (Micro-Attenuated Total Reflectance) accessory (Harrick Split-Pea with Si crystal). The infrared spectra were obtained with a Nicolet Magna 560 FTIR spectrophotometer, a Ge on KBr beamsplitter, and a DTGS with KBr windows detector. Spectra were measured at 1 cm⁻¹ resolution and 32 scans each, in a wavelength range of from 4000 to 400 cm⁻¹, and application of baseline correction. The wavenumbers for Form A obtained are exhibited in the following Table 4.

TABLE 4

| Wavenumbers (cm⁻¹) and relative intensities of absorption bands (¹) |
|---|
| 3454w, 3429w, 3354w, 3301w, 3253w, 3089w, 3080w, 3041w, 3028w |
| 2964w, 2905w, 2875w, 2856w, 2722rw, 2684vw, 2664vw, 2603vw, |
| 2234vw |
| 1704s, 1646w, 1595s, 1550m, 1503m, 1466w, 1453w, 1444w, 1413w |
| 1373w, 1367w, 1340w, 1324m, 1314m, 1306m, 1290w, 1266m, 1244m, |
| 1229m |
| 1187w, 1146s, 1124m, 1104m, 1090m, 1076m, 1052m, 1042s, 1038m, |
| 1024s |
| 987s, 971m, 944m, 909w, 890w, 876w, 841m, 792w, 768s, 742s, 732w, |
| 697m, 674s, 645w, 630m |
| 598w, 593w, 574m, 564s, 553vs, 538m, 533m, 531m, 526m, 508m, |
| 501m, 491m, 471m, 458w, 445w, 442w, 436w, 428w, 418w |

vs = very strong, s = strong, m = medium, w = weak, vw = very weak, br = broad

The IR spectrum in FIG. 8 reflects the vibrational modes of the molecular structure as a crystalline product.

The wavenumbers obtained for Form B are exhibited in the following Table 5.

TABLE 5

| Wavenumbers (cm⁻¹) and relative intensities of absorption bands (¹) |
|---|
| 3614w, 3361m, 3291m, 3088w, 3061w, 3043w, 3028w |
| 2967w, 2905w, 2872w, 2222vw |
| Wavenumbers (cm⁻¹) and relative intensities of absorption bands (¹) |
| 1703s, 1631w, 1595s, 1553m, 1502w, 1467w, 1453w, 1444w, 1436w |
| 1388w, 1374vw, 1366w, 1355vw, 1340w, 1308m, 1291w, 1267m, |
| 1245m |
| 1187w, 1148s, 1125m, 1105m, 1091m, 1077m, 1052m, 1044m, 1025s |
| 990m, 972w, 944m, 912w, 891w, 876vw, 862w, 843w, 836w, 792w, |

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

US 7,700,645 B2

| 9 | 10 |

TABLE 5-continued

| Wavenumbers (cm$^{-1}$) and relative intensities of absorption bands ($^1$) |
|---|
| 769m, 757w, 743m, 717w, 699m, 672m |
| 598w, 591w, 585w, 576m, 566m, 553w, 536m, 509w, 502m, 484w, |
| 471w, 432vw, 425w, 418w |

($^1$) vs = very strong, s = strong, m = medium, w = weak, vw = very weak, br = broad

The IR spectrum in FIG. 10 reflects the vibrational modes of the molecular structure of Form B as a crystalline product.

Following the same analytical IR method, Form B and the amorphous form were also characterised and compared with Form A, as shown in FIGS. 11 to 14. IR spectra of the different physical forms showed distinct spectral differences, most relevant are those in Table 6:

TABLE 6

| Wavenumbers (cm$^{-1}$) and relative intensities of absorption bands ($^1$) | | |
|---|---|---|
| Form A | Form B | Amorphous form |
| 3454m, 3429m, 3353m, | 3615m, 3356m, 3291m, | 3462m, 3362m, 3249m, |
| 3255m, 3089w, 3060m, | 3089m, 3061m, 3043w, | 3062m, 3026m |
| 3041w, 3028w | 3027w | |
| 2963m, 2905m, 2869m, | 2966m, 2905m, 2873m | 2959m, 2871m |
| 2856m | | |
| 1704s, 1646m, 1596s, | 1703s, 1630m, 1595s, | 1704s, 1628s, 1596s, 1525s, |
| 1549s, 1503s | 1552s, 1502m | 1502s |
| 1306s, 1266s, 1244s | 1308s, 1267s, 1245s | 1312s, 1259s |
| 1146s, 1104s, 1090s, 1076s, | 1148s, 1105s, 1090s, 1077s, | 1143s, 1090s, 1014s |
| 1052s, 1042s, 1038s, 1023s | 1052s, 1044s, 1024s | |
| 987s, 971s, 954s, 945s, | 989s, 972s, 944s, 925m, | 960s, 953s, 950s, 944s, 937s, |
| 912m, 909m, 891s, 876s, | 915m, 912s, 891s, 862s, | 922s, 832s |
| 841s, 827s | 843s | |
| 792m, 768s, 742s, 697s, | 792s, 769s, 744s, 699s, 672s | 750br, 702s, 672s |
| 674s | | |

($^1$) s = strong, m = medium, w = weak, vw = very weak, br = broad

The physical Forms A, B, and amorphous form are identified through spectral interpretation, focused on absorption bands specific for each form. Unique and specific spectral differences between forms are noticed in 3 spectral ranges: from 3750 to 2650 cm$^{-1}$ (range 1), from 1760 to 1580 cm$^{-1}$ (range 2) and from 980 to 720 cm$^{-1}$ (range 3).

Range 1 (from 3750 to 2650 cm$^{-1}$)

FIG. 11: Form A shows a double band with absorption maxima at 3454 cm$^{-1}$ and 3429 cm$^{-1}$. Form B shows a single absorption band at 3615 cm$^{-1}$ and amorphous form shows a single absorption band at 3362 cm$^{-1}$.

Range 2 (from 1760 to 1580 cm$^{-1}$)

FIG. 12: Form A shows a single absorption band at 1646 cm$^{-1}$, Form B shows a single absorption band at 1630 cm$^{-1}$ and amorphous form shows a single absorption band at 1628 cm$^{-1}$ with a clearly higher intensity compared to the Form B band. Additionally, amorphous form shows a less intense, broad band at 1704 cm$^{-1}$ compared to both forms A and B bands at about 1704 cm$^{-1}$.

Range 3 (from 980 to 720 cm$^{-1}$)

FIG. 13: Form A shows a distinct set of 5 absorption bands at 911, 890, 876, 862 and 841 cm$^{-1}$. Form B shows a similar set but the 876 cm$^{-1}$ band is missing. Amorphous form shows

a single broad band at about 750 cm$^{-1}$, both forms A and B show two maxima at about 768 cm$^{-1}$ and 743 cm$^{-1}$.

Thermomicroscopy is another useful technique in the study of solid-state kinetics. The kinetics of nucleation processes from solutions or melts, including the analysis of the nucleation speed, can be quantified. The simplest and most widely used method is the melting point determination. As such, a Mettler model FP 82 controller with heating stage was used on a Leitz microscope. A few particles of Form A were placed on a glass slide and observed while heating at 10° C. per minute. The melting range for Form A (1:1) was found to be between 90° and 110° C.

On another means of characterization, the solubility of Form A (1:1) was also a matter subject to study. Its solubility in different solvents at approximate 23° C. was determined to be as follows:

TABLE 7

| Approximate solubility for Form A (1:1), in mg/ml | |
|---|---|
| Solvent | Approximate solubility Form A (mg/ml) |
| Acetone | 106-211 |
| Dichloromethane | 105-209 |
| 1-Methoxy-2-propanol | 160-213 |
| Ethylmethylketone | 102-204 |
| Ethylacetate | 71-107 |
| Ethanol absolute | <3.4 |
| Heptane | <3.4 |
| Water | <3.5 |
| Isopropylether | <3.4 |
| Methoxyanate | >200 |
| Methanol | <3.4 |
| 2-Propanol | <3.4 |
| Tetrahydrofurane | 102-203 |
| Toluene | <3.5 |

Further solubility investigations were performed in function of pH. As such, the aqueous solubilities of Form A (1:1) were measured in solvents with different pH. An excess of the solute was equilibrated with the solvent at 20° C. for at least

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

US 7,700,645 B2

11

24 hours. After removing the undissolved compound, the concentration in solution was determined using UV spectrometry.

TABLE 8

Solubility for Form A (1:1) in function of pH

| Solvent | Solubility (mg/100 ml solution) |
|---------|--------------------------------|
| Water | 16 (pH 5.9) |
| Buffer pH 2 (citrate/HCl) | 18 (pH 2.0) |
| Buffer pH 3 (citrate/HCl) | 10 (pH 3.0) |
| Buffer pH 4 (citrate/HCl) | 9 (pH 4.0) |
| 0.01 N HCl | 18 (pH 2.1) |
| 0.1 N HCl | 83 (pH 1.1) |
| 1.0 N HCl | 620 (pH 0.2) |

Solubility of Form A (1:1) in function of HPβCD (hydroxypropyl-β-cyclodextrin) was measured. An excess of product was equilibrated with the solvent during 2 days at 20° C. After removing the undissolved compound, the concentration in solution was determined by UV spectrometry.

TABLE 9

Solubility for Form A (1:1) in function of HPβCD

| solvent | Solubility in mg/ml solution |
|---------|------------------------------|
| Water | 0.16 (pH = 5.9) |
| 5% HPβCD in water | 2.4 (pH = 5.8) |
| 10% HPβCD in water | 6.5 (pH = 6.0) |
| 20% HPβCD in water | 17 (pH = 6.0) |
| 40% HPβCD in water | 40 (pH = 5.9) |

In a second aspect, the present invention relates to processes for preparing pseudopolymorphs. Pseudopolymorphs of compound of formula (X) are prepared by combining compound of formula (X) with an organic solvent, or water, or mixtures of water and water miscible organic solvents, applying any suitable technique to induce crystallization, and isolating the desired pseudopolymorphs.

By techniques for inducing crystallization are to be understood those processes for the production of crystals, which include amongst others, dissolving or dispersing compound of formula (X) in a solvent medium, bringing the solution or dispersion of compound of formula (X) and the solvent(s) to a desired concentration, bringing the said solution or dispersion to a desired temperature, effecting if any suitable pressure, removing and/or separating any undesired material or impurities, drying the formed crystals to obtain the pseudopolymorphs in a solid state, if such state is desired.

Bringing the solution or dispersion of compound of formula (X) and solvents to a desired concentration does not necessarily imply an increase in the concentration of compound of formula (X). In certain cases, a decrease or no change in concentration could be preferable. By bringing the said solution or dispersion to a desired temperature, one will understand the acts of heating, cooling or leaving at ambient temperature.

The techniques used for obtaining a desired concentration are those common in the art, for instance, evaporation by atmospheric distillation, vacuum distillation, fractioned distillation, azeotropic distillation, film evaporation, other techniques well known in the art and combinations thereof. An optional process for obtaining a desired concentration could as well involve the saturation of the solution of compound of formula (X) and solvents, for example, by adding a sufficient volume of a non-solvent to the solution to reach the saturation point. Other suitable techniques for saturating the solution

12

include, by way of example, the introduction of additional compound of formula (X) to the solution and/or evaporation of a portion of the solvent from the solution. As referred to herein, saturated solution encompasses solutions at their saturation points or exceeding their saturation points, i.e. supersaturated.

Removing and/or separating any undesired material or impurities may be performed by purification, filtering, washing, precipitation or similar techniques. Separation, for example, can be conducted by known solid-liquid separation techniques. Filtering procedures known to those skilled in the art can as well be used in the present process. The filtrations can be performed, amongst other methods, by centrifugation, or using Buchner style filter, Rosenmund filter or plates, or frame press. Preferably, in-line filtration or safety filtration may be advantageously intercalated in the processes disclosed above, in order to increase the purity of the resulting pseudopolymorphic form. Additionally, filtering agents such as silica gel, Arbocel®, dicalite diatomite, or the like, may also be employed to separate impurities from the crystals of interest.

Crystals obtained may be also dried, and such drying process may optionally be used in the different crystallization passages, if more than one crystallization passage is applied. Drying procedures include all techniques known to those skilled in the art, such as heating, applying vacuum, circulating air or gas, adding a desiccant, freeze-drying, spray-drying, evaporating, or the like, or any combination thereof.

Processes for crystallization of pseudopolymorphs of compound of formula (X) embrace multiple combinations of techniques and variations thereof. As such, and by way of example, crystallization of pseudopolymorphs of compound of formula (X) may be executed by dissolving or dispersing compound of formula (X) at a suitable temperature in the solvent whereby portion of the said solvent evaporates increasing the concentration of the compound of formula (X) in the said solution or dispersion, cooling the said mixture, and optionally washing and/or filtering and drying resulting solvate crystals of compound of formula (X). Optionally, pseudopolymorphs of compound of formula (X) may be prepared by dissolving or dispersing compound of formula (X) in a solvent medium, cooling said solution or dispersion and subsequently filtering and drying the obtained pseudopolymorph. Another example of preparation of solvates of compound of formula (X) could be by saturating compound of formula (X) in the solvent medium, and optionally filtering, washing and drying obtained crystals.

Crystal formation may as well involve more than one crystallization process. In certain cases, one, two or more extra crystallization steps may be advantageously performed for different reasons, such as, to increase the quality of the resulting solvate. For instance, pseudopolymorphs of the present invention could also be prepared by adding a solvent to an initial starting base material of compound of formula (X), stirring the solution at a fixed temperature until the substances would be fully solved, concentrating the solution by vacuum distillation, and cooling. A first crystallization would take place and the formed crystals would be newly washed with a solvent, and followed by dissolution of compound of formula (X) with the solvent to form the desired pseudopolymorph. Recrystallization of the reaction mixture would occur, followed by a cooling step from reflux. The formed pseudopolymorph would optionally be filtered and allowed to dry.

By dissolving or dispersing compound of formula (X) in the organic solvent, water or a mixture of water and water miscible organic solvents, one may obtain different degrees of dispersion, such as suspensions, emulsions, slurries or mixtures; or preferably obtain homogeneous one-phase solutions.

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035904
DTX-0001 (Page 26 of 35)

A00361

US 7,700,645 B2

13

Optionally, the solvent medium may contain additives, for example one or more dispersing agents, surfactants or other additives, or mixtures thereof of the type normally used in the preparation of crystalline suspensions and which are well documented in the literature. The additives may be advantageously used in modifying the shape of crystal by increasing the leniency and decreasing the surface area.

The solvent medium containing the solution may optionally be stirred for a certain period of time, or vigorously agitated using, for example, a high shear mixer or homogeniser or a combination of these, to generate the desired droplet size for the organic compound.

Examples of organic solvents useful for the present invention include $C_1$-$C_4$ alcohols such as methanol, ethanol, isopropanol, butanol, 1-methoxy-2-propanol, and the like; $C_1$-$C_4$ chloroalkanes such as dichloromethane; $C_1$-$C_4$ ketones such as acetone; $C_1$-$C_4$ ethers such as anisole, and the like; cycloethers such as tetrahydrofuran; $C_1$-$C_4$ esters such as ethylacetate; $C_1$-$C_4$ sulfonates such as mesylate, ethanesulfonate, butanesulfonate, 2-methyl-1-propanesulfonate; and the like.

Examples of mixtures of water and water miscible organic solvents include, mixtures of water with all organic solvents listed above provided they are miscible in water, e.g. ethanol/water, for instance in a 50/50 ratio.

Preferred solvents are those pharmaceutically acceptable solvents. However, pharmaceutically non-acceptable solvents may also find their use in the preparation of pharmaceutically acceptable pseudopolymorphs.

In a preferred method, the solvent is a pharmaceutically acceptable solvent since it results in a pharmaceutically acceptable pseudopolymorph. In a more preferred method, the solvent is ethanol.

In a particular embodiment, pharmaceutically acceptable pseudopolymorphs of compound of formula (X) can be prepared starting from pseudopolymorphic forms of compound of formula (X), which may not be necessarily pharmaceutically acceptable. For instance, Form A may be prepared starting from Form J. Pseudopolymorphs may also be prepared starting from the amorphous form.

In the mixtures of water and water miscible organic solvents, the amount of water can vary from about 5% by volume to about 95% by volume, preferably from about 25% to about 75% by volume, more preferably from about 40% to about 60% by volume.

It should also be noted that the quality of selected organic solvent (absolute, denaturated, or other) also influences the resulting quality of the pseudopolymorph.

Control of precipitation temperature and seeding may be additionally used to improve the reproducibility of the crystallization process, the particle size distribution and form of the product. As such, the crystallization can be effected without seeding with crystals of the compound of the formula (X) or preferably in the presence of crystals of the compound of the formula (X), which are introduced into the solution by seeding. Seeding can also be effected several times at various temperatures. The amount of the seed material depends on the amount of the solution and can readily be determined by a person skilled in the art.

The time for crystallization in each crystallization step will depend on the conditions applied, the techniques employed and/or solvents used.

Breaking up the large particles or aggregates of particles after crystal conversion may additionally be performed in order to obtain a desired and homogeneous particle size. Accordingly, the solvate crystal forms of compound of formula (X) are optionally milled after undergoing conversion. Milling or grinding refers to physically breaking up the large particles or aggregates of particles using methods and apparatus well known in the art for particle size reduction of

14

powders. Resulting particle sizes may range from millimeters to nanometers, yielding i.e. nanocrystals, microcrystals.

The yield of the preparation process of the pseudopolymorphs of compound of formula (X) may be 10% or more, a more preferred yield would vary from 40% to 100%. Interestingly, the yield varies between 70% and 100%.

Suitably, pseudopolymorphs of the present invention have a purity greater than 90 percent. More suitably, the present pseudopolymorphs have a purity greater than 95 percent. Even more suitably, the present pseudopolymorphs have a purity greater than 99 percent.

In a third aspect, the present invention relates to a pharmaceutical formulation comprising a therapeutically effective amount of a pseudopolymorph of compound of formula (X), and a pharmaceutically acceptable carrier or diluent thereof.

In one embodiment, present invention relates to the use of pharmaceutically acceptable pseudopolymorphic forms of compound of formula (X), preferably Form A, in the manufacture of a medicament for treating diseases caused by retroviruses, such as HIV infections, for example, Acquired Immune Deficiency Syndrome (AIDS) and AIDS-related complex (ARC).

In another embodiment, present invention provides a method for the treatment of a retroviral infection, for example an HIV infection, in a mammal such as a human, which comprises administering to the mammal in need thereof an effective antiretroviral amount of a pharmaceutically acceptable pseudopolymorphic form of compound of formula (X), preferably Form A.

Present invention also relates to a method in which the treatment of a HIV viral infection comprises the reduction of HIV load. Present invention also relates to a method in which the treatment of said HIV viral infection comprises the increase of CD4+ cell count. Present invention relates as well to a method in which the treatment of said HIV viral infection comprises inhibiting HIV protease activity in a mammal.

Pharmaceutically acceptable pseudopolymorphic forms of compound of formula (X), preferably Form A, also referred to herein as the active pharmaceutical ingredients, may be administered by any route appropriate to the condition to be treated, preferably orally. It will be appreciated however, that the preferred route may vary with, for example, the condition of the recipient.

For each of the above-indicated utilities and indications the amount required of the active ingredient will depend upon a number of factors including the severity of the condition to be treated and the identity of the recipient and will ultimately be at the discretion of the attendant physician or veterinarian. The desired dose preferably may be presented as one, two, three or four or more subdoses administered at appropriate intervals throughout the day.

For an oral administration form, pseudopolymorphs of the present invention are mixed with suitable additives, such as excipients, stabilizers or inert diluents, and brought by means of the customary methods into the suitable administration forms, such as tablets, coated tablets, hard capsules, aqueous, alcoholic, or oily solutions. Examples of suitable inert carriers are gum arabic, magnesia, magnesium carbonate, potassium phosphate, lactose, glucose, or starch, in particular, corn starch. In this case the preparation can be carried out both as dry and as moist granules. Suitable oily excipients or solvents are vegetable or animal oils, such as sunflower oil or cod liver oil. Suitable solvents for aqueous or alcoholic solutions are water, ethanol, sugar solutions, or mixtures thereof. Polyethylene glycols and polypropylene glycols are also useful as further auxiliaries for other administration forms.

For subcutaneous or intravenous administration, the pseudopolymorphs of compound of formula (X), if desired with the substances customary therefor such as solubilizers, emulsifiers or further auxiliaries, are brought into solution,

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035905

DTX-0001 (Page 27 of 35)

US 7,700,645 B2

| 15 | 16 |

suspension, or emulsion. The pseudopolymorphs of compound of formula (X) can also be lyophilized and the lyophilizates obtained used, for example, for the production of injection or infusion preparations. Suitable solvents are, for example, water, physiological saline solution or alcohols, e.g. ethanol, propanol, glycerol, in addition also sugar solutions such as glucose or mannitol solutions, or alternatively mixtures of the various solvents mentioned.

Suitable pharmaceutical formulations for administration in the form of aerosols or sprays are, for example, solutions, suspensions or emulsions of the pseudopolymorphs of compound of formula (X) in a pharmaceutically acceptable solvent, such as ethanol or water, or a mixture of such solvents. If required, the formulation can also additionally contain other pharmaceutical auxiliaries such as surfactants, emulsifiers and stabilizers as well as a propellant. Such a preparation customarily contains the active compound in a concentration from approximately 0.1 to 50%, in particular from approximately 0.3 to 3% by weight.

Pseudopolymorphs of the present invention may also be presented in a formulation comprising micrometer-, nanometer- or picometer-size particles of the pseudopolymorph of compound of formula (X), which formulation may contain other pharmaceutical agents and may optionally be converted to solid form.

It may be convenient to formulate the present pseudopolymorphs in the form of nanoparticles which have a surface modifier adsorbed on the surface thereof in an amount sufficient to maintain an effective average particle size of less than 1000 nm. Useful surface modifiers are believed to include those that physically adhere to the surface of the antiretroviral agent but do not chemically bind to the antiretroviral agent.

It may be further convenient to store the pseudopolymorphs of compound of formula (X) in packaging materials which are protective to mechanical, environmental, biological or chemical hazards, or degradation. Conditioning drug substances can be achieved by employing packaging materials impermeable to moisture, such as sealed vapour lock bags. Conditioning drug products, such as tablets, capsules, can be achieved by employing for instance, aluminium blisters.

It should be understood that in addition to the ingredients particularly mentioned above, formulations of this invention includes other agents conventional in the art having regard to the type of formulation in question, for example those suitable for oral administration may include flavouring agents or taste masking agents.

The following examples are intended for illustration only and are not intended to limit the scope of the invention in any way.

EXAMPLE 1

The industrial scale synthesis of Form A (1:1) was performed using the following steps. First a solution was prepared with isopropanol and (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl(1S,2R)-3-[[(4-aminophenyl)sulfonyl](isobutyl)amino]-1-benzyl-2-hydroxypropylcarbamate. The solution was concentrated by vacuum distillation at 70° C. and 200-500 mbar pressure and cooled from a T>35° to a T between 15° and 20° C. for about 10 hours. The crystals formed were newly washed with 3 liters isopropanol and filtered. A subsequent recrystallization from ethanol/water (90 liters/90 liters) was performed. This was followed by a new dissolution step, but with 60 liters ethanol instead. Recrystallization of the reaction mixture from ethanol occurred, followed by a cooling step from reflux to −15° C. approximately and during 10 hours. The ethanolate form E was filtered and let to dry at about 50° C. and about 7 mbar. The yield of this process was at least 75%.

EXAMPLE 2

In another example a mixture of Form D and Form B were prepared. Acetone was used as a solvent during the crystallisation process to form Form D. The crystallisation process then comprised the step of stirring the initial starting compound (10 g) in 70 ml acetone. The solution was subsequently refluxed until the compound was completely solved. 40 ml of water were added and the solution was subsequently cooled slowly until room temperature and stirred overnight. Formed crystals were filtered and dried in the vacuum oven at 50° C. 7.6 g of product resulted from the crystallization, being the yield of this process of about 75%.

EXAMPLE 3

In another example Form J crystals were prepared. Isopropanol was used as a solvent during the crystallisation process to form Form J. The crystallisation process then comprised the step of solving the initial starting material in the hot solvent. The solution was subsequently cooled until room temperature. Formed crystals were filtered and dried in the vacuum oven at 50° C. The crystals contained about 50 mol % isopropanol.

EXAMPLE 4

In this example, the mass losses for different pseudopolymorphs in thermogravimetric (TG) experiments were calculated. Thermogravimetry is a technique that measures the change in mass of a sample as it is heated, cooled or held at constant temperature. Approximately 2 to 5 mg of sample were placed on a pan and inserted into the TG furnace, model Netzsch Thermo-Microbalance TG 209 coupled to a Bruker FTIR Spectrometer vector 22. The samples were heated in a nitrogen atmosphere at a rate of $10°$ C./min, up to a final temperature of 250° C. The detection limit of residual solvents was in the order of 0.1% for distinct stepwise solvent loss over a narrow temperature range (few degrees Celsius). The following TG data were obtained:

Form A: a weight loss of 4.2% was observed in the temperature range of 25-138° C. (ethanol+little water) and of 6.9% (ethanol+$CO_2$) in the temperature range of 25-200° C. Ethanol loss rate was maximal at 120° C. $CO_2$ loss was due to chemical degradation and was visible at around 190° C.

Form B: a weight loss of 3.4% was observed in the temperature range 25-78° C. (water) and of 5.1% in the temperature range 25-110° C. (ethanol+water for T>78° C.). From 110-200° C. further 1.1% weight was lost (ethanol).

Form C: a weight loss of 2.1% was observed in the temperature range 25-83° C. (water+methanol) and of 4.2% in the temperature range 25-105° C. (methanol for T>83° C., distinct step). From 105-200° C. further 2.1% weight was lost (methanol). No ethanol was observed in the gas phase.

Form D: a weight loss of 0.1% was observed in the temperature range 25-50° C., of 4.2% in the temperature range 25-108° C. (acetone+water for T>50° C.) and of 8.2% in the temperature range 25-157° C. (acetone+ethanol for T>108° C.) and of 10.5% in the temperature range 25-240° C. (acetone+ethanol for T>157° C.).

Form E: a weight loss of 0.2% was observed in the temperature range 25-75° C. (water), of 1.8% in the temperature range 25-108° C. (dichloromethane+ethanol for T>75° C.), of 6.8% in the temperature range 25-157° C. (dichloromethane+ethanol for T>108° C.) and of 8.8% in the temperature range 25-240° C. (dichloromethane+ethanol for T>157° C.).

Form F: a weight loss of 0.1% was observed in the temperature range 25-50° C. (probably water), of 1.7% in the temperature range 25-108° C. (ethylacetate+ethanol for

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035906

DTX-0001 (Page 28 of 35)

A00363

US 7,700,645 B2

17

T>50° C.), of 6.6% in the temperature range 25-157° C. (ethylacetate+ethanol for T>108° C.) and of 9% in the temperature range 25-240° C. (ethylacetate+ethanol for T>157° C.).

Form G: a weight loss of 0.0% was observed in the temperature range 25-50° C., of 3.7% in the temperature range 25-108° C. (1-methoxy-2-propanol+ethanol for T>50° C., distinct step), of 8% in the temperature range 25-157° C. (1-methoxy-2-propanol+ethanol for T>108° C.) and of 12.5% in the temperature range 25-240° C. (1-methoxy-2-propanol+ethanol for T>157° C.).

Form H: a weight loss of 0.8% was observed in the temperature range 25-100° C. (anisole+little ethanol) and of 8.8% in the temperature range 25-200° C. (anisole+ethanol for T>100° C.).

Form I: a weight loss of 0.3% was observed in the temperature range 25-89° C. (water) and of 11.0% in the temperature range 25-200° C. (tetrahydrofurane for T>89° C.). No ethanol was observed in the gas phase.

Table 10 shows approximate expected mass losses for different Forms in thermogravimetric (TG) experiments.

Mass loss in % (M+x.LM=100%)

| Pseudopolymorph | BP[° C.] | Hemisol-vate | Monosol-vate | Disol-vate | Trisol-vate |
|---|---|---|---|---|---|
| Form D | 56 | 5.0 | 9.6 | 17.5 | 24.1 |
| Form H | 152 | 9.0 | 16.5 | 28.3 | 37.2 |
| Form E | 40 | 7.2 | 13.4 | 23.7 | 31.8 |
| Form G | 119 | 7.6 | 14.1 | 24.8 | 33.1 |
| Form F | 76 | 7.4 | 13.9 | 24.3 | 32.6 |
| Form A | 78 | 4.0 | 7.8 | 14.4 | 20.2 |
| Form B | 100 | 1.6 | 3.2 | 6.2 | 9.0 |
| Form C | 65 | 2.8 | 5.5 | 10.5 | 14.9 |
| Form I | 66 | 6.2 | 11.6 | 20.8 | 28.3 |

In another set of thermogravimetric methods, Form A, Form A after Adsorption/Desorption, and Form A after Adsorption/Desorption hydratation tests, were all transferred into an aluminum sample pan. The TG curve was recorded on a TA Instrument Hi-Res TGA 2950 thermogravimeter at the following conditions:

| | |
|---|---|
| initial temperature: | room temperature |
| heating rate: | 20° C./min |
| resolution factor: | 4 |
| final condition: | 300° C. or <80[(w/w)%] |

The TG curves of the samples are collected in FIG. 16. Table 11 shows mass losses for the forms tested:

TABLE 11

| | TG (% weight change) | |
|---|---|---|
| Form A | Up to 80° C. | >80° C. |
| Form A | 0.3 | 7.1 |
| Form A after ADS/DES | 2.9 | 4.0 |
| Form A after A/D hydratation test | 5.4 | 0.5 |

The loss of weight at temperatures up to 80° C. is mainly due to the evaporation of solvent (water) present in the sample. The loss of weight at temperatures above 80° C. is mainly due to the evaporation of solvent (ethanolate) present in the sample.

A TG curve of form A at 25° C. under dry nitrogen atmosphere in function of time is collected in FIG. 17. The loss of

18

weight at 25° C. after 10 hours was around 0.6%. This was due to the evaporation of solvent.

EXAMPLE 5

In another example, measurements of differential scanning calorimetry (DSC) were also performed. For such purpose, a Perkin Elmer DSC 204 thermal analysis system was used. From 2 to 5 mg sample of Form A were accurately weighed into a DSC pan. The experiments were performed in an open pan. The sample was equilibrated to approximately 30° C. and then heated at a rate of 10° C. per minute, up to a final temperature of 200° C. The DSC data was obtained following a standard method in the art. The Form A was characterized by differential scanning calorimetry (DSC) in which it showed a sharp endotherm in the range 80-119° C., showing a peak at about 105.6° C., with a delta H=−98.33 J/g onset. Accordingly, the ethanol solvate crystal Form A of compound of formula (X) (1:1) showed the thermograph pattern, which appears in FIG. 8.

In another set of DSC measurements, Form A, Form A after Adsorption/Desorption, and Form A after Adsorption/Desorption hydratation tests were examined. About 3 mg of the samples were transferred into a 30 µl perforated aluminum Perkin Elmer sample pan. The sample pan was closed with the appropriate cover and the DSC curve recorded on a Perkin Elmer Pyris DSC, at the following conditions:

| | |
|---|---|
| initial temperature: | 25° C. |
| heating rate: | 10° C./min |
| final temperature: | 150° C. |
| nitrogen flow: | 30 ml/min |

Form A showed an endothermic signal at about 104.6° C. and a heat of fusion of 95.8 J/g caused by the evaporation of the ethanolate and the melting of the product. Form A after ADS/DES showed a broad endothermic signal due to a mixture of ethanolate Form A and hydrated Form B. Form A after ADS/DES hydratation test showed an endothermic signal at about 73.5° C. and a heat of fusion of 126 J/g caused by the evaporation of water and the melting of the product. Thermograph curves are depicted in FIG. 15.

EXAMPLE 6

In another example stability studies of the Form A in three different conditions were tested out. They included conditions of 25° C. and 60% RH, 40° C. and 75% RH, and 50° C. These studies revealed that at 25° C. and 60% RH long-term stability, the amount of ethanol and water is stable.

Table 12 shows the Stability study for Form A. Long term stability at 25° C./60% RH (Relative Humidity), with brown glass bottles as sample container.

| Test | Release data | 0 month | 1 month | 3 month |
|---|---|---|---|---|
| Residual solvent: % (w/w) ethanol | 7.5 | 7.6 | 7.6 | 7.1 |
| % (w/w) Water | 0.10 | 0.27 | 0.26 | 0.55 |

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

US 7,700,645 B2

**19**

EXAMPLE 7

Adsorption-Desorption Tests

About 23 mg of Form A were transferred into a VTI vapor sorption analyzer model SGA100 and the weight change with respect to the atmospheric humidity was recorded at the following conditions:

| | |
|---|---|
| drying temperature: | 40° C. |
| equilibrium: | ≦0.05% in 5 min. or 60 min. |
| data interval: | 0.05% or 2 min. |
| temperature: | 25° C. |
| first cycle | RH (%) adsorption: 5, 10, 20, 30, 40, 50, 60, 70, 80, 90, 95 |
| | RH (%) desorption: 95, 90, 80, 70, 60, 50, 40, 30, 20, 10, 5 |
| second cycle | RH (%) adsorption: 5, 10, 20, 30, 40, 50, 60, 70, 80, 90, 95 |
| | RH (%) desorption: 95, 90, 80, 70, 60, 50, 40, 30, 20, 10, 5 |

At the drying step about 0.6% weight loss was registered. The obtained dried product was not hygroscopic, it adsorbed up to 0.7% water at high relative humidity. During the desorption cycle a loss of weight of 1.4% was registered, this indicated that the product was losing ethanolate. The obtained product after ADS/DES was a mixture of ethanolate form and hydrated form.

**20**

The ADS/DES curve is collected in FIG. **18**.

Adsorption-Desorption Hydratation Tests

About 23 mg of Form A were transferred into a VTI vapor sorption analyzer model SGA100 and the weight change with respect to the atmospheric humidity was recorded at the following conditions:

| | |
|---|---|
| equilibrium: | ≦0.0005% in 5 min. or 90 min. |
| data interval: | 0.05% or 2 min |
| temperature: | 25° C. |
| cycle | RH (%) adsorption/desorption: 5-95 repeat the cycle 11 times |

At the end of this test a loss of weight of 5.2% was registered. This was comparable with the TG result (TG 5.4% up to 80° C.). The ethanolate form was transferred into a hydrated form. The ADS/DES hydratation test curves are collected in FIG. 19.

EXAMPLE 8

The stability of Form A was studied after storage of the compound in a sample container with an inner cover mode of single LD-PE (string sealed), and outer cover made of PETP/Alu/PE (Moplast) heat sealed. A long term stability study at 25° C./60% RH, and an accelerated stability study at 40° C./75% RH, were performed for a period of 6 months, and the samples analysed at different time points as shown in following tables.

TABLE 13

Long term stability at 25° C./60% RH

| tests | Remark | Specification | Release data | 0 month | 1 month | 3 month | 6 month |
|---|---|---|---|---|---|---|---|
| Polymorphism | ° C. (onset) | For information only | 97.3 | 97.3 | 95.5 | 97.9 | 97.5 |
| DSC | ° C. max | For information only | 104 | 104.2 | 103.5 | 104.2 | 104 |
| Residual solvents | % (w/w) ethanol | <=10.0% | 6.71 | 6.31 | 6.33 | 6.40 | 6.33 |
| | % (w/w) 2-propanol | <=0.5% | 0.04 | 0.04 | 0.05 | 0.05 | 0.05 |
| | % (w/w) THF | <=0.5% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| | % (w/w) acetone | <=0.5% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| | % (w/w) CH₂Cl₂ | <=0.06% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| Water (KF) | % (w/w) | <=7.0% | 0.63 | 0.23 | 0.34 | 0.32 | 0.46 |
| X-Ray powder diffraction | | For information only | C | C | — | — | — |

C: chrystal

TABLE 14

Accelerated stability at 40° C./75% RH

| Tests | Remark | Specification | Release data | 0 month | 1 month | 3 month | 6 month |
|---|---|---|---|---|---|---|---|
| Polymorphism | ° C. (onset) | For information only | 97.3 | 97.3 | 97.5 | 98.0 | 97.8 |
| DSC | ° C. max | For information only | 104 | 104.2 | 103.4 | 1039 | 104.3 |
| Residual solvents | % (w/w) ethanol | <=10.0% | 6.71 | 6.31 | 6.73 | 6.32 | 6.50 |
| | % (w/w) 2-propanol | <=0.5% | 0.04 | 0.04 | 0.05 | 0.05 | 0.05 |
| | % (w/w) THF | <=0.5% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| | % (w/w) acetone | <=0.5% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| | % (w/w) CH₂Cl₂ | <=0.06% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| Water (KF) | % (w/w) | <=7.0% | 0.63 | 0.23 | 0.37 | 0.34 | 0.42 |
| X-Ray powder diffraction | | For information only | C | C | — | — | — |

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

US 7,700,645 B2

21                                                                                        22

Form A exhibited chemical and crystallographic stability at the conditions mentioned in tables 13 and 14.

### EXAMPLE 9

The stability of Form A was studied after storage of the compound in a sample container with an inner cover made of single LD-PE (string sealed), and outer cover made of vapor loc bag (LPS) heat sealed. A long term stability study at 25° C./60% RH, and an accelerated stability study at 40° C./75% RH, were performed for a period of 6 months, and the samples analysed at different time points as shown in following tables.

#### TABLE 15

| | | | Long term stability at 25° C./60% RH | | | | |
|---|---|---|---|---|---|---|---|
| Tests | Remark | Specification | Release data | 0 month | 1 month | 3 month | 6 month |
| Polymorphism | ° C. (onset) | For information only | 97.3 | 97.3 | 96.3 | 96.2 | 98.5 |
| DSC | ° C. max | For information only | 104 | 104.2 | 103.1 | 103.8 | 103.9 |
| Residual solvents | % (w/w) ethanol | <=10.0% | 6.71 | 6.31 | 6.42 | 6.35 | 6.52 |
| | % (w/w) 2-propanol | <=0.5% | 0.04 | 0.04 | 0.06 | 0.05 | 0.05 |
| | % (w/w) THF | <=0.5% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| | % (w/w) acetone | <=0.5% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| | % (w/w) CH$_2$Cl$_2$ | <=0.06% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| Water (KF) | % (w/w) | <=7.0% | 0.63 | 0.23 | 0.32 | 0.38 | 0.49 |
| X-Ray powder diffraction | | For information only | C | C | — | — | — |

#### TABLE 16

| | | | Accelerated stability at 40° C./75% RH | | | | |
|---|---|---|---|---|---|---|---|
| Tests | Remark | Specification | Release data | 0 month | 1 month | 3 month | 6 month |
| Polymorphism | ° C. (onset) | For information only | 97.3 | 97.3 | 97.8 | 97.5 | 97.9 |
| DSC | ° C. max | For information only | 104 | 104.2 | 103.4 | 103.7 | 104.0 |
| Residual solvents | % (w/w) ethanol | <=10.0% | 6.71 | 6.31 | 6.35 | 6.31 | 6.30 |
| | % (w/w) 2-propanol | <=0.5% | 0.04 | 0.04 | 0.06 | 0.05 | 0.05 |
| | % (w/w) THF | <=0.5% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| | % (w/w) acetone | <=0.5% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| | % (w/w) CH$_2$Cl$_2$ | <=0.06% | <0.01 | <0.01 | <0.01 | <0.01 | <0.01 |
| Water (KF) | % (w/w) | <=7.0% | 0.63 | 0.23 | 0.31 | 0.36 | 0.51 |
| X-Ray powder diffraction | | For information only | C | C | — | — | — |

Form A exhibited chemical and crystallographic stability at the conditions mentioned in tables 15 and 16.

### EXAMPLE 10

For the purpose of chemical stability testing, Form A was stored for a period of 1, 4 and 8 weeks under different conditions. These conditions were 40° C./75% RH, 50° C., RT/<5% RH, RT/56% RH, RT/75% RH and 0.3 da ICH light. The compound was analysed after storage by HPLC and by visual inspection. The HPLC method used in this study was HPLC method 909. The results of the tests are reported in the following table.

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035909

A00366

US 7,700,645 B2

23            24

TABLE 17

| Conditions | HPLC Sum of impurities | | | Appearance | | |
|---|---|---|---|---|---|---|
| | 1 week | 4 week | 8 week | 1 week | 4 weeks | 8 weeks |
| Reference | 1.07 | — | — | slightly-yellow | — | — |
| 0.3 da ICH light | 1.01 | — | — | slightly-yellow | — | — |
| 40° C./75% RH | 1.03 | 0.98 | 0.99 | slightly-yellow | slightly-yellow | slightly-yellow |
| 50° C. | 1.05 | 1.08 | 1.06 | slightly-yellow | slightly-yellow | slightly-yellow |
| RT/<5% RH | — | 1.02 | 1.04 | — | slightly-yellow | slightly-yellow |
| RT/56% RH | — | 1.02 | 0.99 | — | slightly-yellow | slightly-yellow |
| RT/75% RH | — | 1.00 | 1.01 | — | slightly-yellow | slightly-yellow |

It was concluded that Form A is chemically stable after storage in all investigated conditions.

### EXAMPLE 11

Different fractions of Form B were characterized with thermogravimetry (TG), differential scanning calorimetry (DSC) and infrared spectroscopy (IR). The results of the tests are reported in the following table.

TABLE 18

| Fractions | TG % | | DSC | |
|---|---|---|---|---|
| | weight change <100° C. | IR | Max (° C.) | Extra (° C.) |
| Form B fraction 1 | 5.65 | Hydrate, Ref | 69.1 | — |
| after ADS/DES | 4.30 | ±Hydrate, Ref, +amorphous | — | — |
| Form B fraction 2 | 5.91 | ~Hydrate, Ref | 75.6 | — |
| after 5 d 40° C./75% RH | 3.56 | ±Hydrate, Ref | 74.1 | — |
| Form B fraction 3 | 3.13 | ±Hydrate, Ref, +amorphous | 77.0 | 67.8 |
| after 5 d 40° C./75% RH | 2.33 | ±Hydrate, Ref, +amorphous | 77.4 | 62.8 |

~hydrate, Ref: identical with reference

### EXAMPLE 12

The adsorption and desorption of water at 25° C. at different conditions of relative humidity was investigated on 38 mg of Form B. The weight change as a function of relative humidity was registered in FIG. 20. At the drying step about 5.6% weight loss was registered for Form B. The obtained dried product was hygroscopic, it adsorbed up to 6.8% water at high relative humidity. After the desorp-

tion cycle about 1.2% water remained on the sample. The obtained product after ADS/DES was a mixture of hydrate and amorphous product.

### EXAMPLE 13

Aqueous solubilities of Form B were measured in solvents with different pH. An excess of the solute was equilibrated with the solvent at 20° C. for at least 24 hours. After removing the undissolved compound, the concentration in solution was determined using UV spectrometry.

TABLE 19

| Solvent | Solubility (mg/100 ml solution) |
|---|---|
| Water | 10 (pH 5.1) |
| Buffer pH 2 (citrate/HCl) | 23 (pH 2.0) |
| Buffer pH 3 (citrate/HCl) | 13 (pH 3.0) |
| Buffer pH 4 (citrate/HCl) | 12 (pH 4.0) |
| 0.01N HCl | 18 (pH 2.1) |
| 0.1N HCl | 150 (pH 1.1) |
| 1.0N HCl | 510 (pH 0.14) |

### EXAMPLE 14

The stability of the crystal structure of Form B was studied after storage of the compound for a period of two weeks at room temperature (RT) under <5%, 56% and 75% relative humidity (RH), 50° C. and 40° C./75% RH. The samples were analyzed with thermogravimetry (TG), differential scanning calorimetry (DSC), infrared spectroscopy (IR) and X-ray diffraction (XRD). The results of the tests are reported in the following table.

TABLE 20

| condition | TG | | IR | XRD | DSC | Appearance |
|---|---|---|---|---|---|---|
| | <100° C. | <225° C. | | | Max (° C.) | |
| 0 days | 5.65 | 0.16 | Ref | Ref | 69.1 | slightly yellow-orange |
| after ADS/DES | 4.30 | 0.18 | ≠Ref | — | — | slightly yellow-orange |
| RT/<5% RH | 0.32 | 0.07 | ≠Ref | ≠Ref | 71.2 | slightly yellow-orange |
| RT/56% RH | 5.71 | 0.25 | ~Ref | ~Ref | 71.0 | slightly yellow-orange |
| RT/75% RH | 6.20 | 0.10 | ~Ref | ~Ref | 71.5 | slightly yellow-orange |
| 50° C. | 0.23 | 0.06 | ≠Ref | ≠Ref | 76.4 | slightly yellow-orange |
| 40° C. 75% RH | 5.77 | 0.07 | ~Ref | ±Ref | 70.4 | slightly yellow-orange |

~Ref: identical with reference

±Ref: similar with reference

≠Ref: different with reference

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

DEFs-JT(Daru) 035910

DTX-0001 (Page 32 of 35)

A00367

US 7,700,645 B2

| 25 | 26 |
|---|---|
| EXAMPLE 15 | EXAMPLE 17 |

In the chemical stability test program Form B was stored for a period of 1, 4 and 9 weeks under different conditions. These conditions were 40° C./75% RH, 50° C., RT/<5% RH, RT/56% RH, RT/75% RH and 0.3da ICH light. The compound was analysed after storage by HPLC and by visual inspection. The HPLC method used in this study was HPLC method 909. The results of the tests are reported in the following table, from which it was concluded that Form B is chemically stable.

TABLE 21

| | HPLC Sum of impurities | | | Appearance | | |
|---|---|---|---|---|---|---|
| Condition | 1 week | 4 week | 9 week | 1 week | 4 weeks | 9 weeks |
| Reference | 1.35 | — | — | lightly yellow-orange | — | — |
| 0.3 da ICH light | 1.30 | — | — | light-orange | — | — |
| 40° C./75% RH | 1.43 | 1.38 | 1.41 | lightly yellow-orange | Orange | light-orange |
| 50° C. | 1.46 | 1.50 | 1.46 | lightly yellow-orange | light-orange | light-orange |
| RT/<50% RH | —- | 1.48 | 1.37 | — | light-orange | light-orange |
| RT/56% RH | —- | 1.11 | 1.35 | — | lightly yellow-orange | light-orange |
| RT/75% RH | —- | 1.34 | 1.29 | —- | light-orange | light-orange |

EXAMPLE 16

Form K was prepared by adding neat methanesulfonic acid to a solution of Form A in THF at r.t. Form K was subsequently mixed with alkali halide and pressed to a pellet (Ph. Eur.) and analyzed by Infrared spectrometry (IR) at the following conditions:

| apparatus: | Nicolet Magna 560 FTIR spectrophotometer |
|---|---|
| number of scans: | 32 |
| resolution: | 1 cm⁻¹ |
| wavelength range: | 4000 to 400 cm⁻¹ |
| baseline correction: | yes |
| detector: | DTGS with KBr windows |
| beamsplitter: | Ge on KBr |
| alkali halide: | KBr (potassium bromide) |

The IR spectrum of Form K, as shown in FIG. 21, reflects the vibrational modes of the molecular structure of the mesylate solvate as a crystalline product.

TABLE 22

Wavenumbers (cm⁻¹) and relative intensities of absorption bands ([1])

3362m, 3064w
2985m, 2964m, 2906m, 2873m, 2632w, 2585w
1687s, 1627w, 1601w
1554m, 1495m, 1480w, 1470w, 1452w, 1443w, 1421w
1383w, 1373w, 1369w, 1345m, 1324m, 1314m, 1299w, 1268m, 1245m, 1221m, 1202s
1190s, 1166vs, 1122m, 1091m, 1077m, 1051s, 1043s, 1023m, 1002m
992m, 969w, 943w, 912w, 888w, 867vw, 836w, 813vw
773m, 754w, 743m, 711˙w, 700m, 658m, 634w
581w, 556m, 505w, 472vw, 452vw, 435vw, 417vw

([1]) vs = very strong, s = strong, m = medium, w = weak, vw = very weak, br = broad

Form K was transferred to a glass capillary cell and analyzed by Raman spectrometry at the following conditions:

| Raman mode: | Nondispersive Raman |
|---|---|
| apparatus: | Nicolet FT-Raman module |
| number of scans: | 64 |

-continued

| resolution: | 4 cm⁻¹ |
|---|---|
| wavelength range: | 3700 to 100 cm⁻¹ |
| laser: | Nd:YVO4 |
| laser frequency: | 1064 cm⁻¹ |
| detector: | InGaAs |
| beamsplitter: | CaF₂ |
| sample geometry: | 180° reflective |
| polarization: | no |

The Raman spectrum of Form K, as shown in FIG. 22, reflects the vibrational modes of the molecular structure of the mesylate as a crystalline product.

TABLE 23

Wavenumbers (cm⁻¹) and relative intensities of absorption bands ([1])

3080m, 3068m, 3059m, 3043w, 3022w, 3006m
2989s, 2978s, 2962s, 2933vs, 2906m, 2871m
1685vw, 1628w, 1603s, 1585w, 1495w, 1479w, 1466w, 1450m, 1423w
1381w, 1346w, 1336w, 1313w, 1290w, 1271w, 1244w, 1230w, 1209m
1190w, 1182m, 1163vs, 1122w, 1105w, 1090m, 1049vss, 1032w, 1003s
989w, 955w, 941w, 914w, 897w, 877w, 856w, 845w, 823m, 814m
783m, 771m, 742w, 658w, 634m, 621w
577w, 561m, 534w, 524w, 497w, 451w, 436w
337w, 308w, 287m, 247w, 206w, 162m, 129m

([1]) vs = very strong, s = strong, m = medium, w = weak, vw = very weak

EXAMPLE 18

About 3 mg of Form K were transferred into a standard aluminium TA-Instrument sample pan. The sample pan was closed with the appropriate cover and the DSC curve recorded on a TA-Instruments Q1000 MTDSC equipped with a RCS cooling unit, at the following conditions:

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

US 7,700,645 B2

<table>
<tr><td>27</td><td>28</td></tr>
</table>

| | |
|---|---|
| initial temperature: | 25° C. |
| heating rate: | 10° C./min |
| final temperature: | 200° C. |
| nitrogen flow: | 50 ml/min |

The DSC curve as depicted in FIG. 23, shows the melting with decomposition of a crystalline product. The melting of Form K occurs at 158.4° C. Due to the decomposition, the heat of fusion calculation can only be used to indicate the crystalline property of the product.

### EXAMPLE 19

Form K was transferred into an aluminum sample pan. The TG curve was recorded on a TA Instruments Hi-Res TGA 2950 thermogravimeter at the following conditions:

| | |
|---|---|
| initial temperature: | room temperature |
| heating rate: | 20° C./min |
| resolution factor: | 4 |
| final condition: | 300° C. or <80[(w/w)%] |

The TG curve is exhibited in FIG. 24. The loss of weight of around 0.2% up to .60° C. was due to the evaporation of solvent. The loss of weight at temperatures above 140° C. was due to the evaporation and decomposition of the product.

### EXAMPLE 20

#### Adsorption-Desorption

About 21 mg of Form K were transferred into a VTI vapor sorption analyzer model SGA100 and the weight change with respect to the atmospheric humidity was recorded at the following conditions:

| | |
|---|---|
| drying temperature: | 40° C. |
| equilibrium: | ≦0.05% in 5 min. or 60 min. |
| data interval: | 0.05% or 2.0 min. |
| temperature: | 25° C. |
| first cycle | RH (%) adsorption: 5,10,20,30,40,50,60,70,80, 90,95 |
| | RH (%) desorption: 95,90,80,70,60,50,40,30,20, 10,5 |
| second cycle | RH (%)adsorption: 5,10,20,30,40,50,60,70,80, 90,95 |

-continued

| |
|---|
| RH (%) desorption: 95,90,80,70,60,50,40,30,20, 10,5 |

The Adsorption-Desorption isotherm is shown in FIG. 25. Form K is hygroscopic. At the initial drying step a loss of weight of 0.3% was registered, comparable to the TG result. Form K adsorbed up to 1.5% water at high relative humidity. The product dried completely during the desorption cycle.

A different study of the adsorption and desorption of water by Form K at 25° C. at different conditions of relative humidity was investigated on an amount of about 18 mg of the mesylate solvate. The weight change as a function of relative humidity was registered. The result is displayed in FIG. 26.

At the drying step about 0.6% weight loss is registered for Form K. The obtained dried product is slightly hygroscopic, it adsorbed up to 1.7% water at high relative humidity. The product dried completely during the desorption cycle.

### EXAMPLE 21

Aqueous solubilities of Form K were measured in solvents with different pH. An excess of the solute was equilibrated with the solvent at 20° C. for at least 48 hours. After removing the undissolved compound, the concentration in solution was determined using UV spectrometry.

#### TABLE 24

| Solvent | Solubility (mg/100 ml solution) |
|---|---|
| Water | 19 (pH 3.3) |
| Buffer pH 2 (citrate/HCl) | 21 (pH 2.0) |
| Buffer pH 3 (citrate/HCl) | 12 (pH 3.0) |
| Buffer pH 4 (citrate/HCl) | 11 (pH 4.0) |
| 0.01N HCl | 24 (pH 2.0) |
| 20% HPβCD in water | 2100 (pH 1.6) |

### EXAMPLE 22

The stability of the crystal structure of Form K batch 1 was studied after storage of the compound for a period of four weeks at room temperature (RT) under 75% relative humidity (RH), 50° C. and 40° C./75% RH. The stability of the crystal structure of Form K batch 2 was studied after storage of the compound for a period of four weeks at room temperature (RT) under <5%, 56% and 75% relative humidity (RH), 50° C. and 40° C./75% RH. The samples were analyzed with thermogravimetry (TG), differential scanning calorimetry (DSC) and infrared spectroscopy (IR). The results of the tests are reported in the following table.

#### TABLE 25

| compound | conditions | TG <80° C. | TG <125° C. | IR | DSC Max (° C.) | DSC Extra (° C.) | Appearance |
|---|---|---|---|---|---|---|---|
| Form K Batch 1 | 0 days | 0.47 | 0.15 | Ref | 143.7 | — | slightly orange |
| | RT/75% RH | 2.87 | 0.19 | ≈Ref | 146.6 | 64.3 | slightly orange |
| | 50° C. | 0.32 | 0.14 | ~Ref | 140.6 | 45.6 | orange |
| | 40° C./75% RH | 1.48 | 3.71 | — | — | — | brown oil |
| Form K Batch 2 | 0 days | 0.16 | 0.11 | Ref | 155.8 | — | slightly orange |
| | RT/<5% RH | 0.00 | 0.03 | ~Ref | 156.9 | — | slightly orange |
| | RT/56% RH | 0.27 | 0.03 | ±Ref | 154.6 | — | slightly orange |
| | RT/75% RH | 1.82 | 0.07 | ≈Ref | 149.2 | 67.0 | slightly orange |
| | 50° C. | 0.12 | 0.12 | ~Ref | 156.8 | — | slightly orange |
| | 40° C./75% RH | 3.26 | 3.08 | — | — | — | brown oil |

~Ref: identical with reference
±Ref: similar with reference
≈Ref: different with reference

Copy provided by USPTO from the PIRS Image Database on 01/10/2013

US 7,700,645 B2

**29**

EXAMPLE 23

In the chemical stability test program Form K batch 1 was stored for a period of 1 and 4 weeks under different conditions. These conditions were 40° C./75% RH, 50° C., RT/75% RH and 0.3da ICH light. Form K batch 2 was also stored for a period of 1 and 4 weeks under different conditions. These conditions were 40° C./75% RH, 50° C., RT/<5% RH, RT/56% RH, RT/75% RH and 0.3 da ICH light. The compound was analysed after storage by HPLC and by visual inspection. The HPLC method used in this study was HPLC method 909. The results of the tests are reported in the following table.

TABLE 26

| compound | conditions | HPLC Sum of impurities | | appearance | |
| --- | --- | --- | --- | --- | --- |
| | | 1 week | 4 weeks | 1 week | 4 weeks |
| Form K batch 1 | Reference | 3.57 | — | slightly-orange | — |
| | 0.3 da ICH light | 2.93 | — | slightly-orange | — |
| | 40° C./75% RH | 5.36 | >90* | slightly-orange | brown oil |
| | 50° C. | 3.99 | 27.53 | slightly-orange | orange |
| | RT/75% RH | — | 3.61 | — | slightly-orange |
| Form K Batch 2 | Reference | 1.50 | — | slightly-orange | — |
| | 0.3 da ICH light | 1.17 | — | slightly-orange | — |
| | 40° C./75% RH | 1.75 | >85* | slightly-orange | brown oil |
| | 50° C. | 1.46 | 1.25 | slightly-orange | slightly-orange |
| | RT/<5% RH | — | 1.58 | — | slightly-orange |
| | RT/56% RH | — | 1.45 | — | slightly-orange |
| | RT/75% RH | — | 1.46 | — | slightly-orange |

EXAMPLE 24

A randomized, placebo-controlled, double-blind, multiple dose escalation trial was performed to examine the safety, tolerability and pharmacokinetics of Form A after oral administration twice or three times daily, in healthy subjects. Four dosages of Form A (400 mg b.i.d., 800 mg b.i.d., 800 mg t.i.d., and 1200 mg t.i.d.) were tested in 4 panels of 9 healthy subjects. Within each panel, 6 subjects were treated with Form A and 3 subjects with placebo for 13 days with a single intake in the morning of day 14. (b.i.d.=twice daily, t.i.d.=three times daily).

Form A was readily absorbed and concentration-time profiles of Form A after repeated dosing were dependent on the dose administered. Steady-state plasma concentrations were reached generally within 3 days, although $C_{t4}$ (conc. at administration time) and $AUC_{24h}$ (area under de curve or bioavailability) decreased over time at all dose levels. $AUC_{24h}$ and $C_{av,ss}$ (conc. at average steady-state) were dose-proportional (daily dose) at 400 mg b.i.d., 800 mg t.i.d. and 1200 mg t.i.d., but was more than dose-proportional at 800 mg b.i.d. $C_{max}$ (maximum conc.) was dose-proportional with respect to dose per intake. Less than 2% of unchanged Form A was excreted in the urine at all dose levels.

The invention claimed is:

1. An ethanolate solvate of the compound (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl(1S,2R)-3-[[(4-aminophenyl)sulfonyl](isobutyl)amino]-1-benzyl-2-hydroxypropyl-carbamate, in which the ratio of compound to ethanol is about 1:1.

**30**

2. A solvate having the formula:

3. A composition comprising an ethanolate solvate of the compound (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl(1S,2R)-3-[[(4-aminophenyl)sulfonyl](isobutyl)amino]-1-benzyl-2-hydroxypropylcarbamate, in which the ratio of compound to ethanol is about 1:1, and an inert carrier.

4. The composition of claim 3 wherein the inert carrier is a pharmaceutically acceptable carrier.

5. The composition of claim 4 wherein the pharmaceutically acceptable carrier is a solid inert carrier.

6. A composition comprising a solvate having the formula:

and an inert carrier.

7. The composition of claim 6 wherein the inert carrier is a pharmaceutically acceptable carrier.

8. The composition of claim 7 wherein the pharmaceutically acceptable carrier is a solid inert carrier.

\* \* \* \* \*



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
#### United States Patent and Trademark Office

#### February 05, 2013

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *7,126,015*
ISSUE DATE: *October 24, 2006*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R. GRANT
Certifying Officer

US007126015B2

(12) **United States Patent**
Kesteleyn et al.

(10) Patent No.: **US 7,126,015 B2**
(45) Date of Patent: **Oct. 24, 2006**

(54) **METHOD FOR THE PREPARATION OF HEXAHYDRO-FURO-[2,3-B]FURAN-3-OL**

(75) Inventors: **Bart Rudolf Romanie Kesteleyn**, Berlare (BE); **Dominique Louis Nestor Surleraux**, Machelen (BE); **Peter Jan Leonard Mario Quaedflieg**, Waalre (NL)

(73) Assignee: **Tibotec Pharmaceuticals Ltd.**, Dublin (IE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 288 days.

(21) Appl. No.: **10/489,059**

(22) PCT Filed: **Sep. 6, 2002**

(86) PCT No.: **PCT/EP02/10062**

§ 371 (c)(1),
(2), (4) Date: **Mar. 9, 2004**

(87) PCT Pub. No.: **WO03/022853**

PCT Pub. Date: **Mar. 20, 2003**

(65) **Prior Publication Data**

US 2004/0249175 A1    Dec. 9, 2004

(30) **Foreign Application Priority Data**

Sep. 10, 2001    (EP) ..................................... 01203416

(51) **Int. Cl.**
*C07D 493/06*    (2006.01)

(52) **U.S. Cl.** ....................................................... 549/464

(58) **Field of Classification Search** ................. 549/464
See application file for complete search history.

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | 94/26749 | * 11/1994 |
| WO | WO 95/06030 | 3/1995 |
| WO | WO 99/67417 | 12/1999 |
| WO | WO 01/25240 A1 | 4/2001 |

OTHER PUBLICATIONS

Schreiber et al., Tetrahed. Letter, (1986), vol. 27(23), pp. 2575-2578.*
Schreiber et al., Tetrahed. Letter, (1988), vol. 29(51), pp. 6689-6692.*
Arun K. Ghosh et al., Nonpeptidal P2 Ligands for HIV Protease Inhibitors: Structure-Based Design, Synthesis, and Biological Evaluation, J. Med. Chem., 1996, 39, pp. 3278-3290.
M. Pezechk et al., A New Route to Perhydro- and Tetrahydro-Furo-2,3b Furans via Radical Cyclisation, Tetrahydron Letters, vol. 27, No. 32, pp. 3715-3718, 1986.
M. Uchiyama et al., Stereoselective synthesis of optically active perhydrofuro[2,3-b]furan derivatives, Tetrahedron Letters 42 (2001) pp. 4653-4656.

* cited by examiner

*Primary Examiner*—Taofiq Solola
(74) *Attorney, Agent, or Firm*—Woodcock Washburn LLP

(57) **ABSTRACT**

The present invention relates to a method for the preparation of hexahydro-furo[2,3-b]furan-3-ol as well as novel intermediates for use in said method. More in particular the invention relates to a stereoselective method for the preparation of hexahydro-furo[2,3-b]furan-3-ol, and to a method amenable to industrial scaling up.

**25 Claims, No Drawings**

DEFs-JT(Daru) 038279
DTX-0007 (Page 2 of 25)

A00372

US 7,126,015 B2

**1**

# METHOD FOR THE PREPARATION OF HEXAHYDRO-FURO-[2,3-B]FURAN-3-OL

## CROSS REFERENCE TO RELATED APPLICATIONS

This Application is a 35 U.S.C. § 371 national phase application of PCT/EP02/10062, with an international filing date of Sep. 6, 2002, which claims priority to application EP 01203416.1, filed on Sep. 10, 2001, all of which are incorporated herein by reference in their entirety.

The present invention relates to a method for the preparation of hexahydro-furo[2,3-b]furan-3-ol as well as novel intermediates for use in said method. More in particular the invention relates to a stereoselective method for the preparation of hexahydro-furo[2,3-b]furan-3-ol, and to a method amenable to industrial scaling up.

Hexahydro-furo[2,3-b]furan-3-ol is an important pharmacological moiety present in the structure of retroviral protease inhibitors such as those described in Ghosh et al. in *J. Med. Chem.* 1996, 39(17), 3278–3290, EP 0 715 618, WO 99/67417, and WO 99/65870. Said publications are hereby incorporated by reference.

Several methods for the preparation of hexahydro-furo[2, 3-b]furan-3-ol (formula (7))

7

HO

are known. Ghosh et al. in *J. Med. Chem.* 1996, 39(17), 3278–3290, describe an enantioselective synthesis to obtain both (3R,3aS,6aR) and (3S,3aR,6aS) hexahydro-furo[2,3-b]furan-3-ol in optically pure form starting from 3(R)-diethyl malate and 3(S)-diethyl malate respectively. This process comprises several steps such as an allylation step using lithium diisopropyl amide, followed by a reduction step, and further a Swern oxidation step followed by an ozonolytic cleavage and a hydroboration step using 9-borabicyclo [3.3.1]nonane (9-BBN). Ghosh et al. also disclose a racemic synthesis of both the (3R,3aS,6aR) and (3S,3aR,6aS) enantiomers of hexahydrofuro[2,3-b]furan-3-ol followed by an enzymatic resolution of the final product. This latter synthesis starts from 2,3-dihydrofuran and comprises the step of treating said intermediate with N-iodosuccinimide and allyl alcohol followed by a radical cyclisation in the presence of a catalyst i.e. cobaloxime. An ozonolytic cleavage followed by a reduction step furnished the racemic hexahydro-furo [2,3-b]furan-3-ol. Optically active compound (3R,3aS,6aR) hexahydro-furo[2,3-b]furan-3-ol is obtained after enzymatic resolution followed by silica gel chromatography. Pezeck et al. *Tetrahedron Lett.* 1986, 27, 3715–3718 also describes a route for the synthesis of hexahydro-furo[2,3-b]furan-3-ol using ozonolysis. Hexahydro-furo[2,3-b]furan-3-ol is also described as an intermediate in the synthesis of optically active perhydrofuro[2,3-b]furan derivatives (Uchiyama et al., *Tetrahedron Lett.* 2001, 42, 4653–4656.). The key step in this procedure is the oxyselenenylation of 2,3-dihydrofuran. This procedure is suitable for use at the laboratory level, yet not amenable for scaling up. Although the two synthetic routes described by Ghosh et al. provide (3R,3aS,6aR) and (3S,3aR,6aS) hexahydro-furo[2,3-b]furan-3-ol in reason-

**2**

able yields and high enantiomeric excess, they both are only feasible on a laboratory scale, but, for a number of reasons, are not amenable to industrial scaling up. For example, these known routes suffer from the disadvantage of utilizing expensive materials, heavy metals and rare compounds, such as the N-iodosuccinimide, the catalyst cobaloxime, lithium diisopropyl amide and 9-BBN. The necessary ozonolysis step has the disadvantage of producing highly reactive and shock-sensitive ozonides and peroxides making this step too dangerous to be applied on industrial scale. Furthermore ozonolysis as well as Swern oxidation are highly exothermic and, as a consequence, have to be performed at very low temperatures. The racemic route needs an enzymatic resolution in the final step of the synthesis followed by silica gel purification. Furthermore, the racemic route suffers from the disadvantage of a low overall mass balance, originating from the fact that the resolution step, leading to the final enantiomerically pure compound, occurs in the last step of the synthesis whereby only a maximum of 50% yield of desired enantiomer can be obtained. Both art-known routes also produce a lot of waste such as solvents and salts in washings operations. Thus, these known methods are not suitable for the production of optically pure stereoisomers of hexahydro-furo[2,3-b]furan-3-ol on an industrial scale.

The main object of the present invention is to provide an improved method for producing hexahydro-furo[2,3-b]furan-3-ol, when compared to the art-known methods and their drawbacks. It is another object to provide a method for the synthesis of hexahydro-furo[2,3-b]furan-3-ol, which is suitable for industrial scaling-up. A further object of the present invention is to provide with a stereoselective method comprising steps wherein the stereochemistry of intermediates or final compounds is controlled, which allows the synthesis of the stereoisomers of hexahydro-furo[2,3-b]furan-3-ol. Another further object is to provide with a method which allows the production of hexahydro-furo[2,3-b]furan-3-ol in an overall yield equal or higher than for the above-described methods and with an enantiomeric excess higher than 50%. Another object of the present invention is to provide with a process for manufacturing hexahydro-furo[2,3-b]furan-3-ol which is produced from readily available starting materials and reagents. Another object of the present invention is to provide with novel intermediate compounds, which are useful as precursors in the synthesis of hexahydro-furo[2, 3-b]furan-3-ol.

The authors of the present invention have surprisingly found a novel and inventive method for the synthesis of stereoisomeric mixtures or stereoisomerically pure forms of hexahydro-furo[2,3-b]furan-3-ol.

Thus, the present method involves the synthesis of hexahydro-furo[2,3-b]furan-3-ol starting from an intermediate of formula (1) wherein $P^1$ and $P^2$ represent each independently a hydrogen, a hydroxy-protecting group or may together form a vicinal-diol protecting group, transforming said intermediate of formula (I) into a nitromethane

1

$$P^1O \qquad \qquad OP^2 \qquad \qquad H$$
$$\qquad\qquad\qquad\qquad O$$

derivative of formula (3) wherein $R^1$ represents alkyl, aryl or aralkyl, $R^2$ represents hydrogen or C(==O)OR$^3$, R$^3$ repre-

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

**3**

sents an alkyl, aryl or aralkyl, or $R^3$, if present, and $R^1$ taken together with the atoms to which they are attached may form a 5 to 8-membered cyclic group which may be optionally substituted with alkyl, aralkyl, or aryl,

3

subsequently transforming said nitromethane derivative into a tetrahydrofuran derivative of formula (6) wherein $OR^4$ represents an alcoholate such as an alkyloxy group, by for instance, making use of a Nef reaction,

6

and then transforming the intermediate of formula (6) into hexahydro-furo[2,3-b]furan-3-ol of formula (7) by way of an intramolecular cyclisation reaction.

7

The above method has the further advantage of using readily available starting material, such as an O-protected glyceraldehyde. The reagents further used in said method are safe and available in bulk. Furthermore, each step of said method provides with the desired compound in good yield. Moreover, each step of said method can be performed stereoselective, which allows the synthesis of pure stereoisomeric forms of said compounds when using, where appropriate, optically pure starting material and reagents. Thus, the method according to the present invention is amenable to industrial scaling-up.

In a preferred embodiment, the present invention relates to a method for the synthesis of hexahydro-furo[2,3-b]furan-3-ol of formula (7), which comprises the steps of:

a) condensing an intermediate of formula (1)

1

resulting in an α,β-unsaturated ester of formula (2), wherein $P^1$, $P^2$, $R^1$ and $R^2$ are defined as above,

**4**

2

b) reacting said ester of formula (2) with nitromethane resulting in an intermediate of formula (3),

3

c) submitting said intermediate of formula (3) to a Nef reaction leading to intermediates of formula (4) and (4')

4

4'

d) transforming said intermediates of formula (4) and (4') into an intermediate of formula (6) and,

6

e) converting intermediate of formula (6) to the compound of formula (7) by an intramolecular cyclisation reaction.

In a more preferred embodiment, the present invention relates to a method for the synthesis of hexahydro-furo[2,3-b]furan-3-ol of formula (7), which comprises the steps of:

a) condensing an intermediate of formula (1) with a suitable oxycarbonylmethylene reagent of formula $CHR^5R^5$—C (==O)—$OR^1$ wherein $R^1$ and $R^2$ are defined as above and $R^5$ represents a hydrogen, a carboxylic ester, a phosphonium salt or a phosphonate ester,

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

DEFs-JT(Daru) 038281
DTX-0007 (Page 4 of 25)

US 7,126,015 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

resulting in an α,β-unsaturated ester of formula (2), wherein $P^1$, $P^2$, $R^1$ and $R^2$ are defined as above,

b) reacting said ester of formula (2) with nitromethane resulting in an intermediate of formula (3),

c) submitting said intermediate of formula (3) to a Nef reaction by treating it with a base and subsequently with a strong acid resulting in a mixture of intermediates of formula (4) and (4'), wherein $R^4$ is as defined above,

d) only in case $R^2$ is different from hydrogen, decarboxy-lating the intermediates of formula (4) and (4') thus forming intermediates of formula (5) and (5') respectively,

e) reducing intermediates of formula (4) and (4') wherein $R^2$ is hydrogen, or intermediates of formula (5) and (5') with a suitable reducing agent resulting in intermediate of formula (6) and,

f) converting intermediate of formula (6) to the compound of formula (7) by an intramolecular cyclisation reaction.

The order of the above mentioned steps in said process may be different from the alphabetical order cited above. For example, step (a) and (b) of said process may be inverted provided that an oxycarbonylmethylene reagent of formula $CHR^2R^8$—$(==O)$—$OR^1$ is used instead of one of formula $CHR^2R^5$—$C(==O)$—$OR^1$ whereby $R^8$ differs from $R^5$ in that $R^8$ can not form a Wittig or Horner-Emmons reagent such as a phosphonium salt or a phosphonate ester. Also, in case $R^2$ is hydrogen, a reduction of the $C(==O)$—$OR^1$ moiety analo-gous to the one described in step e) may be performed prior to the Nef reaction of step (c).

Oxycarbonylmethylene reagents of formula $CHR^2R^5$—$C(==O)$—$OR^1$ wherein $R^5$ represents a carboxylic ester are for instance dicarboxylic esters of formula $R^1O$—$C(==O)$—$CHR^2$—$C(==O)$—$OR^1$. Oxycarbonylmethylene reagents of formula $CHR^2R^5$—$C(==O)$—$OR^1$ wherein $R^5$ represents a phosphonium salt may for instance have the formula $(R^6)_3$ $P$=$CR^2$—$C(==O)$—$OR^1$ wherein $R^6$ is alkyl, aryl or aralkyl. Oxycarbonylmethylene reagents of formula $CHR^2R^5$—$C(==O)$—$OR^1$ wherein $R^5$ represents $(R^7O)_2P$ $(==O)$— may for instance have the formula $(R^7)_2P(==O)$—$CHR^2$—$C(==O)$—$OR^1$ wherein $R^7$ is alkyl, aryl or aralkyl.

Suitably, the invention relates to a method wherein $P^1$ and $P^2$ together form a vicinal-diol protecting group, and par-ticularly, the vicinal-diol protecting group is an acid labile protecting group that remains unaffected during the base treatment step of the Nef reaction. Preferably, said vicinal-

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

DEFs-JT(Daru) 038282
DTX-0007 (Page 5 of 25)

US 7,126,015 B2

7

diol protecting group is selected from the group consisting of methylene, diphenylmethylene, ethylidene, 1-t-butylethylidene, 1-phenylethylidene, (4-methoxyphenyl)ethylidene, 2,2,2-trichloroethylidene, isopropylidene, cyclopentylidene, cyclohexylidene, cycloheptylidene, benzylidene, p-methoxybenzylidene, 2,4-dimethoxybenzylidene, 3,4-dimethoxybenzylidene and 2-nitrobenzylidene. In a most preferred embodiment, $P^1$ and $P^2$ together form a dialkyl methylene such as a isopropylidene or a 3-pentylidene radical.

Interesting vicinal-diol protecting groups are those protecting groups that do not cause an additional stereogenic center in the intermediates of formula (1), (2) and (3).

Suitably, $R^1$ and $R^3$ each independently are $C_{1-8}$alkyl, aryl or aryl$C_{1-6}$alkyl, in particular, $C_{1-6}$alkyl, more in particular, $R^1$ and $R^3$ each independently are methyl, ethyl, propyl, isopropyl, n-butyl, isobutyl, sec-butyl, tert-butyl and pentyl, and preferably, $R^1$ and $R^3$ each independently are methyl, ethyl or tert-butyl.

$R^1$ and $R^3$ when taken together, denoted as —$R^1$—$R^3$—, preferably are —$CH_2$— or —$CH_2$—$CH_2$— optionally substituted with $C_{1-6}$alkyl, aryl or aryl$C_{1-6}$alkyl.

Suitably, $R^4$ is a $C_{1-8}$alkyl, in particular, $R^4$ is methyl, ethyl, propyl, isopropyl, n-butyl, isobutyl, sec-butyl, tert-butyl and pentyl, and preferably, $R^4$ is methyl or ethyl.

In a preferred embodiment, the present invention relates to a stereoselective process for the preparation of pure stereoisomers of hexahydro-furo[2,3-b]furan-3-ol, in particular, (3R,3aS,6aR) hexahydro-furo[2,3-b]furan-3-ol.

The term "hydroxy-protecting group" as used herein refers to a substituent which protects hydroxyl groups against undesirable reactions during synthetic procedures such as those O-protecting groups disclosed in Greene, "Protective Groups In Organic Synthesis," (John Wiley & Sons, New York (1981)). O-protecting groups comprise substituted methyl ethers, for example, methoxymethyl, benzyloxymethyl, 2-methoxyethoxymethyl, 2-(trimethylsilyl)ethoxymethyl, t-butyl, benzyl and triphenylmethyl; tetrahydropyranyl ethers; substituted ethyl ethers, for example, 2,2,2-trichloroethyl; silyl ethers, for example, trimethylsilyl, t-butyldimethylsilyl and t-butyldiphenylsilyl; and esters prepared by reacting the hydroxyl group with a carboxylic acid, for example, acetate, propionate, benzoate and the like.

The term "vicinal-diol protecting group" as used herein refers to protecting groups in the acetal or ketal form and in the orthoester form. Specific examples of the protecting group in the acetal or ketal radical form include methylene, diphenylmethylene, ethylidene, 1-t-butylethylidene, 1-phenylethylidene, (4-methoxyphenyl)ethylidene, 2,2,2-trichloroethylidene, isopropylidene, cyclopentylidene, cyclohexylidene, cycloheptylidene, benzylidene, p-methoxybenzylidene, 2,4-dimethoxybenzylidene, 3,4-dimethoxybenzylidene, 2-nitrobenzylidene, etc. and specific examples of the protecting group in the orthoester form include methoxymethylene, ethoxymethylene, dimethoxymethylene, 1-methoxyethylidene, 1-ethoxyethylidene, 1,2-dimethoxy-ethylidene, alpha-methoxybenzylidene, 1-(N,N-dimethylamino) ethylidene, alpha-(N,N-dimethylamino) benzylidene, 2-oxacyclopentylidene, etc.

The term "alkyl" as used herein alone or as part of a group refers to saturated monovalent hydrocarbon radicals having straight or branched hydrocarbon chains or, in the event that at least 3 carbon atoms are present, cyclic hydrocarbons or combinations thereof and contains 1 to 20 carbon atoms ($C_{1-20}$alkyl), suitably 1 to 10 carbon atoms ($C_{1-10}$alkyl), preferably 1 to 8 carbon atoms ($C_{1-8}$alkyl), more preferably 1 to 6 carbon atoms ($C_{1-6}$alkyl), and even more preferably 1

8

to 4 carbon atoms ($C_{1-4}$alkyl). Examples of alkyl radicals include methyl, ethyl, propyl, isopropyl, n-butyl, isobutyl, sec-butyl, tert-butyl, pentyl, isoamyl, hexyl, cyclopropyl, cyclobutyl, cyclopentyl, cyclohexyl and the like. The term "aryl" as used herein, includes an organic radical derived from an aromatic hydrocarbon by removal of one hydrogen, and include monocyclic and polycyclic radicals, such as phenyl, biphenyl, naphthyl. The term "aralkyl" as used herein, relates to a group of the formula aryl-alkyl in which alkyl and aryl are as defined above. Examples of aralkyl radicals include benzyl, phenethyl and the like.

The term "alkoxy" as used herein alone or as part of a group refers to an alkyl ether radical wherein the term alkyl is as defined above. Examples of alkyl ether radical include methoxy, ethoxy, n-propoxy, isopropoxy, n-butoxy, iso-butoxy, sec-butoxy, tert-butoxy and the like.

The term "stereoselective process" and "stereoselective step" as used herein, essentially relates to a process or a step wherein when using an optically pure starting material, pure stereoisomeric forms of the compounds of interest are obtained at the end of said process or said step.

The term "stereochemically isomeric forms" or "stereoisomeric forms", as used herein, defines all possible isomeric as well as conformational forms, made up of the same atoms bonded by the same sequence of bonds but having different three-dimensional structures which are not interchangeable, which compounds or intermediates obtained during said process may possess. Unless otherwise mentioned or indicated, the chemical designation of a compound encompasses the mixture of all possible stereochemically isomeric forms which said compound may possess. Said mixture may contain all diastereoisomers, enantiomers and/or conformers of the basic molecular structure of said compound. More in particular, stereogenic centers may have the R- or S-configuration, diastereoisomers may have a syn- or anti-configuration, substituents on bivalent cyclic saturated radicals may have either the cis- or trans-configuration and alkenyl radicals may have the E or Z-configuration. All stereochemically isomeric forms of said compound both in pure form or in admixture with each other are intended to be embraced within the scope of the present invention.

Pure stereoisomeric forms of the intermediates of formula (1) and of the starting material or reagents as mentioned herein are defined as isomers substantially free of other enantiomeric or diastereomeric forms of the same basic molecular structure of said compounds, starting material or reagents. Suitably, the term "stereoisomerically pure" compounds, starting material or reagents relates to compounds, starting material or reagents having a stereoisomeric excess of at least 50% (i.e. minimum 75% of one isomer and maximum 25% of the other possible isomers) up to a stereoisomeric excess of 100% (i.e. 100% of one isomer and none of the other), preferably, compounds, starting material or reagents having a stereoisomeric excess of 75% up to 100%, more preferably, compounds, starting material or reagents having a stereoisomeric excess of 90% up to 100%, even more preferred compounds or intermediates having a stereoisomeric excess of 94% up to 100% and most preferred, having a stereoisomeric excess of 97% up to 100%. The terms "enantiomerically pure" and "diastereomerically pure" should be understood in a similar way, but then having regard to the enantiomeric excess, respectively the diastereomeric excess of the mixture in question.

Although the methods for preparing stereoisomerically pure compounds of formula (7) according to the present invention will advantageously employ stereoisomerically pure starting materials, it may be desirable to further purify

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

9

the compounds and intermediates by the application of art-known purification procedures. For instance, enantiomers may be separated from each other by the selective crystallization of their diastereomeric salts with optically active acids. Alternatively, enantiomers may be separated by chromatographic techniques using chiral stationary phases.

Despite the fact that hexahydro-furo[2,3-b]furan-3-ol has three stereogenic centers and theoretically 8 different stereoisomers should occur, only 4 stereoisomers are deemed to exist. This is due to the rigidity of the bicyclic ringstructure in hexahydro-furo-[2,3-b]furan-3-ol which causes the trans-fused stereoisomers thereof to be thermodynamically unfavorable. Only stereoisomers having a cis-fused configuration are thermodynamically stable, thus reducing the number of stereoisomers of hexahydro-furo[2,3-b]furan-3-ol to the following:

| Compound | configuration atom 3 | configuration atom 3a | configuration atom 6a | Stereochemical descriptor |
|---|---|---|---|---|
| 7.1 | R | S | R | (3R,3aS,6aR) |
| 7.2 | R | R | S | (3R,3aR,6aS) |
| 7.3 | S | R | S | (3S,3aR,6aS) |
| 7.4 | S | S | R | (3S,3aS,6aR) |

10

The method of the present invention may be further understood by reference to Scheme 1, wherein $P^1$ and $P^2$ represent each independently a hydrogen, a hydroxy-protecting group or may together form a vicinal-diol protecting group, $R^1$ represents a alkyl, aryl or aralkyl, $R^2$ represents a hydrogen or $COOR^3$, $R^3$ represents a alkyl, aryl or aralkyl, or $R^3$, if present, and $R^1$ taken together with the atoms to which they are attached may form a 6 to 8-membered cyclic group which may be optionally substituted with an alkyl, aryl or aralkyl; and $R^4$ represents alkyl.

Scheme 1 depicts a synthetic method for the synthesis of hexahydro-furo[2,3-b]furan-3-ol (7) starting with intermediate of formula (1) wherein, $P^1$ and $P^2$ represent each independently a hydrogen, a hydroxy-protecting group or may together form a vicinal-diol protecting group.

The above-mentioned hydroxy-protecting group and vicinal-diol protecting group can be readily cleaved by methods known in the art such as hydrolysis, reduction, etc., and are appropriately selected depending on the protecting group used. According to a more preferred embodiment, the vicinal-diol protecting group is an acid labile protecting group, wherein the term "acid labile" as used herein refers to vicinal-diol protecting groups that are readily cleaved using acidic conditions.

Scheme 1

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

DEFs-JT(Daru) 038284
DTX-0007 (Page 7 of 25)

A00377

US 7,126,015 B2

**11**                                **12**

-continued

Several of the protected glyceraldehydes of formula (1) used in the present invention are known compounds. Enantioselective as well as racemic versions of the synthesis of these protected glyceraldehyde derivatives have been described in the literature. For example, the preparation of 2,3-O-isopropylidene-S-glyceraldehyde is described in C. Hubschwerlen, *Synthesis* 1986, 962, the preparation of 2,3-O-isopropylidene-R-Glyceraldehyde is described in C. R. Schmid et al., *J. Org. Chem.* 1991, 56, 4056–4058, and the preparation of 2,3-O-isopropylidene-(R,S)-glyceraldehyde is described in A. Krief et al., *Tetrahedron Lett.* 1998, 39, 1437–1440. Said intermediate of formula (1) may be commercially available, or prepared prior to the reaction or formed in situ. According to a preferred embodiment, said compound is formed in situ.

In the first step of a preferred method for the preparation of a compound of formula (7), an $\alpha,\beta$-unsaturated ester of formula (2) is prepared from intermediate of formula (1) by a condensation reaction with an appropriate oxycarbonylmethylene reagent in the presence of a suitable solvent at a suitable temperature.

In general, any reaction procedure introducing a $=C(R^2)$ $C(=O)OR^1$ moiety in the starting material of formula (1) can be utilized. For instance, such conversion of intermediate of formula (1) to intermediate of formula (2) can be performed using a reaction procedure that makes use of an oxycarbonylmethylene moiety of formula $CHR^5R^5\text{—C}$ $(=O)OR^1$ such as, for example, via a Wittig reaction using phosphorus ylides of the formula $(R^6)_3P=CR^2\text{—C}(=O)$ $OR^1$; via a Horner-Emmons reaction using phosphonates of the formula $(R^{7O})_2P(=O)\text{—}CHR^2\text{—C}(=O)OR^1$, in the presence of a base; or via a Knoevenagel type of condensation reaction using malonate derivatives of the formula $R^1OC(=O)\text{—}CHR^2\text{—C}(=O)OR^1$, in the presence of a base, wherein $R^1$, $R^2$, $R^6$ and $R^7$ have the same meaning as that defined above. Another alternative may be to use a Reformatsky reagent such as oxycarbonylmethylenezinc halides. Yet another alternative involves the use of precursors of $\text{—}C(=O)\text{—}O\text{—}$ moieties such as a cyanide. These types of reaction procedures are described in detail in Jerry March's handbook of Advanced Organic Chemistry.

According to a preferred embodiment, said oxycarbonylmethylene reagent is selected from the group consisting of (alkoxycarbonylmethylene)phosphoranes such as, for example, (carbethoxymethylene)triphenylphosphorane,

methoxycarbonylmethylene)triphenylphosphorane, (carbethoxymethylene)trimethylphosphorane, (carbethoxymethylene)triethylphosphorane, (carbethoxymethylene)tricyclohexylphosphorane or (carbethoxymethylene) tributylphosphorane; alkyl dialkylphosphonoacetates and alkyl diarylphosphonoacetates such as, for example, triethylphosphonoacetate, ethyl dimethylphosphonoacetate, methyl diethylphosphonoacetate or ethyl diphenylphosphonoacetate; alkyl malonate esters such as, for example, dimethylmalonate, diethyl malonate, di-tert-butyl malonate and malonic acid cyclic isopropylidene ester.

Examples of suitable bases include, but are not limited to, alkylamines and aromatic amines such as: pyridine, pyrrolidine, piperidine, morpholine, N-methylmorpholine, 1,4-diazabicyclo[2.2.2]octane (DABCO), 1,3-diazabicyclo [3.4.0]non-5-ene (DBN), 1,8-diazabicyclo[5.4.0]undec-7-ene (DBU), N,N-diethylaniline, N,N-dimethylaminopyridine(s), quinoline, triethylamine and N,N-diisopropylethylamine; as well as sodium-, potassium- or lithium hydride; sodium-, potassium-, lithium- or cesium carbonate; sodium-, potassium-, lithium- or cesium carbonate and alkoxide bases such as sodium, lithium or potassium methoxides, ethoxides, butoxides, t-butoxides, and t-amyloxides; butyllithium and lithium diisopropylamide.

Suitable solvents for this reaction are any hydrocarbon, ether, halogenated hydrocarbon, or aromatic solvents known in the art for the condensation reaction. These would include, but are not limited to, pentane, hexane, heptane, toluene, xylene(s), benzene, mesitylene(s), t-butylmethyl ether, dialkyl ethers (ethyl, butyl), diphenyl ether, chlorobenzene, methylene chloride, chloroform, carbon tetrachloride, acetonitrile, dichlorobenzene, dichloroethane, trichloroethane, cyclohexane, ethylacetate, isopropyl acetate, tetrahydrofuran, dioxane, methanol, ethanol, and isopropanol.

In case a Knoevenagel type of condensation is employed, it may also be convenient to use an acid anhydride, such as acetic anhydride, as a dehydrating agent in the condensation reaction. The fact that water is removed from the reaction medium will push the equilibrium of the reaction towards the $\alpha,\beta$-unsaturated diester resulting in the completion of the reaction. Acetic anhydride may be replaced by tetrahydrofurane, n-methyl-morpholine, or isopropylacetate. The addition of a base may increase the yield of the Knoevenagel reaction. Examples include the use of alkylamines such as

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

13

triethylamine. Preferably, such base is added in small amounts. Alternatively, a Knoevenagel reaction may be performed using TiCl₄.

Suitable temperature for the condensation reaction ranges between room temperature and refluxing temperature of the suitable solvent, a condition readily determined by one skilled in the art of organic synthesis. It is preferred to run the reaction at room temperature.

Depending on the type of condensation reaction and on the reagent used, $\alpha,\beta$-unsaturated mono-esters of formula (2) (when $R^2$=H) or $\alpha,\beta$-unsaturated di-esters of formula (2) (when $R^2$=COOR³) can be synthesized. $\alpha,\beta$-Unsaturated mono-esters of formula (2) ($R^2$=H) and di-esters whereby $R^3$ and $R^1$ are different, can be obtained with E or Z stereochemistry around the double bond. The E/Z isomer ratio depends from the applied condensation reagent and the reaction conditions, the reaction solvent in particular.

The next step of such preferred method consists of the addition of nitromethane as a formyl group precursor, to the $\alpha,\beta$-unsaturated ester intermediate of formula (2), in the presence of a suitable base, resulting in a 1,4-addition product of formula (3). This nitromethane addition step occurs diastereoselectively. The newly formed stereocenter at carbon atom number 3 (C-3) of the pentanoate skeleton is controlled by the stereochemistry at the oxygenated position at carbon atom number 4 (C-4).

The syn/anti ratio is further controlled by the type of $\alpha,\beta$-unsaturated ester (2) (E or Z, mono- or di-ester), the type of base used and the reaction conditions such as reaction solvent and reaction temperature. The syn addition product usually predominates.

Examples of suitable bases include but are not limited to DBN (1,3-Diazabicyclo [3.4.0]non-5-ene) and DBU (1,8-Diazabicyclo [5.4.0]undec-7-ene), triethylamine, pyrrolidine, piperidine, morpholine, N-methylmorpholine, 1,4-di-azabicyclo[2.2.2]-octane (DABCO), dimethylaminopyridine (DMAP), sodium hydroxide, potassium hydroxide, lithium hydroxide, calciumdihydroxide, bariumdihydroxide, sodium carbonate, potassium carbonate, sodium hydride, potassium hydride, sodium methoxide, lithium methoxide, sodium ethoxide, potassium ethoxide, lithium tert-butoxide, sodium tert-butoxide, potassium tert-butoxide, tetrabutylammonium fluoride, tetrabutylammonium hydroxide. Examples of suitable solvents include, but are not limited to pentane, hexane, heptane, toluene, xylene(s), benzene, mesitylene(s), t-butyl-methyl ether, dialkyl ethers (ethyl, butyl), diphenyl ether, chlorobenzene, methylene chloride, chloroform, carbon tetrachloride, acetonitrile, dichlorobenzene, 1,2-dichloroethane, and 1,1,1-trichloroethane, cyclohexane, tetrahydrofuran, dioxane, methanol, ethanol, isopropanol, dimethyl sulfoxide (DMSO), dimethyl formamide (DMF), N-methylpyrrolidone (NMP). The reaction temperature is set in the range of about 0 to about 100° C., preferably in the range of about 10 to about 50° C., more preferably at about room temperature.

Intermediate of formula (3) may be alternatively prepared by a process comprising the steps of first condensing inter-

14

mediate of formula (1) with nitromethane, resulting in an intermediate of formula (8) and secondly, reacting said intermediate of formula (8) with a suitable oxycarbonylmethylene reagent of formula $CHR^2R^8—C(=O)—OR^1$ resulting in said intermediate of formula (3).

It is to be understood that a person skilled in the art may employ other art-known reaction procedures to arrive at intermediate of formula (3) starting from an intermediate of formula (1).

The next step in the methods according to the present invention is to form an intermediate of formula (6) starting from an intermediate of formula (3).

One way of achieving this involves the transformation of an intermediate of formula (3) to the corresponding formyl derivative via a Nef reaction. This step is performed by treating intermediate of formula (3) with first a base and then with a strong acid resulting in intermediates of formula (4) and (4').

The Nef reaction is usually defined as the conversion of a primary or a secondary nitroalkane into the corresponding carbonyl compound (N. Kornblum Organic reactions 1962, 12, 101 and H. W. Pinnick Organic Reactions 1990, 38, 655). In the classical procedure, the nitroalkane is deprotonated with a base in $\alpha$-position of the nitro function, followed by acid-catalyzed hydrolysis of the intermediate 'nitronate' salt via addition to a strong acid present in excess, to give the carbonyl derivative.

Suitable bases may be selected by one of skill in the art of organic synthesis. Suitable bases include, but are not limited to, inorganic bases such as alkali metal, alkali earth metal, and ammonium hydroxides and alkoxides. Suitable bases also include, but are not limited to, metal amides and alkyl lithiums. Examples of suitable strong bases are lithium diisopropyl amide, sodium amide, sodium methoxide, potassium t-butoxide, sodium butoxide, calcium dihydroxide, barium dihydroxide, methyllithium, butyllithium, hexyllithium, phenyllithium, and quaternary alkylammonium hydroxides, DBN (1,3-Diazabicyclo [3.4.0]non-5-ene) and DBU (1,8-Diazabicyclo [5.4.0]undec-7-ene), 1,4-diazabicyclo[2.2.2]octane (DABCO), potassium carbonate, sodium carbonate.

The term "strong acid" as used herein, refers to any conventional strong acid such as the strong, inorganic acids, e.g., hydrochloric acid and sulfuric acid, and the strong organic acids, e.g., benzenesulfonic acid and trichloroacetic acid. The preferred strong acids are concentrated sulfuric acid or hydrochloric acid.

The use of a strong acid causes the deprotection of the acid labile protecting groups, thus forming a diol intermediate of which the primary alcohol condenses with the formyl group to a cyclic hemi-acetal of formula

Using anhydrous conditions and an alcohol solvent such as methanol or ethanol (generically denoted as $R^4—OH$) the cyclic methyl acetal or ethyl acetal of the formyl group is obtained instead. Besides this classical base/acid procedure, Nef-conversions can be accomplished using a broad variety of oxidizing as well as reducing agents known in the art.

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

<table>
<tr><td>15</td><td>16</td></tr>
</table>

According to a preferred embodiment, suitable alcohol solvents are selected from the group consisting of methanol, ethanol and isopropanol.

Said Nef reaction can be carried out at temperatures that range between about −78° C. and about 55° C., the preferred temperatures lying between about −18° C. and about room temperature. The reaction times can range up to about 24 hours and suitably range between about 1 hour and about 24 hours.

According to a preferred embodiment, intermediate of formula (3) is treated with a base and subsequently added to a concentrated strong acid alcoholic solution leading to the conversion of the nitromethane radical of intermediate of formula (3) to a formyl group. Concurrently, the acid treatment also catalyses the cleavage of the protecting groups $P^1$ and $P^2$, resulting in an intramolecular acetal formation leading to intermediates of formula (4) and (4'). The $R^4$ substituent in the intermediates of formula (4) and (4') originate from the alcohol $R^4$—OH.

The bicyclic intermediate of formula (4) is the expected reaction product from the intermediate of formula (3) in a syn configuration while intermediate of formula (4') is the expected reaction product from the intermediate of formula (3) in an anti configuration. The trans-configuration of the substituents at carbon atom number 3 (C-3) and carbon atom number 4 (C-4) on the tetrahydrofuran ring of intermediate of formula (4') prevents the second lactone ring formation as in intermediate of formula (4).

At this stage of the synthesis procedure, when $R^2$ is $COOR^3$, a decarboxylation step is implemented. Said decarboxylation step consists of the removal of —C(=O)—$OR^3$ in intermediates of formula (4) and (4'). In a preferred embodiment, the decarboxylation step is performed by treating intermediates of formula (4) and (4') with a suitable base, such as sodium hydroxide or potassium hydroxide, under heating conditions, resulting, after acidification, in the intermediates of formula (5) and (5') respectively. Concurrently, $R^1$ in intermediate of formula (4') is replaced by hydrogen as can be noted in the formula in intermediate of (5').

The bicyclic lactone derivative of formula (5) is the expected reaction product from intermediate of formula (4), while the carboxylic acid derivative of formula (5') is the expected reaction product from intermediate of formula (4'). The trans-configuration of the substituents at C-3 and C-4 on the tetrahydrofuran ring of intermediate formula (5') prevents the second lactone ring formation as in intermediate of formula (5).

At this stage of the synthesis procedure, the intermediates (4) and (4') or the intermediates (5) and (5') can be separated from one another using art-known chromatographic techniques. In addition to chromatographic techniques, the intermediate of formula (5') can be separated from lactone of formula (5) by means of acid/base extraction. Typically, intermediates of formula (5') can be extracted with a basic aqueous solution such as a sodium bicarbonate solution from a mixture of intermediates of formula (5) and (5') in an organic non-water mixable solvent. Suitable organic non-

water miscible solvents are any hydrocarbon, ether, halogenated hydrocarbon, or aromatic solvents. These would include, but are not limited to, pentane, hexane, heptane, toluene, xylene(s), benzene, mesitylene(s), t-butylmethyl ether, dialkyl ethers (ethyl, butyl), diphenyl ether, chlorobenzene, dichloromethane, chloroform, carbon tetrachloride, acetonitrile, dichlorobenzene, 1,2-dichloroethane, 1,1,1-trichloroethane, ethyl acetate and isopropyl acetate.

In order to improve the extraction yield of lipophilic compounds, water soluble salts may be added to the mixture prior to extraction. A preferable salt includes NaCl. The addition of water miscible salts may increase the yield of the extraction.

Alternatively, a mixture of intermediates (4) and (4'), or intermediates (5) and (5') can be used without further separation, particularly when they were stereoselectively synthesized.

In the following step, intermediates of formula (4) and/or (4') wherein $R^2$ is hydrogen, or the intermediates of formula (5) and/or (5') are reduced with a suitable reducing agent, resulting in intermediate of formula (6).

The reduction step can conveniently be accomplished by treatment of intermediates of formula (4) and/or (4') wherein $R^2$ is hydrogen, or (5) and/or (5') with metal hydrides such as borane complexes, diborane, lithium borohydride, sodium borohydride-LiCl, diisobutylaluminum hydride or lithium aluminum hydride in suitable anhydrous solvents. Examples of suitable anhydrous solvent include but are not limited to dichloromethane, toluene, xylene, benzene, pentane, hexane, heptane, petrol ether, 1,4-thioxane, diethyl ether, diisopropyl ether, tetrahydrofuran, 1,4-dioxane, 1,2-dimethoxyethane, and in general any anhydrous solvent susceptible to being used in a chemical reduction process using the reagents cited above. Said reduction step can be carried out at temperatures that ranges between about −78° C. and about 55° C., the preferred temperatures lying between about −18° C. and about room temperature. The reaction time may range up to about 24 hours, and suitably vary between about 2 and about 24 hours. According to a preferred embodiment, the reduction step is performed using lithium borohydride in tetrahydrofuran. Alternatively, reduction may be accomplished using catalytic hydrogenation. Catalytic hydrogenation may suitably be performed using $H_2$ in combination with metals, including Pd. Pt, Ni and carbon.

In case $R^2$ is a hydrogen, an alternative route may be followed in preparing an intermediate of formula (6) from an intermediate of formula (3). In any of these two alternatives, a Nef procedure is employed. Thus, the conversion of intermediate of formula (3) to intermediate of formula (6), may be alternatively performed by a process comprising the steps of first reducing intermediate of formula (3) with a suitable reducing agent, resulting in an intermediate of formula (9) and secondly submitting the obtained intermediate of formula (9) to a Nef reaction by treatment with a base and then with a strong acid resulting in an intermediate of formula (6).

The last step consists of converting an intermediate of formula (6) to the desired compound of formula (7) by a cyclisation reaction. The cyclisation reaction occurs via an intramolecular transacetalisation reaction and can be performed in any acid-compatible organic solvent or a combination of a water miscible solvent and water and in the presence of a strong organic or inorganic acid. Said reaction is suitably performed by treatment of intermediate of formula (6) with a catalytic amount of a strong acid. In a preferred embodiment, the strong acid is selected from group consisting of hydrochloric acid and sulfuric acid. Said

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

DEFs-JT(Daru) 038287
DTX-0007 (Page 10 of 25)

A00380

US 7,126,015 B2

17

cyclisation step can be carried out at temperatures that range between about −78° C. and about 55° C., the preferred temperatures lying between about −18° C. and about room temperature.

Pure stereoisomeric forms of the above-mentioned compounds and intermediates may be synthesized by said above-described synthesis procedures. For instance, enantiomerically pure starting materials will be employed.

According to a preferred embodiment said above-described method is suitable for the preparation of (3R,3aS, 6aR) hexahydro-furo[2,3-b]furan-3-ol of formula (7.1)

7.1

In a first step, an intermediate of formula (1a) is reacted with a suitable oxycarbonylmethylene reagent as described above resulting in an α,β-unsaturated ester of formula (2a) wherein $P^1$, $P^2$, $R^1$ and $R^2$ have the same meaning as that defined above. The reaction conditions are the same as those described previously for the condensation step. Intermediate (1a) may be preheated prior to a Knoevenagel reaction. Suitable preheating temperatures range from 40–70° C., preferably 50–65° C. The intermediate may then be cooled before the reaction. The order of adding the reagents may influence the yield of the reaction. For instance, in case a Knoevenagel type of condensation is used, it may be convenient to add the oxycarbonylmethylene reagent to intermediate (1a) prior to adding the dehydrating reagent. The manner of adding the dehydrating reagent may influence the yield of the reaction. The dehydrating reagent may be added slowly i.e. by dosing. After adding the dehydrating reagent, the reaction may be performed at temperatures in the range 20–60° C., preferably in the range 35–55° C.

1a

2a

In a second step, said ester of formula (2a) is reacted with nitromethane in the presence of a suitable base, resulting in intermediates of formula (3a) and (3b), wherein $R^1$, $R^2$, $P^1$ and $P^2$ are defined as above.

18

3a

3b

The reaction conditions are the same as those previously described for the nitromethane addition step. The reaction is preferably carried out in an alcoholic solvent in the presence of a non-nucleophilic base such as DBU or sodium methoxide, at room temperature. Depending on the starting material and reaction conditions, this step can be performed stereoselectively.

The next step consists in the transformation of intermediates of formula (3a) and (3b) to the corresponding formyl derivatives via a Nef reaction. According to a preferred embodiment intermediates of formula (3a) and (3b) are treated with a base and subsequently added to a concentrated strong acid alcoholic solution leading to the conversion of the nitromethane radical of intermediates of formula (3a) and (3b) to a formyl group. Concurrently, the acid treatment also catalyses the cleavage of the protecting groups $P^1$ and $P^2$, resulting in an intramolecular acetal formation leading to intermediates of formula (4a) and (4'a), respectively, wherein $R^1$, $R^2$ and $R^4$ are defined as above. Examples of a strong acid alcoholic solution include sulfuric acid in $CH_3OH$. The temperature during treatment with a strong acid alcoholic solution is room temperature or lower. Preferably, the temperature is below 15° C., more preferably, the reaction is performed below 10° C.

4a

4'a

The reaction conditions are the same as those previously described for the Nef reaction.

At this stage of the synthesis procedure, when $R^2$ is $COOR^3$, a decarboxylation step is implemented for inter-

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

19

mediates of formula (4a) and (4'a). The decarboxylation step consists of the removal of the —C(=O)—OR$^3$ in intermediates of formula (4a) and (4'a). In a preferred embodiment the decarboxylation step is performed by treating intermediates of formula (4a) and (4'a) with a suitable base, such as sodium hydroxide or potassium hydroxide, under heating conditions, resulting, after acidification, in the decarboxylated products of formula (5a) and (5'a) respectively. Concurrently, R$^1$ in intermediate of formula (4') is replaced by hydrogen, resulting in a carboxylic acid moiety in intermediate (5'a).

Decarboxylation can also be performed using halides. Suitable reagents including KI, NaCl, LiI, LiBr and KBr, prefembly KI. KI can be dissolved in a solvent such as N-methylpyrrolidone.

Alternatively, decarboxylation can be performed in buffered aqueous solutions. A suitable buffer includes citric acid buffer at pH~6. The decarboxylation reaction is then performed at elevated temperatures, suitably between 50° C. and reflux temperature. Preferably, the reaction temperature is above 80° C.

The decarboxylated mixture can be neutralized using strong acidic resins including DOWEX-H+® or mild acidic resins including AMBERJET®. Said resins can also be used for the cyclization reaction. Mild acidic resins of type AMBERJET® are also suitable for neutralizing the reaction.

5a

5'a

In the next step, intermediate of formula (4'a), when R$^2$ is a hydrogen atom, or the intermediate of formula (5'a) is separated from intermediate of formula (4a) or (5a) respectively, by means of chromatography or acid/base extraction. Intermediate of formula (4'a) or (5'a) can be extracted from the reaction mixture using art-known methods such as with a basic aqueous solution like sodium bicarbonate solution in an organic non-water miscible solvent. The reaction is further carried out with isolated intermediate of formula (4a) or (5a).

Intermediate (5a) can be crystallized using organic solvents. Suitable solvents include isopropylalcohol, ethylacetate, ethanol and methylisobutylketon. An interesting solvent is isopropylalcohol.

In the next step, intermediate of formula (4a) or (5a) is reduced with a suitable reducing agent resulting in intermediate of formula (6a), wherein R$^4$ is defined as above.

20

6a

The reduction step can be accomplished using the same conditions as previously described for the reduction step. According to a preferred embodiment, this step is performed using lithium borohydride in tetrahydrofuran. Alternatively, the reduction can be performed using LiAlH$_4$ or NaBH$_4$ in the presence of LiCl. Catalytic hydrogenation can also be used. Catalytic hydrogenation can be performed using hydrogen gas in the presence of a suitable catalyst. Examples of catalysts suitable for catalytic hydrogenation including nickel, palladium and platina. Suitably, the catalyst is present on an inert surface such as charcoal.

The last step consists of converting intermediate of formula (6a) to the compound of formula (7.1) by a cyclisation reaction. The cyclisation reaction occurs via an intramolecular transacetalisation reaction. Said reaction is preferably performed by treatment of intermediate of formula (6a) with a catalytic amount of a strong acid. In a preferred embodiment, the strong acid is selected from group consisting of hydrochloric acid and sulfuric acid. In one embodiment, the cyclization is performed at low temperature. Preferably, the temperature is below 15° C, more preferably, below 5° C. Following acid treatment, the mixture is neutralized using a suitable base and compound 7.1 is isolated.

Said above-described method is suitable for the preparation of (3R,3aR,6aS) hexahydro-furo[2,3-b]furan-3-ol of formula (7.2), by following the sequence of reactions described above.

7.2

The reaction conditions of the condensation step, and the nitromethane addition step are controlled such that intermediate of formula (3b) is obtained in the highest possible yield, by changing for example the type of base used, the solvent and the reaction temperature. After the Nef reaction, the next step consists of isolating intermediates of formula (4'a) or (5'a) and then reducing said intermediate to obtain intermediate of formula (6b),

6b

which is further cyclised to compound of formula (7.2).

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

DEFs-JT(Daru) 038289
DTX-0007 (Page 12 of 25)

A00382

US 7,126,015 B2

**21**

Similarly, (3S,3aR,6aS) hexahydro-furo[2,3-b]furan-3-ol of formula (7.3), can be obtained by a method according to the present invention, starting from optically pure intermediate of formula (1b).

7.3

1b

In a first step an intermediate of formula (1b) is reacted with a suitable oxycarbonylmethylene reagent resulting in an α,β-unsaturated ester of formula (2b), wherein $P^1$, $P^2$, and $R^2$ have the same meaning as that defined above.

2b

The reaction conditions are the same as that previously described for the condensation step.

In a second step, said ester of formula (2b) is reacted with nitromethane in the presence of a suitable base, resulting in intermediates of formula (3c) and (3d), wherein $R^1$, $R^2$, $P^1$ and $P^2$ are defined as above.

3c

3d

The reaction conditions are the same as that previously described for the nitromethane addition step. The reaction is preferably carried out in an alcoholic solvent in the presence of a non-nucleophilic base such as DBU, at room temperature.

The next step consists in the transformation of intermediates of formula (3c) and (3d) to the corresponding formyl derivatives via a Nef reaction. According to a preferred embodiment intermediates of formula (3c) and (3d) are treated with a base and subsequently added to a concentrated strong acid alcoholic solution. The acid treatment also catalyses the cleavage of the protecting groups $P^1$ and $P^2$,

**22**

resulting in an intramolecular acetal formation leading to intermediates of formula (4b) and (4'b), respectively, wherein $R^1$, $R^2$ and $R^4$ are defined as above.

4b

4'b

The reaction conditions are the same as those previously described for the Nef reaction.

At this stage of the synthesis procedure, when $R^2$ is $COOR^3$, a decarboxylation step is implemented for intermediates of formula (4b) and (4'b). The decarboxylation step consists of the removal of the —C(=O)—$OR^1$ in intermediates of formula (4b) and (4'b). In a preferred embodiment the decarboxylation step is performed by treating intermediates of formula (4b) and (4'b) with a suitable base, such as sodium hydroxide or potassium hydroxide, under heating conditions, resulting, after acidification, in the decarboxylated products of formula (5b) and (5'b) respectively. Concurrently, $R^1$ in intermediate of formula (4'b) is replaced by hydrogen, resulting in a carboxylic acid moiety in intermediate (5'b).

5b

5'b

In the next step, intermediate of formula (4'b) wherein $R^2$ is a hydrogen atom, or intermediate of formula (5'b), is separated from intermediate of formula (4b) or (5b) by means of chromatography or acid/base extraction. The reaction is further carried out with intermediate of formula (4'b) or (5'b).

In the next step, intermediate of formula (4'b) or (5'b) is reduced with a suitable reducing agent resulting in intermediate of formula (6c), wherein $R^4$ has the same meaning as that defined above.

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

| 23 | 24 |

6c

3.1

The reduction step can be accomplished using the same reaction conditions as those previously described for the reduction step.

The last step consists of converting intermediate of formula (6c) to the compound of formula (7.3) by a cyclisation reaction. The cyclisation reaction occurs via an intramolecular transacetalisation reaction. Said reaction is preferably performed by treatment of intermediate of formula (6c) with a catalytic amount of a strong acid in water. In a preferred embodiment, the strong acid is selected from group consisting of hydrochloric acid and sulfuric acid.

The preparation of (3S, 3aS, 6aR) hexahydro-furo[2,3-b] furan-3-ol of formula (7.4) can suitably be performed,

7.4

by following the sequence of reactions described above for the synthesis of compound of formula (7.3) and controlling the conditions of the condensation step, and the nitromethane addition step, such that intermediate of formula (3b) is obtained as the major isomer, by changing for example the type of base used, the solvent and the reaction temperature. After the Nef reaction, the next step consists of isolating intermediates of formula (4b) or (5b) and then reducing said intermediate to obtain intermediate of formula (6d),

6d

which is further cyclised to compound of formula (7.4).

Another aspect of the present invention relates to new intermediates and methods of producing the same. The present invention relates to new intermediates having the formula (3), wherein $P^1$ and $P^2$ are defined as above, $R^2$ is $COOR^3$, and $R^1$ and $R^3$ are defined as above, said intermediates having the formula (3.1).

Said intermediates of formula (3.1) are obtainable by the methods of the present invention.

Also intermediates of formula (3) wherein $R^2$ is hydrogen, said intermediates having the formula (3.2), are deemed novel provided that when $P^1$ and $P^2$ taken together form an isopropylidene, $R^1$ is other than methyl or ethyl.

3.2

According to a preferred embodiment the present invention relates to intermediates having the stereochemistry (3a), (3b), (3c) and (3d), wherein $P^1$, $P^2$, $R^1$, $R^2$, $R^3$ have the same meaning as that defined above.

3a

3b

3c

3d

According to a more preferred embodiment the present invention relates to intermediates of formula (3a), (3b), (3c) and (3d), wherein $P^1$, $P^2$ form together a vicinal-diol protecting group, $R^2$ is $COOR^3$, said intermediates having the

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

25                  26

formula (3a.1), (3b.1), (3c.1) and (3d.1) respectively. Suitably, $R^1$ and $R^3$ each independently are selected from the group consisting of methyl, ethyl, propyl, isopropyl, n-butyl, isobutyl, sec-butyl, tert-butyl and pentyl, more interestingly, $R^1$ and $R^3$ are the same.

-continued

3a.1

3b.1

3c.1

3d.1

3b.1a

3c.1a

3d.1a

Another preferred embodiment of the present invention relates to intermediates of formula (3a), (3b), (3c) and (3d), wherein $P^1$, $P^2$ form together a vicinal-diol protecting group, $R^2$ is H, said intermediates having the formula (3a.2), (3b.2), (3c.2) and (3d.2) respectively. Suitably, $R^1$ is selected from the group consisting of methyl, ethyl, propyl, isopropyl, n-butyl, isobutyl, sec-butyl, tert-butyl and pentyl.

In a yet more preferred embodiment the present invention relates to intermediates having the formula (3a.1), (3b.1), (3c.1) and (3d.1), wherein $P^1$ and $P^2$ taken together form a dialkyl methylene, said intermediates having the formula (3a.1a), (3b.1a), (3c.1a) and (3d.1a) respectively. Suitably, $R^1$ and $R^3$ each independently are selected from the group consisting of methyl, ethyl, propyl, isopropyl, n-butyl, isobutyl, sec-butyl, tert-butyl and pentyl, more interestingly, $R^1$ and $R^3$ are the same. In a more preferred embodiment, $R^1$ and $R^3$ each independently are methyl, ethyl or tert-butyl and more interestingly, $R^1$ and $R^3$ are the same.

3a.1a

3a.2

3b.2

3c.2

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

DEFs-JT(Daru) 038292
DTX-0007 (Page 15 of 25)

A00385

US 7,126,015 B2

27

28

-continued

3d.2

In yet another preferred embodiment the present invention relates to intermediates having the formula (3a.2), (3b.2), (3c.2) and (3d.2), wherein P¹ and P² taken together form a dialkyl methylene, said intermediates having the formula (3a.2a), (3b.2a), (3c.2a) and (3d.2a) respectively. Suitably, R¹ is selected from the group consisting of methyl, ethyl, propyl, isopropyl, n-butyl, isobutyl, sec-butyl, tert-butyl and pentyl, more interestingly, R¹ is methyl, ethyl or tert-butyl.

3a.2a

3b.2a

3c.2a

3d.2a

Intermediates of formula (3c.2a) and (3d.2a) wherein R¹ is ethyl have been described in Patrocinio et al., Synthesis (1994), 5, 474–6.

Suitable, in the intermediates of formula (3a.1a), (3b.1a), (3c.1a) and (3d.1a), and (3a.2a), (3b.2a), (3c.2a) and (3d.2a), alkyl is $C_{1-6}$alkyl, preferably, $C_{1-4}$alkyl, and most preferably methyl or ethyl.

In general, the synthesis of the stereoisomeric forms of formula (3a), (3b), (3c) or (3d) can be performed by starting with optically pure intermediate of formula (1a) or (1b) respectively.

Yet another aspect of the invention relates to intermediates of formula (4), (4'), (5) and (5') which are deemed novel. Said intermediates are obtainable by a method according to the invention.

According to a preferred embodiment the present invention relates to intermediates of formula (5a), (5'b), wherein R⁴ is selected for the group consisting of methyl, ethyl, propyl, isopropyl, n-butyl, isobutyl, sec-butyl, tert-butyl and pentyl. In a more preferred embodiment, R⁴ is methyl or ethyl.

The synthesis of intermediates of formula (5a) or (5'b) are conveniently carried by starting with optically pure intermediate of formula (1a) or (1b) respectively.

The compounds of formula (7) find their particular use in the preparation of a medicament. According to a preferred embodiment, the present compounds of formula (7) are used as precursor in the preparation of anti-viral drugs, in particular anti-HIV drugs, more in particular HIV protease inhibitors.

The compound of formula (7.1) and all intermediates leading to the formation of said stereoisomerically pure compound are of particular interest in preparing HIV protease inhibitors as disclosed in WO 95/24385, WO 99/65870, WO 00/47551, WO 00/76961 and U.S. Pat. No. 6,127,372, WO 01/25240, EP 0 715 618 and WO 99/67417 all incorporated herein by reference, and in particular, the following HIV-protease inhibitors.

[(1S,2R)-2-hydroxy-3-[[(4-methoxyphenyl)sulfonyl](2-methylpropyl)amino]-1-(phenyl-methyl)propyl]-carbamic acid (3R,3 aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl ester (HIV protease inhibitor 1);

[(1S,2R)-3-[[(4-aminophenyl)sulfonyl](2-methylpropyl)amino]-2-hydroxy-1-(phenyl-methyl)propyl]-carbamic acid (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl ester (HIV protease inhibitor 2);

[(1S,2R)-3-[(1,3-benzodioxol-5-ylsulfonyl)(2-methylpropyl)amino]-2-hydroxy-1-(phenylmethyl)propyl]-carbamic acid (3R,3aS,6aR)-hexahydrofuro[2,3-b]furan-3-yl ester (HIV protease inhibitor 3), or any pharmaceutically acceptable addition salt thereof.

Thus, the present invention also relates to HIV protease inhibitors 1, 2, 3 or any pharmaceutically acceptable salt or prodrug thereof, obtained by using a compound of formula (7.1) prepared according to the present invention in the chemical synthesis of said HIV protease inhibitors. Such chemical synthesis is disclosed in the art, for instance in WO 01/25240, EP 0 715 618 and WO 99/67417.

The following examples are meant to be illustrative of the present invention. These examples are presented to exemplify the invention and are not to be construed as limiting the invention's scope.

EXPERIMENTAL SECTION

General Procedures:

Proton NMR spectra were recorded on a Bruker Avance DPX 400 MHz NMR spectrometer. Proton chemical shifts are reported in ppm (δ) relative to internal tetramethylsilane (TMS, δ0.0). Analytical thin-layer chromatography (TLC) was performed using silica gel 60 A $F_{254}$ precoated plates (0.25 mm thickness). TLC Rf values are reported. Visual-

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

29

ization was accomplished by staining with a solution of KMnO₄ in acetone or with a solution of vaniline in a 1/1 mixture of water and concentrated sulfuric acid. Analytical gas chromatography (GC) was performed using a DB-XLB column. Analytical chiral GC was performed using a cyclodex-β column. Detection on both columns was accomplished by employing a flame ionization detector. All solvents and reagents were retrieved by commercial suppliers and used without any treatment or purification prior to their use. L-5,6-O-Isopropylidene-gulono-1,4-lactone was prepared from L-ascorbic acid according to C. Hubschwerlen *Synthesis* 1986, 962–964.

30

(determined by $^1$H NMR). The $^1$H NMR spectrum was consistent with that of the desired structures.

Synthesis of I.4

Compound (I.3, 0.1 mol, 20 g, E/Z: 96/4) and nitromethane (0.11 mol, 6.7 g) were dissolved in acetonitrile (200 ml) and cooled to 0° C. A solution of 1,8-diazabicyclo-[5.4.0]undec-7-ene (0.15 mol, 22.8 g) in acetonitrile (50 ml) was added dropwise over 5 minutes. The reaction mixture was stirred overnight at room temperature. Then, most the solvent was removed under reduced pressure. The oily residue was diluted with water (200 ml) and extracted with

Example I

Synthesis of I.3

Potassium periodate (0.25 mol, 57.5 g) and potassium hydrogen carbonate (0.25 mol, 25 g) were slurried in water (100 ml) and cooled to 0° C. L-5,6-O-Isopropylidene-gulono-1,4-lactone (I.1, 0.12 mol, 26 g) was dissolved in tetrahydrofuran (100 ml) and water (100 ml) and added dropwise over 20 minutes to the periodate solution at 0° C. After addition, the mixture was stirred at room temperature for 4 hours and then cooled to 0° C. The solids were removed by filtration and washed with tetrahydrofuran (100 ml). The combined filtrates containing 2,3-O-isopropylideneglyceraldehyde (I.2) were used without evaporation of the solvents in the next step. Triethylphosphonoacetate (0.114 mol, 32 g) was added to the combined filtrates at 0° C. Potassium carbonate (0.6 mol, 83 g) was dissolved in water (160 ml) and added dropwise over 1 hour at 0° C. to the reaction solution. The two-phase solution was stirred for 4 hours. The organic phase was separated and the aqueous phase was extracted with ethyl acetate (3×100 ml). The combined organic phases were washed with water (2×100 ml) and the solvent was evaporated to give a pale yellow oil. This crude oil was filtered through silica, eluting with n-hexane/ethyl acetate (10/90) to yield compound (I.3, 14.3 g, yield=60%) as an E/Z mixture in a ratio 96/4

ethyl acetate (3×200 ml). The combined organic layers were washed with 5% hydrochloric acid (200 ml) and then with a saturated sodium hydrogen carbonate solution. Drying over MgSO₄ and evaporation under reduced pressure afforded intermediate (I.4, 9 g, yield=34%) in a syn/anti ratio of 75/25 (determined by $^1$H NMR). The $^1$H NMR spectrum was consistent with that of the desired structures.

Synthesis of I.5

A solution of compound (I.4, 0.03 mol, 7.8 g, syn/anti: 75/25) in tetrahydrofuran (100 ml) was cooled to 0° C. Lithium borohydride (0.045 mol, 1 g) was added in portions over 30 minutes and the mixture was stirred overnight at room temperature. The reaction was quenched by the slow addition of a saturated ammonium chloride solution (100 ml) under cooling (0° C.), extracted with ethyl acetate (10×50 ml) and dried over MgSO₄. Evaporation under reduced pressure afforded compound (I.5, 6.02 g, yield=92%) as an oil. The $^1$H NMR spectrum was consistent with that of the desired structures.

Synthesis of hexahydro-furo[2,3-b]furan-3-ol (7.1 and 7.2):

To a stirred solution of compound (I.5, 0.011 mol, 2.4 g, syn/anti mixture) in isopropanol (20 ml), potassium tert-butoxide (0.0132 mol, 1.5 g) was added portionwise over 30

DEFs-JT(Daru) 038294
DTX-0007 (Page 17 of 25)

A00387

minutes at room temperature. The basic solution was transferred to an addition funnel and added dropwise over 10 minutes to a cooled (0° C.) vigorously stirred mixture of concentrated (37%) hydrochloric acid (0.0275 mol, 2.3 ml) in isopropanol (20 ml). The reaction mixture was stirred for 2 hours at room temperature, then triethylamine (0.022 mol, 2.2 g) was added dropwise causing Et₃N.HCl salts to precipitate. The reaction mixture was diluted with ethyl acetate (50 ml) and filtered to remove the salts. The solvent was evaporated under reduced pressure. The residue was diluted with ethyl acetate (50 ml) causing more Et₃N.HCl salts to precipitate. The salts were removed by filtration and the solvent was evaporated under reduced pressure. The residual oil was further purified by silica gel plug filtration with ethyl acetate as eluent to afford a mixture of compounds (7.1/7.2, 1.03 g, yield=72%) in a ratio of 78/22 (determined by ¹H NMR). Analytical samples of the pure compounds (7.1, $Rf_{7.1}$=0.27) and (7.2, $Rf_{7.2}$=0.15) were obtained by means of silica gel chromatography using ethyl acetate as the solvent.

(3R,3aS,6aR)-Hexahydro-furo[2,3-b]furan-3-ol (7.1): ¹H NMR (400 MHz, CDCl₃): δ 1.80–1.91 (1H, m), 2.28–2.34 (1H, m), 2.83–2.89 (1H, m), 3.11 (1H, broad s), 3.35–3.59 (1H, m), 3.85–3.98 (3H, m), 4.38–4.45 (1H, m), 5.66 (1H, d, J=5.2 Hz).

(3R,3aR,6aS)-Hexahydro-furo[2,3-b]furan-3-ol (7.2): ¹H NMR (400 MHz, CDCl₃): δ 1.68–1.75 (1H, m), 2.12–2.23 (1H, m), 2.42 (1H, broad s), 2.79–2.85 (1H, m), 3.81–3.91 (3H, m), 3.964.01 (1H, m), 4.23 (1H, m), 5.89 (1H, d, J=4.9 Hz).

The reaction mixture was stirred overnight at room temperature, then transferred into an addition funnel and added dropwise over 30 minutes to a cooled (0° C.) vigorously stirred solution of concentrated sulfuric acid (0.03 mol, 0.8 ml) in ethanol (10 ml). After stirring at room temperature overnight, the reaction mixture was diluted with water (100 ml) and extracted with dichloromethane (3×50 ml). The combined organic phases were washed with a saturated sodium hydrogen carbonate solution (100 ml), dried over MgSO₄ and evaporated under reduced pressure to afford a crude mixture of products (II.3/II.3', 1.27 g, yield=58%) as an oil. Using ¹H NMR analysis, compound II.3 was identified as the major component in the product mixture. The crude product mixture was used as such in the next step.

Synthesis of (7.1) and (7.2) from Crude (II.3/II.3'):

The crude product mixture (II.3/II.3') (0.006 mol, 1.27 g) was dissolved in tetrahydrofuran (20 ml) and cooled to 0° C. Lithium borohydride (0.009 mol, 200 mg) was added in portions over 5 minutes and the mixture was stirred overnight at room temperature. The solvent was evaporated under reduced pressure and the residue was dissolved in isopropanol (25 ml). Concentrated (37%) hydrochloric acid (1 ml) was added dropwise and the mixture was stirred for 4 hours at room temperature. Then, triethylamine (5 ml) was added dropwise causing Et₃N.HCl salts to precipitate. The reaction mixture was diluted with ethyl acetate (100 ml) and filtered to remove the salts. The solvent was evaporated under reduced pressure. The residue was diluted with ethyl acetate (100 ml) causing more Et₃N.HCl salts to precipitate.

Example II

Synthesis of II.3 and II.3'

A solution of nitromethane (0.011 mol, 0.67 g) in ethanol (5 ml) was cooled to 0° C. 1,8-Diazabicyclo[5.4.0]undec-7-ene (0.015 mol, 2.3 g) in ethanol (5 ml) was added dropwise and the reaction was stirred for 30 minutes. Compound (II.1, 0.01 mol, 2 g, E/Z=96/4) was dissolved in ethanol (5 ml) and added dropwise to the solution at 0° C.

The salts were removed by filtration and the solvent was evaporated under reduced pressure. The residual oil was further purified by silica gel plug filtration with ethyl acetate as eluent to afford a mixture of compounds (7.1/7.2, 0.68 g, yield 87%) in a ratio of 87/13 (determined by ¹H NMR). The ¹H NMR spectrum was consistent with that of the desired structures.

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

**33**                                                                 **34**

Example III

Synthesis of III.2

2,3-O-Isoproylidene-glyceraldehyde (III.1, 0.1 mol, 65 g of a 20% w/w solution of III.1 in tetrahydrofuran) was mixed with dimethyl malonate (0.15 mol, 19.8 g), acetic anhydride (0.3 mol, 30.6 g) and pyridine (0.05 mol, 3.95 g) and stirred at room temperature overnight. The reaction mixture was evaporated under reduced pressure. The residual oil was diluted with dichloromethane (200 ml), washed with a saturated sodium hydrogen carbonate solution (3×100 ml), dried over MgSO$_4$ and evaporated under reduced pressure. Fractionated distillation afforded (III.2), bp: 88–94° C./0.03 mmHg, 14.2 g, yield=58%, purity by GC: 83%). TLC (ethyl acetate/hexane 20/80): Rf$_{(III.2)}$=0.43 (KMnO$_4$ in acetone). $^1$H NMR (400 MHz, CDCl$_3$): δ 1.39 (3H, s), 1.45 (3H, s), 3.71–3.75 (1H, m), 3.81 (3H, s), 3.83 (3H, s), 4.25–4.29 (1H, m), 4.90–4.95 (1H, m), 7.04 (1H, d, J=7.1 Hz).

Synthesis of (III.3):

To a stirred solution of (III.2, 2 mmol, 490 mg) in methanol (20 ml), was added first nitromethane (2.2 mmol, 134 mg) and then 1,8-diazabicyclo[5.4.0]undec-7-ene (0.5 mmol, 76 mg) and the reaction mixture was stirred at room temperature for 3 hours. The solvents were evaporated under reduced pressure. The residual oil was diluted with a saturated ammonium chloride solution, extracted with dichloromethane, dried over MgSO$_4$ and evaporated under reduced pressure to afford crude (III.3) as a syn/anti mixture in ratio's ranging from 90/10 to 97/3 (determined by $^1$H NMR). TLC (ethyl acetate/hexane 20/80): Rf$_{(III.3)}$=0.29 (KMnO$_4$ in acetone): the syn/anti-(III.3) isomers do not appear as separated spots on TLC. The structure of compound syn-(III.3)

was identified from the $^1$H NMR spectrum of the crude reaction mixture: syn-(III.3): $^1$H NMR (400 MHz, CDCl$_3$): δ 1.23 (3H, s), 1.31 (3H, s), 3.13 (1H, −quintet, J=5.5 Hz), 3.55 (1H, d, J=5.5 Hz), 3.66–3.69 (overlapping, 1H, m), 3.68 (3H, s), 3.70 (3H, s), 4.05 (1H, dd, J$_1$=8.8 Hz, J$_2$=7 Hz), 4.22 (1H, −q, J=5.9 Hz), 4.60 (1H, dd, J=14.8 Hz, J$_2$=4.8 Hz), 4.67 (1H, dd, J$_1$=14.8 Hz, J$_2$=5.9 Hz).

Synthesis of (III.4/III.4') from (III.2):

To a stirred solution of (III.2, 0.05 mol, 12.2 g) in methanol (50 ml), was added first nitromethane (0.055 mol, 3.36 g) and then 1,8-diazabicyclo[5.4.0]undec-7-ene (5 mmol, 760 mg) and the reaction mixture was stirred at room temperature for 4 hours. The reaction mixture was cooled to 0° C. and a solution of sodium methoxide 2N in methanol (0.05 mol, 25 ml) was added dropwise over 30 minutes. The mixture was then transferred to an addition funnel and added dropwise over 45 minutes to a cooled vigorously stirred solution of concentrated sulfuric acid (0.125 mol, 12 g) in methanol (25 ml), keeping the internal temperature <10° C. During the addition, a white precipitate was formed and the suspension was stirred overnight at room temperature. The reaction mixture was evaporated to half of the original volume and then slowly poured into a cooled saturated sodium hydrogen carbonate solution (200 ml), keeping the internal temperature <10° C. The aqueous phase was extracted with ethyl acetate (4×50 ml), the combined extracts were washed with water (50 ml) and evaporated to afford a mixture of crude compounds (III.4/III.4', 8.37 g, yield=78%) as an oil. The $^1$H NMR spectrum of the crude reaction mixture showed compound (III.4) to be the major reaction product. An analytical sample of compound (III.4)

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

35                                                          36

was obtained by flash chromatography on silica gel, eluting with ethyl acetate/hexane 50/50. TLC (ethyl acetate/hexane 50/50): $Rf_{(III.4)}$=0.45 (KMnO$_4$ in acetone). (III.4): $^1$H NMR (400 MHz, CDCl$_3$): δ 3.33 (3H, s), 3.39 (1H, dd, J=7.0 Hz J$_2$=4.4 Hz), 3.58 (1H, d, J=4.4 Hz), 3.82 (3H, s), 3.97 (1H, dd, J$_1$=11 Hz, J$_2$=3.9 Hz), 4.10 (1H, d, J=11 Hz), 4.95 (1H, s), 5.23 (1H, dd, J=7.0 Hz, J$_2$=3.9 Hz).

Synthesis of (III.5):

Potassium hydroxide (0.025 mol, 1.42 g) was dissolved in methanol (10 ml) and water (2 ml). A solution of crude (III.4/III.4', 0.023 mol, 5.2 g) in methanol (10 ml) was added and the reaction mixture was heated under reflux for 2 to 3 hours. TLC analysis indicated the complete conversion of all starting material (III.4/III.4') and the reaction mixture was concentrated under reduced pressure to ⅓ of the original volume. The residual solution was mixed with acetic acid (10 ml) and stirred at room temperature for 2 hours. Then, the reaction mixture was diluted with water (20 ml) and extracted with ethyl acetate (3×20 ml). The combined organic layers were washed with a saturated sodium hydro-

cooled on ice and quenched by addition of water (5 ml). The reaction mixture was evaporated under reduced pressure (bath temperature=40° C., P=200 mbar) until most of the tetrahydrofuran was evaporated and the residual aqueous solution was acidified with 2N hydrochloric acid to pH=0–1. The reaction mixture was stirred for 1 hour at room temperature, saturated with sodium chloride and extracted with ethyl acetate (5×20 ml). The combined organic layers were dried over MgSO$_4$ and evaporated under reduced pressure to give compound (7.1, 1.01 g, yield=71%) as a colorless oil. The structure of (7.1) was confirmed by the $^1$H NMR spectrum. The enantiomeric purity of compound (7.1) was determined by GC analysis of its acetate. Therefore, compound (7.1, 0.5 g) was mixed with acetic anhydride (2 g) and N,N-dimethyl-4-aminopyridine (100 mg) and stirred at room temperature overnight. The reaction mixture was diluted with hexane (50 ml) and washed with a saturated hydrogen carbonate solution (2×50 ml) and then with water (50 ml). Chiral GC analysis of the hexane solution allowed to determine the enantiomeric excess of compound (7.1) to be >99%.

Example IV

gen carbonate solution (20 ml), dried over MgSO$_4$ and evaporated under reduced pressure to afford compound (III.5, 2.35 g, yield=65%) as a solid. An analytical sample of compound (III.5) was obtained by recrystallisation from isopropanol to afford pure compound (III.5) as colorless needles. (EtOAc): $Rf_{(III.5)}$=0.49. (III.5): $^1$H NMR (400 MHz, CDCl$_3$): δ 2.51 (1H, dd, J$_1$=18.6 Hz, J$_2$=4.0 Hz), 2.84 (1H, dd, J=18.6 Hz, J$_2$=11.3 Hz), 3.00–3.06 (1H, m), 3.33 (3H, s), 3.95 (1H, dd, J$_1$=10.9 Hz, J$_2$=3.9 Hz), 4.10 (1H, d, J=10.9 Hz), 4.88 (1H, s), 5.14 (1H, dd, J$_1$=7.0 Hz, J$_2$=3.9 Hz).

Synthesis of (7.1) from (III.5):

To a cooled (0° C.) solution of compound (III.5, 0.011 mol, 1.88 g) in tetrahydrofuran (20 ml), lithium borohydride (0.017 mol, 370 mg) was added in portions over 10 minutes. The suspension was stirred overnight at room temperature until TLC analysis indicated the complete conversion of starting material (III.5). Then, the reaction mixture was

Synthesis of (IV.2)

2,3-O-Isopropylidene-glyceraldehyde (IV.1, 1654 mol, 1075 kg of a 20% w/w solution of (IV.1) in tetrahydrofuran) was mixed with dimethyl malonate (1 equiv., 1654 mol, 218 kg) and stirred at 20° C. for 3 hours. Pyridine (0.5 equiv., 827 mol, 65.5 kg) was added and the reaction mixture was heated to 45° C. At this temperature, a solution of acetic anhydride (3 equiv, 4962 mol, 506 kg) in tetrahydrofuran (506 kg) was added over a period of 4 hours. After heating for 12 hours at 45° C., most of the solvent (1200 kg) was removed by vacuum evaporation and the residual oil was diluted with toluene (2500 kg). The organic solution was added over a period of 2 hours to a vigorously stirred aqueous sodium hydrogen carbonate suspension previously prepared by mixing solid sodium hydrogen carbonate (190 kg) with 1N sodium hydrogen carbonate (1760 kg). After phase separation, the aqueous phase was removed and the organic phase was washed with 1N sodium hydrogen car-

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

37 | 38

bonate (1760 kg). Then, most toluene was evaporated under reduced pressure to a residual amount of about 450 kg. Further removal of toluene and solvent switch to methanol was performed by azeotropic distillation with methanol by repeated (twice) addition of methanol (500 kg) and evaporation of the same amount (500 kg) under reduced pressure. Finally, methanol (830 kg) was added to yield intermediate IV.2 (1280 kg of a 23.6% solution in methanol). Intermediate IV.2 was used as such in the next step.

Synthesis of (IV.4/IV.4') from (IV.2):

Intermediate (IV.2) (503 mol, 520 kg of a 23.6% w/w of IV.2 in methanol) was mixed with nitromethane (1.1 equiv., 553 mol, 62 kg of a 55% w/w of nitromethane in methanol) and to the stirred reaction mixture 1,8-diazabicyclo[5.4.0] undec-7-ene (0.1 equiv., 50.3 mol, 7.6 kg) was added over a period of 30 minutes under cooling, keeping the internal temperature <25° C. Stirring was continued at room temperature for 3 hours. The reaction mixture was cooled to 0° C. and sodium methoxide 2N in methanol (1.1 equiv., 553 mol, 100 kg of a 30% w/w solution of sodium methoxide in methanol) was added dropwise over 30 minutes, keeping the internal temperature at 0° C. After 30 minutes at 0° C., the reaction mixture was dosed over a period of 1 hour to a cooled (0° C.), vigorously stirred solution of concentrated sulfuric acid (2.5 equiv. 1258 mol, 128 kg of 96% sulfuric acid) in methanol (200 kg), keeping the internal temperature <10° C. The reaction mixture was further cooled to 0° C. and added to a vigorously stirred, cooled (0° C.) biphasic system of ethyl acetate (450 kg) and 1N sodium hydrogen carbonate (1.9 equiv., 1905 kg) over a period of 1 hour, keeping the internal temperature <15° C. The reaction mixture was filtered to remove most of the precipitated sodium sulfate. After phase separation, the organic phase was collected and the aqueous phase was extracted four times with ethyl acetate (total amount of ethyl acetate: 2250 kg). The collected organic phases were washed with brine (300 kg of a 23% w/w sodium chloride solution) and evaporated under reduced pressure to a residual amount of 750 kg (containing ca. 66 kg of intermediate IV.4). Intermediate IV.4 was used as such in the next step.

Synthesis of (IV.5) from (IV.4)

To a stirred solution of (IV.4) (750 kg of a solution ca. 66 kg IV.4 in methanol) was added water (38 kg) and potassium hydroxide (553 mol, 68 kg of 45% aqueous potassium hydroxide) and the reaction mixture was heated to reflux for 2 hours. After rapid cooling to 35° C., acetic acid (830 mol, 46 kg of 96% acetic acid) was added and the reaction mixture was evaporated under reduced pressure over a period of 10 hours to a residual amount of ca. 200 kg. After cooling to room temperature, more acetic acid (354 kg) was added over a period of 1 hour. After stirring for 2 hour at room temperature, most acetic acid was removed by vacuum evaporation over a period of 10 hours to a residual amount of ca. 250 kg. Water (800 kg) was added and the aqueous solution was extracted three times with ethyl acetate (3×700 kg). The combined organic layers were washed twice with 1N sodium hydrogen carbonate (2×586 kg). A third washing with 1N sodium hydrogen carbonate was performed with pH control; 1N sodium hydrogen carbonate was added until a pH of 6.8–7.2 (ca. 410 kg 1N sodium hydrogen carbonate was used). A solvent switch from ethyl acetate to isopropanol was performed by subsequent evaporation of the organic solution under reduced pressure to a residual amount of 200 kg, addition of isopropanol (350 kg), evaporation of the organic solution under reduced pressure to a residual amount of 200 kg and addition of isopropanol (350 kg). The

reaction mixture was heated to 60–70° C. and isopropanol was further evaporated at that temperature under reduced pressure to a residual amount of ca. 144 kg. After filtration, the reaction mixture was cooled to 0° C. over a period of 4–5 hours, allowing crystallisation of intermediate (IV.5). Filtration and drying (vacuum drying at 40° C.) of the crystals yielded intermediate IV.5 (27 kg). Intermediate IV.5 was used as such in the next step.

Synthesis of (7.1):

To a solution of intermediate (IV.5) (180 mol, 30 kg) in tetrahydrofuran (160 kg), lithium borohydride (1.1 equiv., 198 mol, 43.1 kg of a solution of 10% lithium borohydride in tetrahydrofuran) was added over 30 minutes. The reaction mixture was heated to 50° C. over a period of 1 hour and stirred at that temperature for 2 hours. The obtained suspension was cooled to –10° C. and hydrochloric acid (1.2 equiv. relative to LiBH₄, 238 mol, 27.2 kg of 32% hydrochloric acid) was dosed over a period of 4 hours, keeping the internal temperature <–5° C. After stirring at –10° C. for an additional 2 hours, triethylamine (1.1 equiv. relative to HCl, 261 mol, 26.5 kg) was added over a period of 1 hour, while maintaining the internal temperature <0° C. A solvent switch to ethyl acetate was performed by distillation of the solvents under atmospheric pressure to a residual amount of ca. 100 kg, addition of ethyl acetate (360 kg) and further distillation of the tetrahydrofuran/ethyl acetate solvent mixture with continues addition of ethyl acetate to maintain a constant volume. This procedure was continued until a tetrahydrofuran/ethyl acetate ratio of 4:1 (checked by gas chromatography). The resulting mixture was cooled to 0° C., filtered and the filter cake was washed with two portions of ethyl acetate (2×30 kg). The collected filtrates were evaporated to yield compound (7.1) (18 Kg). The identity of compound 7.1 was confirmed using HPLC, NMR and chiral gas chromatography using reference samples from Example III.

What is claimed is:

1. A method for the synthesis of hexahydro-furo[2,3-b] furan-3-ol of formula (7) starting from an intermediate of formula (1) wherein P¹ and P² represent each independently a hydrogen, a hydroxy-protecting group or may together form a vicinal-diol protecting group,

$$P^1O \diagdown \begin{array}{c} OP^2 \\ | \end{array} \diagdown \begin{array}{c} H \\ \| \\ O \end{array}$$

1

transforming said intermediate of formula (1) into a nitromethane derivative of formula (3) wherein R¹ represents alkyl, aryl or aralkyl, R² represents hydrogen or C(=O)OR³, R³ represents alkyl, aryl or aralkyl, or R³, if present, and R¹ taken together with the atoms to which they are attached may form a 6 to 8-membered cyclic group which may be optionally substituted with alkyl, aralkyl, or aryl,

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

39 | 40

3

subsequently transforming said nitromethane derivative into a tetrahydrofuran derivative of formula (5) wherein $OR^4$ represents an alcoholate,

6

and then transforming the intermediate of formula (6) into hexahydro-furo[2,3-b]furan-3-ol of formula (7) by way of an intramolecular cyclisation reaction

7

**2.** A method according to claim **1** wherein the intermediate of formula (3) is transformed into an intermediate of formula (5) by making use of a Nef reaction.

**3.** A method according to claim **1** for the synthesis of hexahydro-furo[2,3-b]-furan-3-ol of formula (7), which comprises the steps of:

a) condensing an intermediate of formula (1)

1

resulting in an α,β-unsaturated ester of formula (2),

2

b) reacting said ester of formula (2) with nitromethane resulting in an intermediate of formula (3),

3

c) submitting said intermediate of formula (3) to a Nef reaction leading to intermediates of formula (4) and (4')

4

4'

d) transforming said intermediates of formula (4) and (4') into an intermediate of formula (6) and,

6

e) converting intermediate of formula (6) to the compound of formula (7) by an intramolecular cyclisation reaction.

**4.** A method according to claim **1** for the synthesis of hexahydro-furo[2,3-b]furan-3-ol of formula (7), which comprises the steps of:

a) condensing an intermediate of formula (1) with $CHR^2R^5$—C(==O)—$OR^1$ wherein $R^5$ represents a hydrogen, a carboxylic ester, a phosphonium salt or a phosphonate ester,

1

resulting in an α,β-unsaturated ester of formula (2)

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

| 41 | 42 |

e) reducing intermediates of formula (4) and (4'), or intermediates of formula (5) and (5') with a suitable reducing agent resulting in intermediate of formula (6) and,

2

6

b) reacting said ester of formula (2) with nitromethane resulting in an intermediate of formula (3),

f) converting intermediate of formula (6) to the compound of formula (7) by an intramolecular cyclisation reaction.

5. A method according to claim 1 for the synthesis of hexahydro-furo[2,3b]furan-3-ol of formula (7.1) starting from an intermediate of formula (1), wherein P¹ and P² taken together form an isopropylidene,

3

condensing said intermediate of formula (1) resulting in an intermediate of formula (2), wherein P¹ and P² taken together form an isopropylidene, R² represents —C(=O)OR³, wherein R³ is methyl and R¹ is methyl,

c) submitting said intermediate of formula (3) to a Nef reaction by treating it with a base and subsequently with a strong acid resulting in a mixture of intermediates of formula (4) and (4'),

4

reacting said ester of formula (2) into a nitromethane derivative of formula (3) wherein P¹ and P² taken together form an isopropylidene, R² represents —C(=O)OR³, wherein R³ is methyl, and R¹ is methyl,

4'

d) only in case R² is different from hydrogen, decarboxylating the intermediates of formula (4) and (4') thus forming intermediates of formula (5) and (5') respectively,

5

transforming said intermediate of formula (3) using a base and subsequently an acid to yield intermediates of formula (4) and (4'), wherein R² represents —C(=O)OR³, wherein R³ is methyl, R¹ is methyl and R⁴ is methyl,

5'

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

43

+

decarboxylating intermediates of formula (4) leading to an intermediate of formula (5), wherein R⁴ is methyl,

reducing said intermediate of formula (5) with a suitable reducing agent resulting in an intermediate of formula (6), wherein R⁴ is methyl,

transforming the intermediate of formula (6) into compound 7.1 by way of intramolecular cyclization reaction

7.1

6. A method according to claim 3 wherein intermediate of formula (3) is submitted to a Nef reaction using acidic quenching while keeping the temperature below −10° C. during said quenching.

7. A method according to claim 4 wherein the decarboxylation of intermediates of formula (4) and (4′) is performed in a buffered aqueous solution.

8. A method according to claim 3 wherein intermediate (6) is prepared via reduction of intermediates of formula (4) and (4′) or intermediates of formula (5) and (5′) using lithium borohydride in tetrahydrofuran or NaBH₄ in the presence of LiCl.

9. A method according to claim 3 wherein the cyclisation of intermediate of formula (6) to the compound of formula (7) is performed by adding a strong acid to the reaction mixture containing intermediate of formula (6).

10. A method according to claim 9 wherein the cyclisation reaction is performed at a temperature lower than 5° C.

11. A method according to claim 10 wherein the temperature of the reaction mixture while adding the strong acid to the reaction mixture remains lower than −5° C.

44

12. A method according to claim 1 wherein an intermediate of formula (3) is prepared by a process comprising the steps of first condensing an intermediate of formula (1) with nitromethane, resulting in an intermediate of formula (8) and secondly, reacting said intermediate of formula (8) with CHR⁵R⁸—C(═O)—OR¹ wherein R⁸ is hydrogen or a carboxylic ester

8

13. A method according to claim 12 wherein the carboxylic ester is defined as C(═O)—OR¹.

14. A method according to claim 1 wherein an intermediate of formula (6) is prepared by a process comprising the steps of first reducing intermediate of formula (3) wherein R³ is hydrogen with a suitable reducing agent, resulting in an intermediate of formula (9) and secondly submitting the obtained intermediate of formula (9) to a Nef reaction by treatment with a base and then with a strong acid

9

15. A method according to claim 1 wherein hexahydro-furo[2,3-b]furan-3-ol of formula (7) is isolated by adding a small excess of a tertiary amine, followed by the removal of water and removal of formed salts.

16. A method according to claim 1 wherein R¹ and R³ each independently are C₁₋₆alkyl, aryl or arylC₁₋₆alkyl or together with the atoms to which R¹ and R³ are attached form a 6 to 8-membered cyclic group optionally substituted with C₁₋₆alkyl, aryl or arylC₁₋₆alkyl, and wherein R⁴ is C₁₋₆alkyl.

17. A method according to claim 1 wherein R¹, R³ and R⁴ each independently are methyl, ethyl, propyl, isopropyl, n-butyl, isobutyl, sec-butyl, tert-butyl or pentyl.

18. A method according to claim 1 wherein P¹ and P² together form an acid labile vicinal-diol protecting group.

19. A method according to claim 1 wherein P¹ and P² is a dialkyl methylene radical.

20. A method according to claim 4 wherein R⁵ is hydrogen, R¹O—C(═O)—, (R⁶)₃P═wherein R⁶ is alkyl, aryl or aralkyl, or (R⁷O)₂P(═O)— wherein R⁷ is alkyl, aryl, aralkyl.

21. An intermediate having the formula (3),

(3)

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

US 7,126,015 B2

<table>
<tr><td>45</td><td>46</td></tr>
</table>

wherein $P^1$ and $P^2$ represent each independently a hydrogen, a hydroxy-protecting group or may together form a vicinal-diol protecting group, $R^1$ represents alkyl, aryl or aralkyl, $R^2$ represents hydrogen or C(=O)OR$^3$, R$^3$ represents alkyl, aryl or aralkyl, or R$^3$, if present, and R$^1$ taken together with the atoms to which they are attached may form a 6 to 8-membered cyclic group which may be optionally substituted with alkyl, aralkyl, or aryl;

provided that when R$^2$ is hydrogen and P$^1$ and P$^2$ taken together form an isopropylidene, then R$^1$ is other than methyl or ethyl.

**22.** An intermediate having the formula (4) or (4'),

4

4'

wherein R$^1$ represents alkyl, aryl or aralkyl; R$^2$ represents hydrogen or C(=O)OR$^3$; R$^3$ represents alkyl, aryl or aralkyl, or R$^3$, if present, and R$^1$ taken together with the atoms to which they are attached may form a 6 to 8-membered cyclic group which may be optionally substituted with alkyl, aralkyl, or aryl; OR$^4$ represents an alcoholate.

**23.** An intermediate having the formula (5) or (5'),

5

5'

wherein OR$^4$ represents an alcoholate.

**24.** An intermediate according to claim **23** wherein the intermediate has the formula (5a)

5a

**25.** An intermediate according to claim **24** in crystalline form.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 01/25/2013

## PROOF OF SERVICE

I, Deanne M. Mazzochi, an attorney, hereby certify that on this 1st day of May, 2015, pursuant to ECF-6 and ECF-8(D)(1) of the Administrative Order Regarding Electronic Case Filing, dated May 17, 2012, the foregoing **NON-CONFIDENTIAL OPENING BRIEF OF DEFENDANTS-APPELLANTS LUPIN LIMITED AND LUPIN PHARMACEUTICALS, INC.** was filed using the Court's CM/ECF filing system.

I also caused a true and correct copy of the foregoing **NON-CONFIDENTIAL OPENING BRIEF OF DEFENDANTS-APPELLANTS LUPIN LIMITED AND LUPIN PHARMACEUTICALS, INC.** to be served on counsel listed below via ELECTRONIC MAIL on this 1st day of May, 2015:

Gregory L. Diskant (gldiskant@pbwt.com)
Eugene M. Gelernter (emgelernter@pbwt.com)
Irena Royzman (iroyzman@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile:  (212) 336-2222

/s/ Deanne M. Mazzochi
Deanne M. Mazzochi
(dmazzochi@rmmslegal.com)
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
Telephone: (312) 222-6305
Facsimile: (312) 222-6325

*Counsel for Defendants-Appellants*
*Lupin Limited and Lupin Pharmaceuticals, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned hereby certifies that this Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by the Court's March 3, 2015 Order, (Doc. 40). The Brief contains 6,963 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

The Brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The Brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2010 in 14 point type size with Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the undersigned has relied upon the word count feature of the word-processing system used to prepare the Brief.

Dated: May 1, 2015          /s/ Deanne M. Mazzochi
                            Deanne M. Mazzochi
                            RAKOCZY MOLINO MAZZOCHI SIWIK LLP
                            6 West Hubbard Street, Suite 500
                            Chicago, Illinois 60654
                            Telephone: (312) 222-6305
                            Facsimile: (312) 222-6325
                            E-mail: dmazzochi@rmmslegal.com

                            *Counsel for Defendants-Appellants*
                            *Lupin Limited and Lupin Pharmaceuticals,*
                            *Inc.*